Richard L. Charnley (SBN 70430)
Nicole W. Uhlmann (SBN 200783)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone:   310.321.4300
Facsimile:   310.893.0273
Email:      rlc@charnleyrian.com
Email:      nwu@charnleyrian.com

*Attorneys for Plaintiffs Scott
Hallock; WMTI Productions, Inc.;
WMTI Productions North, Inc.; and
The Next Season Company, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT W. HALLOCK, an individual; WMTI PRODUCTIONS, INC., a California corporation; WMTI PRODUCTIONS NORTH, INC., a Canadian corporation; and THE NEXT SEASON COMPANY, INC., a Canadian corporation, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN HEALEY, an individual; PROPAGATE CONTENT, LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:20-cv-2726 <br><br> **COMPLAINT FOR:** <br> **1) COPYRIGHT INFRINGEMENT;** <br> **2) BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> **3) INTERFERENCE WITH CONTRACT;** <br> **4) BREACH OF CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **SPOLIATION NOTICE** <br><br> **[Non-Paper Exhibits Have Been Sent To The Court For Lodging Pursuant to *COVID-19 Notice*]** <br><br> **[Identical Copies Of Lodged Exhibits Will Be Served Along With The Summons And Complaint]** |

COMPLAINT

Plaintiffs SCOTT HALLOCK, an individual, WMTI Productions, Inc., a California corporation, WMTI Productions North, Inc., a Canadian corporation; and THE NEXT SEASON COMPANY, Inc., a Canadian corporation, allege:

## THE PARTIES, JURISDICTION, AND VENUE

### *Plaintiff Parties*

1.    Plaintiff Scott Hallock ("Hallock") is an individual residing in Ventura County, California.

2.    Plaintiff WMTI Productions, Inc. ("WMTI US") is a duly licensed California corporation with its principal place of business in Encino, California.

3.    Plaintiff WMTI Productions North, Inc. ("WMTI North") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada.  WMTI North is qualified to do business in California.

4.    Plaintiff The Next Season Company, Inc. ("TNSCI") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada. TNSCI is qualified to do business in California.

5.    Collectively, WMTI US, WMTI North and TNSCI are referred to herein as "Copyright Holder Plaintiffs."

6.    Collectively, Hallock, WMTI US, WMTI North and TNSCI are referred to herein as "Plaintiffs."

### *Defendant Parties*

7.    On information and belief, Defendant Kevin Healey ("Healey") is an individual who resides in Los Angeles County, California.

8.    On information and belief, Defendant Propagate Content, LLC ("Propagate") is a Delaware limited liability company that is licensed to do business in the state of California and maintains principal offices at 6381 Hollywood Blvd, Floor 4, Los Angeles, CA 90028.

9.    On information and belief, at all times relevant hereto, Healey has been,

and is, a senior vice president, employee and agent of Propagate.

10.   On information and belief, at all times relevant hereto, Propagate has been Healey's employer.

11.   On information and belief, at all times relevant hereto, Healey has acted within the scope and course of his agency and employment for Propagate.

12.   On information and belief, at all times relevant hereto, Propagate has authorized, endorsed, and supported Healey's work as an employee and agent of Propagate.

13.   Plaintiffs are unaware of the names and capacities of the Defendants named herein as Does 1 through 50 and sue such Defendants by their fictitious names.  Plaintiffs will seek leave of court to amend this pleading and set forth the true names and capacities of such Defendants if and when such information has been more fully ascertained.

*Jurisdiction*

14.   This case arises, in part, under 17 U.S.C. Section 101, et seq.  (herein the "Copyright Claims"), such that jurisdiction to adjudicate this case is exclusively vested in this Court pursuant to 28 U.S.C. Section 1331 (federal question) and 28 U.S.C. Section 1338(a) (copyright).

15.   This case also arises, in part, under the laws of the state of California (herein the "State Claims"), which State Claims are so related to the Copyright Claims that they form part of the same case or controversy, such that this Court may exercise supplemental jurisdiction over the State Claims pursuant to 28 U.S.C. Section 1367.

*Venue*

16.   Defendant Healey resides within the geographical boundaries of the United States District Court, Central District of California.  Hence, this Court is the proper venue for adjudication of this case.

17.   Defendant Propagate is a Delaware limited liability company that is

licensed to do business in the state of California and that maintains principal offices at 6381 Hollywood Blvd., Floor 4, Los Angeles, CA 90028, which is within the geographic boundaries of this Court.  As such, this Court is the proper venue for adjudication of this case.

## FIRST CLAIM FOR RELIEF

### *(Copyright Infringement 17 U.S.C. §§ 106, Et Seq. Direct, Contributory and Vicarious) Against Healey, Propagate and Does 1-25, inclusive*

#### <u>*Hallock and Healey Create*</u> Scare Tactics

18.   Working as creative partners and producers, Hallock and Healey wrote, developed and produced a number of television series.  Of these, the most successful was *Scare Tactics.  Scare Tactics* is an American scripted comedy horror hidden camera television show that began production in 2002 and ran for five seasons[1] on the SYFY Channel (aka the SciFi Channel) pursuant to a license agreement between WMTI US and SYFY.  The *Scare Tactics* series was produced and owned by three companies: WMTI US (Seasons 1, 2, 3, 6 (the 22 "best of" episodes) and a one-hour Halloween special); WMTI North (Season 4); and TNSCI (Season 5).

