AARON M. WAIS (SBN 250671)
  amw@msk.com
GABRIELLA A. NOURAFCHAN (301594)
  gan@msk.com
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067-3120
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

Attorneys for Defendants
Kevin Healey and Propagate Content, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT W. HALLOCK, an individual; WMTI PRODUCTIONS, INC., a California corporation; WMTI PRODUCTIONS NORTH, INC., a Canadian corporation; and THE NEXT SEASON COMPANY, INC., a Canadian corporation, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN HEALEY, an individual; PROPAGATE CONTENT, LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive, <br><br> Defendants. | CASE NO. 2:20-cv-02726 CJC (MAAx) <br><br> Honorable Cormac J. Carney <br><br> **COMBINED MEMORANDUM IN SUPPORT OF DEFENDANTS' (1) MOTION TO DISMISS PLAINTIFFS' FAC (FRCP 12(b)(6)) AND (2) MOTION TO STRIKE PLAINTIFFS' STATE LAW CLAIMS (COAS 2-4) PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE (CAL. CODE CIV. P. § 425.16)** <br><br> Hearing Date:  September 14, 2020 <br> Time:          1:30 p.m. <br> Location:      Courtroom 9B <br><br> File Date:  March 24, 2020 <br> Trial Date:  TBD |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

# **TABLE OF CONTENTS**

**Page**

I.      SUMMARY OF ARGUMENT ....................................................................10

II.     RELEVANT FACTUAL BACKGROUND .................................................11

III.    PLAINTIFFS HAVE NOT STATED A CLAIM FOR COPYRIGHT INFRINGEMENT BECAUSE, AS A MATTER OF LAW, THERE IS NO SUBSTANTIAL SIMILARITY BETWEEN *PRANK ENCOUNTERS* AND *SCARE TACTICS*. ....................................................12

    A.      The Two Series Are Not Substantially Similar. ................................15

    B.      The Episodes and Pranks at Issue are Not Substantially Similar. ......18

        1.      "Camp Scarecrow" and "Camp Kill" ........................................18

        2.      "Face Fears" and "Dangerous Obsession" ................................21

        3.      "Fright at the Museum" and "The Mummy".............................24

        4.      "Urgent Scare" and "Satan's Baby" .........................................27

        5.      "Storage War of the Worlds" and "Phantom Power"...............29

        6.      "Split Party" versus "It's My Party" and "Send in the Clowns" ...................................................................................32

        7.      "End of the Road" and "Road Kill"..........................................35

IV.     PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED..........38

    A.      Plaintiffs' State Law Claims Are Preempted By the Copyright Act ..38

        1.      Copyright Preemption Standard ................................................38

        2.      The works at issue, *Scare Tactics* episodes, fall within the subject matter of copyright. ....................................................39

        3.      The rights sought to be protected are not qualitatively different from the rights protected by copyright. ....................39

    B.      Defendants Did Not Copy Protected Expression.............................42

    C.      Plaintiffs Have Not Stated Facts Supporting Their Claims. ..............42

Mitchell
Silberberg &
Knupp LLP

12314720.1

2

# TABLE OF CONTENTS
### (continued)

**Page**

    D.    The Court Should Also Dismiss Hallock's Claim Against Healey for Breach of the 2012 Agreement........................................................44

V.    PLAINTIFFS' STATE LAW CLAIMS SHOULD BE STRICKEN PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE....................47

VI.    CONCLUSION ...............................................................................49

Mitchell
Silberberg &
Knupp LLP

12314720.1

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.,*
121 F. Supp. 3d 950 (C.D. Cal. 2015)....................................................44

*Basile v. Twentieth Century Fox Film Corp.,*
2014 WL 12521340 (C.D. Cal. Aug. 19, 2014)..........................passim

*Bell Atl. Corp. v. Twombly,*
550 U.S. 544 (2007) .........................................................................12

*Benay v. Warner Bros. Enm't, Inc.,*
607 F.3d 620 (9th Cir. 2010) ......................................................passim

*Berkic v. Crichton,*
761 F.2d 1289 (9th Cir. 1985) ......................................20, 21, 26

*Bernal v. Paradigm Talent & Lit. Agency,*
788 F. Supp. 2d 1043 (C.D. Cal. 2010).......................................passim

*Bethea v. Burnett,*
2005 WL 1720631 (C.D. Cal. June 28, 2005)....................16, 17, 29

*Bissoon-Dath v. Sony Computer Entm't Am., Inc.,*
694 F. Supp. 2d 1071 (N.D. Cal. 2010)...............................13, 21, 37

*Brodeur v. Atlas Entm't, Inc.,*
248 Cal. App. 4th 665 (2016).......................................................49

*Campbell v. Walt Disney Co.,*
718 F. Supp. 2d 1108 (N.D. Cal. 2010).......................................passim

*Capcom Co., Ltd. v. MKR Grp., Inc.,*
2008 WL 4661479 (N.D. Cal. Oct. 20, 2008).............................32

*Cates Constr., Inc. v. Talbot Partners,*
21 Cal. 4th 28 (1999)....................................................................40

*Chang Bee Yang v. Sun Tr. Mortg. Inc.,*
2011 WL 6749076 (E.D. Cal. Dec. 22, 2011)............................45

Mitchell
Silberberg &
Knupp LLP

12314720.1

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

## TABLE OF AUTHORITIES
(continued)

<u>**Page(s)**</u>

*Curley v. Wells Fargo & Co.*,
  2014 WL 988618 (N.D. Cal. Mar. 10, 2014) .......................................................44

*Davis v. Nadrich*,
  174 Cal. App. 4th 1 (2009) ...................................................................................43

*Decision Scis. Research Assocs., Inc. v. Am. Auto. Ass'n, Inc.*,
  2019 WL 7166988 (C.D. Cal. Nov. 18, 2019) .....................................................42

*Del Madera Props. v. Rhodes and Gardner, Inc.*,
  820 F.2d 973 (9th Cir. 1987) ..........................................................................39, 41

*DuckHole Inc. v. NBC Universal Media, LLC*,
  2013 WL 5797279 (C.D. Cal. Sept. 6, 2013) .......................................................29

*Emove, Inc. v. Hire A Helper LLC*,
  2018 WL 3207424 (S.D. Cal. June 29, 2018) .......................................................43

*Endemol Entm't B.V. v. Twentieth Television Inc.*,
  1998 WL 785300 (C.D. Cal. Sept. 29, 1998) .......................................................39

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*,
  499 U.S. 340 (1991) ..............................................................................................13

*Fillmore v. Blumhouse Prods., LLC*,
  2017 WL 4708018 (C.D. Cal. July 7, 2017) ........................................................17

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
  462 F.3d 1072 (9th Cir. 2006) .....................................................................passim

*Gadh v. Spiegel*,
  2014 WL 1778950 (C.D. Cal. Apr. 2, 2014) ..................................................passim

*Gallagher v. Lions Gate Entm't Inc.*,
  2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) .............................................passim

*Gilbert v. New Line Prods., Inc.*,
  2010 WL 5790628 (C.D. Cal. Aug. 13, 2010) ................................................28, 32

*Giron v. Wells Fargo Bank, N.A.*,
  2014 WL 12589628 (C.D. Cal. May 27, 2014) ....................................................43

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Harrison Ventures, LLC v. Alta Mira Treatment Ctr., LLC*,
   2010 WL 1929566 (N.D. Cal. May 12, 2010) ..................................................43

*Hilton v. Hallmark Cards*,
   599 F.3d 894 (9th Cir. 2010) ..................................................49

*Hunter v. CBS Broad. Inc.*,
   221 Cal. App. 4th 1510 (2013)..................................................48

*Idema v. Dreamworks, Inc.*,
   162 F. Supp. 2d 1129 (C.D. Cal. 2001)..................................................39, 41

*ISE Entm't Corp. v. Longarzo*,
   2018 WL 1569803 (C.D. Cal. Feb. 2, 2018) ..................................................41

*Jacobsen v. Katzer*,
   609 F. Supp. 2d 925 (N.D. Cal. 2009)..................................................41

*Jenkins v. JPMorgan Chase Bank, N.A.*,
   216 Cal. App. 4th 497 (2013)..................................................42, 44

*Jones v. Aetna Cas. & Sur. Co.*,
   26 Cal. App. 4th 1717 (1994)..................................................44

*Kabehie v. Zoland*,
   102 Cal. App. 4th 513 (2002)..................................................41

*Kouf v. Walt Disney Pictures & Television*,
   16 F.3d 1042 (9th Cir. 1994)..................................................20, 21, 31

*Laws v. Sony Music Entm't, Inc.*,
   448 F.3d 1134 (9th Cir. 2006)..................................................38

*Lichtfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984)..................................................14

*Maiden v. Finander*,
   2013 WL 5969840 (C.D. Cal. Nov. 6, 2013)..................................................12

*Maloney v. T3Media, Inc.*,
   853 F.3d 1004 (9th Cir. 2017)..................................................48

Mitchell
Silberberg &
Knupp LLP

12314720.1

6

DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Maloney v. T3Media, Inc.*,
   94 F. Supp. 3d 1128 (C.D. Cal. 2015).................................................................47

*Metabolife Int'l, Inc. v. Wornick*,
   264 F.3d 832 (9th Cir. 2001).................................................................................47

*Mindys Cosmetics, Inc. v. Dakar*,
   611 F.3d 590 (9th Cir. 2010).................................................................................47

*Newt v. Twentieth Century Fox Film Corp.*,
   2016 WL 4059691 (C.D. Cal. July 27, 2016).......................................................31

*Nygård, Inc. v. Uusi-Kerttula*,
   159 Cal. App. 4th 1027 (2008)..............................................................................48

*Ojjeh v. Brown*,
   43 Cal. App. 5th 1027 (2019)................................................................................47

*Olson v. Nat'l Broad. Co., Inc.*,
   855 F.2d 1446 (9th Cir. 1988)..............................................................................18

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
   50 Cal. 3d 1118 (1990).....................................................................................40, 43

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018).................................................................................47

*PNC Equip. Fin., LLC v. California Fairs Fin. Auth.*,
   2013 WL 978260 (E.D. Cal. Mar. 12, 2013)........................................................43

*Quinones v. Ocwen Loan Servicing, LLC*,
   282 F. Supp. 3d 1207 (C.D. Cal. 2017).................................................................43

*Rice v. Fox Broad. Co.*,
   330 F.3d 1170 (9th Cir. 2003)..............................................................................17

*Roth v. Madison Nat. Life Ins. Co.*,
   702 F. Supp. 2d 1174 (C.D. Cal. 2010).................................................................42

*Rumble, Inc. v. Daily Mail & Gen. Tr. PLC*,
   2020 WL 2510652 (C.D. Cal. Feb. 12, 2020)..........................................38, 40, 41

Mitchell
Silberberg &
Knupp LLP

12314720.1

7

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Sarver v. Chartier,*
   813 F.3d 891 (9th Cir. 2016) ...................................................................... 47, 48

*Scott v. Meyer,*
   2009 WL 10673163 (C.D. Cal. Dec. 2, 2009) ............................................ 26, 38

*Segal v. Rogue Pictures,*
   2011 WL 11512768 (C.D. Cal. Aug. 19, 2011) ................................................ 18

*Segal v. Rogue Pictures,*
   544 F. App'x 769 (9th Cir. 2013) ..................................................................... 36

*Selby v. New Line Cinema Corp.,*
   96 F. Supp. 2d 1053 (C.D. Cal. 2000) .............................................................. 41

*Shame on You Prods. v. Elizabeth Banks,*
   120 F. Supp. 3d 1123 (C.D. Cal. 2015) .................................................... passim

*Silas v. Home Box Office, Inc.,*
   201 F. Supp. 3d 1158 (C.D. Cal. 2016) ............................................................ 18

*Siqueiros v. Fed. Nat. Mortg. Ass'n,*
   2014 WL 3015734 (C.D. Cal. June 27, 2014) .................................................. 43

*Sprewell v. Golden St. Warriors,*
   266 F.3d 979 (9th Cir. 2001) ........................................................................... 13

*Sybersound Records, Inc. v. UAV Corp.,*
   517 F.3d 1137 (9th Cir. 2008) ......................................................................... 41

*Wild v. NBC Universal, Inc.,*
   2011 WL 13272427 (C.D. Cal. June 28, 2011) ................................................ 41

*Tamkin v. CBS Broad., Inc.,*
   193 Cal. App. 4th 133 (2011) ..................................................................... 48, 49

*The Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.,*
   1985 WL 1077775 (C.D. Cal. June 13, 1985) ............................................. 17, 18

*Wild v. NBC Universal, Inc.,*
   513 F. App'x 640 (9th Cir. 2013) ..................................................................... 13

Mitchell
Silberberg &
Knupp LLP

12314720.1

8

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Wilder v. CBS Corp.*,
2016 WL 693070 (C.D. Cal. Feb. 13, 2016) ...................................40, 41, 48, 49

*Wilson v. Fritter*,
2019 WL 6908049 (C.D. Cal. Nov. 5, 2009) ..................................................... 13

*Winchester Mystery House, LLC v. Glob. Asylum, Inc.*,
210 Cal. App. 4th 579 (2012) ............................................................................ 43

*Zella v. E.W. Scripps Co.*,
529 F. Supp. 2d 1124 (C.D. Cal. 2007).................................................. 13, 16, 17

## STATUTES

17 U.S.C.
§ 102 ................................................................................................................. 39
§ 103 ................................................................................................................. 39
§ 301(a) ............................................................................................................. 38

Cal. Code. Civ. P.
§ 425.16 .................................................................................................. 11, 47, 48

Fed. R. Civ. P.
Rule 10(c) .......................................................................................................... 13
Rule 12(b)(6) ..............................................................................................passim

## OTHER AUTHORITIES

4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright*
§ 1.01[B][1][a][ii] ............................................................................................ 14
§ 13.03[A] ......................................................................................................... 40

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

## I.      SUMMARY OF ARGUMENT[1]

The lawsuit filed by Plaintiff Scott Hallock and his companies improperly tries to use copyright law to own the concept of a hidden camera show that places unsuspecting "marks" in a staged setting and scares them. Such shows are not new; since 1948, when *Candid Camera* first aired, many hidden camera shows have come and gone that are based on this very premise. As Hallock openly admits, such shows "take [] advantage of the ***age-old practice*** of friends playing practical jokes on each other. 'Boo' is one of the ***oldest tricks in the book***." Decl. of James Berkley ("BD") Ex. 23, p. 187 (emphases added); *see also id.* Ex. 24.