19.   *Scare Tactics* was broadcast in half-hour episodes.  Each episode featured four compact short stories setting forth, among other things: specific action points; specific dialogue/talking points; specific character mannerisms; specific stage instructions; specific wardrobe/costumes; specific locations; specific special effects; the introduction of a carefully selected temporary newcomer (the "Mark") to the group of actors who interact with the Mark in a seemingly safe setting per the instructions of the producers; and the pre-set addition of strange occurrences to the mix for the purpose of capturing the Mark's authentic reactions on "hidden

---

[1] A "sixth" season is comprised of the "best of" episodes of *Scare Tactics*.

cameras."

20.   Over the course of the five seasons, Hallock and Healey produced 93 original episodes of *Scare Tactics*,  consisting of over 372 original separate short stories, which aired domestically (on SYFY) as well as internationally in over 70 territories[2] on six continents (North America, South America, Europe, Africa, Australia/Oceania and Asia).  In addition, Hallock and Healey produced a one-hour Halloween Special for SYFY as well as a sixth season, which was comprised of the "best of" episodes of *Scare Tactics*.

21.   Hallock and Healey commenced the creative process for the individual *Scare Tactics* short stories by retaining a group of writers, who, under the supervision of Hallock and Healey, wrote the stories as "works for hire" in a "collaborative writing room."  The ensuing stories were reviewed and edited by Hallock and Healey until they were satisfied that the individual stories were appropriate.

22.   Based on the final stories, Hallock and Healey physically produced individual stories, selecting individual locations, building specific sets, choosing and adapting props, hiring actors, rehearsing with the actors and the camera operators so that they knew their specific lines and the timing thereof,  timing the specific "action points" or "plot points" that the actors were required to achieve, and instructing the actors how they were expected to interact with the Mark.

23.   When the stories were fully developed and the rehearsals were undertaken to satisfaction, Hallock and Healey filmed each story (sometimes several times with

---

[2] *Scare Tactics* entered into a distribution agreement with Rive Gauche, which licensed *Scare Tactics* episodes internationally to the following territories: Algeria, Alto Adige, Armenia, Australia, Austria, Azerbaijan, Bahrain, Belarus, Belgium, Canada, Capo D'Istria, Caribbean, Central America, Chad, Channel Islands, Denmark, Djibouti, Dom Toms, Dominican Republic, Egypt, England, English Europe, France, Germany, Greece, Iceland, Indonesia, Iran, Iraq, Isle of Man, Israel, Italy, Japan, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Libya, Liechtenstein, Luxembourg, Malaysia, Mauritania, Mexico, Monaco, Morocco, Netherlands, New Zealand, Northern Ireland, Oman, Papua New Guinea, Philippines, Qatar, Republic of Yemen, Russia, San Marino, Saudi Arabia, Scotland, Singapore, Somalia, South Korea, Sudan, Syria, Switzerland, Tunisia, Thailand, Turkey, Ukraine, Uzbekistan, United Arab Emirates, Wales and Vatican City.

different Marks), selecting and editing one for eventual airing on television.  When broadcast as a full half-hour show, individual stories, each approximately 5 minutes long were "introduced" by a celebrity host who was also provided a script written in the "writers room."  The entire process, from the initial writing of a story through the physical production through editing and delivery resulted in what is sometimes referred to herein as the "Protected Expression."

24.   Each of the final stories in film form that was broadcast was registered with the United States Copyright Office.

25.   *Scare Tactics* garnered accolades, including being the most watched non-news, primetime cable program in adults 18-49 and the best ever rating for a series premiere in SYFY history.  It is, therefore, not surprising that *Scare Tactics* has been seen in over seventy territories all over the world.

*Hallock and Healey Have Disputes*

26.   Despite the overwhelming success of *Scare Tactics*, in and around 2011, disputes between Hallock and Healey arose that ultimately resulted in Healey divesting himself of *Scare Tactics*, as more particularly described hereinafter.

27.   These disputes were settled, first, via a settlement agreement executed in 2012 (the "2012 Agreement")[3] and, second, via a settlement agreement executed in 2016 (the "2016 Agreement")[4].  A true and correct copy of the 2016 Agreement is attached hereto and incorporated herein by reference as **Exhibit 1**.

28.   As a result of the 2016 Agreement, Healey agreed to, and did, "assign and transfer to HALLOCK all of his direct and indirect rights and interests of any kind or nature whatsoever in and to SCARE TACTICS."  (See Exhibit 1).  This was accomplished by:

> a.  Healey transferring to Hallock any and all possible ownership Healey

---

[3] The 2012 Agreement contains a provision that arguably renders that agreement "confidential."  The 2012 Agreement will be filed under seal if and when necessary.