Plaintiffs' FAC is convoluted but Plaintiffs' claims boil down to a federal copyright claim and state law claims for breach of the implied covenant of good faith and fair dealing and interference with contract, all of which arise from the exact same allegation: episodes of Defendants' hidden camera show, *Prank Encounters*, copy protected expression from episodes of Plaintiffs' hidden camera show, *Scare Tactics*.[2] Because there is no unlawful copying as a matter of law and for the other reasons addressed herein, all of Plaintiffs' claims should be dismissed.

*First*, pursuant to Rule 12(b)(6), Plaintiffs have not, and cannot allege substantial similarity in protected expression between *Prank Encounters* and *Scare Tactics*. The concept of a hidden camera show that scares its marks is not protectable, and the format of *Prank Encounters* and *Scare Tactics* varies greatly. And while Plaintiffs allege a laundry list of scattered, purported similarities between episodes, their list depends on mischaracterization, trivialities, or

---

[1] "Plaintiffs" refers collectively to Scott Hallock ("Hallock"), WMTI Productions, Inc. ("WMTI US"), WMTI Productions North, Inc. ("WMTI North"), and The Next Season Company, Inc. ("TNSCI"). WMTI US, WMTI North, and TNSCI are referred to collectively as the "Corporate Plaintiffs." "Defendants" refer to Kevin Healey ("Healey") and Propagate Content, LLC ("Propagate").

[2] At the end of the FAC, almost as an afterthought, Hallock alone also asserts a fourth cause of action against Healey for breach of contract involving another hidden camera show (*Freak Encounters*). This fourth claim—and why it fails as a matter of law—are addressed separately. *Infra*, § IV.D.

Mitchell Silberberg & Knupp LLP

12314720.1

*admittedly* unprotectable stock elements and *scenes-a-faire*, which cannot support substantial similarity. *Infra*, pp. 12-38.

*Second*, pursuant to Rule 12(b)(6), but also California's anti-SLAPP statute, Cal. Code. Civ. P. § 425.16, Plaintiffs state law claims should be dismissed and stricken. The anti-SLAPP statute applies because the development and exploitation of *Prank Encounters* are acts in furtherance of free speech *and* in connection with matters of public interest. Plaintiffs cannot show a probability of prevailing because their state law claims mimic their copyright claims and thus are preempted by copyright law. The state law claims fail for the independent reasons that there was a lack of copying; the agreement at issue (a 2016 settlement agreement between Hallock and Healey) explicitly permits Healey to have made and exploited *Prank Encounters*; and there is no allegation as to how *Prank Encounters* actually prevents Plaintiffs from exploiting *Scare Tactics*, which is not surprising as Plaintiffs continue to exploit *Scare Tactics* to this very day. *Infra*, pp. 38-49.

## II.   RELEVANT FACTUAL BACKGROUND

Hallock and Healey are former business partners who created and exploited a number of reality-based television series, including *Scare Tactics*, a hidden camera prank show that originally aired on the Syfy Channel. FAC ¶ 18. In 2011, disputes arose between Hallock and Healey, which they settled, in part, through a 2016 settlement agreement (FAC, Ex. 1 (the "2016 Agreement")).

In the 2016 Agreement, Healey gave up his rights in *Scare Tactics*, including copyright. FAC ¶¶ 28-29 & Ex. 1, pp. 2-3, ¶ 3. Healey, however, expressly retained his right to develop a new, competing hidden camera show:

> For further certainty, the transfer of the rights in this
> AGREEMENT, including SCARE TACTICS and IP
> RIGHTS, shall not have the effect of a non-competition
> clause, and does not prevent HEALEY from pursuing
> other scary, paranormal themed or hidden camera shows.

FAC, Ex. 1, p. 3, ¶ 3.

Consistent with his rights under the 2016 Agreement, Healey, together with Propagate, developed a new hidden camera show, *Prank Encounters* (FAC ¶¶ 38-39), which also scares its marks but differs significantly in format and content from *Scare Tactics*. *Infra*, pp. 15-38. The series was made available to stream on Netflix in October 2019. FAC ¶¶ 38-39. This lawsuit followed.

In their FAC, Plaintiffs, in their first cause of action, allege eight separate claims for copyright infringement, each alleging that a *Prank Encounters* episode copies protected expression from a *Scare Tactics* episode.[3] Plaintiffs then recast their copyright claims as state law claims and contend that Defendants breached the covenant of good faith and fair dealing implicit in the 2016 Agreement and also interfered with it because their alleged copying of *Scare Tactics* supposedly prevents Plaintiffs from exploiting *Scare Tactics*. These claims, as a matter of law, have no merit.

## III.   PLAINTIFFS HAVE NOT STATED A CLAIM FOR COPYRIGHT INFRINGEMENT BECAUSE, AS A MATTER OF LAW, THERE IS NO SUBSTANTIAL SIMILARITY BETWEEN *PRANK ENCOUNTERS* AND *SCARE TACTICS*.

A court may dismiss a complaint when it does not contain enough facts to state a claim for relief that is plausible on its face. Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In determining whether a claim is stated, courts "need not accept as true unreasonable inferences, unwarranted deductions of fact, or conclusory legal allegations cast in the form of factual allegations." *Maiden v. Finander*, 2013 WL 5969840, at *2 (C.D. Cal. Nov. 6, 2013). Courts also "need not … accept as true allegations that contradict matters

---

[3] Hallock does not own the copyrights to *Scare Tactics*; instead WMTI US is the copyright owner of *Scare Tactics* episodes 101, 117, 206, 301, and 305; WMTI North is the copyright owner of *Scare Tactics* episodes 401 and 405; and TNSCI is the copyright owner of *Scare Tactics* episode 509. Accordingly, as stated in the Motion to Dismiss (Dkt. 28), each copyright claim as to a specific episode is actually brought only by the specific Corporate Plaintiff who owns the copyright for that episode. *See* FAC ¶¶ 5, 40-42. Regardless, for convenience, Defendants refer to "Plaintiffs" in this memorandum.

1   properly subject to judicial notice or by exhibit."[4] *Sprewell v. Golden St. Warriors*,

2   266 F.3d 979, 988 (9th Cir. 2001), *amended*, 275 F.3d 1187 (9th Cir. 2001).

3         To state a claim for copyright infringement, Plaintiffs must allege "(1)

4   ownership of a valid copyright, and (2) copying of constituent elements of the

5   work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S.

6   340, 361 (1991). Copying requires access and "that the works at issue are

7   substantially similar in their protected elements." *Zella v. E.W. Scripps Co.*, 529 F.

8   Supp. 2d 1124, 1132-33 (C.D. Cal. 2007). Where, as here, "the copyrighted work

9   and the alleged infringement are both before the court, capable of examination, and

10  comparison, non-infringement can be determined on a motion to dismiss." *Gadh v.*

11  *Spiegel*, 2014 WL 1778950, at *3 n.2 (C.D. Cal. Apr. 2, 2014). For this motion

12  only, Defendants do not dispute ownership or access, only substantial similarity.[5]

13        On a motion to dismiss, substantial similarity is determined by the objective

14  "extrinsic test," which focuses on "articulable similarities between the plot,

15  themes, dialogue, mood, setting, pace, characters, and sequence of events" of the

16  works at issue. *Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072,

17  1077 (9th Cir. 2006), *overruled on other grounds by Skidmore v. Zeppelin*, 952

18  F.3d 1051 (9th Cir. 2020). This is assessed by comparing, not basic plot ideas, but

19  "specific, concrete elements" of ***expression*** rather than generalizations. *Bissoon-*

20  *Dath v. Sony Computer Entm't Am., Inc.*, 694 F. Supp. 2d 1071, 1079 (N.D. Cal.

21  2010).

22         

---

[4] In this regard, the *Prank Encounters* and *Scare Tactics* episodes at issue, and the 2016 Agreement are "attached to [the FAC]" and thus "deemed part of the complaint for all purposes, including for … determining the sufficiency of the plaintiff's claims." *Wilson v. Fritter*, 2019 WL 6908049, at *2 (C.D. Cal. Nov. 5, 2009), *R&R adopted*, 2010 WL 3893992 (C.D. Cal. Sept. 30, 2010); FRCP 10(c).

[5] "[T]here is ample authority" for court to dismiss copyright claims on a motion to dismiss for lack of substantial similarity. *Zella*, 529 F. Supp. 2d at 1130 (quoting *Christianson v. West Pub. Co.*, 149 F.2d 202, 203 (9th Cir. 1945)) (dismissing claim for lack of substantial similarity); *e.g. Wild v. NBC Universal, Inc.*, 513 F. App'x 640, 641 (9th Cir. 2013) (same); *Gallagher v. Lions Gate Entm't Inc.*, 2015 WL 12481504, *15 (C.D. Cal. Sept. 11, 2015) (same); *Basile v. Twentieth Century Fox Film Corp.*, 2014 WL 12521340, *9 (C.D. Cal. Aug. 19, 2014) (same).

Often, as is the case here, plaintiffs try to satisfy their burden by alleging a laundry list of scattered, purported similarities. *See* FAC ¶ 44 & Sch. I-VII. The Ninth Circuit, however, has long rejected such lists as "inherently subjective and unreliable." *Lichtfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).[6] "[S]ubstantial similarity requires a detailed examination of the works themselves," not Plaintiffs' subjective mischaracterizations. *Funky Films*, 462 F.3d at 1075; *Gallagher*, 2015 WL 12481504, at *8 (similarities "only found in the Complaint" and "works themselves reveal two rather different characters"). Also, "slight or trivial similarities are not substantial and are therefore non-infringing." 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.03[A] ("Nimmer"). And, because courts "must take care to inquire only whether the protectable elements, standing alone, are substantially similar," "[courts] filter out and disregard the non-protectable elements in making [their] substantial similarity determination," (*Funky Films*, 462 F.3d at 1077), such as "abstracted idea[s] of a general plot," "familiar stock scenes and themes that are staples of literature," and "*scenes-à-faire*," *i.e.,* "situations and incidents that flow necessarily or naturally from a basic plot premise."[7] *Benay v. Warner Bros. Enm't, Inc.*, 607 F.3d 620, 624-25 (9th Cir. 2010), *overruled on other grounds by Skidmore*, *supra*, 952 F.3d 1051.

Here, while Plaintiffs allege that certain *Prank Encounters* episodes infringe certain *Scare Tactics* episodes, it is unclear whether Plaintiffs also allege that the entirety of *Prank Encounters* infringes *Scare Tactics*. Regardless of how framed, dismissal is proper because, after filtering out unprotected elements, there is a complete lack of substantial similarity between the two series, as well as between each specific *Prank Encounters* episode and *Scare Tactics* episode at issue, a

---

[6] *See also Bernal v. Paradigm Talent & Lit. Agency*, 788 F. Supp. 2d 1043, 1061, 1063 (C.D. Cal. 2010) (no substantial similarity despite 133 page chart with side-by-side comparisons of the two works).

[7] As explained in Defendants' Request for Judicial Notice ("RJN"), on a motion to dismiss, this Court may take judicial notice of generic elements of those works. *See* RJN.

conclusion reinforced by Plaintiffs' repeated admissions that the concepts over which they are suing are not new or protectable and their attempts to claim that content in *Prank Encounters* somehow infringes multiple episodes of *Scare Tactics* (to the point they can't even keep straight what episode they are suing over).

## A.   The Two Series Are Not Substantially Similar.

Plaintiffs repeatedly go so far as to call *Prank Encounters* a "reboot" of *Scare Tactics*). *E.g.*, FAC ¶ 38. This is a gross mischaracterization; the two shows are nothing alike and this lack of similarity between the shows also informs the more specific analysis of each *Prank Encounters* versus *Scare Tactics* episode.