[4] The 2016 Agreement is not "confidential."

had in WMTI US, which held title in and to various *Scare Tactics* intellectual property;

b. Healey transferring to Hallock and Hallock's designee any and all possible ownership Healey had in WMTI North and TNSCI, which held title in and to various *Scare Tactics* intellectual property; and

c. To further ensure that Healey was severing every possible claim in and to *Scare Tactics* intellectual property, Healey agreed to, and did, transfer to Hallock, personally, all of Healey's interest in and to copyrights, trademarks, brands, trade names, the "series," previously developed movie concepts, and the direct and indirect rights to exploit any and all intellectual property relating to *Scare Tactics*.

(Collectively, the bundle of productions, the brand, the intellectual property and other ancillary rights, both direct and indirect of any kind regarding *Scare Tactics* are sometimes referred to herein as the "Franchise." )

29.  In other words, in accordance with the 2016 Agreement, Healey was to divest himself completely of all *Scare Tactics* assets – both tangible and intangible – and was not to use the assets at all.

30.  Plaintiffs are informed and believe, and thereon allege, that notwithstanding the clear mandate set forth in the 2016 Agreement (that Healey divest himself of all assets pertaining to *Scare Tactics* and transfer the same to Plaintiffs), to this day, Healey has failed to divest himself of the tangible, physical assets relating to *Scare Tactics*, and, thus, has failed to transfer the same to Plaintiffs.

31.  Plaintiffs are further informed and believe, and thereon allege, that, to this day, Healey has retained the tangible, physical assets related to *Scare Tactics*.

32.  Plaintiffs, as 100% owners of the Franchise, are entitled to exploit the Franchise and reap all of the benefits incident thereto – both pecuniary and non-pecuniary.

33.   As a result of the foregoing, among other transactions, WMTI US holds exclusive exploitation rights worldwide to *Scare Tactics* seasons 1 through 3, the "best ofs" and the Halloween Special, and, via license from WMTI North and TNSCI, exclusive worldwide exploitation rights (other than Canada) to seasons 4 and 5.

### *Healey Joins Propagate*

34.   Shortly after executing the 2016 Agreement, knowing that he had no rights to exploit the Franchise in any manner whatsoever, Healey joined Propagate as its vice president.

35.   On or about May 11, 2016, Howard Owens ("Owens"), a senior executive with Propagate was advised that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights."  (A true and correct copy of a Facebook messenger exchange between Hallock and Owens, dated May 11, 2016, which evidences Owens' express knowledge that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights," is attached hereto and incorporated herein by reference as **Exhibit 2**).

36.   Healey's knowledge and background relevant to the Franchise, including specifically the fact that Healey divested himself of the Franchise (including the right to remake, sequelize, spinoff or reboot the Franchise in any manner whatsoever), is and was imputed to Propagate as Healey's principal per California Civil Code Section 2332, which states: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

37.   Likewise, Howard Owens' knowledge (that he knew Hallock was the "exclusive owner of the *Scare Tactics* franchise") is and was imputed to Propagate as Owens' principal per California Civil Code Section 2332.

*Healey and Propagate "Reboot"* Scare Tactics

38.   Notwithstanding the fact that (1) Healey had actual knowledge that he had no rights in the Franchise and (2) Propagate had imputed knowledge of the same, on information and belief, Healey and Propagate nonetheless commenced, supervised and completed production and delivery to the online streaming company Netflix of an allegedly "new" *Scare Tactics* television series, which Healey and Propagate named *Prank Encounters*.  The resulting "new" series is sometimes referred to herein as the "Reboot. "

39.   To date, on information and belief, Healey and Propagate have released only 8 half-hour episodes in the Reboot, so obviously not all of the *Scare Tactics* stories have been copied by Healey and Propagate; however, a number of specifically identifiable *Scare Tactics* stories have been copied by Healey and Propagate in the Reboot.

40.   At issue in the Copyright Holder Plaintiffs' Copyright Claims against Defendants, and each of them, are the following *Scare Tactics* copyrights:

      a.   "Camp Kill" -- "*Scare Tactics*" episode 101, U.S. Copyright No. PA 0001912469.  Claimant WMTI US.

      b.   "My Heart Belongs to Misery" aka "Dangerous Obsession" -- "*Scare Tactics*" episode 117, U.S. Copyright No. PA 0001912469.   Claimant WMTI US.

      c.   "The Mummy" -- "*Scare Tactics*" episode 206, U.S. Copyright No. PA 0001912453.  Claimant WMTI US.

      d.   "Satan's Baby" -- *Scare Tactics* episode 301, U.S. Copyright No. PA 0001664256.  Claimant WMTI US.

      e.   "Phantom Power" -- *Scare Tactics* episode 305, U.S. Copyright No. PA 0001664256.  Claimant WMTI US.

      f.   "It's My Party" – *Scare Tactics* episode 401, U.S. Copyright No. PA 0001817857.  Claimant WMTI North.

g. "Road Kill" -- "*Scare Tactics*" episode 405, U.S. Copyright No. PA 0001817863.  Claimant WMTI NORTH.

h. "Send In the Clowns" -- "*Scare Tactics*" episode 509, U.S. Copyright No. PA 0001831682.  Claimant TNSCI.