<u>Prank Encounters</u>: Each *Prank Encounters* episode focuses on one prank, which plays out over 20-plus minutes, which Plaintiffs admit is "four times" longer than each *Scare Tactics* prank. FAC ¶ 44c. Given its length, each episode has an elaborate backstory and fleshed out roles for the many actors involved. The show uses a "collision" format (hence a reference in each episode to the marks "colliding"), focused on **two** marks. The marks start apart, engaged in different tasks with different actors, and each episode toggles back and forth between their perspectives, as well as the production truck. Eventually, the marks "collide," at which point they jointly face the unnerving or horror-themed crisis until the reveal.

From the production truck, Gaten Matarazzo not only hosts the show but plays a prominent role. He begins every episode by introducing the audience to the backstory. Then, he not only follows the action as it occurs but is involved in the direction, narration, and development of each prank. He also often plays a role in the prank itself. He also makes the reveal at the end and then walks the marks through their experience and leads the actors in applauding the marks' good sport.

<u>Scare Tactics</u>: In contrast, each *Scare Tactics* episode includes 4 separate pranks, each "approximately 5 minutes long." FAC ¶¶ 19, 23. Each prank unfolds quickly in a linear fashion. An accomplice (family/friend) sets up one "mark" who interacts with actors while a scary event occurs before culminating in a "boo"-style

scare. An actor then reveals that the mark is on *Scare Tactics*. *Id.* ¶ 19. As each prank is so short, the show is "judicious" in its choices (*id.* ¶ 44c), meaning there is little exposition of plot or characters (many do not even have names) and the pranks mostly take place in a single setting, with just the mark and a couple actors. A host guides the audience through the clips, after-the-fact from a soundstage, by introducing each prank and making humorous comments. *Id.* ¶ 23.

Put simply, the only similarity is that both are hidden camera shows that prank someone using an unsettling or scary premise. This is not copyrightable; it is a generic concept or idea. RJN, p. 3. *E.g. Bethea v. Burnett*, 2005 WL 1720631, at *11 (C.D. Cal. June 28, 2005) ("Plaintiffs cannot copyright the idea of having a well-known business leader … host a reality television program."); *Zella*, 529 F. Supp. 2d at 1133 ("generic elements of cooking shows and talk shows" not protectable; "no one can own [a] basic idea …"). And even if Plaintiffs could allege infringement for use of this generic concept, the shows are formatted[8] and paced differently[9] (*supra*), and specific episodes differ significantly, with *Prank Encounters* using additional plotlines, characters, settings, and scenes (*infra*, pp. 18-38), further preventing a finding of substantial similarity.[10] Other similarities of which Plaintiffs complain are also not actionable, whether comparing the two series or the specific *Prank Encounters* and *Scare Tactics* episodes complained of:

- Plaintiffs allege similarity because both shows have hosts (FAC ¶ 44e), but the "generic idea to have a host is not protectable." *Zella*, 529 F. Supp.

---

[8] *E.g. Zella*, 529 F. Supp. 2d at 1135–36 ("Rachael Ray [also] contains segments on shopping, gift-giving, parenting, [] and fashion, along with cooking segments"); *Basile*, 2014 WL 12521340, at *8 ("presence of characters in one work without counterparts in [] other weighs in favor of finding [no] substantially similar[ity]").

[9] *Bernal*, 788 F. Supp. 2d at 1070 (pace dissimilar between "film" and "television series with multiple hour-long episodes").

[10] Plaintiffs concede these differences. *See* FAC ¶ 44a (conceding short story not protectable); ¶ 44b (admitting horror works "normally have a distinct yet simple story arc: against increasingly impossible odds, a person (protagonist) faces an evil force (villain)."); ¶ 44c (conceding pace different); Sch. I-VII (repeatedly conceding added storylines, characters, and settings in *Prank Encounters*).

2d at 1137; *The Dick Clark Co., Inc. v. Alan Landsburg Prods., Inc.*, 1985 WL 1077775, at *3 (C.D. Cal. June 13, 1985) (same). *See also* RJN, p. 3. Also, the hosts' roles here differ significantly. *Supra*, pp. 15-16. *E.g. Zella*, 529 F. Supp. 2d at 1137 (defendants' host "performs an opening monologue, gives advice, and interacts with the studio audience," features "absent from [plaintiffs' host]").

•   Plaintiffs allege similarity because both shows follow the same sequence of a set-up, a climatic scare, and a reveal. This, however, is how pranks, and thus, prank shows, work—one person puts another person into a scary, confusing, or embarrassing situation to trick him or her—a fact that one only needs to have had friends or watched television to verify. RJN, p. 3. Thus, the "limiting doctrines of merger and *scenes a faire*" preclude protection. *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1177 (9th Cir. 2003) ("[S]equencing of first performing [a magic] trick and then revealing the secrets behind the trick" not protected); *Zella*, 529 F. Supp. 2d at 1135 (same as to talk show elements); *The Dick Clark Co.*, 1985 WL 1077775, at *3 (same as to outtake show elements). Moreover, while a *Scare Tactics* prank proceeds rapidly over 5 minutes in a single setting with little exposition, a *Prank Encounters* prank is drawn out over 20-plus minutes, includes elaborate storylines, and toggles between multiple perspectives and settings.

•   Plaintiffs allege similarity because both shows use marks and actors playing roles, but this also flows from the prank show concept. *Bethea*, *Zella*, *The Dick Clark Co.*, *supra*. Moreover, they differ: on *Scare Tactics*, the mark is not required to perform elaborate jobs; they are largely passive observers who are scared. On *Prank Encounters*, the marks are incorporated into the storyline and collaborate with the actors and each other. The roles on *Prank Encounters* are also more fleshed out and there are more roles. *Zella*, 529 F. Supp. 2d at 1137; *Basile*, *supra*, n. 8. Finally, any arguably overlapping roles are expressed differently.

•   Plaintiffs allege similarity in moods (e.g. "worried"), but the "moods" are generic. *E.g., Fillmore v. Blumhouse Prods., LLC*, 2017 WL 4708018, at *8

(C.D. Cal. July 7, 2017) ("general suspense is not protectable"); *Segal v. Rogue Pictures*, 2011 WL 11512768, at *7 (C.D. Cal. Aug. 19, 2011) ("dark, foreboding mood" generic). The moods are also contrived, the actual mood is not protected; it is what one expects from a prank show, initially tense, scary at the climax, and then light-hearted and comical after the reveal. *E.g. Olson v. Nat'l Broad. Co., Inc.*, 855 F.2d 1446, 1451 (9th Cir. 1988) (moods "common to genre of action-adventure" not actionable).

- Plaintiffs allege similarity in themes (FAC ¶ 44a) but "[b]oth works appear to be designed solely for entertainment and not to communicate come sort of moral lesson." *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1180 (C.D. Cal. 2016). Plaintiffs cannot monopolize an entertaining prank show.

- Plaintiffs allege similarity in dialogue (FAC ¶ 44a) but fail to identify any "extended similarity of dialogue" (*Olson*, 855 F.2d at 1450), despite amending their Complaint for this very purpose (Dkt. 16). The point is conceded. *See Gadh*, 2014 WL 1778950, at *6 ("no similarity as to dialogue" where "Complaint does not quote a single line of dialogue … or otherwise point out specific similarities").

In sum, there is no copying of protected expression between the two series.

## B.   The Episodes and Pranks at Issue are Not Substantially Similar.

Each *Prank Encounters* episode at issue is not substantially similar in protected expression to the *Scare Tactics* episode alleged to have been copied.

### 1.   "Camp Scarecrow" and "Camp Kill"

The *Prank Encounters* episode, "Camp Scarecrow," (Decl. of Gabriella A. Nourafchan ("ND") Ex. 4)[11] concerns a closed sleepaway camp called "Camp Scarecrow" that closed after campers went missing. A groundskeeper, Lucius, was

---

[11] In addition to the published, copyrighted *Scare Tactics* episodes, Plaintiffs also submit "scripts" of each. However, as the "final creation" of each work is the "completed video of each story" (FAC ¶ 44d) and these are the only allegedly copyrighted works, the Court need only to compare each episode of *Prank Encounters* with each as-aired *Scare Tactics* episode. For convenience, Defendants have resubmitted the relevant *Scare Tactics* and *Prank Encounters* episodes.

blamed for their disappearance and sent to a mental institution but he protested his innocence, claiming unnatural foul play.

The marks, Regan and Cameron, are hired to help plan the reopening. They arrive separately; as Regan arrives, she sees a man in the road holding a scarecrow (Lucius). Regan and Cameron go to separate male and female cabins, each joined by other counselors. The two groups talk via radio. An explosion occurs outside. A male counselor says he planted dynamite to kill gophers and leaves to investigate. Regan mentions the mysterious man she saw to her group. Another blast occurs and Cameron and the male counselors leave their cabin to investigate. Regan sees a photo of Lucius, who she recognizes as the man with the scarecrow. Alarmed, the female counselors call park ranger Dave; Dave warns them to stay inside. Regan learns more about Lucius while Cameron's group finds the first male counselor, injured, next to a fallen scarecrow. Lucius suddenly appears and yells at them to put the scarecrow back up. After initially resisting, Lucius then goes with Dave.

Next, Cameron and Regan collide when Cameron's group joins Regan's group in the girl's cabin. As they talk, Cameron and Regan see a person with a "very scary outfit" (he looks like a scarecrow) and holding a "pitchfork thing" walk by. The group calls Dave, who is injured; he says Lucius escaped. Two counselors leave to help Dave but are attacked by the scarecrow man. A counselor arms some more dynamite. Lucius appears, but runs away; the counselor blows him up. The scarecrow man appears and attacks another counselor. Dave returns and is attacked by the scarecrow man. Matarazzo appears and makes the reveal.

In contrast, in *Scare Tactics'* "Camp Kill" (ND Ex. 5), Lindsey sets-up Miranda and the two go to a cabin in the woods to meet with two owners of "Camp Rainbow," which closed due to an unexplained accident. One owner, Travis, leaves to get some paperwork and Miranda sees a person carrying a "sword" walk by the cabin. She panics and explains what she saw to the others but is interrupted by Travis, who calls on a walkie-talkie in a panic, telling them to lock the door. The

man with the sword attacks Travis and tries to break into the cabin. The attacker wears a mask with make-up caked on it. While this ensues, Travis reenters the cabin, injured and bloody. As Miranda screams, one of the actors makes the reveal.

<u>Plot and Sequencing</u>[12]: While both incorporate the "concept of a mad man menacing people at a cabin in the woods," Plaintiffs concede this is "not new." FAC, Sch. VI, p. 2. *See Gadh*, 2014 WL 1778950, at *5 ("shared focus" not actionable where plaintiffs concede it is "not a new concept"). Indeed, the concept of "young adults venturing to a remote cabin in the woods after ignoring various warnings of death and danger" "has been mimicked in countless horror movies over the decades" (e.g. the iconic *Friday the 13th* series) and, thus, is not protectable. *Gallagher*, 2015 WL 12481504, at *4 n.3.[13] Otherwise, the two are completely different; "Camp Kill" is one scene, with no exposition, where a man with a sword walks by the cabin, attacks the cabin owner, and then the cabin. "Camp Scarecrow," in turn, has an elaborate backstory and multiple storylines, (e.g. Lucius and the scarecrow, investigating explosions, multiple encounters with Lucius, and multiple attacks by the scarecrow). *E.g. Funky Films*, 462 F.3d at 1081 (no substantial similarity where "'Six Feet Under,' unlike 'The Funk Parlor,' is not a murder mystery" but "explores the intimate lives of each member of the Fisher family" and "develops separate plot-lines around each").[14]

---

[12] A court must "look[] beyond the vague, abstracted idea of a general plot" when assessing similarities. *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985). Even where two works "share the same basic plot premise," no substantial similarity exists where "a closer inspection reveals that they tell very different stories."*Benay*, 607 F.3d at 625.

[13] *See also Berkic*, 761 F.2d at 1293 (plot of "young professional who courageously investigates" a criminal organization that murders healthy people and sells the organs for transplants an unprotectable "basic plot idea"); *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994) (no protection for general plot idea of "a life struggle of kids fighting insurmountable dangers").

[14] Plaintiffs' other similarities (e.g. the figure walks by a window, the camp closed due an incident) are "random similarities scattered throughout the works" and do not suffice, particularly where they are stock elements that flow from the unprotected idea of someone attacking people in the woods, and plaintiffs have genericized differently expressed elements so as to make them sound the same.