41.   Defendants' works that infringed upon the Copyright Holder Plaintiffs' copyrights in the above-referenced stories and misappropriated other intellectual property rights belonging to the Copyright Holder Plaintiffs include the following stories:

a. "End of the Road";

b. "Face Fears";

c. "Urgent Scare";

d. "Camp Scarecrow";

e. "Storage War of the Worlds";

f. "Fright At the Museum"; and

g. "Split Party".

42.   Specifically, Defendants' Reboot infringes upon the Copyright Holder Plaintiffs' copyright in specific *Scare Tactics* stories, as follows:

a. Defendants' story  "End of the Road" infringes on the Copyright Holder Plaintiffs' copyright in  "Road Kill," as is evidenced, in part, by:

   i.   the written story for "Road Kill" (**Exhibit 3**);

   ii.  the final "Road Kill" story seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 4**); and

   iii. the final "End of the Road" story seen on Netflix (**Exhibit 5**).

b. Defendants' story "Face Fears" infringes on the Copyright Holder Plaintiffs' copyright in "My Heart Belongs to Misery" aka "Dangerous Obsession," as is evidenced, in part, by:

       i.  the written story for "My Heart Belongs to Misery" aka "Dangerous Obsession" (**Exhibit 6**); and

      ii.  the final "My Heart Belongs to Misery" aka "Dangerous Obsession" story seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 7**); and

     iii.  the final "Face Fears" story seen on Netflix (**Exhibit 8**).

c. Defendants' story "Urgent Scare" infringes on the Copyright Holder Plaintiffs' copyright in "Satan's Baby," as is evidenced, in part, by:

       i.  the written story for "Satan's Baby" (**Exhibit 9**);

      ii.  the final story for "Satan's Baby" seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 10**); and

     iii.  the final "Urgent Scare" story seen on Netflix (**Exhibit 11**).

d. Defendants' story "Camp Scarecrow" infringes on the Copyright Holder Plaintiffs' copyright in "Camp Kill," as is evidenced, in part, by:

       i.  the written story for "Camp Kill" (**Exhibit 12**);

      ii.  the final story for "Camp Kill," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 13**); and

     iii.  the final "Camp Scarecrow" story seen on Netflix (**Exhibit 14**).

e. Defendants' story "Storage War of the Worlds" infringes on the Copyright Holder Plaintiffs' copyright in "Phantom Power," as is evidenced, in part, by:

       i.  the written story for "Phantom Power" (**Exhibit 15**);

      ii.  the final story for "Phantom Power," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 16**); and

iii. the final "Storage War of the Worlds" story seen on Netflix (**Exhibit 17**).

    f.  Defendants' story "Fright at the Museum" infringes on the Copyright Holder Plaintiffs' copyright in "The Mummy," as is evidenced, in part, by:

        i.  the written story for "The Mummy" (**Exhibit 18**);

        ii.  the final story for "The Mummy," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 19**); and

        iii.  the final "Fright at the Museum" story seen on Netflix (**Exhibit 20**).

    g.  Defendants' story "Split Party" infringes on the Copyright Holder Plaintiffs' copyright in "Party Forever" and "Send in the Clowns," as is evidenced, in part, by:

        i.  the written stories for "Party Forever" and "Send in the Clowns" (**Exhibits 21 and 22**);

        ii.  the final stories for "Party Forever" and "Send in the Clowns," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibits 23 and 24**); and

        iii.  the final "Split Party" story seen on Netflix (**Exhibit 25**).

43. For purposes of illustration, the Copyright Holder Plaintiffs have selected a typically unique *Scare Tactics* story named "Wood You Chip Up This Body." This story is not part of the instant claim but demonstrates the Copyright Holder Plaintiffs' protected expression.  Materials submitted include:

    a.  the "written story" (**Exhibit 26**);

    b.  the "host script" (**Exhibit 27**); and

    c.  an actual copy of the story, i.e. the Copyright Holder Plaintiffs' protected expression that was eventually filmed and released on

television (**Exhibit 28**).

Combined, these exhibits show that the resulting final story that was broadcast was an actual rendering of ideas in the form of protectable expression of articulable concrete elements reflecting a particularized expression of the underlying concept.

44.   The specific instances set forth in paragraph "42." illustrate not only Healey's blatant poaching of the Copyright Holder Plaintiffs' copyrights in the subject specific *Scare Tactics* stories but also Propagate's flagrant ratification thereof.  Moreover, the cited instances evidence Healey's utter disregard of his contractual obligations to Hallock pursuant to the 2016 Agreement.

45.   The Copyright Holder Plaintiffs spent countless number of hours and an estimated Forty Million Dollars ($40,000,000) to develop, produce and deliver the *Scare* Tactics episodes.  Development, production and delivery of content is expensive,[5] and by infringing upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as herein alleged, Defendants have effectively destroyed the Copyright Holder Plaintiffs' ability to realize the full extent of returns on their significant financial investment.