(…continued)

Mitchell Silberberg & Knupp LLP

12314720.1

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

<u>Characters</u>[15]: Plaintiffs allege that both works include camp counselors and a "menacing figure" (FAC, Sch. VI, p. 6), but these are stock characters that flow from the works' shared premise of people being stalked in the woods. *Benay*, 607 F.3d at 627; *Gallagher*, 2015 WL 12481504 at *4 n.3. And there are no similarities between them: in "Camp Kill," "the menacing figure" wears a makeup-covered mask and carries a sword; in "Camp Scarecrow," it is a scarecrow holding a scythe. *E.g. Funky Films*, 462 F.3d at 1078-79 (no substantial similarity where characters only "similar at the abstract level"). The "counselors" are marks, who are unscripted and react to very different events. In "Camp Kill," the other characters are the owners; "Camp Scarecrow," has no owners but has others characters not present in "Camp Kill," i.e., other counselors, Lucius, and Dave. *Id.*

Setting: Plaintiffs point to the shared use of a cabin in the woods but this is a "basic premise," beyond which there are no similarities. *Gallagher*, 2015 WL 12481504, at *10. Further, "Camp Kill" takes place in one cabin, whereas "Camp Scarecrow" includes scenes in vans, two separate cabins, and the woods. *Campbell v. Walt Disney Co.*, 718 F. Supp. 2d 1108, 1114-15 (N.D. Cal. 2010) (no substantial similarity where one "set at two large racetracks" while other "set in a rough neighborhood, a school, and the main character's home and work").

### 2.    "Face Fears" and "Dangerous Obsession"

The *Prank Encounters* episode "Face Fears" (ND Ex. 6) concerns a plastic surgeon, Dr. Ritter, and a woman, supposedly his wife, Teresa, incapacitated in bed with her face covered in bandages due to surgery. The first mark, Dallas, is

---

(…continued)
*Kouf*, 16 F.3d at 1045-46 (court "unimpressed by Kouf's compilation of random similarities … such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight"); *Berkic*, 761 F.2d at 1294 ("small miseries of domestic life, romantic frolics at the beach, and conservative or evil bureaucracies" unprotectable).

[15] "[T]he bar for substantial similarity in a character is set quite high." *Gallagher*, 2015 WL 12481504, at *7 (citation omitted). "[O]nly distinctive characters are protectable[,]" *Benay*, 607 F.3d at 626, and courts must be careful "to slice or filter out" mere embodiments of stock ideas. *Bissoon-Dath*, 694 F. Supp. 2d at 1088.

hired to care for Theresa with another caregiver, Julian. The second mark, Nick, is hired to assist a private investigator, Dave, look for a missing woman, Nicole.

Dr. Ritter tells Dallas about Theresa's condition and stresses it is important to call her Theresa; meanwhile, Dave tells Nick about Nicole's disappearance and shows him pictures of Nicole, her tattoo, and her missing car. Nick and Dave interview Dr. Ritter's neighbor, who says the photo of Nicole looks like Theresa and talks about Dr. Ritter's odd behavior; meanwhile, Dr. Ritter displays odd behavior in introducing Dallas to Theresa, including repeatedly whispering "Theresa" in his wife's ear. Dr. Ritter leaves and Dallas is alone with Theresa, who starts mumbling in fear and convulsing until Julian returns and gives her morphine. Meanwhile, Dave and Nick find Nicole's car under a tarp at Dr. Ritter's house.

The collision happens next when Nick and Dave arrive at Dr. Ritter's house. Evidence rapidly unspools allowing Nick and Dallas to reach the conclusion that Theresa is Nicole, including photos of the two, the tattoo, and a call from "Detective Gaines" to inform Dallas that Dr. Ritter's wife is dead. Dr. Ritter returns and he and Dave leave the room to talk. Theresa wakes up briefly and mumbles that she is Nicole. Dallas calls the police. Dr. Ritter (but not Dave) returns, covered in blood. Dr. Ritter sedates Julian. Dallas angrily confronts Dr. Ritter, who admits that Theresa died on the operating table and that he replaced her with Nicole. Tension builds and Dr. Ritter threatens to sedate Dallas and Nick only for Matarazzo to arrive and reveal to them that they are on *Prank Encounters*.

In *Scare Tactics*' "Dangerous Obsession" (ND Ex. 7), the mark, CJ, is hired to care for Jerry's bedridden "wife," Sara, who he says had an accident. As he tells CJ how he met Sara, flashbacks (unseen by CJ) reveal that Jerry is a stalker, who kidnapped Sara by hitting her with his car. Jerry introduces CJ to Sara, force feeds pills to Sara, kisses her goodbye, and leaves. Once he leaves, Sara opens her eyes, spits out the pills, and asks CJ for help. Sara's feet are cuffed to the bed so she sends CJ to get the keys. CJ gets the keys and calls her friend, Chris. While CJ is

unlocking Sara's cuffs, Jerry returns and sedates Sara. He picks up another syringe and turns to CJ, saying he will take good care of her, at which point Sara reveals to CJ that she is on *Scare Tactics*. Chris—who set Sara up—enters the bedroom.

<u>Plot and Sequencing</u>: Beyond "[t]he dramatic concept of a woman being kidnapped by a stranger and held against her will," which Plaintiffs admit "is not new" (FAC, Sch. I, p. 3) and, thus, not protectable (*e.g. Gadh, supra,* p. 20), the plots are dissimilar. "Dangerous Obsession" concerns a stalker who chains his obsession to a bed, while "Face Fears" involves a deranged doctor who kidnaps a woman and reconstructs her face to replace his wife, as well as the investigators hired to find her, a story Plaintiffs admit[16] is missing from their prank.[17]

<u>Characters</u>: Plaintiffs claim that both include a "husband," an injured "wife," and a "caregiver" (FAC, Sch. I, p. 6) but these stem from the admittedly generic storyline of woman being kidnapped and held against her will and the need to introduce the mark into the story. *Campbell*, 718 F. Supp. 2d at 1115 ("cocky kid" and an "older mentor" characters not protected because flow from "basic plot idea" of the "young mentee-older mentor storyline"). And they are expressed differently: Dr. Ritter is a plastic surgeon, whose job is emphasized, while Jerry is only shown as a stalker. Sara is alert and tries to facilitate her escape, while Theresa is barely conscious and only mumbles and convulses. *See Shame on You Prods. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1163 (C.D. Cal. 2015) (no similarity between "uptight" "conservative" "career woman," and woman with unknown occupation who engaged in crass, inappropriate conversations). Finally, "Face Fears" includes another caretaker, a private eye and his assistant, a neighbor, and a detective.

---

[16] *See* FAC, Sch. I, p. 5 ("added elements involv[ing] another Mark who believes he is helping a Private Detective search for a missing woman" are absent from Plaintiffs' work); *Id.*, p. 3 ("added B story … crosses the original story").

[17] Plaintiffs point to similarities such as a "shrine," a husband saying goodbye wife, and the threat of sedation, but these are random, commonplace, trivial elements and expressed differently; e.g. one shrine is hidden in a closet, whereas the other is a montage of photos above a dresser and Jerry says "goodnight, my angel" to Sara, whereas Dr. Ritter repeatedly kisses Theresa and says her name.

<u>Setting</u>: While Plaintiffs allege that both take place in "upscale homes" at night (FAC, Sch. I, p. 6), "commonplace settings such as houses" are not protected. *Bernal*, 788 F. Supp. 2d at 1071. Further, the houses look nothing alike—Jerry's house is nondescript, whereas Dr. Ritter's house is larger, modern, and better decorated. *Funky Films*, 462 F.3d at 1080 ("well maintained funeral home" and funeral home "in shambles" not similar). "Face Fears" also includes scenes in Dave's car, Dr. Ritter's driveway, and the neighbor's driveway. *Campbell*, *supra*.

### 3.   "Fright at the Museum" and "The Mummy"

The *Prank Encounters* episode, "Fright at the Museum" (ND Ex. 8) involves a sarcophagus being delivered to a museum for an exhibit about Apophis, the god of chaos. After the sarcophagus arrived at the museum warehouse, strange things occurred, which employees blamed on Ahmad Moussain, an Egyptologist. Moussain says the sarcophagus is cursed. He is banned after trying to sabotage the exhibit to stop the curse. One mark, Khadijah, is hired to help another employee, Dave, deliver the sarcophagus and another artifact from the warehouse to the museum. The other mark, Matty, is hired to assist the museum curator, Kathy.

Khadijah and Dave drive to the warehouse and meet Jeff, who recently had a crate fall on him. They retrieve the sarcophagus but the second artifact is missing. Meanwhile, Matty and Kathy find a crate in Kathy's office, which includes an artifact, a panel with a serpent on it. When Matty touches the artifact, the lights flicker, and Jeff (2 miles away) feels a sharp pain in his leg. Jeff is afraid of the sarcophagus and wants it gone. As Khadijah and Dave drive the sarcophagus to the museum; Moussain appears and warns they "must keep the two pieces separate."

At the museum, Khadijah and Matty collide. Khadijan and Dave deliver the sarcophagus to Kathy's office, where the group realizes that the missing artifact is the serpent panel already in the office and that it is actually a piece missing from the sarcophagus. They place it on the sarcophagus, the lights flicker, and the group hears a scream from Jeff (who had driven over). He is on the ground and says he

Mitchell
Silberberg &
Knupp LLP

12314720.1

saw a snake. Khadijan sees a flyer about Moussain, which says to call security (played by Matarazzo). She does and Matarazzo says locks the office. Khadijan and Matty help Kathy translate hieroglyphics on the sarcophagus. Moussain calls the office and warns them not to "initiate the curse." Khadijan reads the translation aloud and the lights flicker violently. Matty opens a drawer, which is filled with snakes. Beetles fall out of a ceiling vent. Matarazzo appears and is attacked by Moussain. As Khadijan and Matty panic, Moussain falls through the ceiling and is attacked by a small serpent demon. Matarazzo reappears and makes the reveal.

As for *Scare Tactics'* "The Mummy," initially, it is unclear what Plaintiffs are even alleging is infringed. In their FAC, Plaintiffs initially base their claim on a clip of a prank involving an Egyptian curse (*See* FAC, ¶ 42f & Ex. 19; ND Ex. 9) but then submit a full episode that includes a different prank involving an Egyptian curse (*See* FAC, ¶ 48; Ex. 33; ND Ex. 10). This only highlights the absurdity of Plaintiffs' claims; the concept of an Egyptian curse is so generic, Plaintiffs cannot even keep straight what they are suing over. It does not matter; neither clip is substantially similar to "Fright at the Museum."

In the first "The Mummy" (ND Ex. 9), Pedro sets up his friend, Helder, who helps a curator test market videos. Helder and the curator enter a storage room with video displays and artifacts. Helder watches a video, narrated by Morgan, about a pharaoh, the Blood King. As Helder looks at an ancient map, there is a noise and a vase falls off a shelf. Helder nervously watches the next video, which cuts out. The lights flicker and a mummy breaks out of a box. A security guard rushes in and the mummy attacks him. As the mummy advances toward Helder, Morgan reappears on one of the video screens and makes the reveal. Pedro comes into the room.

In the second "The Mummy" (ND Ex. 10), Allen sets up his sister, Lee Ann, who goes to an "archeological research facility" (a chain-link storage space) to help a professor catalog artifacts from a pharaoh's tomb. The professor mentions a curse and leaves the room. Another actor, Travis, is dismissive of the curse and

picks up an artifact. The lights flicker and a coffin-like box in the corner moves violently. Travis taunts the box, the lights flicker again, and a mummy breaks out of the box and attacks Travis. As Lee Ann flees, the professor makes the reveal.

<u>Plot and Sequencing</u>: Regardless of which version of "The Mummy" is analyzed, the only similarity is the basic plot idea of an ancient Egyptian curse and someone being attacked, but Plaintiffs admit that "[t]he tale of a cursed pharaoh's tomb being disturbed resulting in harm to those who interact with its artifacts is an old one and not protectable" FAC, Sch. VII, p. 2. *E.g. Gadh*, *Berkic*, *Kouf, Funky Films*, *supra*, p. 20. And the idea is expressed differently; in both versions of "The Mummy," after an artifact is touched, a mummy breaks out of a box and attacks; "Fright at the Museum" concerns a curse, a group unknowingly initiating the curse by finding and combining cursed objects and saying the curse, an Egyptologist trying to save them, an attack by a small demon, as well as other storylines. *Id*.[18]

<u>Characters</u>: The only parallel character is the curator in the first "The Mummy," which is a stock character owing to the museum setting, and expressed differently. *Campbell*, *supra*, p. 23. While Plaintiffs point to a "monster," one is a mummy and one is a small serpent demon. *See Scott v. Meyer*, 2009 WL 10673163, at *3 (C.D. Cal. Dec. 2, 2009) (two vampires with different traits not substantially similar). Finally, "Fright at the Museum" also features additional characters, including multiple employees and Moussain. *See Basile*, *supra*, n.8.

<u>Setting</u>: Plaintiffs claim that both works occur at "nighttime at a storage area in a facility housing Egyptian artifacts" (FAC Sch. VII, p. 7), which would not suffice even if it were accurate. *Bernal*, 788 F. Supp. 2d at 1071 (no similarity where "only similarity… is that they are both set in a suburban neighborhood."). In

---

[18] Plaintiffs point to similarities with the second "The Mummy" such as inventorying artifacts and a "physical touch of the pharaoh's coffin [] leading to physical danger" (FAC, Sch. VII, p. 4), but these are random and flow naturally from the premise. Others (e.g. lights flickering, a mark screaming) are also random and trivial and flow from the premise of scaring someone.