46.   The Copyright Holder Plaintiffs, are informed and believe, and thereon allege, that in order to accomplish the unauthorized Reboot of the Franchise, Healey and Propagate used *Scare Tactics* personnel, including:

        a.   *Scare Tactics* writers, including Doug Perkins, David Storrs and Kevin Healey;

        b.   *Scare Tactics* actors, including David Storrs, Sven Holmberg and

---

[5] Bill Carter, *The Laughter Is Fading in Sitcom Land: Reality Shows, Costs and Innovative Comedy Threaten a TV Staple*, N.Y. TIMES, May 24, 2004, at E1 (noting that scripted shows cost between $850,000 and $1.2 million on average to produce); see also MITTELL, supra note 56, at 91; Ted Magder, *Television 2.0: The Business of American Television in Transition*, in REALITY TV: REMAKING TELEVISION CULTURE 141, 147 (Susan Murray & Laurie Ouellette eds., 2d ed. 2009). The show *Shark Tank* cost about $750,000 to produce, which is considered cheap given its ratings. Bill Carter, *Reality TV, Shaking Off Recession, Takes Entrepreneurial Turn*, N.Y. TIMES, Mar. 28, 2011, at B1. *The Voice*, however, cost $2.3 million to produce. Kim Masters & Lacey Rose, *The Miracle of The Voice*, HOLLYWOOD REP. (June 24, 2011), available at http://www.hollywoodreporter.com/news/miracle-voice-202039.

Gabriel Pimentel;

    c. *Scare Tactics* technical supervisor Steve Canas;

    d. *Scare Tactics* producers, including Hilary Frimond, Doug Perkins, David Storrs, and, of course, Healey;

    e. *Scare Tactics* production designer Joe Warson and construction manager Brad Franks;

    f. *Scare Tactics* talent casting director Suzanne Broderick; and, of course,

    g. *Scare Tactics* former creative partner and executive producer, Healey, who, on information and belief, directed the "writers' room" for Propagate's *Prank Encounters*, for which Healey has screen credit, and directed the actors.

### *The Public Decries the Reboot*

47.   The Reboot started streaming in the United States on Netflix on or about October 25, 2019.  Almost immediately, it was clear that Propagate and Healey's attempt to reboot the Franchise by "changing the name" fooled no one.

48.   Given Healey's in-depth, firsthand familiarity with the Franchise, it is no surprise that viewers, as well as reviewers, recognized *Prank Encounters* as nothing more than a "knock off" or "re-boot" of the Franchise.

49.   But, from the start, Propagate/Healey's clear intent was to leverage the popularity of the Franchise by producing content (albeit under a different name) that was and is so substantially similar to the Franchise that it had the effect of not only attracting the same *Scare Tactics* audience but also confusing the audience as to the origins of the Reboot.  In making the Reboot, Propagate and Healey deliberately damaged the Franchise, thereby depriving not only the Copyright Holder Plaintiffs of the rights and benefits to which they were and are entitled under the Copyright Act but also Hallock of the rights and benefits to which he was and is entitled under the 2016 Agreement.

50.   On information and belief, in furtherance of this intent and strategy, Defendants "went public," to wit:

   a.   The "host" of *Prank Encounters*, Gaten Matarazzo, stated on national network television that when he was initially approached to "host" *Prank Encounters*, he was told that the intent was to "make a show like *Scare Tactics* that hadn't been on the air in a while"; and,

   b.   Healey personally posted on social media that, in 2019, he had been "working hard" and was "almost done" with "a show that will thrill fans of #scaretactics"; and

   c.   Healey also touted that he had created *Scare Tactics* and that "[*Prank Encounters*] takes [*Scare Tactics*] to another level."

True and correct copies of Healey's comments are attached hereto and incorporated herein by reference as **Exhibit 29**.

51.   Indeed, the public immediately took to social media to deride the Reboot, commenting, as follows:

   a.   How about "Taking the entire concept of SCARE TACTICS..." ???;

   b.   "What in the "*Scare Tactics*" (sic) rip off is going on" (dated October 15, 2019);

   c.   "Basically *Scare Tactics* 2.0";

   d.   "Sounds like that show scare tactics";

   e.   "Puts you in the mind of *Scare Tactics* … ";

   f.   "You should check out *Prank Encounters* .. It's like *Scare Tactics* on steroids," and, in response, "Nah, they basically just stole this exact episode";

   g.   "This is exactly like *Scare Tactics*";

   h.   "This is just an off brand version of *Scare Tactics*";

   i.   "Their (i.e. *Scare Tactics*) new episodes are under the name *Prank Encounters* on Netflix which recently came out";

j. "Isn't this called SCARE TACTICS or wait PUNK'D? Where have all the original ideas gone…";

k. Replying to a comment of a "HUGE fan of *Scare Tactics*, "Said the same thing they even have one of the same scare actor in it";

l. "*Prank Encounters* reminds me of how awesome show *Scare Tactics* was back in the day"; and

m. "Scare Tactics vibes. #PrankEncounters."

(Collectively, the above-referenced comments are attached hereto and incorporated herein by reference as **Exhibit 30**).