Mitchell
Silberberg &
Knupp LLP

12314720.1

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

reality, each version of "The Mummy" occurs in a small storage area, while Defendants' work takes place in multiple locations—a large warehouse, a van, and an office. *E.g. Campbell*, *supra*, p. 21.

### 4.   "Urgent Scare" and "Satan's Baby"

The *Prank Encounters* episode "Urgent Scare" (ND Ex. 11) concerns an astronaut who has something growing inside of him from space. The first mark, Jaeda, is hired as a hospital receptionist, while the second mark, Abbey, is hired to work for a transport company that caters to government and military VIPs.

Abbey and another transport employee, Dave, pick up an astronaut, Lieutenant Colonel Jeffrey Lewis and his wife, Kathy, to drive them to a CDC event. Meanwhile, Jaeda makes small talk with a doctor, Dr. Dittman, who speaks about aliens being real; Jaeda agrees. On the way, Lt Col Lewis discusses taking samples from an asteroid and quarantining. He feels a sharp pain in his stomach and begins to bleed. Abbey calls a CDC employee (Matarazzo) and updates him; then the group takes Lt Col Lewis to the hospital where Abbey and Jaeda collide.

Upon arrival, Lt Col Lewis is taken to a room. Dr. Dittman and Kathy give information to Abbey and Jaeda in furtherance of the set-up: Dr. Dittman mentions Lt Col Lewis' stomach is distended and Kathy recounts how Lt Col Lewis has acted oddly and lost 60 pounds since returning from space. Dr. Dittman mentions a parasite to Jaeda as the go to take an ultrasound. Abbey tells Dave she thinks Lt Col Lewis's problem relates to space. Lt Col Lewis continues to scream in pain.

The ultrasound reveals a mass in Lt Col Lewis's stomach that is moving. Lt Col Lewis tells Jaeda and Dr. Dittman to call General Comstock who will "know what to do" to "fix" and "contain it." Dr. Dittman calls the General, who says he will send two experts. Jaeda and Abbey continue to speculate. Dr. Dittman, Jaeda, Kathy, and Abbey all end up in Lt Col Lewis's room. Dr. Dittman and Jaeda examine Lt Col Lewis's stomach and his stomach moves, startling Jaeda. The two "experts" arrive screaming "lockdown" and carrying a box and say "whatever

1  comes out, goes in [the box]." Lt Col Lewis's stomach erupts and an alien

2  emerges, attacking one of the experts. Matarazzo arrives and makes the reveal.

3      *Scare Tactics*' "Satan's Baby" (ND Ex. 12) starts with Morgan alluding to

4  being made pregnant by Satan. The mark, Brittany, is set up by her mom. Brittany

5  is hired as a receptionist at an urgent care center. A man runs in, panicked, saying

6  his wife is in labor; he tells the doctor "it's happening now." In front of Brittany,

7  the husband makes a mysterious phone call, stating "it's time," "his son is about to

8  arrive," and "praise him." The doctor asks Brittany to help deliver the baby. A tall,

9  imposing man dressed like a priest (meant to be Satan) arrives, scaring Brittany.

10  The pregnant wife screams in distress. Satan says "we just need the baby, [the

11  wife] doesn't matter." The wife flatlines, is revived, and gives birth to a small

12  satanic creature who attacks the doctor and says "praise me." As Brittany screams,

13  Satan reveals that she is on *Scare Tactics*. Brittany's mom enters the room.

14      <u>Plot and Sequencing</u>: The only similarity is both incorporate the concept of

15  something scary coming out of a person's body and attacking people, which is not

16  new, nor protectable. *E.g. Basile*, 2014 12521340, at *5 (discussing work in which

17  "violent squid-like alien is removed from [actor's] womb."). Moreover, the

18  concept is expressed differently. In one, a woman gives birth to the devil's child,

19  whereas in the other, an alien grows inside of an astronaut and explodes out of his

20  stomach. *E.g. Shame on You*, 120 F. Supp. 3d at 1152 (no similarity because while

21  both leads "make it to an important event" one is a "farewell brunch" and other is a

22  "news broadcast"). Otherwise, the plots are totally dissimilar with "Urgent Scare"

23  having multiple additional storylines.[19]

24  _____

25  [19] Plaintiffs' other similarities such as a receptionist answering a phone or a doctor
    escorting a patient to a room, are random, trivial and arise from the works' generic
26  plot and setting. *E.g. Gilbert v. New Line Prods., Inc.*, 2010 WL 5790628, at *9
    (C.D. Cal. Aug. 13, 2010) (no substantial similarity when "asserted similarities …
27  flow from the screenplays' shared generic plot of mothers who scheme to derail
    their son's pending marriage to woman who the mothers disapprove of."); *Shame
28  on You*, 120 F. Supp. 3d at 1151 (same where similarities "flow directly from the
    basic premise of a walk of shame"). Plaintiffs genericize other "similarities" to the
                                                              (…continued)

1   <u>Characters</u>: Plaintiffs claim similarity but the characters are either

2   unprotectable stock characters that flow from the medical setting (e.g. doctor and

3   receptionist)[20] or expressed differently; e.g. one "frightening creature" is Satan's

4   baby and the other is an alien. One "patient" is a pregnant woman giving birth to

5   Satan's baby, while the other is an astronaut with an alien using his body as a host.

6   FAC, Sch. IV, p. 2 (admitting "ailing astronaut is substituted for a pregnant

7   woman"). And in "Satan's Baby," the "mysterious man in black" is Satan dressed

8   like a priest, whereas in "Urgent Scare," it is two government "experts" in black

9   suits. *E.g. Benay*, 607 F.3d at 627 (works "present the Japanese Emperor in starkly

10  different ways"); *Basile,* 2014 WL 12521340, at *7 ("form of artificial intelligence

11  [] indistinguishable from mankind" not similar to "humans who have robotic

12  implants that make them appear less human"). Finally, "Urgent Scare" also

13  features a second mark, transportation employee, spouse, and experts.

14      <u>Setting</u>: Both works take place in medical facilities, but this is a common

15  setting that flows from the premise of someone needing medical help. *E.g. Bethea*,

16  2005 WL 1720631, at *12. The settings also look different, are utilized differently,

17  and "Urgent Scare" moves from a van, to a waiting room, to the operating room.

18          **5.     "Storage War of the Worlds" and "Phantom Power"**

19      The *Prank Encounters* episode, "Storage War of the Worlds" ("Storage

20  War") (ND Ex. 13), involves aliens and a highly classified storage facility that

21  houses a top secret room known as the "life form containment unit" (the "LFCU"),

22  which is keeping a fighter pilot (from 1951) alive through secret technology. The

23  first mark, Dashawnda, is hired to help a government official, Mary, catalog files at

24  the storage facility, along with another employee, Dave. The second mark, Justin,

25  ─────────────────────
    (…continued)

26  point of absurdity such as equating delivering Satan's son to an alien bursting out
    of an astronaut's stomach by calling both "abdominal pain."

27  [20] *E.g. DuckHole Inc. v. NBC Universal Media, LLC*, 2013 WL 5797279, at *8

28  (C.D. Cal. Sept. 6, 2013) ("generic idea to have veterinarians [and] nurses … is not
    protectable")

1   is hired to help an electrical engineer, Sven, investigate the cause of electrical

2   issues in the nearby area.

3       Dashawnda and Dave review files, including instructions about the LFCU

4   and photos of the pilot. Meanwhile, Justin and Sven find a breaker box near the

5   storage facility. They try to "jump start" the electricity but the power goes out and

6   an alarm goes off inside the facility. They head towards the facility. Meanwhile,

7   Dashawnda, Dave, and Mary find the source of the alarm and discover the LFCU.

8       Next, the collision occurs when Sven and Justin arrive at the warehouse.

9   Mary asks Sven and Justin for help restoring the power. Dashawnda shows Sven

10  and Justin how to get into the LFCU and the group enters the LFCU. Justin and

11  Sven accidentally lock the group in and Dashawnda receives a call from "LFCU

12  Technical Support" (Matarazzo), who says no one has entered the room in over 65

13  years. After attempts to escape, Matarazzo tells Dashawnda that they need to fix

14  the electrical issue because the LFCU is failing and a human's life is at stake.

15      The group finds the pilot in a sealed containment unit. Matarazzo says not to

16  open the container, but Dave opens it, waking the pilot. The pilot says that "they"

17  are feeding off of his blood and dies. Matarazzo tells Dashawnda that the pilot was

18  keeping three aliens alive and the room will self-destruct unless the group can keep

19  one of the aliens (who are in chambers and have tentacle arms) alive by turning

20  three manual cranks. Dave and Sven turn the cranks. All three aliens seemingly

21  die, but one alien breaks out and attacks Dave. Mary shoots it with a laser. As the

22  self-destruct counts down under ten, Matarazzo arrives and makes the reveal.

23      In *Scare Tactics*' "Phantom Power" (ND Ex. 14), Holly sets up Amanda,

24  and the two help a utility worker investigate electricity theft. The group discovers

25  an illegal meter and follows wires into a small house, where they find a machine, a

26  mannequin, and a tarp. Amanda thinks someone is building a robot. A homeowner

27  appears and accuses them of stealing his technology. The tarp moves and someone

28  mumbles "help me." It is a distressed man in a wheelchair with cables attached to

his head. He says the homeowner is doing "crazy things" to him and begs them not to shut down the machine, which is keeping him alive. The utility worker shuts off the machine and the distressed man passes out. A military-styled robot appears, attacks the utility worker, and points a gun at Holly and Amanda. The homeowner screams at Holly and Amanda for a moment, but then makes the reveal.

Plot and Sequencing: The two are nothing alike. "Phantom Power" concerns a homeowner building robots, whereas "Storage War" is about a secret government project keeping aliens alive using human life, as well as the storyline of the marks trying to get out of the LFCU before it self-destructs, a premise that is entirely absent from "Phantom Power." *See Funky Films*, 462 F.3d at 1078 (defendants' work "develops separate plot-lines around [characters] for whom there are no comparable characters in [plaintiffs']"). And while Plaintiffs allege substantial similarity because both involve "odd power surge issues" and individuals "being held against [their] will" and "kept alive by electricity" (FAC, Sch. II, p. 3), these similarities are trivial or generic and, in any event, expressed differently. *See Kouf*, 16 F.3d at 1045-46 (random similarities such "the presence of an attic, danger scenes, concerned parents, and kids sleeping outside" not actionable).[21]

Characters: Plaintiffs point to Dashawnda and Holly both being "young civilian[s]" and the utility worker and Sven being "much older" (FAC, Sch. II, p. 5) but "[s]imilarity in age [] is not protectable and does not demonstrate [] substantially similar[ity]." *Newt v. Twentieth Century Fox Film Corp.*, 2016 WL 4059691, at *10 (C.D. Cal. July 27, 2016). Plaintiff allege that both works feature similar aged "electrocuted Soldiers" in military clothing attached to electrodes" but this is a gross mischaracterization based on Plaintiffs blending two characters—an unknown man hooked up to electrodes and a military-styled robot—in "Phantom Power." In "Storage War," the pilot is not a robot, he is not attached to electrodes,

---

[21] The same is true of Plaintiffs' other alleged similarities (FAC, Sch. II, pp. 2-4), e.g. studying an electrical box and wires, getting attacked from behind.

and does not get electrocuted. *Basile,* 2014 WL 12521340, at *7, *supra*. Further, the other prominent characters in "Storage War"—Mary, Dave, the aliens, and tech support—also have no counterpart in "Phantom Power." *Funky Films*, *supra*.

Setting: Plaintiffs call the setting a "remote storage facility in the 'middle of nowhere'" (FAC, Sch. II, p. 6) but this is not protectable. *See Capcom Co., Ltd. v. MKR Grp., Inc.*, 2008 WL 4661479, at *10 (N.D. Cal. Oct. 20, 2008) (no substantial similarity despite both occurring in "a rural two-story mall with a helipad on top and a gun shop and music playing inside"). Nor is it accurate. "Phantom Power" occurs in one room of a small home, whereas "Storage War" occurs in various rooms of an abandoned government storage facility. *Basile*, 2014 WL 12521340, at *7 ("works simply do not share the same setting").

### 6. "Split Party" versus "It's My Party" and "Send in the Clowns"

Initially, Plaintiffs "cannot simply selectively filter elements from ['It's My Party' and 'Send in the Clowns'] and summarily compare them to various elements of ['Split Party']." *Gilbert*, 2010 WL 5790628, at *3. Instead, "the works must be assessed individually and not manipulated for any parties' own benefit." *Id.*

The *Prank Encounters* episode, "Split Party" (ND Ex. 15) involves Matarazzo accepting an invite to a birthday party of a supposed 8-year old girl, Stacey, whose "father," Jerry, is not right. The first mark, Ashanti, is hired to work for the party planner, Becky. The second mark, Kelsey, is hired as an assistant to Matarazzo and his manager, Eddie.