52. In addition to the general public, critics provided reportage, as follows:

a. <u>IMDb</u> wrote:  "<u>Very similar</u> to the show "*Scare Tactics*" that was on Sci-Fi, except in that show people were set up by someone they knew and with "*Prank Encounters*" the targets don't know each other (emphasis added);

b. Jacqueline Gualtieri of <u>Distractify.com</u> wrote: "The [ ] complaint that has come out so far about the [*Prank Encounters*] series is that it sounds *incredibly similar* to *Scare Tactics*, which was on Syfy and Chiller from 2003 to 2013. On *Scare Tactics*, regular people encountered monsters and supernatural creatures in creepy pranks on a hidden camera show, which sounds <u>remarkably similar</u> to *Prank Encounters* (emphasis added);

c. Andy Denhart of <u>Reality Blurred</u> wrote: "Netflix's attempt to create its own *Scare Tactics* is mostly embarrassing … ".

d. For <u>Film Daily</u>, Bec Heim wrote: *Scare Tactics* (2003 – 2013) aired on Syfy for five seasons and over 100 episodes. The show, hosted in its last three seasons by Tracy Morgan, sends friends and family ("the accomplice") of the mark ("the victim") on a one-off job … The basic concept is <u>identical</u> to *Prank Encounters*. The differences: just one

victim; family and friends nominate the victim; and each 30-minute episode usually has multiple scenarios. *Prank Encounters* has two victims, no nominations are mentioned, and just one scenario per episode. Either way, both *Scare Tactics* and *Prank Encounters* lure victims with a fake job and intend to scare them."

    e. For Netflixlife.com, Courtney Mroch writes in reviewing *Prank Encounters*: "*Prank Encounters* is very similar to [*Scare Tactics*]."

(Collectively, the reportage referenced immediately above are attached hereto and incorporated herein by reference as **Exhibit 31**).

53.  In November 2019, Hallock viewed 8 episodes of *Prank Encounters* for the first time.  Unlike the general viewers who saw *Scare Tactics* and *Prank Encounters* as perhaps "very similar," due to: (a) Hallock's familiarity with the entire *Scare Tactics* portfolio, (b) Hallock's knowledge of Healey's involvement in both *Scare Tactics* and *Prank Encounters*, and (c) the specifics of the 2016 Agreement, Hallock concluded that by producing and releasing *Prank Encounters* as a "reboot" of the Franchise, Healey had not only directly, knowingly and willfully deprived Hallock of the benefits of the 2016 Agreement, but also directly, knowingly and willfully infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

54.  The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that Healey knew or should have known that the Reboot infringed, and continues to infringe, upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

55.  Plaintiffs are informed and believe, and thereon allege, that Healey's conduct in creating, developing, producing and releasing the Reboot amounts not only to an effective "taking" by Healey of the very Franchise that he had agreed, contractually, to divest himself of and transfer to Plaintiffs, thereby depriving them of the benefits of their bargain under the 2016 Agreement, but also a taking of the

protections imbued to them under the Copyright Act.

56.   The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that by producing the Reboot when it knew or should have known that doing so infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, Propagate, too, directly infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

57.   The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate, perhaps not a stranger to knocking off content,[6] also contributorily infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as evidenced by the following:

     a.  Propagate supervised and/or had the ability to supervise Healey;

     b.  Propagate, as Healey's principal, knew or should have known that the Franchise belonged to the Copyright Holder Plaintiffs;

     c.  Propagate knew or should have known that Healey and Hallock had entered into the 2016 Agreement, which resulted in Healey having been divested of all right, title and interest in and to the Franchise;

     d.  Propagate knew or should have known that the Reboot infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories;

     e.  Propagate facilitated the production of the Reboot by financing it;

     f.  Propagate facilitated the release of the Reboot by entering into distribution agreement(s) related thereto; and

     g.  Propagate knew or should have known that Healey was contractually barred from pursing any *Scare Tactics* creative endeavor after ceding the Franchise to the Copyright Holder Plaintiffs.

58.   The Copyright Holder Plaintiffs are further informed and believe, and

---

[6] Hallock is informed and believes, and thereon alleges, that Propagate was accused of having knocked off *Shark Tank* when it produced *Planet of the Apps*.

thereon allege, that the foregoing conduct by Propagate caused, allowed, induced and encouraged Healey to infringe upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories and that such contributed in a significant way to Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

59.   The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate failed, and continues to fail, to take steps to prevent and/or limit Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.[7]

60.   The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate reaped a direct financial interest as a result of Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

61.   The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that, in addition to reaping pecuniary benefits, Propagate also reaped non-pecuniary benefits from Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

62.   On information and belief, and as set forth above, *Prank Encounters* started streaming over Netflix in late October 2019 in the United States.  However, again on information and belief, Netflix has the capacity to stream in over 190 countries, and has already streamed, or will be streaming, *Prank Encounters* to viewers in a majority of these territories.

63.   Through the Reboot, Defendants have produced, reproduced, prepared copies and derivative works based upon, distributed, and publicly displayed the Copyright Holder Plaintiffs' copyrighted works without their consent.  In so doing, Defendants have violated the Copyright Holder Plaintiffs' exclusive rights under 17

---

[7] In December 2019, Plaintiff's counsel sent Defendants a letter regarding the destruction of electronically stored information and advised them that suit was imminent.