At Jerry's mansion, Ashanti, Becky, and another planner stand in a line to meet Jerry. Jerry acts oddly and meticulously. Meanwhile, Kelsey meets Eddie and Matarazzo, they drive to the party, and Kelsey reads Stacey's letter; it mentions "special cupcakes." Ashanti's group sets up and puts out a surprise cake from Becky. Jerry is enraged at the cake and throws it on the ground outside. He brings out Stacey's cupcakes in a sing-song fashion. Eddie, Kelsey and Matarazzo arrive

and see the cake on the ground. Jerry answers the door and makes them stand in a line. He calls for Stacey but she does not come.

Kelsey and Ashanti collide. Jerry complains about imperfections in the decorations and aggressively pops balloons that he says are blown up wrong. Both groups suspect something is off. Everyone goes to the dining room. Matarazzo eats his cupcake and asks for coconut water. Becky and Ashanti have to go to the van for the water, which upsets Jerry. He leaves the room. Eddies eats a cupcake. Eddie and Matarazzo have stomach pain. Kelsey suspects a problem with the cupcakes.

A gardener, Julian, appears, tied up with tape dangling from his mouth. He tells the group that Jerry is crazy. Jerry returns wearing a dress and makeup and his hair in pigtails; he attacks Julian. Jerry alternates speaking in a deep voice and a kid voice; Kelsey insinuates he has a split personality. Matarazzo and Eddie foam at the mouth and collapse. Jerry forces the other actors to eat the cupcakes and they also foam at the mouth and collapse. Jerry pressures Ashanti and Kelsey to eat the cupcakes; they refuse. Matarazzo wakes up and shoves a cupcake into Jerry's mouth, knocking him unconscious. Matarazzo then makes the reveal.

In *Scare Tactics'* "It's My Party" (ND Ex. 16), Jade, sets up Katelyn, who is a waitress at a birthday party for Tim. Tim opens his presents. Steve crashes the party holding a cake. The group wants Steve to leave but he says he is here make peace and insists everyone eat his cake. Everyone has a piece, including Katelyn. As they eat, Steve explains that he is actually there for revenge and the cake is poisoned. He will give them a DVD with the antidote if Tim wires him millions. As people get sick, the other waitress hits Steve with a bottle, and hands the DVD to Katelyn. She plays the DVD, which is of Tracy Morgan making the reveal.

In *Scare Tactics'* "Send in the Clowns" (ND Ex. 17), Mike sets up his friend, Giorgio, who is hired perform as a clown at a young girl, Olivia's birthday party. Giorgio and another actor (also a clown) meet the dad. He scolds them for playing with the decorations, and leaves. Giorgio and the actor hear a voice in the

closet. Inside is a panicked clown tied up. The clown tells them there is no party, the dad is crazy, and tries to run away. The dad returns in a dress and a blonde wig, and hits the clown with a mallet. The dad forces Giorgio and the actor to make balloon animals. He electrocutes the actor with a hand buzzer. As the dad ties the actor up, Giorgio runs for it. The actors make the reveal and Mike enters the room.

Plot and Sequencing: Each *Scare Tactics* episode is not substantially similar to "Split Party." While Plaintiffs point to the use of poisoned birthday desserts (FAC, Sch. V, p. 4), which only appears in "It's My Party," the concept of poisoning food is hardly original or protectable. RJN, p. 3; *e.g. Shame on You*, 120 F. Supp. 3d at 1151 ("walk of shame" not protectable). And the plots are entirely different—in "It's My Party," a scorned friend crashes an adult's party and tricks everyone into eating poisoned cake; in "Split Party," the host, who has split personality, serves poisoned cupcakes due to a dark desire to harm Matarazzo, who he is obsessed with. *E.g. Benay*, 607 F.3d at 626 (no similarity where plaintiffs' work was a "revenge story" but defendants' work was "a captivity narrative").

Plaintiffs also point to the inclusion of a "creepy and odd" father who likes things done a certain way and dresses up as a young girl to attack people. FAC, Sch. V., p. 3-5. The concept of the "creepy and odd" person, which only appears in "Send in the Clowns," is a common element in fiction, as is the concept of split personalities and things not being as they seem. RJN, p. 3. And the expression differs greatly. In "Send in the Clowns," the unnamed man is obsessed with clowns and sets up a party to kidnap clowns for his entertainment; he attacks using a mallet. Jerry, in turn, sets up the party because of a dark obsession with a celebrity, is meticulous, and uses poisoned cupcakes to harm his guests. *Benay*, *supra*.[22]

Characters: Plaintiffs claim similarity in the fathers but, again, these are not similar or protectable. *Campbell, Shame on You, supra*, p. 23. Plaintiffs point to the

---

[22] Plaintiffs' other alleged similarities (e.g. being tied up, threats of harm, being incapacitated), are random, trivial, or *scenes-a-faire*.

marks being hired to work at a party, but any similarity ends with that generic concept. In "It's My Party," the mark is a waitress; in "Send in the Clowns," a clown; and in "Split Party" a party planner assistant and assistant to a celebrity. Plaintiffs also point to a "tied up character" who warns the marks, but this too is not protectable and expressed differently (clown vs. gardener). *See Gallagher*, 2015 WL 12481504, at *4 ("[A]ppearance of a character foreshadowing the danger ahead is commonplace in horror films."). And "Split Party" features numerous other characters, including the second mark, Matarazzo, Eddie, Becky, Julian, and the other party planner. Finally, Plaintiffs point to a "Celebrity Guest," but, there is no celebrity in "Send in the Clowns"; in "It's My Party," Morgan appears on a DVD for seconds to wish Tim a happy birthday; but in "Split Party," Matarazzo has an active role as the guest of honor and the target of the poisoning.

    <u>Setting</u>: Plaintiffs allege that both occur at "a birthday party at a mansion in the middle of the day" (FAC, Sch. V, p. 7), but "commonplace settings such as houses" or parties are not protectable. *Bernal*, 788 F. Supp. 2d at 1071. Moreover, Plaintiffs' pranks take place in a single room of an unidentified house, whereas "Split Party," takes place at an elaborate mansion, as well as in a car, outside the mansion, and multiple rooms within the mansion. *E.g. Campbell*, *supra*, p. 21.

### 7.    "End of the Road" and "Road Kill"

    In the *Prank Encounters* episode, "End of the Road" (ND Ex. 18), the first mark, Sade', is hired by the Highway Safety Board to help an inspector, Bert. The second mark, Bruna, is hired by Freemont Insurance to help a supervisor, Mary. They will investigate a stretch of road called "Dead Man's Curve" where many accidents have occurred. Sade' sees a video of an 8 or 9 foot dark figure causing an accident; Bruna sees an accident photo showing blood and fur. A naturalist, Daniel, and a videographer, Rob, join Sade's group. Sade' thinks the woods are haunted.

    Both groups head separately to "Dead Man's Curve." Sade's group finds a hubcap with hair on it. Bruna and Mary stop and are scared by a hiker frantically

1   looking for his friend, Dale, who disappeared after an encounter with a bear-like

2   animal. Dale was wearing a yellow vest. At the crash site, Daniel finds a yellow

3   vest covered in bloody claw marks. As Bruna and Mary reach the crash site, a large

4   creature hits their car and goes into the woods.

5       Bruna and Sade' collide. The group share information. Another car, with the

6   driver and Matarazzo (playing John), stops and asks for directions and drives on.

7   The group hears a loud crash. Everyone runs to the crash; the driver is injured and

8   John is missing. The group gets into a van except Daniel who looks for John. They

9   hear growling and panic. The van will not start. Daniel is attacked by Bigfoot. The

10  hiker reappears and is attacked. Daniel is attacked again. Bigfoot then attacks the

11  van. Matarazzo appears and makes the reveal.

12      In *Scare Tactics'* "Road Kill" (ND Ex. 19), Chad sets up Brad, who is hired

13  to assist an investigator inspect a car accident. At the accident site, Brad finds a

14  bumper with hair and blood. Peter, a farmer, arrives, and tells Brad about a large

15  creature he saw. They hear a howl and Peter leaves. Brad and the investigator hear

16  more howls and then crash. They find a wrecked van missing a door, with scratch

17  marks and blood on the seats and doors. The driver is gone. The driver suddenly

18  appears, panicked. He gets in the car and says he hit something. The investigator,

19  and then the driver are attacked by a werewolf. The driver makes the reveal.

20      <u>Plot and Sequencing</u>: The only similarity between "Road Kill" and "End of

21  the Road" is the unprotected basic idea of being attacked in the woods by a hairy

22  monster.[23] RJN, p. 3. *E.g. Segal v. Rogue Pictures*, 544 F. App'x 769, 770 (9th Cir.

23  2013) ("Other than the generic plot feature of twins and hauntings, the selection

24  and sequencing of [] works have no relationship to one another—identical,

25  fraternal, or otherwise."); FAC, Sch. III, p. 7 (admitting "auto vs. animal accidents

---

[23] Amazingly, Plaintiffs bring a separate claim alleging that the monster attacking people in the woods concept in "End of the Road" also copies protected expression from another show. FAC, ¶¶ 91-92; *infra*, pp. 44-47. By claiming that the same concept infringes two shows, Plaintiffs only underscore that it is not protectable.

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

Mitchell
Silberberg &
Knupp LLP

12314720.1

26

27

28

occur [] all too frequently."). Moreover, "Road Kill" uses a werewolf, while "End of the Road" uses Bigfoot, who are different and, in any event, not protectable themselves. *See Bissoon-Dath*, 694 F. Supp. 2d at 1088 ("[M]ythical beasts … are unprotectable elements"); *Benay*, 607 F.3d at 627 (character "based on a historical figure … unprotected for copyright purposes"). Finally, "End of the Road" is told from two perspectives and includes elements absent from "Road Kill" (e.g. missing hiker, insurance investigation, Daniel being attacked).[24]

<u>Characters</u>: Plaintiffs try to point to the use of a "creature" but again the creatures at issue are unprotectable elements and different: one is a werewolf, the other, Bigfoot. Plaintiffs allege that Brad and Sade' are both hired to work for a government investigator but this is false; Brad actually helps an investigator for an unidentified "company." Plaintiffs point to a missing driver and a videographer but these are stock elements derived from the shared premise of an auto accident and explaining a cameraman's presence. In any event, the missing driver and videographer in "Road Kill" are not distinctive (*see Shame on You*, 120 F. Supp. 3d at 1164). Finally, Plaintiffs allege that Peter and Daniel "play[] the same role" (FAC, Sch. III, p. 7), but Daniel is a naturalist and far more central to "End of the Road," including being attacked, while Peter is a farmer, who delivers a few lines. *See Basile,* 2014 WL 12521340, at *7; *Gallagher*, 2015 WL 12481504, at *8 (no similarity between character that is "second person to be 'killed'" and another that is the "main character of the film and one of the last two survivors"). "End of the Road" also features numerous characters that do not appear in "Road Kill," including the second mark, Mary, the hiker, and Matarazzo and his friend.

---

[24] Plaintiffs point to other scattered and trivial "similarities" (e.g. howls, crashes, missing characters, being hired to investigate car accidents and debris covered in blood and hair) but these are either stock elements, or flow naturally from the shared construct used to get the marks on a wooded road and being attacked, which do not suffice to show substantial similarity. *E.g. Shame on You*, 120 F. Supp. 3d at 1152 (where central premise of both is a walk of shame, works "must employ devices to extend the lead character's return to her abode; thus here, both Darci and Meghan lose their cellular telephones and wallets…").

1    <u>Setting</u>: Plaintiffs allege that both works occur on a "country road" at night
2    but that basic similarity is not protectable. *Scott*, 2009 WL 10673163, at *3
3    ("forested area … is unprotectable"). And while "Road Kill" occurs on a dirt road
4    in a rural farming area, "End of the Road" takes place on a paved road in the
5    woods called "Dead Man's Curve." "End of the Road" also features other settings,
6    e.g. Mary's office, Bert's trailer, and multiple locations along the road.

7    In summary, Plaintiffs cannot allege substantial similarity between any of
8    the episodes of *Prank Encounters* at issue and the comparable *Scare Tactics* prank.

9    **IV.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED.**

10   Plaintiffs have also failed to state claims for breach of the implied covenant
11   of good faith and fair dealing (COA 2) and interference with contract (COA 3) for
12   several reasons. As to each:

13   **A.   <u>Plaintiffs' State Law Claims Are Preempted By the Copyright</u>**
14   **<u>Act.</u>**

15   **1.   Copyright Preemption Standard**

16   The Copyright Act provides the sole remedy for all claims invoking rights
17   "equivalent to any of the exclusive rights within the general scope of copyright …
18   in works of authorship[.]" 17 U.S.C. § 301(a). Where a state law claim falls within
19   the exclusive sphere of the Copyright Act, it is preempted and must be dismissed.
20   *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006). Preemption
21   is "both explicit and broad," so as to promote national uniformity in addressing
22   claims involving copyrighted works. *Rumble, Inc. v. Daily Mail & Gen. Tr. PLC*,
23   2020 WL 2510652, at *3 (C.D. Cal. Feb. 12, 2020) (quoting *G.S. Rasmussen &*
24   *Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 904 (9th Cir. 1992)).