1  U.S.C. §§ 106 and 501.

2      64.    Through the Reboot, Defendants have deprived the Copyright Holder

3  Plaintiffs of the benefits of full exploitation[8] of the Franchise.

4      65.    Defendants' infringements have been undertaken knowingly and with

5  intent to financially gain from the Copyright Holder Plaintiffs' protected

6  copyrighted work.

7      66.    Even though Propagate knew that the Copyright Holder Plaintiffs held

8  exclusive rights in and to the Franchise, including, among other things, the

9  copyrighted works and the format, Propagate nonetheless failed to exercise its right

10  and ability to supervise persons within its control, including but not limited to

11  Healey, so as to prevent the subject infringement, and Propagate did so with intent

12  to further its financial interest.

13      67.    Accordingly, Defendants have directly, contributorily and vicariously

14  infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics*

15  stories.

16      68.    Because of Defendants' willfulness and recklessness in infringing on the

17  Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, the

18  Copyright Holder Plaintiffs are entitled to their actual damages as well as

19  Defendants' attributable profits in an amount to be proven at trial.  Further, the

20  Copyright Holder Plaintiffs are entitled to all other relief allowed under the

21  Copyright Act.

22      69.    Defendants' infringement has caused, and will continue to cause,

23  irreparable harm to the Copyright Holder Plaintiffs, for which the Copyright Holder

24  Plaintiffs have no adequate remedy at law.  Unless Defendants' conduct is

25  restrained, harm will continue to occur into the future, such that the Copyright

26

27  [8] Full exploitation includes global licensing of TV formats, which is a multi-billion dollar business. According to one
industry report, "the production volume generated by traded TV formats was €9.3 billion ($10.3 billion USD) for the

28  years 2006-2008, with 445 original formats traded among fourteen countries." Format Recognition & Prot. Ass'n.

Holder Plaintiffs are entitled, upon further application, to issuance of preliminary and permanent injunctive relief.

## SECOND CLAIM FOR RELIEF

### Breach Of Implied Covenant Of Good Faith And Fair Dealing
### Against Propagate, Healey And Does 26-50, inclusive

70.    Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 69 above, as if fully set forth herein.

71.    Plaintiffs are informed and believe, and thereon allege, that, as alleged hereinabove, in 2016, pursuant to the 2016 Agreement, Healey ceded to Hallock and the Copyright Holder Plaintiffs (WMTI US, WMTI North and TNSCI) any and all right, title and interest Healey had in and to the Franchise.

72.    Plaintiffs are informed and believe, and thereon allege, that Healey also ceded his interests in and to WMTI US to Hallock and his interests in WMTI North and TNSCI to Hallock and Hallock's designee.

73.    Among others, benefits conveyed under the 2016 Agreement included all forms of direct and indirect rights to exploit the Franchise through reboots, spinoffs, sequels, prequels and any other form of derivative use.

74.    By rebooting *Scare Tactics* and then choosing to call the Reboot by a different name (*Prank Encounters*), Healey and Propagate deprived Plaintiffs of not some, but <u>all</u>, of the benefits conveyed to Plaintiffs by the 2016 Agreement.  This includes not only the copyright infringements, alleged above, but also use of any "unprotected elements," including without limitation the format of *Scare Tactics* and exploitation of the Franchise by Healey and Propagate that, as Gaten Matarazzo put it, was to be "like *Scare Tactics*."

75.    Plaintiffs are informed and believe, and thereon allege, that Propagate knew or should have known that the Reboot infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories and other rights to exploit the

Franchise held by Plaintiffs, resulting in a breach of the 2016 Agreement, which only allowed Healey to pursue "other" (as opposed to same, related or similar) (i.e., "non-*Scare Tactics*") scary, paranormal-themed or hidden camera shows – certainly not a Reboot of *Scare Tactics* under a different name.

76.     As with every contract, included in the 2016 Agreement was an implied promise of good faith and fair dealing.  The implied promise ensured that Healey, and by imputation, Propagate, would refrain from conduct that would deprive Plaintiffs of the right to receive all of the benefits conveyed under the 2016 Agreement.

77.     Propagate knew or should have known that the 2016 Agreement contained an implied covenant of good faith and fair dealing and that, by allowing Healey to make the Reboot, Healey would be in breach of the implied covenant of good faith and fair dealing implicit in the 2016 Agreement.

78.     As a result of the above alleged breach, Plaintiffs sustained consequential and special damages in an amount to be proven at trial.

### THIRD CLAIM FOR RELIEF

***Interference With Contract***
***Against Propagate and Does 51-75, inclusive***

79.     Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 78 above, as if fully set forth herein.

80.     The 2016 Agreement is a valid contract between the Plaintiffs, on the one hand, and Healey, on the other hand, which contract essentially "sold" Healey's interests in and to the Franchise to Hallock (and his designee in the case of WMTI North and TNSCI), thereby eliminating any right, title or interest in or to the Franchise by Healey.

81.     On information and belief, Propagate had knowledge that Healey had once owned a piece of the Franchise and that, as of 2016, Hallock (and his designee in the case of WMTI North and TNSCI) was the 100% owner of the Franchise.