25   "The Ninth Circuit employs a two-part test to determine whether the
26   Copyright Act preempts a particular state law claim." *Rumble, Inc.*, 2020 WL
27   2510652, at *3. "Preemption occurs when: (1) the work at issue comes within the
28   subject matter of copyright; and (2) the rights that the plaintiff asserts under state

Mitchell
Silberberg &
Knupp LLP

12314720.1

law are equivalent to those protected by the Act." *Id.* (citing *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1212 (9th Cir. 1998)). Here, this test is readily met.

### 2. The works at issue, *Scare Tactics* episodes, fall within the subject matter of copyright.

The first prong is met when the works at issue come within the "subject matter of copyright," "as defined by 17 U.S.C. §§ 102 and 103." *Id*. Television episodes like the *Scare Tactics* episodes here unquestionably fall within the "subject matter of copyright," which protects "original works of authorship fixed in any tangible medium of expression," including "motion pictures and other audiovisual works." 17 U.S.C. § 102(a)(6). *See Endemol Entm't B.V. v. Twentieth Television Inc.*, 1998 WL 785300, at *3 (C.D. Cal. Sept. 29, 1998) ("[I]dea, format and concept for the television series 'Forgive Me'" falls within subject matter of copyright). Indeed, Plaintiffs allege that the *Scare Tactics* episodes are registered with the Copyright Office (FAC ¶ 40). *See Rumble, Inc.*, 2020 WL 2510652, at *3 (works were registered). Thus, the first prong "is not subject to serious dispute." *Id.*

### 3. The rights sought to be protected are not qualitatively different from the rights protected by copyright.

The second prong is satisfied because Plaintiffs' claims do nothing more than seek to hold Defendants liable for alleged copyright infringement. "[T]o survive preemption, the state cause of action must protect rights that are qualitatively different from the rights protected by copyright." *Rumble ,Inc.*, 2020 WL 2510652, at *3 (quoting *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004)). This means that "[t]he state claim must have an 'extra element' which changes the nature of the action." *Id.* (quoting *Del Madera Props. v. Rhodes and Gardner, Inc.*, 820 F.2d 973, 977 (9th Cir. 1987)). Where a claim is based on "the alleged encroachment on one's exclusive right to profit from sale or reproduction of one's original work(s) of authorship," it is not "qualitatively different" from those rights protected by copyright and, thus, is preempted. *Idema*

1  *v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1193 (C.D. Cal. 2001); *Wilder v. CBS*

2  *Corp.*, 2016 WL 693070, *6 (C.D. Cal. Feb. 13, 2016) (claim based on "allegation

3  that an original idea has been used … falls within the "large variety of [pre-empted

4  state law] causes of action."); Nimmer § 1.01[B][1][a][ii] ("[U]nauthorized

5  reproduction, distribution, performance, or display [that] causes the plaintiff to lose

6  the benefits that would flow from an actual or prospective contract do not appear to

7  differ qualitatively from rights under copyright," because copyright "also

8  contemplates loss of actual or prospective contract benefit by reason of such

9  unauthorized acts."). Such is the case here.

10       Plaintiffs' state law claims are grounded in the 2016 Agreement, in which

11  Healey gave up all of his interests in *Scare Tactics*, including "copyrights" and

12  "any and all direct and indirect rights to use or exploit such copyrights," meaning

13  that Plaintiffs had the exclusive right to exploit *Scare Tactics*. FAC, Ex. 1, ¶ 3; *id.*

14  ¶ 75 (referencing conveyance of rights). Plaintiffs contend that, as a result, the

15  covenant of good faith and fair dealing prevented Defendants from using *Scare*

16  *Tactics* so as to frustrate their exclusive right of exploitation, but that Defendants

17  deprived them of and interfered with their rights by copying protectable expression

18  from *Scare Tactics* in *Prank Encounters*.[25] Specifically: "[*Prank Encounters*]

19  ***infringed*** upon the Copyright Holder Plaintiffs' ***copyrights*** in specific *Scare*

20  *Tactics* stories and other rights to exploit the Franchise held by Plaintiffs, resulting

21  in a breach of the 2016 Agreement." FAC ¶ 77 (emphases added); ¶ 81

22  (incorporating allegations into claim for tortious interference). In this regard,

23  Plaintiffs' claims do not seek to protect rights qualitatively different from their

---

25  A claim for breach the implied covenant is stated where a party prevents the
other party from enjoying a right under the contract. *See Cates Constr., Inc. v.
Talbot Partners*, 21 Cal. 4th 28, 43 (1999). A claim for interference with contract,
is stated when a plaintiff alleges "(1) a valid contract between plaintiff and a third
party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts
designed to induce a breach or disruption of the contractual relationship; (4) actual
breach or disruption of the contractual relationship; and (5) resulting damage."
*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990).

1   rights protected by copyright,[26] and the conduct complained of is nothing more than

2   alleged copyright infringement.[27]

3        Consequently, Plaintiffs' breach of the implied covenant of good faith and

4   fair dealing claim is preempted. *E.g. supra,* n. 26 & 27 (collecting cases); *Rumble,*

5   *Inc.*, 2020 WL 2510652, at *4 ("When, as here, a contractual term does no more

6   than promise not to infringe on copyrighted works, claims stemming from that

7   term's breach are preempted and the plaintiff's exclusive remedy lies under the

8   Copyright Act."); *Selby v. New Line Cinema Corp.*, 96 F. Supp. 2d 1053, 1061-62

9   (C. D. Cal. 2000) (dismissing breach of contract claim based on violation of an

10  alleged promise not to use a plaintiff's copyrighted work); *ISE Ent't Corp. v.*

11  *Longarzo*, 2018 WL 1569803, at *8 (C.D. Cal. Feb. 2, 2018) (breach of contract

12  based on allegedly "making unauthorized use of [a plaintiff's video] clips"

13  preempted). So too is Plaintiffs' tortious interference claim, which depends on the

14  same conduct as the breach claim. *E.g. Wilder*, 2016 WL 693070, at *7

15  (interference claim preempted where plaintiff alleged defendants "copied,

16  reproduced and distributed her work without her permission"); *Idema*, 162 F.

17  Supp. 2d at 1193 (claim of intentional interference preempted when the plaintiff

18  alleged that the defendants copied plaintiff's original work); *Wild v. NBC*

19  *Universal, Inc.*, 2011 WL 12372427, at *18 (C.D. Cal. June 28, 2011) (intentional

20  interference claim alleging defendants "intended to interfere with … [economic

---

21  [26] *See Del Madera,* 820 F.2d at 977 ("promise ... not to use [plaintiff's copyrighted

22  work] is equivalent to the protection provided by section 106 of the Copyright
    Act."), *overruled on other grounds by Fogerty v. Fantasy, Inc.*, 510 U.S. 517

23  (1994); *Kabehie v. Zoland*, 102 Cal. App. 4th 513, 528 (2002) ("The promise not
    to infringe adds nothing to a breach of contract action for copyright infringement.

24  A breach of contract action based on this type of promise must be preempted in
    order to prevent parties from circumventing federal copyright law and nullifying

25  the preemption provided for in section 301.").

26  [27] *See Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1151 (9th Cir. 2008)
    ("[T]o the extent an alleged wrongful act by the Corporation Defendants is based

27  on copyright infringement, it is preempted"); *Jacobsen v. Katzer*, 609 F. Supp. 2d
    925, 933 (N.D. Cal. 2009) (contract claim that simply "alleges violations of the

28  exact same exclusive federal rights protected by Section 106 of the Copyright Act"
    is preempted).

1  relationships] by wrongfully incorporating themes, story lines, plots, characters,

2  and locations of [plaintiff's work] into [defendant's work]" preempted).

3  ### B.   Defendants Did Not Copy Protected Expression.

4        Even if not preempted, Plaintiffs claims fail because each depends on

5  Plaintiffs' allegation that Defendants copied protectable expression from *Scare*

6  *Tactics* but, as discussed above, Defendants did not copy protectable expression.

7  *See supra*, pp. 12-38. Absent the predicate alleged copying, Plaintiffs' claims fail.

8  ### C.   Plaintiffs Have Not Stated Facts Supporting Their Claims.

9        Plaintiffs' claims fail for two additional reasons: there was no breach or

10  interference. Specifically:

11        ***First***, the 2016 Agreement explicitly permitted Healey to develop and

12  exploit *Prank Encounters*. "It is well established the scope of the implied covenant

13  of good faith and fair dealing in any contract cannot be interpreted so broadly as to

14  prohibit a party from taking an action that is expressly authorized by the

15  agreement." *Jenkins v. JPMorgan Chase Bank, N.A.*, 216 Cal. App. 4th 497, 526

16  (2013), *as modified* (June 12, 2013), and *disapproved of on other grounds by*

17  *Yvanova v. New Century Mortg. Corp.*, 62 Cal. 4th 919 (2016). Here, the parties

18  explicitly agreed that the 2016 Agreement "shall not have the effect of a non-

19  competition clause" and that Healey was free to "pursu[e] other scary, paranormal-

20  themed or hidden camera shows," i.e., *Prank Encounters*. FAC, Ex. 1, p. 3, ¶ 3.

21  Accordingly, no covenant of good faith and fair dealing can be inferred that would

22  prevent him from doing so. *E.g. Decision Scis. Research Assocs., Inc. v. Am. Auto.*

23  *Ass'n, Inc.*, 2019 WL 7166988, at *12 (C.D. Cal. Nov. 18, 2019) ("[B]ecause

24  Defendant's conduct … was expressly permitted under the Agreement, such

25  conduct cannot be a breach of the implied duty of good faith and fair dealing.");

26  *Roth v. Madison Nat. Life Ins. Co.*, 702 F. Supp. 2d 1174, 1180 (C.D. Cal. 2010)

27  (no implied covenant claim where defendant's conduct "was in accordance with

28  the express terms of the [contract]"). Nor may a tortious interference claim lie. *See*

Mitchell
Silberberg &
Knupp LLP

12314720.1

1  *Harrison Ventures, LLC v. Alta Mira Treatment Ctr., LLC*, 2010 WL 1929566, at

2  *5 (N.D. Cal. May 12, 2010) ("When … the complaint fails to allege an underlying

3  breach [of the contract], no claim for intentional interference can be stated.").

4  **Second**, Plaintiffs do not actually allege any facts showing a deprivation of

5  Plaintiffs' ability to exploit *Scare Tactics*. To successfully allege a breach or

6  tortious interference claim, the acts complained of must actually interfere with the

7  plaintiff reaping the benefits of the contract. *E.g. PNC Equip. Fin., LLC v.

8  California Fairs Fin. Auth.*, 2013 WL 978260, at *2 (E.D. Cal. Mar. 12, 2013)

9  (dismissing tortious interference claim where counter-plaintiff did not adequately

10  allege an actual breach or resulting damages); *see also Emove, Inc. v. Hire A

11  Helper LLC*, 2018 WL 3207424, at *4 (S.D. Cal. June 29, 2018) (granting

12  summary judgment on breach claim where conduct "did not, in and of itself, cause

13  Plaintiffs to lose the benefits of the [contract at issue]"); *Siqueiros v. Fed. Nat.

14  Mortg. Ass'n*, 2014 WL 3015734, at *7 (C.D. Cal. June 27, 2014) (same); *see also

15  Pacific Gas & Electric Co.*, 50 Cal. 3d at 1126. Here, while Plaintiffs conclusorily

16  allege that Defendants' development and exploitation of *Prank Encounters*

17  deprived them of "<u>all</u> of the benefits" conveyed by the 2016 Agreement (FAC

18  ¶ 76), they do not allege how this is so. Rote recitations of legal conclusions do not

19  suffice[28] and absent alleging facts showing an actual opportunity lost to exploit

20  *Prank Encounters*, Plaintiffs have not stated claims.[29] *E.g. Giron v. Wells Fargo

---

21  [28] *Quinones v. Ocwen Loan Servicing, LLC*, 282 F. Supp. 3d 1207, 1209 (C.D. Cal.

22  2017) ("[A]llegations that are no more than a statement of a legal conclusion …
   will not be sufficient to state a claim upon which relief can be granted") (quoting

23  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

24  [29] Plaintiffs' tortious interference claim also fails because Plaintiffs have not
   alleged Propagate's actual knowledge of the 2016 Agreement. *See Davis v.

25  Nadrich*, 174 Cal. App. 4th 1, 12 (2009) (proof that defendant should have known
   about the contract does not suffice). While Plaintiffs allege that a senior

26  executive of Propagate received a message from Hallock stating Hallock was the "exclusive
   owner of the Scare Tactics franchise," including "worldwide format [and] media

27  rights" (FAC ¶ 35 & Ex. 2), the message does not mention the 2016 Agreement
   and, thus, cannot satisfy the knowledge element. *See Winchester Mystery House,

28  LLC v. Glob. Asylum, Inc.*, 210 Cal. App. 4th 579, 596–97 (2012) (no knowledge
   proven where plaintiff's message did not identify the specific contract at issue or
                                                              (…continued)

1  *Bank, N.A.*, 2014 WL 12589628, at *3 (C.D. Cal. May 27, 2014) (dismissing claim

2  where plaintiff did not allege specific deprivation of rights); *Jenkins*, 216 Cal. App.