82.     By supporting and funding Healey's producing of *Prank Encounters,* Propagate intended that Healey would produce a show like *Scare Tactics,* and, in so doing, Propagate knew that Healey would, thereby, breach the covenant of good faith and fair dealing implied in the 2016 Agreement.

83.     In so acting, Propagate caused Healey to breach the 2016 Agreement, causing resulting harm to Plaintiffs, and each of them, of which Propagate's conduct was a substantial factor.

84.     As to the Copyright Holder Plaintiffs, they have sustained past economic loss and will sustain future economic loss.  As to Hallock, in addition to past economic loss and future economic loss, he has suffered and will continue to suffer future non-economic loss, including mental suffering and affiliated bodily injury, subject to proof at trial.

## FOURTH CLAIM FOR RELIEF

### *Breach Of Contractal Duty To Account And Pay Proceeds Against Healey and Does 77-100, inclusive*

85.     Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 84 above, as if fully set forth herein.

86.     Hallock and Healey created and produced a show titled *Freak Encounters*, which aired on Animal Planet.   *Freak Encounters* was owned by The Gifted Show, Inc., which is a California corporation ("Gifted").

87.     Via the 2012 Agreement, Healey transferred all of Healey's right, title and interest in and to Gifted to Hallock.  Consequently, Hallock is 100% owner of Gifted.

88.     Notwithstanding Hallock's 100% ownership of Gifted, Hallock and Healey agreed that, with respect to *Freak Encounters*, either of them could take steps to seek opportunities to develop, produce and exploit the title, provided that neither Hallock nor Healey could individually exploit *Freak Encounters* without first obtaining the other's prior written approval.  Then, assuming such "approval,"

the individual responsible for the exploitation (referred to as "the Managing Party")
would pay, or cause to be paid, to the other (referred to as the "Non-Managing
Party") a participation equal to 50% of all budgeted fees, corporate overheads,
deferred fees and back-end participations, whether the title was directly exploited or
there was a derivative or ancillary production based thereon.  The Managing Party
was also entitled to a 5% "off the top" payment of all revenues not used to finance
the approved exploitation.

89.    One of the episodes of *Freak Encounters* is titled "Werewolf."

90.    Within the last four years, Healey exploited "Werewolf" by using
protected elements in the "Werewolf" episode, including specifically the actual
rendering of ideas in the form of protectable expression of articulable concrete
elements reflecting a particularized expression of the underlying concept, in the
Reboot, swapping out the "werewolf" for a "big foot," but otherwise lifting the
story from *Freak Encounters* and naming it "End of the Road."

91.    A video of "Werewolf" and a video of "End of the Road" are attached
hereto as **Exhibits 32 and 5**, respectively.

92.    On information and belief, at no time following execution of the 2012
Agreement has Healey advised or provided notice to Hallock or Gifted that Healey
intended to or was in the process of exploiting *Freak Encounters*.

93.    At no time following execution of the 2012 Agreement has Healey
accounted to Hallock or Gifted for any sums received as a result of exploiting *Freak
Encounters*.

94.    Exploiting an episode of *Freak Encounters* without: (1) advising
Hallock thereof, (2) obtaining Hallock's prior written approval, (3) accounting to
Hallock, and (4) compensating Hallock therefor, constitute individual and collective
breaches of the 2012 Agreement by Healey.

95.    Healey's breach of the 2012 Agreement has directly and proximately
caused damage to Hallock in an amount subject to proof at trial.

96.     Hallock is entitled to full and accurate accounting relating to use of "Werewolf."

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand Judgment be entered in their favor jointly and severally against all Defendants, as follows:

    a.   Ordering Defendants to account for all gains, profits and advantages derived from their wrongful acts;

    b.   Ordering all gains, profits and advantages derived from Defendants' wrongful acts be held in constructive trust for the benefit of Plaintiffs;

    c.   Awarding actual damages suffered by Plaintiffs and any profits attributable to Defendants' wrongful acts;

    d.   Awarding Plaintiffs statutory damages;

    e.   Awarding Plaintiffs compensatory, special and non-economic damages;

    f.   Awarding Plaintiffs attorney's fees, interest and costs; and

    g.   Awarding Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

Dated:      March 24, 2020         CHARNLEY RYAN LLP

By: _____
Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock, WMTI Productions, Inc., WMTI Productions North, Inc., The Next Season Company, Inc.*

## SPOLIATION NOTICE

On December 18, 2019, Defendants were put on notice to preserve any all materials relating to the claims contained within this complaint, and any and all materials, or facts, which are relevant to the resolution of the issues alleged herein. By service of this pleading, Defendants are provided additional notice to preserve all relevant evidence important to this litigation, whether hard copy or electronically stored information ("ESI").

Dated:        March 24, 2020        **CHARNLEY RIAN LLP**

By: _____
Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock,*
*WMTI Productions, Inc., WMTI*
*Productions North, Inc., The Next Season*
*Company, Inc. and The Gifted Show, Inc.*

## **DEMAND FOR JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:      March 24, 2020          **CHARNLEY RIAN LLP**

By: _____

Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock,*
*WMTI Productions, Inc., WMTI*
*Productions North, Inc., The Next Season*
*Company, Inc. and The Gifted Show, Inc.*