3  4th at 525 (dismissing claim absent facts showing defendant "(1) deprived

4  [plaintiff] of the right to receive any benefits under the [contract], or (2) refused to

5  perform a specific act presupposed by the terms of the [contract]"). (Defendants

6  strongly question how such allegations can be made consistent with Rule 11 as

7  Hallock admittedly continues to exploit *Scare Tactics*. BD, Exs. 23-25).[30]

8  **D.  The Court Should Also Dismiss Hallock's Claim Against Healey**
**for Breach of the 2012 Agreement.**

9

10  Tacked onto the end of the FAC is a fourth claim in which Hallock alleges

11  that Healey breached a 2012 agreement between the two (the "2012 Agreement").

12  The basis for *this* claim is remarkable: having alleged that the *Prank Encounters*

13  episode, "End of the Road," infringes WMTI North's copyrights in the *Scare*

14  *Tactics* episode, "Road Kill," because both involve a prank in which a hairy

15  creature attacks people on a road (FAC ¶ 42a), Hallock now alleges that "End of

16  the Road" also copies protected expression from an episode of another hidden

17  _____

18  (...continued)
its terms). Similarly, while Plaintiffs also seek to impute Healey's knowledge of

19  the 2016 Agreement to Propagate by saying that Healey is the agent of Propagate
(FAC ¶ 36), this is a legal conclusion, not an allegation of facts. *E.g. Chang Bee*

20  *Yang v. Sun Tr. Mortg. Inc.*, 2011 WL 6749076, at *6 (E.D. Cal. Dec. 22, 2011)
("mere references to 'principals' and 'agents' do not suffice" and dismissing claim

21  where complaint offered only "conclusory allegations" of agency).

22  [30] Only Hallock and Healey are parties to the 2016 Agreement. See FAC, Ex. 1, p.
1 (identifying parties to agreement) & p. 8 (agreement executed only by Hallock

23  and Healey). Thus, if the Court allows either claim to proceed, only Hallock can
assert a claim for breach of the implied covenant and only Healey can be a

24  defendant. *See Jones v. Aetna Cas. & Sur. Co.*, 26 Cal. App. 4th 1717, 1722
(1994)) (affirming dismissal of non-party's claim; "someone who is not a party to

25  the contract has no standing to enforce it"); *Curley v. Wells Fargo & Co.*, 2014
WL 988618, at *8 (N.D. Cal. Mar. 10, 2014) (dismissing claim against non-party

26  to agreement; "one who is not a party to the underlying contract may not be held
liable ... for as to him no such implied covenant exists."). And only Hallock can

27  assert a claim for tortious interference against Propagate. *See Almont Ambulatory*
*Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 121 F. Supp. 3d 950, 981 (C.D. Cal.

28  2015) (dismissing claim because plaintiff did not meet the "elemental requirement
that it be an actual party to the contracts with which it asserts interference").

1   camera show, *Freak Encounters*, because it too involves a prank in which a hairy

2   creature attacks people on a road. That Plaintiffs contend that the same concept in

3   "End of the Road" copies two separate works underscores how baseless Plaintiffs'

4   claims are and that they are trying to monopolize unprotected ideas.

5       Nevertheless, turning to the purported merits of the claim, it is as legally

6   deficient as Plaintiffs' other claims and should be dismissed because Hallock has

7   not alleged any conduct constituting a breach of the 2012 Agreement and, to the

8   extent he has, the claim is preempted by the Copyright Act. Plaintiff alleges as

9   follows: The series *Freak Encounters*, which aired on Animal Planet, is owned by

10  The Gifted Show, Inc. FAC ¶ 88. In the 2012 Agreement, Healey transferred all of

11  his rights in Gifted to Hallock, meaning Hallock "is 100% owner of Gifted." FAC

12  ¶ 89. Nevertheless, as it pertains to *Freak Encounters*, Hallock and Healey

13  remained free to "seek opportunities to develop, produce and exploit the title,"

14  provided that the party first obtained approval for any deal from the other party and

15  paid to him a percentage of any revenue earned. FAC ¶ 90.[31] Hallock alleges that

16  Healey breached the 2012 Agreement because "Healey exploited 'Werewolf' by

17  using protected elements in the 'Werewolf' episode" without consent or payment.

18  FAC ¶¶ 92-96. This claim fails for three reasons.

19      ***First***, as alleged, the 2012 Agreement addresses a party's attempt to "seek

20  opportunities to develop, produce and exploit the title," i.e., *Freak Encounters*.

21  FAC ¶ 90. While Hallock conclusorily alleges that this is what Healey did, this

22  contention is self-evidently false; Healey clearly developed a *new* show. Over 16

23  episodes, *Freak Encounters* used "documented evidence and eyewitness accounts

24  of legendary beasts [] as inspiration to bring unsuspecting people face to face with

25  a monster" to see whether "they believe." ND Ex. 20. The series aired on Animal

26

27  ───────────────
    [31] Defendants have submitted the relevant excerpts from the 2012 Agreement
28  (Healey Decl. Ex. 1 & RJN, p. 2), although Plaintiffs' allegations alone fail to state
    a claim.

Planet in 2011 (and is still available to stream online through Animal Planet's website). *See* https://www.animalplanet.com/tv-shows/freak-encounters/. *Prank Encounters*, in turn, is a new—and, as discussed above, different—series that Healey separately developed, produced, and distributed through Netflix. FAC ¶ 38 and ND Exs. 4, 6, 8, 11, 13, 15, 18. Thus, the claim fails.

> **Second**, to the extent that Hallock alleges Healey breached the 2012 Agreement by copying protectable expression from "Werewolf," no provision of the 2012 Agreement is alleged to prohibit such copying. Moreover, even if there were such a restriction, it would be no more than a recitation of a copyright holder's rights under the Copyright Act and any unauthorized copying complained of would give rise to a copyright infringement claim. Thus, a breach of contract claim would be preempted and it would be incumbent of the copyright holder to sue for infringement. *See supra*, pp. 38-40 (collecting cases regarding preemption).

> **Third**, Healey did not copy any protectable expression. The format of *Prank Encounters* and the specific content of "End of the Road" are discussed above. *Supra*, pp. 15-18 & 35-38. The episode does not include any *protected* expression from "Werewolf." While both are episodes of hidden camera shows, this is not protected. *Supra*, p. 16. While both involve attacks by a hairy creature; this too is not protected (*supra*, pp. 36-37) and expressed differently: "End of the Road" involves Bigfoot, whereas, same as "Road Kill," "Werewolf" involves a werewolf. Moreover, the two are otherwise not substantially similar. In contrast to "End of the Road," *supra*, "Werewolf" focuses on the prank and discussions of real eyewitness accounts of werewolves and an interview of a paranormal expert. The unseen host's only role is to narrate through a voiceover. Like *Scare Tactics*, not *Prank Encounters*, in "Werewolf," the mark, Heather, is set up by a friend. The prank itself proceeds from a farmhouse, where Heather and two accident investigators (actors) interview an accident survivor, to the roadside, where they investigate an accident scene, to another accident scene, where the driver is

present, not missing, to an office, where the climactic attack occurs involving a paramedic and an investigator. In sum, the only arguable similarities are the use of unprotected elements such as nondescript, stock characters (e.g. a driver, an investigator), *scenes-a-faire* (e.g. a person being attacked), and generic, random, and trivial similarities (e.g. damage to a car).

## V.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE STRICKEN PURSUANT TO CALIFORNIA'S ANTI-SLAPP STATUTE.

Finally, all of Plaintiffs' state law claims should not just be dismissed but also stricken pursuant to California's anti-SLAPP statute and fees awarded.

California's anti-SLAPP statute, Cal. Code Civ. Proc. § 425.16, "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). While "framed as a rule of state procedure, California's anti-SLAPP statute protects substantive rights and thus applies in federal court." *Maloney v. T3Media, Inc.*, 94 F. Supp. 3d 1128, 1132 (C.D. Cal. 2015) (citing *U.S. ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 973 (9th Cir. 1999). The statute "must be construed broadly." *Ojjeh v. Brown*, 43 Cal. App. 5th 1027, 1035 (2019); *Mindys Cosmetics, Inc. v. Dakar*, 611 F.3d 590, 595 (9th Cir. 2010) (same).

A court evaluates an anti-SLAPP motion in two steps. *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016). First, the defendant must "make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech." *Id*. Second, the court evaluates whether plaintiff has "establish[ed] a reasonable probability that the plaintiff will prevail on his or her … claim." *Sarver*, 813 F.3d at 901. If the motion is "based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies." *Planned*

Mitchell
Silberberg &
Knupp LLP

12314720.1

1  *Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th
2  Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018). Both prongs are satisfied here.

3  **First**, prong one is easily satisfied. Protected activity includes "any []
4  conduct in furtherance of the exercise … of free speech in connection with a public
5  issue or an issue of public interest," (CCP § 425.16(e)(4)), an analysis that focuses
6  "not [on] the form of the plaintiff's cause of action but, rather, the defendant's
7  *activity* that gives rise to his or her asserted liability, *Wilder*, 2016 WL 693070, at
8  *10 (collecting cases). Here, the activity about which Plaintiffs complain in each of
9  their state law claims is that, in creating and exploiting *Prank Encounters*,
10 Defendants wrongly copied protected expression from *Scare Tactics* and *Freak
11 Encounters*. *See* FAC ¶¶ 76, 81, & 92. Courts have repeatedly held that creating
12 and distributing expressive works like *Prank Encounters* are acts in furtherance of
13 free speech. *See Wilder*, 2016 WL 693070, at *10 (production and distribution of
14 "The Talk" acts in furtherance of free speech), *Hunter v. CBS Broad. Inc.*, 221 Cal.
15 App. 4th 1510, 1521 (2013) (creating television show is exercise of free speech);
16 *Tamkin v. CBS Broad., Inc.*, 193 Cal. App. 4th 133, 143 (2011) ("creation, casting,
17 and broadcasting of an episode of a popular television show" are protected).

18 *Prank Encounters* also meets the public interest requirement, which is
19 broadly defined as "***any issue in which the public is interested***." *Nygård, Inc. v.
20 Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042 (2008) (emphasis in original); *Sarver*,
21 813 F.3d at 901 ("Interpreting the California Supreme Court's pronouncements, we
22 have construed 'public issue or public interest' broadly…") (internal quotation
23 marks and citation omitted). There is no debating the public's long-standing
24 interest in, debate, and discussion of pranks and hidden camera shows. *See* BD
25 Exs. 1-8. Indeed, as Hallock admits, "friends playing practical jokes on each other"
26 is an "age-old practice." BD Ex. 23, p. 187. Thus, in creating and distributing a
27 show about people being pranked, Defendants' acts were in connection with a
28 matter of public interest. *E.g. Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 n.3

Mitchell
Silberberg &
Knupp LLP

12314720.1

48

(9th Cir. 2017) (website of "photographs memorializ[ing] cherished moments in NCAA sports history" matter of public interest); *Wilder*, 2016 WL 693070, at *11 (shows "such as 'The Talk,' which discusses motherhood, pop culture, current events, and includes celebrity interviews" in connect with a matter of public interest) *Brodeur*, 248 Cal. App. 4th at 677-78 ("[M]icrowave oven scene plainly drew on an issue of public interest in the 1970's…").[32]

    ***Second***, Plaintiffs cannot establish a reasonable probability of prevailing because, for all the reasons explained above, their claims fail as a matter of law. *Supra*, pp. 38-47. *E.g. Wilder*, 2016 WL 693070, at *11 (granting anti-SLAPP motion where plaintiff's interference claim failed pursuant to Rule 12(b)(6)).

## VI.   CONCLUSION

    For the foregoing reasons, Defendants respectfully request that the Court dismiss the Corporate Plaintiffs' copyright claims and strike (or, alternatively, dismiss if the anti-SLAPP statute is held not to apply) Plaintiffs' state law claims.


DATED: July 13, 2020                    MITCHELL SILBERBERG & KNUPP LLP


                                        By:   /s/ Aaron M. Wais
                                              Aaron M. Wais (SBN 250671)
                                              Gabriella A. Nourafchan (301594)
                                              Attorneys for Defendants Kevin Healey
                                              and Propagate Content, LLC

---

[32] The public's interest in *Prank Encounters*'s host, Matarazzo (BD Exs. 9-14), and the show itself (BD Exs. 15-22; *see also* FAC Exs. 30-31) further establishes the public's interest. *E.g. Hilton v. Hallmark Cards*, 599 F.3d 894, 908 (9th Cir. 2010) (Paris Hilton's "privileged lifestyle and her catchphrase ('that's hot') are matters of widespread public interest"); *Brodeur v. Atlas Entm't, Inc.*, 248 Cal. App. 4th 665, 674-78 (2016) (statute applied, in part, because of "the public interest in the movie as a whole—which is conceded and undeniable…"); *Tamkin*, 193 Cal. App. 4th at 143 (creation and broadcasting of *CSI* television episode are public issues).