1  AARON M. WAIS (SBN 250671)
      amw@msk.com
2  GABRIELLA A. NOURAFCHAN (301594)
      gan@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
4  Los Angeles, CA  90067-3120
   Telephone: (310) 312-2000
5  Facsimile: (310) 312-3100

6  Attorneys for Defendants
   Kevin Healey and Propagate Content, LLC
7

8                 UNITED STATES DISTRICT COURT

9                 CENTRAL DISTRICT OF CALIFORNIA

10

11  SCOTT W. HALLOCK, an individual;        CASE NO. 2:20-cv-02726 CJC (MAAx)
    WMTI PRODUCTIONS, INC., a
12  California corporation; WMTI            Honorable Cormac J. Carney
    PRODUCTIONS NORTH, INC., a
13  Canadian corporation; and THE NEXT      **DECLARATION OF GABRIELLA A.**
    SEASON COMPANY, INC., a                 **NOURAFCHAN IN SUPPORT OF**
14  Canadian corporation,                   **MOTION TO DISMISS**
                                            **PLAINTIFFS' FIRST AMENDED**
15             Plaintiffs,                  **COMPLAINT AND MOTION TO**
                                            **STRIKE PLAINTIFFS' STATE LAW**
16        v.                                **CLAIMS**

17  KEVIN HEALEY, an individual;
    PROPAGATE CONTENT, LLC, a               Hearing Date:    September 14, 2020
18  Delaware Limited Liability Company;     Time:            1:30 p.m.
    and DOES 1 through 100, inclusive,      Location:        Courtroom 9B
19
               Defendants.
20                                          File Date:   March 24, 2020
                                            Trial Date:  TBD
21

22

23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

12313799.1

_____
        **NOURAFCHAN DECL. ISO MOTION TO DISMISS AND MOTION TO STRIKE**

## DECLARATION OF GABRIELLA A. NOURAFCHAN

I, Gabriella A. Nourafchan, declare:

1.      I am an attorney at law duly licensed to practice law in the State of California and before this Court. I am an attorney with the law firm of Mitchell Silberberg & Knupp LLP, attorneys of record for Defendants Kevin Healey ("Healey") and Propagate Content, LLC ("Propagate," collectively with Healey, "Defendants").

2.      I submit this declaration in support of Defendants' Motions to Dismiss and to Strike Plaintiffs'[1] First Amended Complaint ("FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6) and California's anti-SLAPP statute (Cal. Code. Civ. P. § 425.16).

3.      I have personal knowledge of the following facts, and if called and sworn as a witness, could and would competently testify thereto.

4.      Attached hereto as **Exhibit 1** is a true and correct copy of the "FAC" (Dkt. 20), without exhibits, dated May 29, 2020.

5.      Attached hereto as **Exhibit 2** is a true and correct copy of the Plaintiffs' Notice of Errata to the FAC (Dkt. 25), dated July 6, 2020.

6.      Attached hereto as **Exhibit 3** is a true and correct copy of the Settlement Agreement and Mutual Release between Hallock and Healey dated January 1, 2016, which was originally attached as Exhibit 1 to the FAC.

7.      After the filing of their lawsuit and prior to the filing of Defendants' motions, Plaintiffs' counsel provided us with true and correct copies of the full episodes of *Scare Tactics* at issue, which they represented were the episodes deposited with the Copyright Office. They then also attached these episodes in bulk as Exhibit 33 to the FAC. For purposes of these motions, Defendants accept

---

[1] "Plaintiffs" refers collectively to Scott Hallock ("Hallock"), WMTI Productions, Inc. ("WMTI US"), WMTI Productions North, Inc. ("WMTI North"), and The Next Season Company, Inc. ("TNSCI").

this representation and are providing the Court with true and correct copies of the copyrighted episodes of *Scare Tactics* at issue in this lawsuit, as identified below.

8.    Attached hereto as **Exhibit 4** is a true and correct copy of the *Prank Encounters* episode titled "Camp Scarecrow," originally attached as Exhibit 14 to the FAC. As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

9.    Attached hereto as **Exhibit 5** is a true and correct copy of *Scare Tactics* episode 101, which was attached as part of Exhibit 33 to the FAC. A segment of episode 101 (beginning at 16:55), includes the prank titled "Camp Kill," which itself was originally attached as Exhibit 13 to the FAC. This is the episode that Plaintiffs claim is infringed by the *Prank Encounters* episode titled "Camp Scarecrow" (*see* Exhibit 4, above). As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

10.    Attached hereto as **Exhibit 6** is a true and correct copy of the *Prank Encounters* episode titled "Face Fears," originally attached as Exhibit 8 to the FAC. As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

11.    Attached hereto as **Exhibit 7** is a true and correct copy of *Scare Tactics* episode 117, which was attached as Exhibit 33 to the FAC. A segment of episode 117 (beginning at 5:58), includes the prank titled "Dangerous Obsession", which itself was originally attached as Exhibit 7 to the FAC. This is the episode that Plaintiffs claim is infringed by the *Prank Encounters* episode titled "Face Fears" (*see* Exhibit 6, above). As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

12.    Attached hereto as **Exhibit 8** is a true and correct copy of the *Prank Encounters* episode titled "Fright at the Museum," originally attached as

1  Exhibit 20 to the FAC. As explained in Defendants' concurrently filed Notice of

2  Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to

3  Local Rule 5-4.2.

4        13.    Attached hereto as **Exhibit 9** is a true and correct copy of a *Scare*

5  *Tactics* prank titled "The Mummy," which was originally attached as Exhibit 19 to

6  the FAC. This is the prank that Plaintiffs claim is infringed by the *Prank*

7  *Encounters* episode titled "Fright at the Museum" (*see* Exhibit 8, above). Plaintiffs

8  allege that this prank is included in *Scare Tactics* episode 206, a true and correct

9  copy of which is attached hereto as **Exhibit 10**, which was attached as part of

10  Exhibit 33 to the FAC.  However, episode 206 does not include the allegedly

11  infringed work, "The Mummy"; instead, a segment of episode 206 (beginning at

12  11:19) includes a different prank involving an Egyptian curse. As explained in

13  Defendants' concurrently filed Notice of Lodging, these Exhibits have been lodged

14  with the Court in hard copy pursuant to Local Rule 5-4.2.

15        14.    Attached hereto as **Exhibit 11** is a true and correct copy of the *Prank*

16  *Encounters* episode titled "Urgent Scare," originally attached as Exhibit 11 to the

17  FAC. As explained in Defendants' concurrently filed Notice of Lodging, this

18  Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

19        15.    Attached hereto as **Exhibit 12** is a true and correct copy of *Scare*

20  *Tactics* episode 301, which was attached as part of Exhibit 33 to the FAC. A

21  segment of episode 301 (beginning at 00:43) includes the prank titled "Satan's

22  Baby," which itself was originally attached as Exhibit 10 to the FAC. This is the

23  episode that Plaintiffs claim is infringed by the *Prank Encounters* episode titled

24  "Urgent Scare" (*see* Exhibit 11, above). As explained in Defendants' concurrently

25  filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy

26  pursuant to Local Rule 5-4.2.

27        16.    Attached hereto as **Exhibit 13** is a true and correct copy of a video of

28  the *Prank Encounters* episode titled "Storage War of the Worlds," originally

Mitchell
Silberberg &
Knupp LLP

12313799.1

**NOURAFCHAN DECL. ISO MOTION TO DISMISS AND MOTION TO STRIKE**

attached as Exhibit 17 to the FAC. As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

17.     Attached hereto as **Exhibit 14** is a true and correct copy of *Scare Tactics* episode 305, which was attached as part of Exhibit 33 to the FAC. A segment of episode 305 (beginning at 5:56) includes the prank titled "Phantom Power," which itself was originally attached as Exhibit 16 to the FAC. This is the episode that Plaintiffs claim is infringed by the *Prank Encounters* episode titled "Storage War of the Worlds" (*see* Exhibit 13, above). As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

18.     Attached hereto as **Exhibit 15** is a true and correct copy of the *Prank Encounters* episode titled "Split Party," originally attached as Exhibit 25 to the FAC. As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

19.     Attached hereto as **Exhibit 16** is a true and correct copy of *Scare Tactics* episode 401, which was attached as part of Exhibit 33 to the FAC. A segment of episode 401 (beginning at 00:49), includes the prank titled "It's My Party," which itself was originally attached as Exhibit 23 to the FAC. Plaintiffs claim that this episode is infringed by the *Prank Encounters* episode titled "Split Party" (*see* Exhibit 15, above). As explained in Defendants' concurrently filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

20.     Attached hereto as **Exhibit 17** is a true and correct copy of *Scare Tactics* episode 509, which was attached as part of Exhibit 33 to the FAC. A segment of episode 509 (beginning at 16:29), includes the prank titled "Send in the Clowns," which itself was originally attached as Exhibit 24 to the FAC. Plaintiffs also claim that this episode is infringed by the *Prank Encounters* episode titled

Mitchell Silberberg & Knupp LLP

12313799.1

**NOURAFCHAN DECL. ISO MOTION TO DISMISS AND MOTION TO STRIKE**

1   "Split Party" (*see* Exhibit 15, above). As explained in Defendants' concurrently

2   filed Notice of Lodging, this Exhibit has been lodged with the Court in hard copy

3   pursuant to Local Rule 5-4.2.

4          21.     Attached hereto as **Exhibit 18** is a true and correct copy of the *Prank*

5   *Encounters* episode titled "End of the Road," originally attached as Exhibit 5 to the

6   FAC. As explained in Defendants' concurrently filed Notice of Lodging, this

7   Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

8          22.     Attached hereto as **Exhibit 19** is a true and correct copy of *Scare*

9   *Tactics* episode 405, which was attached as part of Exhibit 33 to the FAC. A

10  segment of episode 405 (beginning at 5:07) includes the prank titled "Road Kill,"

11  which itself was originally attached as Exhibit 4 to the FAC. This is the episode

12  that Plaintiffs claim is infringed by the *Prank Encounters* episode titled "End of the

13  Road" (*see* Exhibit 18, above). As explained in Defendants' concurrently filed

14  Notice of Lodging, this Exhibit has been lodged with the Court in hard copy

15  pursuant to Local Rule 5-4.2.

16         23.     Attached hereto as **Exhibit 20** is a true and correct copy of the *Freak*

17  *Encounters* episode titled "Werewolf," originally attached as Exhibit 32 to the

18  FAC. As explained in Defendants' concurrently filed Notice of Lodging, this

19  Exhibit has been lodged with the Court in hard copy pursuant to Local Rule 5-4.2.

20

21         I declare under penalty of perjury under the laws of the United States of

22  America that the foregoing is true and correct.

23         Executed this 13th day of July, 2020, at Los Angeles, California.

24

25

26                                          Gabriella A. Nourafchan

27

28

Mitchell
Silberberg &
Knupp LLP

12313799.1

**NOURAFCHAN DECL. ISO MOTION TO DISMISS AND MOTION TO STRIKE**

# EXHIBIT 1

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 05/13/20 Page 8 of 145 Page ID
#:476
Case 2:20-cv-02726-CJC-MAA Document 26-1 Filed 05/29/20 Page 9 of 32 Page ID #:198

Richard L. Charnley (SBN 70430)
Nicole W. Uhlmann (SBN 200783)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone: 310.321.4300
Facsimile: 310.893.0273
Email: rlc@charnleyrian.com
Email: nwu@charnleyrian.com

*Attorneys for Plaintiffs Scott*
*Hallock; WMTI Productions, Inc.;*
*WMTI Productions North, Inc.; and*
*The Next Season Company, Inc.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT W. HALLOCK, an individual; WMTI PRODUCTIONS, INC., a California corporation; WMTI PRODUCTIONS NORTH, INC., a Canadian corporation; and THE NEXT SEASON COMPANY, INC., a Canadian corporation, <br><br> Plaintiffs, <br><br> v. <br><br> KEVIN HEALEY, an individual; PROPAGATE CONTENT, LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive, <br><br> Defendants. | Case No.: 2:20-cv-2726 <br><br> **AMENDED COMPLAINT FOR:** <br> 1) **COPYRIGHT INFRINGEMENT;** <br> 2) **BREACH OF CONTRACT – COVENANT OF GOOD FAITH AND FAIR DEALING;** <br> 3) **INTERFERENCE WITH CONTRACT;** <br> 4) **BREACH OF CONTRACT** <br><br> **DEMAND FOR JURY TRIAL** <br><br> **SPOLIATION NOTICE** <br><br> **[Non-Paper Exhibits Have Been Sent To The Court For Lodging Pursuant to *COVID-19 Notice*]** <br><br> **[Identical Copies Of Lodged Exhibits Will Be Served Along With The Amended Complaint]** |

Plaintiffs SCOTT HALLOCK, an individual, WMTI Productions, Inc., a California corporation, WMTI Productions North, Inc., a Canadian corporation, and THE NEXT SEASON COMPANY, Inc., a Canadian corporation, allege:

## THE PARTIES, JURISDICTION, AND VENUE

### *Plaintiff Parties*

1.     Plaintiff Scott Hallock ("Hallock") is an individual residing in Ventura County, California.

2.     Plaintiff WMTI Productions, Inc. ("WMTI US") is a duly licensed California corporation with its principal place of business in Encino, California.

3.     Plaintiff WMTI Productions North, Inc. ("WMTI North") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada.  WMTI North is qualified to do business in California.

4.     Plaintiff The Next Season Company, Inc. ("TNSCI") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada. TNSCI is qualified to do business in California.

5.     Collectively, WMTI US, WMTI North and TNSCI are referred to herein as "Copyright Holder Plaintiffs."

6.     Collectively, Hallock, WMTI US, WMTI North and TNSCI are referred to herein as "Plaintiffs."

### *Defendant Parties*

7.     On information and belief, Defendant Kevin Healey ("Healey") is an individual who resides in Los Angeles County, California.

8.     On information and belief, Defendant Propagate Content, LLC ("Propagate") is a Delaware limited liability company that is licensed to do business in the state of California and maintains principal offices at 6381 Hollywood Blvd, Floor 4, Los Angeles, CA 90028.

9.     On information and belief, at all times relevant hereto, Healey has been,

and is, a senior vice president, employee and agent of Propagate.

10.  On information and belief, at all times relevant hereto, Propagate has been Healey's employer.

11.  On information and belief, at all times relevant hereto, Healey has acted within the scope and course of his agency and employment for Propagate.

12.  On information and belief, at all times relevant hereto, Propagate has authorized, endorsed, and supported Healey's work as an employee and agent of Propagate.

13.  Plaintiffs are unaware of the names and capacities of the Defendants named herein as Does 1 through 100 and sue such Defendants by their fictitious names.  Plaintiffs will seek leave of court to amend this pleading and set forth the true names and capacities of such Defendants if and when such information has been more fully ascertained.

## *Jurisdiction*

14.  This case arises, in part, under 17 U.S.C. Section 101, et seq.  (herein the "Copyright Claims"), such that jurisdiction to adjudicate this case is exclusively vested in this Court pursuant to 28 U.S.C. Section 1331 (federal question) and 28 U.S.C. Section 1338(a) (copyright).

15.  This case also arises, in part, under the laws of the state of California (herein the "State Claims"), which State Claims are so related to the Copyright Claims that they form part of the same case or controversy, such that this Court may exercise supplemental jurisdiction over the State Claims pursuant to 28 U.S.C. Section 1367.

## *Venue*

16.  Defendant Healey resides within the geographical boundaries of the United States District Court, Central District of California.  Hence, this Court is the proper venue for adjudication of this case.

17.  Defendant Propagate is a Delaware limited liability company that is

licensed to do business in the state of California and that maintains principal offices at 6381 Hollywood Blvd., Floor 4, Los Angeles, CA 90028, which is within the geographic boundaries of this Court.  As such, this Court is the proper venue for adjudication of this case.

## FIRST CLAIM FOR RELIEF

### (Copyright Infringement 17 U.S.C. §§ 106, Et Seq. Direct, Contributory and Vicarious) Against Healey, Propagate and Does 1-25, inclusive

#### <u>Hallock and Healey Create</u> Scare Tactics

18.   Working as creative partners and producers, Hallock and Healey wrote, developed and produced a number of television series.  Of these, the most successful was *Scare Tactics*.  *Scare Tactics* is an American scripted comedy horror hidden camera television show that began production in 2002 and ran for five seasons[1] on the SYFY Channel (aka the SciFi Channel) pursuant to a license agreement between WMTI US and SYFY.  The *Scare Tactics* series was produced and owned by three companies: WMTI US (Seasons 1, 2, 3, 6 (the 22 "best of" episodes) and a one-hour Halloween special); WMTI North (Season 4); and TNSCI (Season 5).

19.   *Scare Tactics* was broadcast in half-hour episodes.  Each episode featured four compact short stories setting forth, among other things: specific action points; specific dialogue/talking points; specific character mannerisms; specific stage instructions; specific wardrobe/costumes; specific locations; specific special effects; the introduction of a carefully selected temporary newcomer (the "Mark") to the group of actors who interact with the Mark in a seemingly safe setting per the instructions of the producers; and the pre-set addition of strange occurrences to the mix for the purpose of capturing the Mark's authentic reactions on "hidden cameras."

---

[1] A "sixth" season is comprised of the "best of" episodes of *Scare Tactics*.

20.   Over the course of the five seasons, Hallock and Healey produced 93 original episodes of *Scare Tactics*,  consisting of over 372 original separate short stories, which aired domestically (on SYFY) as well as internationally in over 70 territories[2] on six continents (North America, South America, Europe, Africa, Australia/Oceania and Asia).  In addition, Hallock and Healey produced a one-hour Halloween Special for SYFY as well as a sixth season, which was comprised of the "best of" episodes of *Scare Tactics*.

21.   Hallock and Healey commenced the creative process for the individual *Scare Tactics* short stories by retaining a group of writers, who, under the supervision of Hallock and Healey, wrote the stories as "works for hire" in a "collaborative writing room."  The ensuing stories were reviewed and edited by Hallock and Healey until they were satisfied that the individual stories were appropriate.

22.   Based on the final stories, Hallock and Healey physically produced individual stories, choosing and casting the characters (including the "Mark"), selecting individual locations, building specific sets, choosing and adapting props, hiring actors, rehearsing with the actors and the camera operators so that they knew their specific lines and the timing thereof,  timing the specific "action points" or "plot points" that the actors were required to achieve, and instructing the actors how they were expected to interact with the Mark.

23.   When the stories were fully developed and the rehearsals were undertaken to satisfaction, Hallock and Healey filmed each story (sometimes several times with different Marks), selecting and editing one for eventual airing on television.  When

---

[2] *Scare Tactics* entered into a distribution agreement with Rive Gauche, which licensed *Scare Tactics* episodes internationally to the following territories: Algeria, Alto Adige, Armenia, Australia, Austria, Azerbaijan, Bahrain, Belarus, Belgium, Canada, Capo D'Istria, Caribbean, Central America, Chad, Channel Islands, Denmark, Djibouti, Dom Toms, Dominican Republic, Egypt, England, English Europe, France, Germany, Greece, Iceland, Indonesia, Iran, Iraq, Isle of Man, Israel, Italy, Japan, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Libya, Liechtenstein, Luxembourg, Malaysia, Mauritania, Mexico, Monaco, Morocco, Netherlands, New Zealand, Northern Ireland, Oman, Papua New Guinea, Philippines, Qatar, Republic of Yemen, Russia, San Marino, Saudi Arabia, Scotland, Singapore, Somalia, South Korea, Sudan, Syria, Switzerland, Tunisia, Thailand, Turkey, Ukraine, Uzbekistan, United Arab Emirates, Wales and Vatican City.

**EX.  1    PG.  12**

broadcast as a full half-hour show, individual stories, each approximately 5 minutes long were "introduced" by a celebrity host who was also provided a script written in the "writers room." The entire process, from the initial writing of a story through the physical production through editing and delivery resulted in what is sometimes referred to herein as the "Protected Expression."

24. Each of the final stories in film form that was broadcast was registered with the United States Copyright Office.

25. *Scare Tactics* garnered accolades, including being the most watched non-news, primetime cable program in adults 18-49 and the best ever rating for a series premiere in SYFY history. It is, therefore, not surprising that *Scare Tactics* has been seen in over seventy territories all over the world.

### *Hallock and Healey Have Disputes*

26. Despite the overwhelming success of *Scare Tactics*, in and around 2011, disputes between Hallock and Healey arose that ultimately resulted in Healey divesting himself of *Scare Tactics*, as more particularly described hereinafter.

27. These disputes were settled, first, via a settlement agreement executed in 2012 (the "2012 Agreement")[3] and, second, via a settlement agreement executed in 2016 (the "2016 Agreement")[4]. A true and correct copy of the 2016 Agreement is attached hereto and incorporated herein by reference as **Exhibit 1**.

28. As a result of the 2016 Agreement, Healey agreed to, and did, "assign and transfer to HALLOCK all of his direct and indirect rights and interests of any kind or nature whatsoever in and to SCARE TACTICS." (See Exhibit 1). This was accomplished by:

    a. Healey transferring to Hallock any and all possible ownership Healey had in WMTI US, which held title in and to various *Scare Tactics* intellectual property;

---

[3] The 2012 Agreement contains a provision that arguably renders that agreement "confidential." The 2012 Agreement will be filed under seal if and when necessary.
[4] The 2016 Agreement is not "confidential."

    b. Healey transferring to Hallock and Hallock's designee any and all possible ownership Healey had in WMTI North and TNSCI, which held title in and to various *Scare Tactics* intellectual property; and

    c. To further ensure that Healey was severing every possible claim in and to *Scare Tactics* intellectual property, Healey agreed to, and did, transfer to Hallock, personally, all of Healey's interest in and to copyrights, trademarks, brands, trade names, the "series," previously developed movie concepts, and the direct and indirect rights to exploit any and all intellectual property relating to *Scare Tactics*.

(Collectively, the bundle of productions, the brand, the intellectual property and other ancillary rights, both direct and indirect of any kind regarding *Scare Tactics* are sometimes referred to herein as the "Franchise.")

29. In other words, in accordance with the 2016 Agreement, Healey was to divest himself completely of all *Scare Tactics* assets – both tangible and intangible – and was not to use the assets at all.

30. Plaintiffs are informed and believe, and thereon allege, that notwithstanding the clear mandate set forth in the 2016 Agreement (that Healey divest himself of all assets pertaining to *Scare Tactics* and transfer the same to Plaintiffs), to this day, Healey has failed to divest himself of the tangible, physical assets relating to *Scare Tactics*, and, thus, has failed to transfer the same to Plaintiffs.

31. Plaintiffs are further informed and believe, and thereon allege, that, to this day, Healey has retained the tangible, physical assets related to *Scare Tactics*.

32. Plaintiffs, as 100% owners of the Franchise, are entitled to exploit the Franchise and reap all of the benefits incident thereto – both pecuniary and non-pecuniary.

33. As a result of the foregoing, among other transactions, WMTI US holds exclusive exploitation rights worldwide to *Scare Tactics* seasons 1 through 3, the

"best ofs" and the Halloween Special, and, via license from WMTI North and TNSCI, exclusive worldwide exploitation rights (other than Canada) to seasons 4 and 5.

### *Healey Joins Propagate*

34.   Shortly after executing the 2016 Agreement, knowing that he had no rights to exploit the Franchise in any manner whatsoever, Healey joined Propagate as its vice president.

35.   On or about May 11, 2016, Howard Owens ("Owens"), a senior executive with Propagate was advised that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights."  (A true and correct copy of a Facebook messenger exchange between Hallock and Owens, dated May 11, 2016, which evidences Owens' express knowledge that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights," is attached hereto and incorporated herein by reference as **Exhibit 2**).

36.   Healey's knowledge and background relevant to the Franchise, including specifically the fact that Healey divested himself of the Franchise (including the right to remake, sequelize, spinoff or reboot the Franchise in any manner whatsoever), is and was imputed to Propagate as Healey's principal per California Civil Code Section 2332, which states: "As against a principal, both principal and agent are deemed to have notice of whatever either has notice of, and ought, in good faith and the exercise of ordinary care and diligence, to communicate to the other."

37.   Likewise, Howard Owens' knowledge (that he knew Hallock was the "exclusive owner of the *Scare Tactics* franchise") is and was imputed to Propagate as Owens' principal per California Civil Code Section 2332.

### *Healey and Propagate "Reboot"* Scare Tactics

38.   Notwithstanding the fact that (1) Healey had actual knowledge that he had no rights in the Franchise and (2) Propagate had imputed knowledge of the same, on

information and belief, Healey and Propagate nonetheless commenced, supervised and completed production and delivery to the online streaming company Netflix of an allegedly "new" *Scare Tactics* television series, which Healey and Propagate named *Prank Encounters*.  The resulting "new" series is sometimes referred to herein as the "Reboot. "

39.   To date, on information and belief, Healey and Propagate have released only 8 half-hour episodes in the Reboot, so obviously not all of the *Scare Tactics* stories have been copied by Healey and Propagate; however, a number of specifically identifiable *Scare Tactics* stories have been copied by Healey and Propagate in the Reboot.

40.   At issue in the Copyright Holder Plaintiffs' Copyright Claims against Defendants, and each of them, are the following *Scare Tactics* copyrights:

   a.   "Camp Kill" -- "*Scare Tactics*" episode 101, U.S. Copyright No. PA 0001912469.  Claimant WMTI US.

   b.   "My Heart Belongs to Misery" aka "Dangerous Obsession" -- "*Scare Tactics*" episode 117, U.S. Copyright No. PA 0001912469.   Claimant WMTI US.

   c.   "The Mummy" -- "*Scare Tactics*" episode 206, U.S. Copyright No. PA 0001912453.  Claimant WMTI US.

   d.   "Satan's Baby" -- *Scare Tactics* episode 301, U.S. Copyright No. PA 0001664256.  Claimant WMTI US.

   e.   "Phantom Power" -- *Scare Tactics* episode 305, U.S. Copyright No. PA 0001664256.  Claimant WMTI US.

   f.   "It's My Party" – *Scare Tactics* episode 401, U.S. Copyright No. PA 0001817857.  Claimant WMTI North.

   g.   "Road Kill" -- "*Scare Tactics*" episode 405, U.S. Copyright No. PA 0001817863.  Claimant WMTI NORTH.

   h.   "Send In the Clowns" -- "*Scare Tactics*" episode 509, U.S. Copyright

AMENDED COMPLAINT

**EX.  1    PG.  16**

1   No. PA 0001831682.  Claimant TNSCI.

2   41.  Defendants' works that infringed upon the Copyright Holder Plaintiffs'

3   copyrights in the above-referenced stories and misappropriated other intellectual

4   property rights belonging to the Copyright Holder Plaintiffs include the following

5   stories:

6         a.  "End of the Road";

7         b.  "Face Fears";

8         c.  "Urgent Scare";

9         d.  "Camp Scarecrow";

10        e.  "Storage War of the Worlds";

11        f.  "Fright At the Museum"; and

12        g.  "Split Party".

13  42.  Specifically, Defendants' Reboot infringes upon the Copyright Holder

14  Plaintiffs' copyright in specific *Scare Tactics* stories, as follows:

15        a.  Defendants' story  "End of the Road" infringes on the Copyright

16           Holder Plaintiffs' copyright in  "Road Kill," as is evidenced, in part,

17           by:

18             i.  the written story for "Road Kill" (**Exhibit 3**);

19            ii.  the final "Road Kill" story seen on television, representing the

20               Copyright Holder Plaintiffs' protected expression (**Exhibit 4**);

21               and

22            iii.  the final "End of the Road" story seen on Netflix (**Exhibit 5**).

23        b.  Defendants' story "Face Fears" infringes on the Copyright Holder

24           Plaintiffs' copyright in "My Heart Belongs to Misery" aka

25           "Dangerous Obsession," as is evidenced, in part, by:

26             i.  the written story for "My Heart Belongs to Misery" aka

27               "Dangerous Obsession" (**Exhibit 6**); and

28            ii.  the final "My Heart Belongs to Misery" aka "Dangerous

Case 2:20-cv-02786-CJC-MAA Document 261-2 Filed 05/13/20 Page 18 of 145 Page ID
Case 2:20-cv-02786-CJC-MAA Document 61-1 Filed 05/29/20 Page 91 of 32 Page ID#:208
#:486

Obsession" story seen on television, representing the Copyright

Holder Plaintiffs' protected expression (**Exhibit 7**); and

   iii.  the final "Face Fears" story seen on Netflix (**Exhibit 8**).

c.  Defendants' story "Urgent Scare" infringes on the Copyright Holder

Plaintiffs' copyright in "Satan's Baby," as is evidenced, in part, by:

   i.  the written story for "Satan's Baby" (**Exhibit 9**);

   ii.  the final story for "Satan's Baby" seen on television,

representing the Copyright Holder Plaintiffs' protected

expression (**Exhibit 10**); and

   iii.  the final "Urgent Scare" story seen on Netflix (**Exhibit 11**).

d.  Defendants' story "Camp Scarecrow" infringes on the Copyright

Holder Plaintiffs' copyright in "Camp Kill," as is evidenced, in part,

by:

   i.  the written story for "Camp Kill" (**Exhibit 12**);

   ii.  the final story for "Camp Kill," as seen on television,

representing the Copyright Holder Plaintiffs' protected

expression (**Exhibit 13**); and

   iii.  the final "Camp Scarecrow" story seen on Netflix (**Exhibit 14**).

e.  Defendants' story "Storage War of the Worlds" infringes on the

Copyright Holder Plaintiffs' copyright in "Phantom Power," as is

evidenced, in part, by:

   i.  the written story for "Phantom Power" (**Exhibit 15**);

   ii.  the final story for "Phantom Power," as seen on television,

representing the Copyright Holder Plaintiffs' protected

expression (**Exhibit 16**); and

   iii.  the final "Storage War of the Worlds" story seen on Netflix

(**Exhibit 17**).

f.  Defendants' story "Fright at the Museum" infringes on the Copyright

Holder Plaintiffs' copyright in "The Mummy," as is evidenced, in part, by:

    i.  the written story for "The Mummy" (**Exhibit 18**);

    ii.  the final story for "The Mummy," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 19**); and

    iii.  the final "Fright at the Museum" story seen on Netflix (**Exhibit 20)**.

g.  Defendants' story "Split Party" infringes on the Copyright Holder Plaintiffs' copyright in "It's My Party" and "Send in the Clowns," as is evidenced, in part, by:

    i.  the written stories for "It's My Party" and "Send in the Clowns" (**Exhibits 21 and 22**);

    ii.  the final stories for "It's My Party" and "Send in the Clowns," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibits 23 and 24**); and

    iii.  the final "Split Party" story seen on Netflix (**Exhibit 25**).

43. For purposes of illustration, the Copyright Holder Plaintiffs have selected a typically unique *Scare Tactics* story named "Wood You Chip Up This Body." This story is not part of the instant claim but demonstrates the Copyright Holder Plaintiffs' protected expression. Materials submitted include:

a.  the "written story" (**Exhibit 26**);

b.  the "host script" (**Exhibit 27**); and

c.  an actual copy of the story, i.e. the Copyright Holder Plaintiffs' protected expression that was eventually filmed and released on television (**Exhibit 28**).

Combined, these exhibits show that the resulting final story that was broadcast was an actual rendering of ideas in the form of protectable expression of articulable

1    concrete elements reflecting a particularized expression of the underlying concept.

2    44.   The Defendants' stories identified above copy the protectable expression in

3    the Copyright Holder Plaintiffs' original stories by, among other things, using,

4    without permission or license, the actual concrete elements that make up the total

5    sequence of events, the relationships among the major characters, and the settings

6    and mood.  In other words, there is a high degree of similarity of plot, sequencing,

7    characters, setting, and mood in the Copyright Holder Plaintiffs' original work and

8    Defendants' work.

a.   Both the Copyright Holder Plaintiffs' works and Defendants' works
are essentially "short stories" (as opposed to full-length works such as
feature films) concerned with a single effect conveyed in a few
significant scenes.  In these short stories, just as with some of the best
short stories of all time (e.g., "The Gift of the Magi," "To Build a
Fire," and "A Dark Brown Dog"), economy is stressed[5]: the plot is not
quite as complex and characters are not quite as fully developed.
While these stories are "compressed," a similarity comparison of the
concrete expression of ideas of two short stories demonstrates
Defendants' copying of concrete articulable elements, including plot,
theme, dialogue, mood, setting, and characters.

b.   "Scènes à faire" is not applicable to the Copyright Holder Plaintiffs'
stories.  Scènes à faire suggests that some elements of a work might
be mandated or customary because they flow from a particular
environment or literary convention.[6]   Akin to "scènes à faire," is the
concept of the story "arc," or the chronological construction of plot.

---

[5] Plaintiffs use these American short stories to illustrate a point, not to suggest that Plaintiffs' works, or Defendants' works for that matter, are in the same critically-acclaimed league as these American literary classics.

[6]   For example, if a couple is having dinner at an Italian restaurant, it follows that the scene will have checkered tablecloths, red glass candles, a waiter with a moustache who speaks with an accent, a solicitous owner, red wine, breadsticks, pizza, a noisy kitchen, etc., and these things could be considered "typical" or "stock" and consumed by "scènes à faire."  But the "Italian restaurant scènes à faire" would clearly not apply to Michael Corleone returning from the bathroom, gun in hand, to murder Sollozzo and McCluskey.

The "arc of a story" is made up of its beginning, middle, and end. A "story plot" is comprised of individual events, while "arc" is the sequence of those events. Stories in the "Horror/Scary" genre (such as Plaintiffs' and Defendants') normally have a distinct yet simple story arc: against increasingly impossible odds, a person (protagonist) faces an evil force (villain)." Because the genre regularly presents this type of arc, it is easy for a copier to claim that everything in the genre is consumed by "scènes à faire" and, therefore, nothing is "original" fair game for plagerizing. But this conclusion defies common experience and denies the individual and collective creative choices of the storyteller, which, once again, include the above-referenced literary elements (character (traits), setting, sequence, mood, etc.).

c. While the the Copyright Holder Plaintiffs' and Defendants' stories fall within the "horror/scary" genre and indeed present the same "story arc," for each of the subject 7 stories, the *Scare Tactics* creators approached matters in a distinct manner, creating a novel plot and populating the plot with, among other things, a specific creative sequencing, characters,setting, and mood. And, Plaintiffs had to be judicious in their choices as they had to accomplish the "scare" within the 4-5 minute timeframe. Defendants, armed with four times the amount of time than Plaintiffs to accomplish the "scare," failed to similarly approach matters in a distinct manner, creating a novel plot and populating the plot with, among other things, a specific creative sequencing, characters,setting, and mood. Instead, Defendants merely copied the Copyright Holder Plaitnffs' works in a virtually identical manner, making their works substantially similar to Plaintiffs' original works.

d.  Because the Copyright Holder Plaintiffs' final creation is not a "script" but rather a completed video of each story, the Copyright Holder Plaintiffs allege that a comparison, for similarity purposes, should, by all rights, be based on a review and comparison of the final stories themselves.

e.  The Copyright Holder Plaintiffs further allege that such a review and comparison reveals that, with respect to the Copyright Holder Plaintiffs' works, each of Defendants' 7 episodes contains: the same plot; the same characters; the same sequencing; the same setting (and time of day); and even the same "scary mechanism."  In addition to the foregoing substantial similarities, there is even the blatant similarity of utilizing the series host as a "surprise guest."[7]

f.  The Copyright Holder Plaintiffs further allege that Defendants' copying, as alleged above, was intentional and not coincidental, i.e., Defendants engaged in outright copying of a massive amount of intellectual property that was owned by the Copyright Holder Plaintiffs as well as Hallock individually.  Defendants did so not by cherry-picking a few of Plaintiffs' original stories, but by copying, without authorization or license, the entire *Scare Tactics* Franchise and simply changing the name to "Prank Encounters."

g.  Although the Copyright Holder Plaintiffs allege that the most appropriate "comparison" between their original works and Defendants' works is in the video versions themselves (supplied as Exhibits to this Amended Complaint), the Copyright Holder Plaintiffs have taken the additional step of evaluating and comparing each of their proffered individual stories to those of Defendants' stories.  The

---

[7] In one story involving a "birthday party," the Copyright Holder Plaintiffs featured the "Scare Tactics" series host as a "surprise guest" at the birthday party, which the Defendants unabashedly copy (i.e., Defendants' series host is also a "surprise guest" at a birthday party).

comparisons are attached to this Amended Complaint as Schedules I through VII.  In each individual schedule, the Copyright Holder Plaintiffs set out the substantial similarities of articulable elements (often virtually identical) appearing in both the Copyright Holder Plaintiffs' original works and Defendants' copies.  In the Schedules, the Copyright Holder Plaintiffs also support and demonstrate: the highly creative aspect of their work through use of unusual, not commonplace choices made when bringing their various short stories to life; how the Copyright Holder Plaintiffs' specific decisions regarding plot, characters, sequencing, settings and mood could have been approached differently; and how Defendants' chose to copy, without authorization, the Copyright Holder Plaintiffs' unique creative decisions and expressions.

    i.  Schedule I provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Dangerous Obsession," and Defendants' copy, "Face Fears."

    ii.  Schedule II provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Phantom Power," and Defendants' copy, "Storage War Of the Worlds."

    iii.  Schedule III provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Road Kill," and Defendants' copy, "End of the Road."

    iv.  Schedule IV provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Satan's Baby," and Defendants' copy, "Urgent Scare."

    v.  Schedule V provides a detailed analysis of the substantial

similarities between the Copyright Holder Plaintiffs' original work, "Send In the Clowns" and "It's My Party" and Defendants' copy, "Split Party."

    vi.   Schedule VI provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Camp Kill," and Defendants' copy, "Camp Scarecrow."

    vii.   Schedule VII provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "The Mummy," and Defendants' copy, "Fright at the Museum."

45.   The specific instances of copying, alleged above, illustrate not only Healey's blatant poaching of the Copyright Holder Plaintiffs' copyrights in the subject specific *Scare Tactics* stories but also Propagate's flagrant ratification thereof. Moreover, the cited instances evidence Healey's utter disregard of his contractual obligations to Hallock pursuant to the 2016 Agreement.

46.   The Copyright Holder Plaintiffs spent countless number of hours and an estimated Forty Million Dollars ($40,000,000) to develop, produce and deliver the *Scare Tactics* episodes. Development, production and delivery of content is expensive,[8] and by infringing upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as herein alleged, Defendants have effectively destroyed the Copyright Holder Plaintiffs' ability to realize the full extent of returns on their significant financial investment.

47.   The Copyright Holder Plaintiffs, are informed and believe, and thereon

---

[8] Bill Carter, *The Laughter Is Fading in Sitcom Land: Reality Shows, Costs and Innovative Comedy Threaten a TV Staple*, N.Y. TIMES, May 24, 2004, at E1 (noting that scripted shows cost between $850,000 and $1.2 million on average to produce); see also MITTELL, supra note 56, at 91; Ted Magder, *Television 2.0: The Business of American Television in Transition*, in REALITY TV: REMAKING TELEVISION CULTURE 141, 147 (Susan Murray & Laurie Ouellette eds., 2d ed. 2009). The show *Shark Tank* cost about $750,000 to produce, which is considered cheap given its ratings. Bill Carter, *Reality TV, Shaking Off Recession, Takes Entrepreneurial Turn*, N.Y. TIMES, Mar. 28, 2011, at B1. *The Voice*, however, cost $2.3 million to produce. Kim Masters & Lacey Rose, *The Miracle of The Voice*, HOLLYWOOD REP. (June 24, 2011), available at http://www.hollywoodreporter.com/news/miracle-voice-202039.

AMENDED COMPLAINT

allege, that in order to accomplish the unauthorized Reboot of the Franchise, Healey and Propagate used *Scare Tactics* personnel, including:

    a. *Scare Tactics* writers, including Doug Perkins, David Storrs and Kevin Healey;

    b. *Scare Tactics* actors, including David Storrs, Sven Holmberg and Gabriel Pimentel;

    c. *Scare Tactics* technical supervisor Steve Canas;

    d. *Scare Tactics* producers, including Hilary Frimond, Doug Perkins, David Storrs, and, of course, Healey;

    e. *Scare Tactics* production designer Joe Warson and construction manager Brad Franks;

    f. *Scare Tactics* talent casting director Suzanne Broderick; and, of course,

    g. *Scare Tactics* former creative partner and executive producer, Healey, who, on information and belief, directed the "writers' room" for Propagate's *Prank Encounters*, for which Healey has screen credit, and directed the actors.

48. Attached hereto for inclusive purposes as **Exhibit 33** (submitted in electronic media as a flash drive and incorporated herein by reference) is what Plaintiffs believe to be a full set of each "Scare Tactics" Episode in which a copied "Scare Tactics" short story appears (not just individual short stories). Plaintiffs provide the "start time" for each subject "short story" in each "Episode", which is designated by a time code (i.e. Copyright Plaintiffs' story "Road Kill" is found at ST Episode 405 at 5:06). Also included (directly following the applicable "Scare Tactics" episode in the submitted electronic media) is the entire episode of Defendants' corresponding episode (i.e. S1E2 "End of the Road").

*The Public Decries the Reboot*

17.
AMENDED COMPLAINT

49.   The Reboot started streaming in the United States on Netflix on or about October 25, 2019.  Almost immediately, it was clear that Propagate and Healey's attempt to reboot the Franchise by "changing the name" fooled no one.

50.   Given Healey's in-depth, firsthand familiarity with the Franchise, it is no surprise that viewers, as well as reviewers, recognized *Prank Encounters* as nothing more than a "knock off" or "re-boot" of the Franchise.

51.   But, from the start, Propagate/Healey's clear intent was to leverage the popularity of the Franchise by producing content (albeit under a different name) that was and is so substantially similar to the Franchise that it had the effect of not only attracting the same *Scare Tactics* audience but also confusing the audience as to the origins of the Reboot.  In making the Reboot, Propagate and Healey deliberately damaged the Franchise, thereby depriving not only the Copyright Holder Plaintiffs of the rights and benefits to which they were and are entitled under the Copyright Act but also Hallock of the rights and benefits to which he was and is entitled under the 2016 Agreement.

52.   On information and belief, in furtherance of this intent and strategy, Defendants "went public," to wit:

   a. The "host" of *Prank Encounters*, Gaten Matarazzo, stated on national network television that when he was initially approached to "host" *Prank Encounters*, he was told that the intent was to "make a show like *Scare Tactics* that hadn't been on the air in a while"; and,

   b. Healey personally posted on social media that, in 2019, he had been "working hard" and was "almost done" with "a show that will thrill fans of #scaretactics"; and

   c. Healey also touted that he had created *Scare Tactics* and that "[*Prank Encounters*] takes [*Scare Tactics*] to another level."

True and correct copies of Healey's comments are attached hereto and incorporated herein by reference as **Exhibit 29**.

53.   Indeed, the public immediately took to social media to deride the Reboot, commenting, as follows:

    a.  How about "Taking the entire concept of SCARE TACTICS..." ???;

    b.  "What in the "*Scare Tactics*" (sic) rip off is going on" (dated October 15, 2019);

    c.  "Basically *Scare Tactics* 2.0";

    d.  "Sounds like that show scare tactics";

    e.  "Puts you in the mind of *Scare Tactics* … ";

    f.  "You should check out *Prank Encounters* .. It's like *Scare Tactics* on steroids," and, in response, "Nah, they basically just stole this exact episode";

    g.  "This is exactly like *Scare Tactics*";

    h.  "This is just an off brand version of *Scare Tactics*";

    i.  "Their (i.e. *Scare Tactics*) new episodes are under the name *Prank Encounters* on Netflix which recently came out";

    j.  "Isn't this called SCARE TACTICS or wait PUNK'D? Where have all the original ideas gone…";

    k.  Replying to a comment of a "HUGE fan of *Scare Tactics*, "Said the same thing they even have one of the same scare actor in it";

    l.  "*Prank Encounters* reminds me of how awesome show *Scare Tactics* was back in the day"; and

    m.  "Scare Tactics vibes. #PrankEncounters."

(Collectively, the above-referenced comments are attached hereto and incorporated herein by reference as **Exhibit 30**).

54.   In addition to the general public, critics provided reportage, as follows:

    a.  <u>IMDb</u> wrote:  "<u>Very similar</u> to the show "*Scare Tactics*" that was on Sci-Fi, except in that show people were set up by someone they knew and with "*Prank Encounters*" the targets don't know each other

Case 2:20-cv-02786-CJC-MAA Document 61-2 Filed 05/13/20 Page 29 of 145 Page ID
Case 2:20-cv-02786-CJC-MAA Document 16-1 Filed 05/29/20 Page 21 of 32 Page ID #:218
#:496

(emphasis added);

   b. Jacqueline Gualtieri of <u>Distractify.com</u> wrote: "The [ ] complaint that has come out so far about the [*Prank Encounters*] series is that it sounds *incredibly similar* to *Scare Tactics*, which was on Syfy and Chiller from 2003 to 2013. On *Scare Tactics*, regular people encountered monsters and supernatural creatures in creepy pranks on a hidden camera show, which sounds <u>remarkably similar</u> to *Prank Encounters* (emphasis added);

   c. Andy Denhart of <u>Reality Blurred</u> wrote: "Netflix's attempt to create its own *Scare Tactics* is mostly embarrassing … ".

   d. For <u>Film Daily</u>, Bec Heim wrote: *Scare Tactics* (2003 – 2013) aired on Syfy for five seasons and over 100 episodes. The show, hosted in its last three seasons by Tracy Morgan, sends friends and family ("the accomplice") of the mark ("the victim") on a one-off job … The basic concept is <u>identical</u> to *Prank Encounters*. The differences: just one victim; family and friends nominate the victim; and each 30-minute episode usually has multiple scenarios. *Prank Encounters* has two victims, no nominations are mentioned, and just one scenario per episode. Either way, both *Scare Tactics* and *Prank Encounters* lure victims with a fake job and intend to scare them."

   e. For Netflixlife.com, Courtney Mroch writes in reviewing *Prank Encounters*: "*Prank Encounters* is very similar to [*Scare Tactics*]."

(Collectively, the reportage referenced immediately above are attached hereto and incorporated herein by reference as **Exhibit 31**).

   55. In November 2019, Hallock viewed 8 episodes of *Prank Encounters* for the first time. Unlike the general viewers who saw *Scare Tactics* and *Prank Encounters* as perhaps "very similar," due to: (a) Hallock's familiarity with the entire *Scare Tactics* portfolio, (b) Hallock's knowledge of Healey's involvement in

both *Scare Tactics* and *Prank Encounters*, and (c) the specifics of the 2016 Agreement, Hallock concluded that by producing and releasing *Prank Encounters* as a "reboot" of the Franchise, Healey had not only directly, knowingly and willfully deprived Hallock of the benefits of the 2016 Agreement, but also directly, knowingly and willfully infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

56.  The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that Healey knew or should have known that the Reboot infringed, and continues to infringe, upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

57.  Plaintiffs are informed and believe, and thereon allege, that Healey's conduct in creating, developing, producing and releasing the Reboot amounts not only to an effective "taking" by Healey of the very Franchise that he had agreed, contractually, to divest himself of and transfer to Plaintiffs, thereby depriving them of the benefits of their bargain under the 2016 Agreement, but also a taking of the protections imbued to them under the Copyright Act.

58.  The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that by producing the Reboot when it knew or should have known that doing so infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, Propagate, too, directly infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

59.  The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate, perhaps not a stranger to knocking off content,[9] also contributorily infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as evidenced by the following:

      a.  Propagate supervised and/or had the ability to supervise Healey;

---

[9] Hallock is informed and believes, and thereon alleges, that Propagate was accused of having knocked off *Shark Tank* when it produced *Planet of the Apps*.

b. Propagate, as Healey's principal, knew or should have known that the Franchise belonged to the Copyright Holder Plaintiffs;

c. Propagate knew or should have known that Healey and Hallock had entered into the 2016 Agreement, which resulted in Healey having been divested of all right, title and interest in and to the Franchise;

d. Propagate knew or should have known that the Reboot infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories;

e. Propagate facilitated the production of the Reboot by financing it;

f. Propagate facilitated the release of the Reboot by entering into distribution agreement(s) related thereto; and

g. Propagate knew or should have known that Healey was contractually barred from pursing any *Scare Tactics* creative endeavor after ceding the Franchise to the Copyright Holder Plaintiffs.

60.     The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that the foregoing conduct by Propagate caused, allowed, induced and encouraged Healey to infringe upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories and that such contributed in a significant way to Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

61.     The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate failed, and continues to fail, to take steps to prevent and/or limit Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.[10]

62.     The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate reaped a direct financial interest as a result of

---

[10] In December 2019, Plaintiff's counsel sent Defendants a letter regarding the destruction of electronically stored information and advised them that suit was imminent.

Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

63.    The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that, in addition to reaping pecuniary benefits, Propagate also reaped non-pecuniary benefits from Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

64.    On information and belief, and as set forth above, *Prank Encounters* started streaming over Netflix in late October 2019 in the United States.  However, again on information and belief, Netflix has the capacity to stream in over 190 countries, and has already streamed, or will be streaming, *Prank Encounters* to viewers in a majority of these territories.

65.    Through the Reboot, Defendants have produced, reproduced, prepared copies and derivative works based upon, distributed, and publicly displayed the Copyright Holder Plaintiffs' copyrighted works without their consent.  In so doing, Defendants have violated the Copyright Holder Plaintiffs' exclusive rights under 17 U.S.C. §§ 106 and 501.

66.    Through the Reboot, Defendants have deprived the Copyright Holder Plaintiffs of the benefits of full exploitation[11] of the Franchise.

67.    Defendants' infringements have been undertaken knowingly and with intent to financially gain from the Copyright Holder Plaintiffs' protected copyrighted work.

68.    Even though Propagate knew that the Copyright Holder Plaintiffs held exclusive rights in and to the Franchise, including, among other things, the copyrighted works and the format, Propagate nonetheless failed to exercise its right and ability to supervise persons within its control, including but not limited to Healey, so as to prevent the subject infringement, and Propagate did so with intent

---

[11] Full exploitation includes global licensing of TV formats, which is a multi-billion dollar business. According to one industry report, "the production volume generated by traded TV formats was €9.3 billion ($10.3 billion USD) for the years 2006-2008, with 445 original formats traded among fourteen countries." Format Recognition & Prot. Ass'n.

to further its financial interest.

69. Accordingly, Defendants have directly, contributorily and vicariously infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

70. Because of Defendants' willfulness and recklessness in infringing on the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, the Copyright Holder Plaintiffs are entitled to their actual damages as well as Defendants' attributable profits in an amount to be proven at trial. Further, the Copyright Holder Plaintiffs are entitled to all other relief allowed under the Copyright Act.

71. Defendants' infringement has caused, and will continue to cause, irreparable harm to the Copyright Holder Plaintiffs, for which the Copyright Holder Plaintiffs have no adequate remedy at law. Unless Defendants' conduct is restrained, harm will continue to occur into the future, such that the Copyright Holder Plaintiffs are entitled, upon further application, to issuance of preliminary and permanent injunctive relief.

## SECOND CLAIM FOR RELIEF

### *(Breach Of Implied Covenant Of Good Faith And Fair Dealing)*
### *Against Propagate, Healey And Does 26-50, inclusive*

72. Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 69 above, as if fully set forth herein.

73. Plaintiffs are informed and believe, and thereon allege, that, as alleged hereinabove, in 2016, pursuant to the 2016 Agreement, Healey ceded to Hallock and the Copyright Holder Plaintiffs (WMTI US, WMTI North and TNSCI) any and all right, title and interest Healey had in and to the Franchise.

74. Plaintiffs are informed and believe, and thereon allege, that Healey also ceded his interests in and to WMTI US to Hallock and his interests in WMTI North and TNSCI to Hallock and Hallock's designee.

75.     Among others, benefits conveyed under the 2016 Agreement included all forms of direct and indirect rights to exploit the Franchise through reboots, spinoffs, sequels, prequels and any other form of derivative use.

76.     By rebooting *Scare Tactics* and then choosing to call the Reboot by a different name (*Prank Encounters*), Healey and Propagate deprived Plaintiffs of not some, but <u>all</u>, of the benefits conveyed to Plaintiffs by the 2016 Agreement.  This includes not only the copyright infringements, alleged above, but also use of any "unprotected elements," including without limitation the format of *Scare Tactics* and exploitation of the Franchise by Healey and Propagate that, as Gaten Matarazzo put it, was to be "like *Scare Tactics*."

77.     Plaintiffs are informed and believe, and thereon allege, that Propagate knew or should have known that the Reboot infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories and other rights to exploit the Franchise held by Plaintiffs, resulting in a breach of the 2016 Agreement, which only allowed Healey to pursue "other" (as opposed to same, related or similar) (i.e., "non-*Scare Tactics*") scary, paranormal-themed or hidden camera shows – certainly not a Reboot of *Scare Tactics* under a different name.

78.      As with every contract, included in the 2016 Agreement was an implied promise of good faith and fair dealing.  The implied promise ensured that Healey, and by imputation, Propagate, would refrain from conduct that would deprive Plaintiffs of the right to receive all of the benefits conveyed under the 2016 Agreement.

79.     Propagate knew or should have known that the 2016 Agreement contained an implied covenant of good faith and fair dealing and that, by allowing Healey to make the Reboot, Healey would be in breach of the implied covenant of good faith and fair dealing implicit in the 2016 Agreement.

80.     As a result of the above alleged breach, Plaintiffs sustained consequential and special damages in an amount to be proven at trial.

## THIRD CLAIM FOR RELIEF

### *(Interference With Contract)*
### *Against Propagate and Does 51-75, inclusive*

81.     Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 78 above, as if fully set forth herein.

82.     The 2016 Agreement is a valid contract between the Plaintiffs, on the one hand, and Healey, on the other hand, which contract essentially "sold" Healey's interests in and to the Franchise to Hallock (and his designee in the case of WMTI North and TNSCI), thereby eliminating any right, title or interest in or to the Franchise by Healey.

83.     On information and belief, Propagate had knowledge that Healey had once owned a piece of the Franchise and that, as of 2016, Hallock (and his designee in the case of WMTI North and TNSCI) was the 100% owner of the Franchise.

84.     By supporting and funding Healey's producing of *Prank Encounters,* Propagate intended that Healey would produce a show like *Scare Tactics,* and, in so doing, Propagate knew that Healey would, thereby, breach the covenant of good faith and fair dealing implied in the 2016 Agreement.

85.     In so acting, Propagate caused Healey to breach the 2016 Agreement, causing resulting harm to Plaintiffs, and each of them, of which Propagate's conduct was a substantial factor.

86.     As to the Copyright Holder Plaintiffs, they have sustained past economic loss and will sustain future economic loss.  As to Hallock, in addition to past economic loss and future economic loss, he has suffered and will continue to suffer future non-economic loss, including mental suffering and affiliated bodily injury, subject to proof at trial.

# FOURTH CLAIM FOR RELIEF

### *(Breach Of Contractual Duty To Account And Pay Proceeds)*
### *Against Healey and Does 77-100, inclusive*

87.     Plaintiffs repeat and incorporate by reference the allegations in paragraphs 1 through 84 above, as if fully set forth herein.

88.     Hallock and Healey created and produced a show titled *Freak Encounters*, which aired on Animal Planet.   *Freak Encounters* was owned by The Gifted Show, Inc., which is a California corporation ("Gifted").

89.     Via the 2012 Agreement, Healey transferred all of Healey's right, title and interest in and to Gifted to Hallock.  Consequently, Hallock is 100% owner of Gifted.

90.     Notwithstanding Hallock's 100% ownership of Gifted, Hallock and Healey agreed that, with respect to *Freak Encounters*, either of them could take steps to seek opportunities to develop, produce and exploit the title, provided that neither Hallock nor Healey could individually exploit *Freak Encounters* without first obtaining the other's prior written approval.  Then, assuming such "approval," the individual responsible for the exploitation (referred to as "the Managing Party") would pay, or cause to be paid, to the other (referred to as the "Non-Managing Party") a participation equal to 50% of all budgeted fees, corporate overheads, deferred fees and back-end participations, whether the title was directly exploited or there was a derivative or ancillary production based thereon.  The Managing Party was also entitled to a 5% "off the top" payment of all revenues not used to finance the approved exploitation.

91.     One of the episodes of *Freak Encounters* is titled "Werewolf."

92.     Within the last four years, Healey exploited "Werewolf" by using protected elements in the "Werewolf" episode, including specifically the actual rendering of ideas in the form of protectable expression of articulable concrete elements reflecting a particularized expression of the underlying concept, in the

Reboot, swapping out the "werewolf" for a "big foot," but otherwise lifting the story from *Freak Encounters* and naming it "End of the Road."

93.     A video of "Werewolf" and a video of "End of the Road" are attached hereto as **Exhibits 32 and 5**, respectively.

94.     On information and belief, at no time following execution of the 2012 Agreement has Healey advised or provided notice to Hallock or Gifted that Healey intended to or was in the process of exploiting *Freak Encounters*.

95.     At no time following execution of the 2012 Agreement has Healey accounted to Hallock or Gifted for any sums received as a result of exploiting *Freak Encounters*.

96.     Exploiting an episode of *Freak Encounters* without: (1) advising Hallock thereof, (2) obtaining Hallock's prior written approval, (3) accounting to Hallock, and (4) compensating Hallock therefor, constitute individual and collective breaches of the 2012 Agreement by Healey.

97.     Healey's breach of the 2012 Agreement has directly and proximately caused damage to Hallock in an amount subject to proof at trial.

98.     Hallock is entitled to full and accurate accounting relating to use of "Werewolf."

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand Judgment be entered in their favor jointly and severally against all Defendants, as follows:

a.  Ordering Defendants to account for all gains, profits and advantages derived from their wrongful acts;

b.  Ordering all gains, profits and advantages derived from Defendants' wrongful acts be held in constructive trust for the benefit of Plaintiffs;

c.  Awarding actual damages suffered by Plaintiffs and any profits attributable to Defendants' wrongful acts;

d.  Awarding Plaintiffs statutory damages;

e. Awarding Plaintiffs compensatory, special and non-economic damages;

f. Awarding Plaintiffs attorney's fees, interest and costs; and

g. Awarding Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

Dated: May 29, 2020

**CHARNLEY RIAN LLP**

By: _____

Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock,*
*WMTI Productions, Inc., WMTI*
*Productions North, Inc., The Next Season*
*Company, Inc.*

29.
AMENDED COMPLAINT

1       **SPOLIATION NOTICE**

2       On December 18, 2019, Defendants were put on notice to preserve any all

3 materials relating to the claims contained within this complaint, and any and all

4 materials, or facts, which are relevant to the resolution of the issues alleged herein.

5 By service of this pleading, Defendants are provided additional notice to preserve

6 all relevant evidence important to this litigation, whether hard copy or

7 electronically stored information ("ESI").

8

9 Dated:     May 29, 2020      **CHARNLEY RIAN LLP**

10

11                     By:

12                         Richard L. Charnley

                            Nicole W. Uhlmann

13                         *Attorneys for Plaintiffs Scott Hallock,*

                          *WMTI Productions, Inc., WMTI*

14                         *Productions North, Inc., The Next Season*

                          *Company, Inc. and The Gifted Show, Inc.*

15

16

17

18

19

20

21

22

23

24

25

26

27

28

30.

AMENDED COMPLAINT

# **DEMAND FOR JURY DEMAND**

Plaintiffs hereby demand a trial by jury on all claims and issues so triable pursuant to Federal Rule of Civil Procedure 38.

Dated:      May 29, 2020      **CHARNLEY RIAN LLP**

By: _____
    Richard L. Charnley
    Nicole W. Uhlmann
    *Attorneys for Plaintiffs Scott Hallock,*
    *WMTI Productions, Inc., WMTI*
    *Productions North, Inc., The Next Season*
    *Company, Inc. and The Gifted Show, Inc.*

31.

# SCHEDULE I

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 07/13/20 Page 41 of 145 Page ID
#:509
Case 2:20-cv-02726-CJC-MAA Document 21-2 Filed 05/29/20 Page 2 of 57 Page ID #:231

# SCHEDULE I

## PLAINTIFFS' ORIGINAL WORK, "DANGEROUS OBSESSION"

The story begins with a compassionate" Husband" hiring a temporary home Caregiver (the "Mark"), to watch over his Wife, who he claims has been injured in an accident and lives in a comatose state [everyone in the episode, but for the Caregiver, is an actor who rehearsed lines and action under direction prior to filming].

The Husband discusses how much he loves his Wife, then shows the Caregiver, a young woman, how to give his Wife medication, then she is told to sit with the Wife and read an article from a magazine to her, as it supposedly helps keep the Wife calm.

The Husband says he will be leaving for 45 minutes. Before leaving, he kisses his Wife on the forehead and says, "Goodbye, my angel." The "kiss" is "long, lingering and creepy."

After the Husband leaves, the Wife suddenly wakes up and spits the pills out, shocking the Caregiver.

The Wife claims she has been kidnapped by the Husband and that the Husband is actually a fan who is obsessed with her. She orders the Caretaker to open a nearby closet.

Inside, the Caregiver discovers a shrine that has been built to "honor" the Wife. The Wife then pulls back her blankets to reveal her legs are chained. She tells the Caregiver to retrieve keys that are stored in another room as the Wife starts to dial the police.

The Caregiver finds the keys, and the Wife is about to be freed when the Husband suddenly appears (back early and unexpectedly). He injects his Wife with a hypodermic needle and the Wife quickly slumps back into bed.

The Husband claims that whatever his Wife said is not to be believed, as the drugs make her "delusional."

The Caregiver begs to leave, but the Husband picks up another needle and indicates he is going to inject the Caregiver as well. The Caregiver is really afraid

SCHEDULE I

and does not know what to do next.   But, before the Husband can inject the Caregiver, the Wife rises up and informs the Caregiver that she is on "Scare Tactics."

**DEFENDANTS' WORK, "FACE FEARS"**

The Defendants' work is roughly four and a half times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.   These added elements involve another Mark who believes he is helping a Private Detective search for a missing woman.  This filler does not materially change Plaintiffs' original story.

The Defendants' work begins with a young woman (the "Caregiver" -- "Mark"), who is starting a new job as a Caregiver.  The Caregiver  is helped by a male nurse (the "Nurse") who tells the new Caregiver that they have both been hired by a famous plastic surgeon (the "Surgeon") to care for the man's Wife, who has had "some work done."

The Caregiver is then introduced to the Surgeon, who claims that his Wife has recently had an accident and is sedated to help with the pain.  He says that his Wife is disoriented, and sometimes says "non-sensical" things, and, thus, anything she says should be dismissed.

The Caregiver is then shown the Wife, who lies seemingly unconscious in a bed.  After professing his love for his Wife, the Surgeon proudly gestures to a "shrine" (his words) that he has constructed for her above a nearby chest of drawers.

The Surgeon then indicates a nearby trove of morphine and fentanyl, which he tells the Caregiver and Nurse to administer if his Wife awakens and becomes agitated.  The Surgeon then kisses his Wife on the forehead, and tells her he loves her, ending with "goodbye my sweet".   The "kiss" is "long, lingering and creepy." He then informs the Caregiver and the Nurse that he is leaving.

The Nurse steps out to go to the bathroom, leaving the Caregiver alone.  The Caregiver picks up a magazine and tells the Wife she will find a good article to read to her.  But, before Caregiver can, the Wife suddenly startles herself "awake," and mumbles, "I'm not supposed to be here" and "not mine" before falling unconscious again.

SCHEDULE I

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 07/13/20 Page 43 of 145 Page ID
#:511
Case 2:20-cv-02726-CJC-MAA Document 21-2 Filed 05/29/20 Page 6 of 17 Page ID #:233

The Nurse then returns, and the Caregiver catches him up to date.  The Wife suddenly awakens again. Nurse claims it is agitation, and he supposedly injects morphine into the Wife to calm her.

At this point, an added B story (a second mark helping a private detective) crosses the original story.  Supposedly following a clue as to the whereabouts of a "missing woman," the second mark and the detective enter the room.  They hypothesize that the woman in the bed is not who the Surgeon claims, but instead a missing woman from another state.

At this point, the Caregiver starts to understand that the Wife in the bed is not who the Surgeon claimed and that the Surgeon has changed her appearance with plastic surgery, as well as removing a tattoo on her arm that could be an identifying feature.

The Nurse returns just as the Wife becomes agitated again, and this time, the Nurse gives her some calming medication. He is brought up to speed on the theory regarding the about the Wife that they have been discussing.  A phone call from a "police detective" convinces them they are correct about their theory.

The Surgeon calls and tells the Caregiver he is on his way home.  Moments later, he arrives early and unexpectedly and asks what is going on.  The second mark and the "PI" tell him their theory, which the Surgeon rejects. The Surgeon then says he wants to talk to the PI alone, and they step away.  Shortly after, there is a loud off-screen "thud" (someone falling to the floor?).

The Wife awakens and says she is not supposed to there and claims she has been kidnapped. Just as the police are being summoned via telephone, the Surgeon returns and, using an incapacitating agent, renders the Nurse unconscious.  The Caregiver and the "investigator mark" are on their own and in danger.

The Surgeon has blood on his shirt and scratches on his face, implying he killed the PI offscreen.  He then threatens the Caretaker and the other mark with a hypodermic needle.  They are really scared.  It is at this point that the marks are told they are on "Prank Encounters."

## SIMILARITY ANALYSIS

The dramatic concept of a woman being kidnapped by a stranger and held against her will is not new.  However, in this case, Plaintiffs' idea is developed and expressed concretely through a skillful use of dialogue, settings, machinations,

SCHEDULE I

3

**EX. 1   PG. 43**

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 05/13/20 Page 44 of 145 Page ID
Case 2:20-cv-02726-CJC-MAA Document 31-1 Filed 05/29/20 Page 6 of 57 Page ID #:234
#:512

characters, and actors that expand the concept into an original and fresh story. These concrete elements, established in the Plaintiffs' original work, "Dangerous Obsession," also appear in the Defendants' alleged copycat work, "Face Fears."

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' copycat work.

### The Plots Are Substantially Similar

1. In Plaintiffs' original work, a man kidnaps a woman and holds her against her will in a bed, keeping her sedated. He hires a caregiver to watch over the woman, who he claims is his wife, while he leaves the house for a short time. This exact set up is the basis for Defendants' work "Face Fears." Plaintiffs made an executive decision in deciding to portray a seemingly loving Husband care for his incapacitated Wife. Plaintiffs could have presented a patient/nurse caretaking situation or a Rockstar/groupie situation. Among the myriad options available to Plaintiffs ultimately made the executive decision to have a Husband character with an incapacitated Wife. Defendants' executive decision, here, is not one of creativity; rather, it is one of copying.

2. In Plaintiffs' original work, the Husband tells the caregiver that his wife was in a serious accident and that he has been caring for her at home. This element also appears in the Defendants' work.

3. In Plaintiffs' original work, the Husband claims the woman is the love of his life, and has built a "shrine" to her, which understandably concerns the caregiver. These story elements also appear in Defendants' work.

4. In Plaintiffs' original work, the Husband tells the caregiver that the woman is unconscious and heavily medicated, thus anything she might utter should not be taken seriously. This story element also appears in Defendants' work.

SCHEDULE I

5. In Plaintiffs' original work, the Husband leaves, but not before whispering "Goodbye, my angel" and giving the woman a creepy kiss on the forehead. These story elements appear in the Defendants' work.

6. In Plaintiffs' original work, the Caregiver reads an article from a magazine to the woman, as the sound of voices soothes her. In Defendants' work, the caregiver undertakes the same task.

7. In Plaintiffs' original work, the woman awakens and tells the Caregiver her plight. In the Defendants' work, the woman stirs and tells the Caregiver she does not belong here. The same basic incidents generate the same fear and questioning in both stories: the Caregiver in each case is now wary of the tale she has been told and is starting to fear for her own safety.

8. In Plaintiffs' original work, the Husband returns home unexpectedly and becomes aware that his scheme has been discovered. In the Defendants' work, the also Husband returns sooner than expected and is equally unhappy that his scheme has been exposed.

9. In Plaintiffs' original work, the Husband produces a hypodermic needle and threatens the Caregiver, implying she will soon be unconscious and thus unable to summon help. In the Defendants' work, the Husband also reveals a hypodermic needle and, by his actions, also implies harm to the caregiver. Here, Plaintiffs could have had the Husband wield a knife. Defendants could have had the Husband wield a scalpel. Instead, the Plaintiffs conceived of a hypodermic needle. This creativity was then copied by Defendants.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

### The Sequencing Is Substantially Similar

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

As the "original", Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.

SCHEDULE I

5

For instance, Plaintiffs could have started the story showing the Husband alone in the room with his unconscious wife, making everything "perfect" by touching up the "shrine" before going downstairs to meet the caregiver. This is not the same sequence that Plaintiffs' original work followed, demonstrating the Plaintiffs' sequence was a unique expression of the underlying story concept chosen by the creators. Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not. As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

### The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' work, there are three characters, the Husband, the "injured/comatose" Wife, and the Caregiver (Mark). These three characters are used identically in Defendants' work.

### The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' work was designed to take place in an upscale, well-maintained private home. The story takes place during the night. These were obviously creative choices as there are different "settings" that could have been selected to create a different mood (i.e. a rundown apartment in a blighted place of town could create a different mood for the viewer, as would heavy security locks on doors and bars on windows). But the choice of a low security "private home" supports the apparent ability of the Husband to keep his "bride" in true comfort and to afford the costs of a private nurse and nice surroundings for his "wife." The setting in Defendants' work is virtually identical (even to the point of using a two-story house). And, Defendants' work also takes place at "night".

### The Moods Are Substantially Similar

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the readers. Mood is developed in a literary piece

SCHEDULE I

6

**EX. 1   PG. 46**

through various methods, including setting, theme, tone and diction. Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and; intense romantic.  In the case of Plaintiffs' works, this may include fearful; tense; anxious, suspenseful; ghoulish; macabre, grim; and scary.

The mood in Dangerous Obsession is ambivalence, in that, from the outset, there is a sense that something is "not quite right" with the unconscious "wife" and the husband's message to the "caregiver."  The mood in Face Fears is the same.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of Plaintiffs' original.

SCHEDULE I

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 07/13/20 Page 48 of 145 Page ID
Case 2:20-cv-02726-CJC-MAA Document 10-1-2 Filed 05/29/20 Page 9 of 57 Page ID #:238
#:516

# SCHEDULE II

# SCHEDULE II

## PLAINTIFFS' ORIGINAL WORK, "PHANTOM POWER"

Plaintiffs' original work, "Phantom Power," begins with a young Assistant, who is hired to assist an Electrician determine the cause of a sudden "system surge" of power noted in a specified power grid.   This Assistant is the Mark.

Together, the Electrician and Assistant discover a "bootleg" meter and follow an illegal power cord into a mysterious building.

Inside, the Assistant and the Electrician discover mannequins attached to electrodes as well as a machine/transformer that is using a lot of power.   Before they can investigate further, the Assistant and the Electrician are confronted by a Crazed Inventor who accuses them of trespassing for purposes of "stealing his technology."

The Electrican then discovers a hidden "living" Soldier (in service fatigues) attached to wires that run to the machine/transformer.

The Electrician wants to turn off the machine and free the Soldier, but the Soldier begs him not to, as it is the only thing keeping him alive.

Not believing the Soldier, the Electrician turns off the machine and the Soldier "dies."

The Crazed Inventor then summons a Cyborg/Robot to kill the Electrician and then turn his evil intentions to the terrified Assistant, who is then told she is "on Scare Tactics."

## DEFENDANTS' WORK, "STORAGE WAR OF THE WORLDS"

The Defendants' work is roughly four and a half times the length of Plaintiffs' original story and includes filler that is not in Plaintiffs' original work.   This filler does not materially change Plaintiffs' original story as the Marks in Defendants' work eventually end up in the same "scare" as in Plaintiffs' original work.

In Defendants' work, an Assistant (the Mark) is hired to help an Electrician track down the source of power issues at a facility that is soon to be demolished.

SCHEDULE II

1

While investigating an exterior electrical panel, the Electrician and the Assistant discover a "bootleg" meter and follow an illegal power cord into a mysterious building.  They enter and discover lots of old electrical equipment.  This leads them to discover a Soldier hooked up to electrical wires and equipment.  The power has been keeping him alive.  A decision is made to shut the power down that is feeding the life containment unit of the Soldier. The Soldier "dies." The Assistant and the Electrician notice other containment units that appear to house unseen life forms.  Finally, an Alien creature escapes from one of the containment units, incapacitates the Electrician, and is about to attack the Assistant, at which point the Assistant is told he is on "Prank Encounters."

## SIMILARITY ANALYSIS

There are elements and characters appearing in Defendants' work that do not appear in Plaintiffs' original work; however, in this case, Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in Plaintiffs' original work, "Phantom Power", also appear in the Defendants' alleged copycat work, "Storage War of the Worlds."

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' original work and "re-appears" in the Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

### The Plots Are Substantially Similar

1.   In Plaintiffs' original work, a Mark is hired to help an "Electrician" investigate odd power surge issues.   This *exact* set up is the basis for the Assistant's journey in Defendants' work.  Instead of an Electrician, Plaintiffs could have had the Mark assist a homeowner man, a little old lady, or a gas utility worker.   Plaintiffs had many options, yet Plaintiffs chose Electrician. So, too, did Defendants.

SCHEDULE II

2

2.  In Plaintiffs' original work, the events take place at night in a remote storage
    facility.  In Defendants' work, the events also occur at night and in a remote
    storage facility.  That Plaintiffs chose a remote storage facility is deliberate.
    Plaintiffs had countless other venue choices.  So, too, did Defendants.  Yet,
    both chose remote storage facilities.

3.  In Plaintiffs' original work, the Assistant and the Electrician study an
    outdoor electrical box for clues. There they find an "extra" wire that should
    not be there coming out of the electrical box.  In the Defendants' work, the
    "Electrician" and the Assistant replicate the same story beat.  Plaintiffs could
    have employed countless ways to intrigue the Assistant and Electrician into
    going to the storage facility.  They didn't have to use the ole' "extra" wire
    trick.  Yet, Plaintiffs did.  So, too, did Defendants.

4.  In Plaintiffs' original work, the Electrician and the Assistant follow the
    "extra" wires to a mysterious building, which they believe may provide
    clues as to the electrical issues they are investigating.  In Defendants' work,
    the same action occurs.   This extra wires bit is not "stock" setup for the plot.
    That both Plaintiffs and Defendants employ this unnecessary scheme to
    intrigue the Assistant and Electrician is uncanny.

5.  In Plaintiffs' original work, the Electrician and the Assistant enter and find
    unusual electrical machines.  In Defendants' work, the Electrician and the
    Assistant also enter and find unusual electrical machines. Plaintiffs didn't
    have to have the "victim" Soldier attached to electrodes.  The victim could
    have been in a hyperbaric chamber with oxygen almost depleted.  There are
    countless ways Plaintiffs could have presented the "victim" of the Crazed
    Inventor.  Plaintiffs chose a Soldier character.  So, too, did Defendants.

6.  In Plaintiffs' original work, the Electrician and the Assistant discover a
    Soldier being held against his will.  The Soldier is attached to electricity that
    he says is keeping him alive.  In Defendants' work, the Electrician and the
    Assistant also discover a Soldier, also being held against his will, also being
    kept alive by electricity.   Here, it is clear that one would be hardpressed to
    come up with the same imaginative plot point that the victim Soldier's very

SCHEDULE II

3

EX.  1    PG.  51

existence is tied to electricity.  Yet, Defendants do just that.  That defies the odds.

7.  In Plaintiffs' original work, the Electrician flips a big switch on a power box that leads to the accidental death of the Soldier.  In Defendants' work, the *same* action occurs.  Plaintiffs didn't have to have the Soldier die to invoke fear in the Assistant/Mark.  In fact, that the Soldier dies in Plaintiffs' work is a bit incredulous.  It's similarly incredulous for the Soldier in Defendants' work to have died as a result of the power being shut off.

8.  In Plaintiffs' original work, the actions of the Electrician and the Assistant lead to the reveal of a strange a non-human life form (the Cyborg).  The *same* occurs in Defendants' episode (an Alien).   The Cyborg/Alien are unnecessary "fluff" to each of these stories.  Neither the cyborg nor the alien are "stock" characters necessary to accomplish the "scare."  Yet, both Plaintiffs and Defendants employ such.

9.  In Plaintiffs' original work, the non-human life form incapacitates the Electrician by attacking him from behind. In Defendants' work, the *same* action occurs.  Plaintiffs could have had the non-human life form attack the Crazed Inventor.  Defendants, armed with so much time than Plaintiffs, could have taken creative license and had the non-human life form morph into other, eerie forms.  Yet, Defendants chose, instead, to have the non-human life form incapacitate the Electrician  by attacking him from behind – just like Plaintiffs.

10.  In Plaintiffs' original work, the Electrician getting attacked is the penultimate story beat before the Assistant, who is terrified, is told he is on a television show. In Defendants' copycat work, the *same* structure occurs.

Pivotal scenes in the Defendants' work mimic key scenes and situations seen in Plaintiffs' original work. These include specific actions, characters, use of props and threat of deadly harm to the Assistants.  The "story spine" of Plaintiffs' work, "Phantom Power," is clearly visible in Defendants' work, "Storage War of the Worlds," and the basic narrative and thrust of Plaintiffs' original work have clearly been appropriated and utilized in the Defendants' work.

SCHEDULE II

4

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/18/20   Page 53 of 145   Page ID
#:543
Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/18/20   Page 54 of 57   Page ID
#:218

## The Sequencing Is Substantially Similar

In addition to the same, virtually identical elements appearing in both works, these elements appear in the same order or sequence in each work.

This is true even though Plaintiffs' story could have been told through a different creative choice of the play-by-play lineup of elements while delivering the same finished scary product.

For instance, without re-writing the whole story, in Plaintiffs' work: the Electrician and the Assistant could enter the building at the very beginning of the piece, trace electrical cords back to a bunch of crazy machines, then to a meter, and then further into the building where they see the Soldier attached to electrodes. Or, in Plaintiffs' work, instead of a soldier attached to electrodes, it could have been a little old lady or a dog. Plaintiffs could have had the electrodes attached to a grenade and a timer. Plaintiffs did not. Trying to help, Plaintiffs' characters turn off the power and accidently "kill" the Soldier. All of these choices indicate creative options made by Plaintiffs when creating their work and sequencing it in a unique and concrete manner. Notably, Defendants did not even bother to adjust their sequencing. As a result, their sequencing is clearly a copy of Plaintiffs and is substantially similar.

## The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. The characters In each work are also the "same."  The Assistant (Mark) is a young civilian person. The Electrician is much older (instead of an age cohort with a similar expertise). The "electrocuted Soldiers" are also the same age and both are wearing clothing identifying them as "military servicemen." The soldiers were both being used to keep non-human life forms alive.  Instead of a Soldier attached to electrodes, Plaintiffs could have had a little old lady or a dog attached to electrodes.  Plaintiff did not.  Defendants, too, could have had any other life form attached to the electrodes.  Defendants did not.  Moreover, the use of electrodes was not a necessary component of Plaintiffs' story or Defendants' story.  Yet, both stories employ the use of electrodes.

SCHEDULE II

5

**EX. 1   PG. 53**

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' original work was designed, by creative choice, to take place at a remote storage facility in the "middle of nowhere," thus leaving the Mark isolated and with no immediate chance of rescue.  The events take place at night, clearly a creative choice because "usually" a "meter reader" does his or her job during daytime work hours.  Obviously, the "setting" was a creative choice for this story (which could have been acted out during the day in an industrial warehouse).

**The Moods are Substantially Similar**

Mood is a device used to create an emotional response and attachment to the work in furtherance of the theme.  The same is true of setting and pace.  Here, the "mood" for Defendants' work is lifted directly from Plaintiffs' work: mysterious and strange, eerie and <u>not at all</u> commonplace. Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is an unapologetic copy of the original.

SCHEDULE II

EX. 1     PG. 54

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 07/13/20   Page 55 of 145   Page ID
Case 2:20-cv-02726-CJC-MAA   Document 20-1   Filed 03/29/20   Page 16 of 57   Page ID
#:545

# SCHEDULE III

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/29/20   Page 56 of 145   Page ID
#:546
Case 2:20-cv-02726-CJC-MAA   Document 30-1   Filed 05/19/20   Page 57 of 57   Page ID
#:524

# SCHEDULE III

## PLAINTIFFS' ORIGINAL WORK, "ROAD KILL"

In this story, an Assistant (the Mark) is hired to help a Government Investigator (an actor) look into a series of accidents involving government vehicles. A Videographer (also an actor) rides with them to make a video record of everything they find.  The three travel at night to a spot on an isolated, rural road and come upon an accident scene, including debris from a wrecked car.

The Assistant finds a car part, the grille of the wrecked car covered in blood and hair.  As the investigation continues, a local Farmer appears and tells them that three weeks ago, he saw "something very big" shoot across the road.  Suddenly there is a "howl" from the woods.  The Assistant thinks it was from wolves.  The Farmer leaves quickly.

The team returns to their car, where they hear another howl and then the sound of a car crash.  They investigate and discover another vehicle on the road, this time a wrecked van. The Driver of the van is missing, and there is blood and scratch marks inside and outside the van.  When the Investigator goes to look at the van, the frightened Assistant stays behind.

The missing van Driver then appears at their car seeking help.

The Drive joins the Assistant and the Videographer in their car, leaving the Investigator outside.  Suddenly, they see the Investigator attacked and pulled away by a mysterious Creature.  The Driver wants to start the car to flee but is unable to do so.

The three are stuck in the car when a large hairy Creature suddenly reaches into the car and attempts to pull the Driver out through the window.  At this point, with the Mark begging to leave, the Driver informs the Mark that he is on "Scare Tactics."

## DEFENDANTS' WORK, "END OF THE ROAD"

The Defendants' work is roughly four and a half times the length of Plaintiffs' and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the two Marks eventually end up in

SCHEDULE III

1

the same "scare" as in Plaintiffs' work.  Mark 1 is hired by a government agency to investigate a series of car accidents.  She is accompanied by a Government Investigator and a Videographer.  Joining them is a Naturalist.  Mark 2 is hired by an Agent from an insurance company to investigate the same accidents.

Traveling along an isolated rural road at night, Mark 1 and her team come upon the remains of an accident scene. While looking over the debris, they discover remnants/car parts from the accident covered in blood and hair.   Meanwhile, while traveling to the same site, Mark 2 and the Agent come across a man who claims his friend has gone missing in the woods.

When the two Marks finally meet up, they discuss what they have discovered so far, but then they hear an animal noise – a "growl" -- coming from the woods.  An "unexpected" car approaches on the rural road. There are two Young Men inside. Asking for instructions, they are told that they are far from their destination. The car drives off down the road.  Moments later, everyone hears the sound of an car crash down the road.

Rushing to the scene, they discover the same car.  The young male Driver is injured.  His passenger is missing.

The Marks see what they think is fur embedded in the wreckage.  Deciding they need to take the injured Driver to a hospital, everyone except the Naturalist and the Videographer climb into a nearby government van that will not start.

Then, while scanning for the missing passenger, the Naturalist is attacked by a big hairy Creature, as is another person who is looking for his missing hiking partner.  The Creature then attacks the government van and attempts to drag the injured Driver out a window, but fails.  The missing young Passenger then runs up and tells the Marks, who are supposedly terrified, that they are on "Prank Encounters."

**SIMILARITY ANALYSIS**

There are elements and characters appearing in Defendants' work that do not appear in Plaintiffs' original; however, in this case, Plaintiffs' concept is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story. These concrete elements established in Plaintiffs' original work, "Road Kill," also appear in the Defendants' alleged work, "End of the Road."

SCHEDULE III

2

**EX.  1   PG.  57**

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' original work and "re-appears" in the Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a Mark is hired by a government agency to investigate car accidents involving government vehicles.  In Defendants' copy, Mark 1 is hired by a government agency to investigate car accidents. Defendants' set up is identical to Plaintiffs'.  Plaintiffs didn't have to employ government agency characters.  Plaintiffs could have employed insurance agents instead.  Or, Plaintiffs could have had investigators working for the district attorney's office.  Defendants, armed with so much more time than Plaintiffs, had countless options as far as their choice of characters goes. Yet, Defendants chose the same government agency characters.

2. In Plaintiffs' original work, a Videographer joins the team to record the investigation. In Defendants' work a Videographer is also on board.  The Videographer is an add on character not completely necessary for the plot. Yet, both Plaintiffs and Defendants have the Videographer.

3. In Plaintiffs' original work, the incident occurs at night on an isolated, rural road.  Again, Defendants use an identical setting.  Plaintiffs could have had the investigative location be at a church parking lot or a college campus or a campground.  Plaintiffs did not and neither did Defendants.

4. In Plaintiffs' original work, there is debris from a car wreck - a car part covered in blood and hair.  In Defendants' work, there is debris from a car wreck - a car part covered in blood and hair.  Plaintiffs may have decided to have the car part covered in blood and hair because they were up against a limited timeframe.  Defendants, however, were not.  Defendants had ample opportunity to elicit the notion that a hairy and scary Creature lurked nearby.

SCHEDULE III

3

They had license to create a "build-up" of sorts, yet they chose to take the same "shortcut" as Plaintiffs.

5. In Plaintiffs' original work, the Mark and a Farmer/Animal Expert examine mysterious hair on the wreckage. The Farmer says he doesn't know what it is. In Defendants' work, the "Farmer" part is played by a Naturalist/Animal Expert who also examines mysterious hair on the wreckage and has no answers.  Defendants' use of a "Naturalist" instead of a "Farmer" is not a real change in the Animal Expert character. In fact, this is a method used by many screen writers to mask their copying of work by another writer.  This character is completely unnecessary to both Plaintiffs' story and Defendants' story.  No doubt Plaintiffs' and Defendants' Animal Expert character played by the Farmer and Naturalist, respectively, foreshadows a threat of some sort.  Both Plaintiffs' story and Defendants' story would have accomplished the "scare" without the Animal Expert.  Yet, both stories include this unnecessary character.

6. In Plaintiffs' original work, the Farmer gives an eyewitness account of a mysterious Creature he could not identify that was moving too quickly moving across the road. In the Defendants' work, the Mark is shown security camera footage of a mysterious Creature quickly very moving across the road and learns (just as the Farmer) that the Naturalist could not identify the Creature.

7. In Plaintiffs original work, scary howls are heard from the nearby woods.  Clearly similar, in Defendants' work scary growls are heard from the nearby woods.  Plaintiffs' use of howls may have been necessitated by the time limit constraints.  Defendants didn't have such time constraints.  Thus, Defendants could have employed numerous other option to elicit the existence of a scary Creature lurking about.

8. In Plaintiff's original work, the Mark and his team hear, and then investigate, a second car crash down the road. In Defendants' work, the Marks also hear, and then investigate, a second car crash down the road.  This "live" car crash is completely unnecessary to establish the existence of a scary Creature

SCHEDULE III

4

lurking about.  Yet, both Plaintiffs and Defendants have such a "live" car crash.

9. In Plaintiffs' original work, the Driver of the wrecked car is missing, and there is blood and hair on the vehicle.  In Defendants' work, the Passenger is missing, and there is also blood and hair on the vehicle.  Here, Defendants had the opportunity to have multiple characters go missing.  Yet, Defendants kept to the script – Plaintiffs' script, that is.

10. In Plaintiffs' original work, the Investigator, while looking for the missing Driver, is attacked by a Creature and disappears.  In Defendants' work, while looking for a missing passenger, the Naturalist is attacked by a Creature and disappears.   Again, Defendants, armed with four times the amount of time as Plaintiffs, chose to do as Plaintiffs had done.

11. In Plaintiffs' original work, the Mark stays inside the car and is joined by the missing Driver.  In Defendants' work, the Marks also stay inside the car and are joined by the injured Driver.   The similarities are simply uncanny.

12. In Plaintiffs' original work, the frightened Mark wants to leave, but the vehicle won't start. In Defendants' work, the frightened Marks want to leave, but the vehicle won't start.  Plaintiffs could have had the car's mobility be thwarted by a fallen tree.  Plaintiffs seems, instead, to have chosen ignition problems.  Defendants, armed with ample time, could have had the car start, only to have a tire spin-out or any number of other calamities befall the car and its occupants.

13. In Plaintiffs' original work, the Creature attacks the vehicle and attempts to drag the injured Driver away through a window.  In Defendants' work, the Creature also attacks the vehicle and attempts to drag the injured Driver away through a window.  Defendants had ample time to be a bit more creative than Plaintiffs here.  Yet, Defendants chose the shortcut; they chose Plaintiffs' version.

SCHEDULE III

5

14. In Plaintiffs' original work, the attack fails, and the Mark is then told he is on "Scare Tactics."  In Defendants' work, the attack also fails, and the Marks are then told they are on "Prank Encounters."

As clearly evidenced, Defendants' work mimics content in Plaintiffs' original work and, in some cases, wholly appropriates key scenes, and situations from Plaintiffs' original work.  These include not only specific actions, but also characters, use of props, and large hairy Creatures.

The basic and original story line of Plaintiffs' "Road Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "End of the Road."

## Sequencing Is Substantially Similar

In addition to the virtually identical plot elements appearing in both Plaintiffs' work and Defendants' work, these elements appear in the same order or sequence in each work.

For example, the convention of creating a second car accident in each episode is deliberately sequenced late Plaintiffs' work and appears at an identical time in Defendants' work.  In both cases, the "late second car crash" is followed directly by the Creature attack and is used to drive home the possibility of a dangerous creature in the area.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For instance, the Mark in Plaintiffs' original work could have come upon the accident scene through a completely different set-up, say as a new employee mapping the road, or looking for dead animals. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead, Plaintiffs chose to have the Mark hired by the government to help in the investigation of car accidents, the exact same set up used by Defendants.

SCHEDULE III

6

**EX. 1   PG. 61**

Rather than copying Plaintiffs' original sequencing, Defendants could have
adjusted their sequencing, but they did not.  As a result, Defendants' sequence is
substantially similar to Plaintiffs' original.

## The Characters Are Substantially Similar

A character is a person (or perhaps an animal or Creature) used to perform
action and speak dialogue, moving the story along a plot line. In Plaintiffs' original
work, we see a Mark who is hired to assist an Investigator, but not just any
Investigator.  No, the Mark is hired to assist a Government Investigator.  They are
accompanied by a Videographer.  The Videographer is not a "stock" character.  At
one point, a local Farmer appears (familiar with wildlife), and near the end of the
story, the Driver of a crashed auto also appears.  The second car crash victim is
certainly not a "stock" character necessary to accomplish the "scare."

In Defendants' work, the Mark is hired to help the Investigator and they are
joined by a Videographer (the same characters).  The "Naturalist" plays the same
role as the "Farmer". Then there is the Driver of the crashed vehicle.  Counting the
Creature, the five characters are virtually identical to those in Plaintiffs' original
work.

## The Settings Are Substantially Similar

The setting is the time and location in which the story takes place.  The
definition of setting can also include social status, weather, historical period, and
details about immediate surroundings. The setting provides the backdrop to the
story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants'
work are the same - cars travel on a country road, night, debris from a car wreck,
work lights set up, hearing a second "crash" and going to that spot where they get
into a car to leave.  The choice of a country road to investigate an auto vs. animal
accident was a creative option selected by Plaintiffs.  Notably, auto vs. animal
accidents also occur on busy highways and secondary roads all too frequently (i.e.
mountain lions in Southern California; deer and elk in Colorado).

SCHEDULE III

7

**EX.  1   PG.  62**

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is essentially "helpful," i.e. from the onset, everyone is trying jointly to solve the puzzle.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "helpful" mood used by Defendants is identical to Plaintiffs'.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work I s an almost identical copy of the original.

SCHEDULE III

8

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 07/13/20   Page 64 of 145   Page ID
Case 2:20-cv-02726-CJC-MAA   Document 20-1   Filed 05/29/20   Page 25 of 57   Page ID
#:532
#:234

# SCHEDULE IV

# SCHEDULE IV

## PLAINTIFFS' ORIGINAL WORK, "SATAN'S BABY"

In Plaintiffs' story, "Satan's Baby," a Receptionist (the Mark) is hired to work as a receptionist at an urgent care facility. The Doctor, with whom she works, informs her that her main job is to answer the phone.

A Pregnant Woman and her Spouse rush in. The Pregnant Woman appears to be in significant pain. The Doctor takes the Pregnant Woman into the treatment area, leaving the Receptionist with the Spouse in the waiting room. The Spouse makes a phone call to someone and informs the person that "it's time."

The Doctor enrolls the Receptionist to help him with the Pregnant Woman. The Receptionist is instructed to hold the Pregnant Woman's hand to comfort her. The Pregnant Woman, who claims to be only five months pregnant, is in severe pain.

A Man in Black arrives at the urgent care facility. The Spouse claims the Man in Black is a priest.

The Pregnant Woman flatlines for a beat but is revived by the Doctor. Suddenly, a "Frightening Creature" bursts out of her abdomen. The Frightening Creature, covered in blood, attacks the Doctor, biting him on the neck. The Frightening Creature then turns toward the Receptionist, who is terrified. But, before the Creature can attack the Receptionist, she is informed that she is on "Scare Tactics."

## DEFENDANTS' WORK, "URGENT SCARE"

The Defendants' work is roughly four and a half times the length of Plaintiffs' original work and includes filler that is not in Plaintiffs' original work. These added elements involve another Mark who believes she is helping an astronaut and his wife with a personal appearance. This filler does not materially change Plaintiffs' original story as the two Marks eventually end up in the same "scare" as in Plaintiffs' work.

In Defendants' work, a Receptionist (the Mark) is hired as a receptionist at an urgent care facility. The Doctor informs her that her main responsibility is to answer the phone.

A Man and his Spouse enter the facility.  The Man is in pain.  The Doctor takes him to the treatment room. The Man, an astronaut, has recently returned from space and is having pain in his abdomen. The Doctor asks the Receptionist to help him with the Man, and she holds the Man's hand to comfort him.  The Doctor leaves the Man in the treatment area to call a government official.

While assisting the Doctor, the Receptionist feels a "heartbeat" emanating from the Man's abdomen.  Suddenly, a Man in Black enters, informing the Doctor that whatever comes out of the Man's stomach belongs to the Man in Black.

As the Man screams in pain, his stomach rips open and a "Frightening Creature" bursts out of him and attacks the Doctor.  The Frightening Creature also attacks and bites the Man in Black.  The Frightening Creature is clearly going to attack the Receptionist and the other mark, but before harm happens, it is revealed that they are on "Prank Encounters."

**SIMILARITY ANALYSIS**:

In the Defendants' work, an ailing astronaut is substituted for a pregnant woman, but this change, and perhaps the addition of some filler, does not alter the basic concept, intent, dramatic thrust and concrete and specific actions exhibited in Plaintiffs' original work and utilized in Defendants' alleged copycat work.

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and that "re-appears" in the Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a receptionist is hired to work as a receptionist in an urgent care facility at night.  This is exactly the same setup used in Defendants' work.  Plaintiffs could have had the Mark assist a midwife with the birth of a baby at a pregnant woman's home.  Or, Plaintiffs could have had the Mark be a temporary worker at a senior care facility or a camp counselor.  Or,

Plaintiffs could have employed the urgent care facility but had the mark be an inspector or sorts or a nurse's aide.

2. In Plaintiffs' original work, the Receptionist at the urgent care facility is a young woman in her late teens/early 20s. In Defendants' work, the mark is also a young woman in her late teens/early 20s.  Plaintiffs could have had the Mark be a middle-aged woman or an elderly man.  Plaintiffs did and neither did Defendants.

3. In Plaintiffs' original work, the Receptionist works alone with a single Doctor, and is told her job is to answer the phone.  In Defendants' work, the setup is the same. Plaintiffs did not have to have the Mark be a receptionist whose primary duty was to answer phones.  The answering phones part is distinctly creative in that an urgent care facility does not evoke thoughts of answering phones; rather, an urgent care facility evokes thoughts having patients fill out paperwork, scheduling appointments, and taking patients to treatment rooms.

4. In Plaintiffs' original work, a Pregnant Woman in distress is brought by her Spouse into the urgent care facility for treatment.  In Defendants' work, a Man in distress with his abdomen is brought by his Spouse into the urgent care facility for treatment.  Although the genders are changed, the Pregnant Woman and the Man with abdominal pain clearly play the same part in both works (the carrier for the Frightening Creature).

5. In Plaintiffs' original work, the Doctor escorts the ailing Pregnant Woman into the treatment room, leaving the Receptionist at her desk. This action is repeated exactly in Defendants' work.  This, too, is especially distinctive. Doctors are universally portrayed as too scholarly and esteemed to do the menial task of escorting their patients to treatment rooms.  Yet, Plaintiffs deliberately chose to go against the grain in this respect.  So, too, did Defendants.

6. In Plaintiffs' original work, the doctor returns to the front desk and asks the Receptionist to assist him with the "patient."  This action also occurs in Defendants' work.  That a Doctor would ask a seemingly ignorant layperson to

SCHEDULE IV

3

assist with urgent medical care defies logic.  Nonetheless, Plaintiffs take said route.  So, too, do Defendants.

7. In Plaintiffs' original work, in the treatment room, the Receptionist/Mark is instructed to hold the patient's hand as comfort.  These exact same instructions and subsequent action are replicated in Defendants' work. Plaintiffs could have been instructed to lay a warm compress on the patient's abdomen, or a wet washcloth on the patient's forehead.  Instead, Plaintiffs chose, deliberately, to have the Receptionist/Mark hold the patient's hand.  So, too, did Defendants.

8. In Plaintiffs' original work, the Pregnant Woman is in severe abdominal pain, about to give birth.  In Defendants' story, the Man is in severe abdominal pain, and is suffering from a distended abdomen.  Plaintiffs deliberately chose to have a Frightening Creature emerge from an abdomen and chose a Pregnant Woman to accomplish this task.  Defendants could have had their Frightening Creature emerge from their patient's back or side.  Alternatively, Defendants could have had their patient sleep with a sheet covering their body and head, only to emerge as the Frightening Creature.  Instead, Defendants chose the abdomen.  Such was not required to invoke the "scare," yet Defendants chose it anyway.

9. In Plaintiffs' original work, a mysterious Man in Black arrives, deeply interested in the outcome of the incident.  Similarly, in Defendants' work, a mysterious Man in Black arrives, also deeply interested in the outcome.  This is perhaps the most egregious example of Defendants' copying.  The Man in Black no doubt adds to the suspense of the story.  He's creepy.  However, he is not necessary to Plaintiffs' story or Defendants' story.  Yet, both stories have this Man in Black character, who, again, is essentially a fluff character.  Plaintiffs' plot of an alien-like Frightening Creature emerging from the abdomen of an urgent care patient does not require the inclusion of this Man in Black.  He is not a "stock" character necessary to accomplish the "scare."  Yet, this same "fluff" character is in Defendant's work as well.

10.  In Plaintiffs' original work, the Pregnant Woman expels a Frightening Creature covered in blood.  In Defendants' work, the Man expels a Frightening Creature covered in blood.

SCHEDULE IV

4

**EX. 1   PG. 68**

11. In Plaintiffs' original work, the Frightening Creature attacks the Doctor, biting him in the neck. In Defendants' episode, the Frightening Creature attacks the Doctor, and is seen biting the Man in Black in the neck. Plaintiffs did not have to have the Frightening Creature bite anyone, and certainly did not have to have the bite levelled at the Doctor. Neither did Defendants.

12. In Plaintiffs' original work, as the Receptionist/Mark cowers in terror, the Frightening Creature turns his focus on her, just before she is informed, she is on "Scare Tactics." In Defendants' work, the Frightening Creature does the same, and the Mark(s) are informed they are on "Prank Encounters."

13. In addition, the actor (Gabriel Pimentel) chosen by the Plaintiffs to play the "Frightening Creature" in their original work is the same actor chosen to play the same role in the Defendants' work.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

## The Sequencing Is Substantially Similar

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the "Frightening Creature" bursting out of the patient and attacking other characters is deliberately sequenced late in Plaintiffs' work and appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product. For instance, the wife in the original work could have arrived at the urgent care facility by herself experiencing minor discomfort. As she sits in the reception area, her spouse arrives, and the pain could start to get worse. Then, when the "Man in Black" arrives, the pain becomes excruciating and she is rushed to the back. This is

SCHEDULE IV

5

**EX. 1    PG. 69**

not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.  In addition, there is no need for Plaintiffs to have included the Man in Black.  Plaintiffs' story would, no doubt, have elicited fear in the Receptionist without the Man in Black.  He was not necessary to the story.  Likewise, Defendants' story did not need the Man in Black.  The Man in Black is arguably fluff to both Plaintiffs' and Defendants' stories. Yet, the Man in Black is presented in both Plaintiffs' work and Defendants' work.

Rather than copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

## The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Receptionist who is hired to assist an Urgent Care Doctor. They encounter a Pregnant Woman with severe abdominal pain and her Spouse.  At one point, a mysterious Man in Black appears, and near the end of the story, a Frightening Creature emerges from the patient-Pregnant Woman and attacks the Doctor.  In Defendants' work, the Mark is also a Receptionist that is hired to assist a Doctor at an urgent care facility, at which a Man with severe abdominal pain and his Spouse arrive.  At one point, a mysterious Man in Black appears, and near the end of the story, a Frightening Creature that emerges from the abdomen of the patient-Man appears and attacks the Doctor. These five characters are virtually identical to those in Plaintiffs' original work.  A patient may be necessary.  A doctor may be necessary.  The Man in Black is not.  The Spouse is similarly unnecessary.  Yet, both Satan's Baby and Urgent Scare have the Man in Black and Spouse characters – neither of which are "stock" characters necessary to the plot.

## The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and

SCHEDULE IV

6

details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same – an urgent care facility at night. The specific setting of Plaintiffs' original work was clearly a creative choice. For example, Plaintiffs could have set the concept at a regular doctor's office during the day instead of setting it at night in an urgent care facility.  Plaintiffs could have utilized multiple "doctors and nurses" working at the facility alongside the Receptionist, and still involved the Receptionist in the actions exhibited.  The setting could have been a senior care facility or a home whose resident had abdominal pain.  Defendants could have had the Man visit his internist related to a blemish on his abdomen or experience an itch, either of which intensifies at the doctor's office.  Defendants did not.  Instead, Defendants chose the same setting as Plaintiffs.

It should be noted that pregnant women in distress would be much more likely to go to their pediatrician or emergency room at a hospital with a pediatric ward. Therefore, the choice of an urgent care facility as opposed to a pediatrician's office or emergency room is a concrete expression by Plaintiffs.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "urgency," i.e. from the moment the Pregnant Woman in abdominal pain enters, everyone is urgently trying to solve her medical crisis and comfort her.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "urgent" mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is an unabashed copy of the original.

SCHEDULE IV

7

**EX. 1   PG. 71**

# SCHEDULE V

Case 2:20-cv-02726-CJC-MAA  Document 31-2  Filed 05/28/20  Page 73 of 145  Page ID
#:563
Case 2:20-cv-02726-CJC-MAA  Document 31-2  Filed 05/28/20  Page 34 of 57  Page ID
#:568

# SCHEDULE V

## PLAINTIFFS' ORIGINAL WORKS, "IT'S MY PARTY" & "SEND IN THE CLOWNS"

In Plaintiffs' "It's My Party", a Waitress (the Mark) is hired to assist a Caterer at a rich man's birthday party.  The Birthday Man arrives and begins to open gifts proffered by his Guests – including, as a "birthday present", a special appearance by the actual host of Scare Tactics, Tracey Morgan.  Then, in the middle of the party, a clearly Unwanted Guest arrives, carrying a birthday cake.  His presence unnerves the partygoers, but he says he wants to make amends to Birthday Man.

The Waitress slices and serves the cake; the Unwanted Guest insists that the Waitress enjoy the cake as well.  As the Waitress and the partygoers eat, the Unwanted Guest tells a story about how he and Birthday Man had dreams to start a company.  But, he claims, Birthday Man cut him out, stole his idea, and made millions.

Suddenly, partygoers start to foam at the mouth. The Unwanted Guest announces that the cake is poisoned.  But he has the antidote instructions on a DVD, and he will let them have it for ransom.  The Caterer sneaks up and strikes the Unwanted Guest with a bottle, which knocks the Unwanted Guest out.  Then, the Caterer gives the DVD to the Waitress.  The Caterer then tells the Waitress to play the DVD.  At first, the DVD will not play, creating fear in the Waitress.  But, eventually, it starts, and that is when the Host of Scare Tactics, Tracy Morgan, appears on the DVD screen and reveals she is on "Scare Tactics".

Plaintiffs' "Send in the Clowns" begins when a Temporary Helper (the Mark) is hired by a Creepy Dad to help at his young Daughter's birthday party.  The Temporary Helper will work with another Assistant.  They are instructed to blow up balloons and put together gift bags, and later, they will perform a clown show.

Creepy Dad leaves to get his "Daughter" and the Temporary Helper and the Assistant dress as clowns. They hear muffled cries coming from a nearby closet where they discover a Woman, also dressed as a clown, her hands bound with rope. She tells them that there is no party, no Daughter, that the Creepy Dad is insane and that they have to leave.

SCHEDULE V

1

The Woman rushes to leave but is intercepted by the Creepy Dad, now dressed as a little girl, complete with wig. He uses a mallet to knock the Woman out, then orders the Mark and the Assistant to create balloon animals.

Getting angrier, the Creepy Dad orders the Assistant to shake his hand. She does, and a hidden handheld joy buzzer electrocutes her. The Temporary Helper races out of the room, but he is stopped and told he is on "Scare Tactics

## DEFENDANTS' WORK, "SPLIT PARTY"

Defendants' work is roughly four and a half times the length of each of Plaintiffs' works and includes filler that is not in Plaintiffs' original works.

"Split Party" deals with two Marks, who both meet a rich Creepy Dad, who is holding a birthday party for his young "Daughter" at his mansion. Mark # 1 takes a different dramatic path to reach the party, and the events that happen to her before she arrives at the mansion are simply "filler" to help inform her reality, but do not materially affect the underlying concept and telling of the prank as the two Marks eventually end up in the same "scare" as in Plaintiffs' combined works.

Mark 2, a Temporary Helper, arrives at the mansion to meet a Caterer whom she will help along with another Assistant. The Temporary Helper and the other Assistant are both introduced to a Creepy Dad, who tells them he wants the perfect party for his young "Daughter". He calls for his Daughter to "come meet the help", but she does not respond.

Mark # 1, a Van Passenger, arrives in a van along with a Celebrity Guest (the Host, playing himself), who is supposedly making a surprise appearance for the little girl. The Celebrity's Manager is with them.

The Creepy Dad disposes of a birthday cake that the Caterer had brought, and instead, shows the Celebrity Guest "special cupcakes" he claims the Daughter baked in his honor. He encourages the Celebrity Guest to consume one as he fetches his Daughter for the big surprise.

The Celebrity Guest eats a cupcake, as does his Manager. Both immediately fall ill, as the treats have been poisoned. A man, whose hands are bound with rope, rushes in. He is the Gardener. He claims that the Creepy Dad is insane and that they should leave. The Creepy Dad re-appears, now dressed in a little girl's outfit, and subdues the Gardener with poison cake.

SCHEDULE V

2

With both the Celebrity Guest and the Manager now foaming at the mouth from the poison, the Creepy Dad insists that everyone have a bite of the cupcakes. The Temporary Helper and the Van Passenger resist, and the threat from the Creepy Dad is ended when the Celebrity Guest suddenly awakens and shoves one of the supposedly poisoned cupcakes into the Creepy Dad's mouth, rendering him unconscious. It is here where the Temporary Worker and the Van Passenger are informed they are on "Prank Encounters".

## SIMILARITY ANALYSIS:

Although Defendants' work has story elements and characters not appearing in Plaintiffs' two episodes, these changes do not alter the basic concept, dramatic thrust and concrete elements exhibited in Plaintiffs' works and utilized in Defendants' copycat work.

Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story. These concrete elements, established in Plaintiffs' original works, "It's My Party" and "Send in the Clowns", also appear in Defendants' alleged copycat work, "Split Party".

The following is an analysis of the specific details of Plaintiffs' rendering of the original stories, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In both of Plaintiffs' original works, a Mark is hired to assist at a Rich Man's birthday party in a mansion. The party occurs during the day. This is the exact same set up as exhibited in Defendants' episode. The Mark could have been hired to assist at a party venue, country club or private room at a restaurant. Also, the Man did not have to be rich and living in a mansion. These are all examples of Plaintiffs' executive decision and choice among the myriad of choices Plaintiffs could have chosen.

2. In Plaintiffs' original work "Send in the Clowns", the Dad is portrayed as creepy and odd. In Defendant's copycat work, the character of the Dad is also creepy and odd. Plaintiffs could have had the creepy character be a mother or grandmother or sister or nanny. Plaintiffs' choice among the many choices

SCHEDULE V

3

shows Plaintiffs' executive, creative input.  Defendants, too, had countless choices with regard the character employed to accomplish the "scare."  Yet, unlike Plaintiffs, who made a choice, an executive creative decision, Defendants simply copied Plaintiffs' creative input with regard to the Dad– lock, stock and barrel.

3. In Plaintiffs' original work, "Send in the Clowns", Plaintiffs have the Creepy Dad exhibit his "creepiness" by making it clear that the Creepy Dad likes things done a certain way, with an exacting standard that renders him "creepy".  For example, when the Creepy Dad discovers the workers have done something that he does not like, he gets irrationally upset. In Defendants' work, the same action occurs.  Plaintiffs could have had the Creepy Dad exhibit his "creepiness" by exhibition of a tic, fits of laughter or alternating fits of laughter and tears.  Plaintiffs did not.  Defendants, too, could have exhibited the Creepy Dad's "creepiness" in a variety of ways, but Defendants did not.  Instead, Defendants' story has Creepy Dad exhibit his "creepiness" in the same manner as Plaintiffs' work.

4. In Plaintiffs' original work, "Send in the Clowns", the young Daughter constantly referenced by the Creepy Dad does not, in fact, exist.  In Defendants' work, the young Daughter also constantly referenced by the Creepy Dad also does not exist.  Plaintiffs could have the Creepy Dad have an actual daughter or son or the party could have been for the Creepy Dad's wife, girlfriend, mother or any other person or animal.  Plaintiffs did not.  Neither did Defendants.  The choice by Plaintiffs to have Creepy Dad have a non-existent daughter is the creative input and election among the myriad of choice articulated by Plaintiffs.  The fact that Defendants have the same Creepy Dad with the same non-existent daughter shows that Defendants made no such executive choice and offered no such creative input.

5. In Plaintiffs' original work, "It's My Party", the guests enjoy the birthday dessert not realizing it has been poisoned.  In Defendants' work, the same action occurs.  Plaintiffs could have had the guests poisoned with lemonade or a vapor mist or gas.  Plaintiffs did not.  Neither did Defendants.

6. In Plaintiffs' original work, "It's My Party", the guest of honor eats the poisoned birthday dessert and is stricken ill. This also occurs in Defendants' work.

SCHEDULE V

4

7. In Plaintiffs' original work, "Send in the Clowns", a character with wrists bound by rope who has clearly been abducted appears and warns that the Creepy Dad is insane and that they should get "out of here" immediately. But before anyone can escape, this character is rendered unconscious by the Dad. In the Defendants' work, the same action occurs. This character is not necessary to invoke the fear in the Mark or the audience. Plaintiffs chose to include this character, nonetheless. So did Defendants.

8. In Plaintiffs' original work, "Send in the Clowns", the Creepy Dad surprises everyone by appearing dressed as a little girl and claiming to be the aforementioned "Daughter". In Defendants' copycat episode, the same action occurs. There was enough "creepiness" in Plaintiffs' original work to invoke fear in the Mark and audience. Plaintiffs did not have to present the Creepy Dad dressed as a little girl. Neither did Defendants. But they both did.

9. In Plaintiffs' original work, 'Send in the Clowns", it is implied that the Mark will be harmed if he does not do exactly what the Creepy Dad asks. In the Defendants' work, the same action occurs. Plaintiffs could have implied that the Creepy Dad would kill the pet dog or the Creepy Dad's elderly 100-year mother. Plaintiffs did not. This portrays Plaintiffs' decision – creative decision – among the many choices available to Plaintiffs. Defendants could have had the Creepy Dad do any number of things. Defendants did not. Instead, Defendants did as Plaintiffs had done.

10. In Plaintiffs' original work, "It's My Party", the man threatening the party guests is incapacitated by someone at the party. The very next beat is the reveal that this is a prank. No one needed to be incapacitated in Plaintiffs' work. Plaintiffs could have accomplished their reveal by an EMT worker who is called to treat the poisoned victims. Plaintiffs could have had someone instruct the Mark to call "9-1-1," where upon the 911 Operator made the reveal. Plaintiffs did not. Neither did Defendants. Instead, Defendants accomplishes the reveal in the same manner.

It is clear that key original elements from both Plaintiffs' "Send in the Clowns" and "It's My Party" appear in Defendants' episode, "Split Party". These include specific actions, settings, costumes, props, use of poison, an imaginary Daughter,

SCHEDULE V

5

**EX. 1    PG. 77**

and threat to Marks. The dramatic spine of Plaintiffs' works clearly form the dramatic spine of the Defendants' work.

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the plot point about the man who served poison to the party guests being incapacitated in Plaintiffs' work appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original works was clearly a creative choice even though Plaintiffs' stories could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product. For example, the Plaintiff could have told the same story in "It's My Party" by having the Mark be hired to help at a nighttime cocktail party, an afternoon barbeque or a Sunday brunch. The menacing man could have poisoned the drinks instead of dessert. Also, in "Send in the Clowns", the Plaintiffs could have created a story where the little girl does exist but is tied up in an upstairs bedroom while her insane dad pretends to be the birthday girl. The options available to Plaintiffs are limitless. The choice Plaintiffs make is Plaintiffs' creative decision. Defendants could have demonstrated their creative input by choosing an alternate sequencing.

These are not the same sequences that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not. As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. Most of the characters in the Defendants' work are the same as in Plaintiffs' original works: we see the Temporary Helper and the Van Passenger who are young people in their

SCHEDULE V

6

**EX. 1    PG. 78**

early 20's hired to assist in throwing parties. They work with a Caterer and fellow Assistants. There is a Creepy Dad/Menacing Man who poisons the guest of honor. There is a character who has clearly been tied up and kidnapped by the Creepy Dad. This character adds flavor to the story, but this character is by no means necessary to accomplish the intended result – fear in the Mark.  To emphasize, the fact that Plaintiffs add this character, among the myriad of choices available to them, is in and of itself a creative input.  Plaintiffs demonstrate their arrangement of characters to create their story.  This is their creativity.  Also, there is an oft-mentioned young Daughter who does not exist. Plaintiffs did not need to have a daughter and certainly did not need to have that Daughter be non-existent.  There is a Creepy Dad who also appears dressed as and assuming the character of his non-existent Daughter. The dress-up by the Creepy Dad in Plaintiffs' work add to the Creepy Dad's "creepiness," but it is by no means required to scare the Mark. Likewise, Defendants' work did not need to have the Creepy Dad dress up.  But, Defendants did – just like Plaintiffs.  Then, there is a Celebrity Guest who participates in the story itself.  The inclusion of the Celebrity Guest is Plaintiffs' creative input.  Plaintiffs had many choices available to them, but their decision among the many choices is a creative input on Plaintiffs' part.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original works and Defendants' work are the same – a birthday party at a mansion in the middle of the day. Every other Prank Encounters episode takes place at night. The overwhelming majority of the pranks in Scare Tactics episodes take place at night. The specific setting of Plaintiffs' original works was clearly a creative choice. For example, Plaintiffs original story "It's My Party" could have easily been a nighttime dinner party, an afternoon barbeque or a Sunday morning brunch, considering all the guests were adults. The fact that it was set during the day was a concrete expression selected by Plaintiffs. The unusual choice of Defendants to copy the plots, characters, and

SCHEDULE V

7

**EX. 1   PG. 79**

Case 2:20-cv-02726-CJC-MAA Document 31-2 Filed 05/29/20 Page 80 of 145 Page ID
#:270
Case 2:20-cv-02726-CJC-MAA Document 20-1 Filed 05/29/20 Page 41 of 57 Page ID
#:270

"settings" of two diverse Scare Tactics pranks set during the day cannot be mere coincidence.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "unnerved," i.e. from the moment the Mark meets the Creepy Dad, to the reveal of the Dad dressed as his non-existent Daughter, the Mark is clearly unnerved. Considering that Defendants used Plaintiffs' plot, characters, and settings, it should be no surprise that the "unnerved" mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, unique daytime setting, and mood, it is abundantly clear that the Defendants' work is an undeniable copy of the original.

SCHEDULE V

8

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 07/13/20   Page 81 of 145   Page ID
#:549
Case 2:20-cv-02726-CJC-MAA   Document 20-1   Filed 05/29/20   Page 42 of 57   Page ID

# SCHEDULE VI

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/29/20   Page 82 of 145   Page ID
Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/29/20   Page 43 of 57   Page ID
#:550
#:272

# SCHEDULE VI

## PLAINTIFFS' ORIGINAL WORK, "CAMP KILL"

In Plaintiffs' story, "Camp Kill", a Mark arrives as a New Camp Counselor at a camp for kids located in the remote woods. It is nighttime.  The New Counselor is told that the camp is re-opening after an "incident" forced it to shut down last year.  The New Camp Counselor is meeting with two Supervisors (one Male, one Female) along with some other counselors. The Male Supervisor leaves to get some papers from another cabin, taking a two-way radio to stay in touch.

After he is gone, the New Camp Counselor sees a Menacing Figure that is wearing a mask and carrying a machete pass by a window.  Meanwhile, the Male Supervisor screams over the two-way radio, apparently getting attacked and being left for dead (which is not seen by the New Camp Counselor/Mark).  The other Counselors (all women) start to become very scared.  As the New Camp Counselor's fear level rises, the Male Supervisor stumbles in, bloodied and injured, telling everyone, including the New Camp Counselor that there is a maniac out there.

Suddenly, the Menacing Figure breaks a window and struggles to get inside.  This is when the actors reveal that the Mark is on "Scare Tactics."

## DEFENDANTS' WORK, "CAMP SCARECROW"

Defendants' episode, "Camp Scarecrow," is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the Marks eventually end up in the same "scare" as in Plaintiffs' original work.

In "Camp Scarecrow," two Marks, a new Male Camp Counselor and a new Female Camp Counselor, arrive at a camp for kids located in the remote woods. It is nighttime.  They are told the camp is re-opening after an "incident" forced it to shut down last year.  The Male Camp Counselor and the Female Camp Counselor meet separately with two Supervisors (one Male, one Female) along with some other counselors.

The Female Supervisor points out to the Female Camp Counselor that the camp uses two-way radios to communicate.  The Female Camp Counselor then uses a radio to talk to the Male Camp Counselor, who is in a different cabin with Male Supervisors.  A Male Supervisor informs the women (by radio) that the men are going out to search for an Assistant Supervisor who left earlier and has not been heard from.

The Female Camp Counselor suddenly sees a Menacing Figure, wearing a mask and carrying a scythe, pass by a window in the cabin she is in.  The Female Supervisor tells her about a Groundskeeper who was arrested in connection with the "incident" that led to the forced "shutdown."

The Male Camp Counselor and others come upon the Assistant Supervisor who had not been heard from since leaving the cabin.  He has been injured.  He was attacked (an action not seen by either Mark) and is woozy.  The Groundskeeper suddenly appears and is arrested by a Park Ranger for the attack.

The Female and Male Camp Counselors again see the Menacing Figure outside a window.  They use the two-way radio to call the Park Ranger for help.  He tells them that the Groundskeeper has escaped his custody.  Both the Male Camp Counselor and the Female Camp Counselor, now together in one cabin, see different people attacked outside by the Menacing Figure, who then breaks a window and yanks a Supervisor outside.  The Menacing Figure tries to get in but is stopped when the Host of the show enters and reveals to the Marks that they are on "Prank Encounters."


**SIMILARITY ANALYSIS**:

The concept of a mad man menacing people at a cabin in the woods is not new.  However, in this case, Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in the Plaintiffs' original work, "Camp Kill," also appear in the Defendants' alleged copycat work, "Camp Scarecrow."

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 07/13/20   Page 84 of 145   Page ID
#:574
Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/29/20   Page 45 of 57   Page ID
#:252

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and that "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a new Female Camp Counselor arrives at night at a kids' camp located in the remote woods where she has been hired to be a camp counselor.  This is the same setup utilized in Defendants' work, with the exception that two Marks are hired, one Male, the other Female. Plaintiffs did not have to have the Mark be a camp counselor.  Plaintiffs could have had the Mark be a cook, a prospective parent or person scouting camps on behalf of another.  The same is true for Defendants.

2. In Plaintiffs' original work, the new Female Camp Counselor is informed by the Supervisors that the camp is just now re-opening after being closed due to an unfortunate incident. In Defendants' work, the Marks are also informed by their respective Supervisors that the camp is just now re-opening after an unfortunate incident. Defendants could have had the new Camp Counselors at the inaugural season of camp.  There did not have to be an "incident" at all.  Or, Plaintiffs could have presented the Marks with a story that the camp had formerly been a facility for the criminally insane.  There are a number of avenues to set the stage to invoke fear.  Plaintiffs chose an "incident" so terrible that it caused the camp to have been shut down.  Defendants chose the same "incident" theory.

3. In Plaintiffs' original work, it is established by a Supervisor that the camp uses two-way radios to communicate. In Defendants' work, the same use of two-way radios is established by the Supervisors.  In today's age of unlimited advanced digital communication technology, that Plaintiffs chose a rather archaic two-way radio system to communicate is deliberate.  It was not necessary to create the "scare."  Plaintiffs could have had the Assistant

SCHEDULE VI

3

**EX. 1   PG. 84**

Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 07/13/20   Page 85 of 145   Page ID
#:573
Case 2:20-cv-02726-CJC-MAA   Document 31-2   Filed 05/29/20   Page 46 of 57   Page ID
#:273

Supervisor be outfitted with a company cell phone with "location" fixed in an "on" position, but that happens to yield no information as to the whereabouts of the Assistant Supervisor. That would have been ominous. There was no artistic benefit for Plaintiffs to have employed two-way radios. Two-way radios were, in no way, necessary to Plaintiffs' scare. Similarly, Defendants' use of two-way radios was of no consequence to the scare in Defendants' episode. Given the plethora of communication options available to Defendants, it is surprising that they chose two-way radios.

4. In Plaintiffs' original work, a Supervisor leaves to get paperwork from another cabin, taking a radio with him. In Defendants' work, a Supervisor also leaves a cabin to check something, and also carries a radio. Defendants could have had the Supervisor forget the radio device and have that Supervisor's radio emit strange noises. Instead, Defendants chose the same plot point as Plaintiffs.

5. In Plaintiffs' original work, a Menacing Figure with a weapon is outside. The figure walks by a window and the actors inside the cabin are positioned so only the Mark can see the figure out the window. In the Defendants' work, the exact same action occurs. Plaintiffs could have had the Mark see the Menacing Figure while en route from the dining hall to the Mark's cabin, or from the pool area to the dining hall. So, too, could Defendants. Plaintiff did not and neither did Defendants.

6. In Plaintiffs' original work, the Supervisor is attacked by a Menacing Figure, an incident not seen by the Mark. In Defendants' copycat work, the Supervisor is attacked, an incident also not seen by either of the Marks. It could have been the camp dog that got attacked in Plaintiffs' story or the cook. It was not. And, as we know, Defendants could have had the Menacing Figure attack anyone. They instead chose to have the Menacing Figure attack a supervising male camp counselor.

7. In Plaintiffs' original work, the injured Supervisor returns to the cabin and explains the attack. In Defendants' work, the injured Supervisor also returns to a cabin and explains the attack. Plaintiffs could have had the camp counselors, including the New Camp Counselor, come upon the injured

SCHEDULE VI

4

Supervisor the next morning. Plaintiffs did not. Defendants could have had the Marks learn about an attack on a person or animal, such as the "camp" dog, in a variety of ways. The discovery of the injured Supervisor was instead the same as in Plaintiffs' work.

8. In Plaintiffs' original work, there is a moment of calm right before the Menacing Figure breaks a window in an attempt to attack people inside the cabin. In Defendants' episode, there is also a moment of calm right before the Menacing Figure breaks a window to attack people inside the cabin. Plaintiffs could have had the Menacing Figure appear behind a post or a tree while the counselors, and Mark, walked the grounds. Defendants could have presented the Menacing Figure's threatened attack on the counselors and Marks in a variety of ways. They did not. They chose instead to mimic the presentation in Plaintiffs' original work.

9. In Plaintiffs' original work, just as it appears the Menacing Figure is coming back, the New Camp Counselor is informed she is on TV. In Defendants' episode, just as it appears the Menacing Figure is coming back, the Host of the show appears to inform the Marks they are on TV.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

The basic and original story line of Plaintiffs' "Camp Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "Camp Scarecrow."

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the "Menacing Figure" breaking through the window to attack people inside the cabin is deliberately sequenced late in Plaintiffs' work and

SCHEDULE VI

5

**EX. 1   PG. 86**

appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For example, Plaintiffs could have told the same story by having the Mark be hired as part of a cleaning crew or a person scouting the camp, and not as a camp counselor; Plaintiffs could have had the camp be fully operational, and not re-opening after something bad happened last season. And, the whole thing could have taken place during daylight hours. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Mark who is hired to be a Camp Counselor. They meet with two Camp Supervisors and other Counselors.  At one point, they see a Menacing Figure outside.  In Defendants' work, the Marks are also hired to be Camp Counselors. Defendants could have had the Marks be clean-up crew or a parent or sibling interested in "scouting" the camp or a city inspector.  They did not.  As with Plaintiffs' Mark, Defendants' Marks meet with two Camp Supervisors and other Counselors.  Defendants Marks could have, instead, met with an inspector, parents interested in checking out the camp, or owners of the property.  The options are virtually endless.  Plaintiffs' work includes a Menacing Figure outside. Plaintiffs could have had a rabid dog, wolf, bobcat or even an alien or a character that rises from the dead.  Again, the options available to Plaintiffs and Defendants are

SCHEDULE VI

**EX. 1   PG. 87**

limitless.  Despite the plethora of options, Defendants' characters are virtually
identical to those in Plaintiffs' original work.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The
definition of setting can also include social status, weather, historical period, and
details about immediate surroundings. The setting provides the backdrop to the
story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants'
work are the same – a kids' summer camp in the remote woods at night. The
specific setting of Plaintiffs' original work was clearly a creative choice. For
example, Plaintiffs could have set the concept at a kids' sports camp in a gym
during the day.  The gym could have been located at a major sports complex used
by professional athletes. In fact, when things start going wrong at such an upscale
facility, it might be even scarier. But the choice of an abandoned kids' summer
camp in the remote woods at night was a concrete expression selected by Plaintiffs.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "worried,"
i.e. from the moment the Camp Supervisors describe having to shut the camp down
due to a mysterious "incident" to the appearance of a Menacing Figure outside,
everyone in the cabins is on edge and worried.  Considering that Defendants used
Plaintiffs' plot, characters and settings, it should be no surprise that the "worried"
mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story,
including an articulation of the actual concrete elements including plot,
sequencing, characters, setting, and mood, it is abundantly clear that the
Defendants' work is an unabashed copy of the original.

SCHEDULE VI

7

Case 2:20-cv-02726-CJC-MAA   Document 20-1   Filed 05/29/20   Page 80 of 97   Page ID
#:279

# SCHEDULE VII

# SCHEDULE VII

## PLAINTIFFS' ORIGINAL WORK, "THE MUMMY"

Plaintiffs' story, "The Mummy," is set at night at an "archeological research institute."  A Temp (the Mark) is hired to assist a Professor and his Aide to inventory items from a pharaoh's tomb.  The Professor informs the Temp that a "curse" is alleged to have followed the artifacts and that all of the earlier excavation team members died shortly after unearthing the pharaoh and his treasures.  The pharaoh's coffin lies nearby.

The Professor leaves to run an errand, leaving the Temp and the Aide alone.  As the Temp and the Aide examine and itemize artifacts, the lights "flicker."  The Temp is worried, but the Aide dismisses any thought of a curse.  Suddenly, the pharaoh's coffin begins to shake.  The Temp and the Aide rush out to another room, where they contact the Professor by electronic communication, begging him to return.

When the Professor joins them, together they re-enter the room with the coffin and artifacts. The Professor is doubtful anything really happened and asks that the Temp and the Aide get back to work. The Professor leaves. The Aide knocks on the lid of the coffin and something inside knocks back.  Suddenly a Mummy breaks out of the coffin and attacks the Aide. The Temp is terrified, but after the attack, the Temp is told she is on "Scare Tactics."

## DEFENDANTS' WORK, "FRIGHT AT THE MUSEUM"

Defendants' work, "Fright at the Museum," is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the Marks eventually end up in the same "scare" as in Plaintiffs' work.

In Defendants' work, Two Marks are hired to help a museum Curator prepare artifacts from a pharaoh's tomb for public presentation.

As one Mark helps a Curator with the artifacts, the lights "flicker." Then, a tale of an alleged curse is related to the participants.  When a pharaoh's sarcophagus is delivered, the Marks help unwrap it, which leads to a series of events culminating

Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/29/20   Page 91 of 145   Page ID
#:581
Case 2:20-cv-02726-CJC-MAA   Document 31-2-1   Filed 05/29/20   Page 92 of 145   Page ID
#:581

in the sarcophagus vibrating.  One Mark uses electronic communication equipment to contact a supervisor for help.  Meanwhile, a member of the excavation team arrives to warn the Marks of the danger.

Things turn worse when one Mark reads the translation of an evil curse, which leads to a Creature attacking the group.  Right after the attack, both Marks are told they are on "Prank Encounters."

## SIMILARITY ANAYLYSIS

The tale of a cursed pharaoh's tomb being disturbed resulting in harm to those who interact with its artifacts is an old one and not protectable.

What is original is the way in which this concept is dramatized.  Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in Plaintiffs' original work, "The Mummy," also appear in Defendants' alleged work, "Fright at the Museum."

The fact that Defendants use additional characters, scenes and action does not alter the basic narrative and filmed action, which originated in Plaintiffs' work and which "re-appears" in Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

### The Plots Are Substantially Similar

1. In Plaintiffs' original work, "The Mummy," a host outlines the upcoming prank, referencing Egyptian artifacts and an evil curse.  In Defendants' "Fright at the Museum," a host offers the same introduction.

2. In Plaintiffs' original work, which is set at night, the Temp is hired to help a Professor inventory and catalogue artifacts from the pharaoh's tomb.  In Defendants' work, which is also set at night, the Marks are hired to assist a Curator with essentially the same job, inventorying artifacts from a pharaoh's tomb.   Plaintiffs could have had the Temp

**EX.  1   PG.  91**

assist the Aide in setting up a display at a highly anticipated art exhibition.  Or, Plaintiffs could have had the Temp and Aide assist in analyzing the veracity of the artifacts.  Plaintiffs did not.  And, as we know, neither did Defendants.

3. In Plaintiffs' original work, the coffin holding the pharaoh's remains is kept in close proximity to the Temp.  In Defendants' work, the pharaoh's remains are also kept close to the participants.  Again, Plaintiffs' work is only 4 to 5minutes long.  Thus, it makes sense that, to avoid filler, Plaintiffs' work would have the coffin in close proximity to the Temp.  Defendants' work, on the other hand, is four times longer than Plaintiffs' work.  Thus, Defendants do not have the same need as Plaintiffs to employ such a "shortcut."  Yet, Defendants do exactly that.  Their inertia, in this regard, amounts to more than a lack of creativity; rather, it demonstrates their choice to copy Plaintiffs.

4. In Plaintiffs' original work, the Temp is told of a deadly curse surrounding the artifacts.  In Defendants' work, the Marks are also informed of a deadly curse.   Plaintiffs could have elected to educate the Mark in a number of different ways.  For example, the Professor could have been on a phone call with an unknown party, seemingly repeating the unknown party's ominous message that an evil curse awaits them.  Or, the Aide could have listened to a voicemail that elicits the foreboding of an evil curse.  Given the fact that Plaintiffs' work is only 4 to 5 minutes long, this cut-to-the-chase introduction makes sense.  One could argue that it is necessary for the plot to emerge and the story to be completed within the 4 to 5 minute segment.  Defendants do not have this same urgency as their episode is four times longer than Plaintiffs' segment.  Clearly, Defendants had sufficient "screen time" to develop the foreboding of evil lurking amongst the Egyptian artifacts.  It is axiomatic that the more time one has to present the plot, the more avenues there are to do so.  Plaintiffs had to cut to the chase.  Defendants did not.

5. In Plaintiffs' original work, when the artifacts are touched, the lights "flicker."  In Defendants' work, the exact same action is portrayed.  At

first blush, the flickering lights may seem trivial.  It is not.  There are
many ways Plaintiffs could have signaled "strange things to come": an
eerie noise; a halo of a ghostly figure; the Aide going into a trance; a
radio spewing noise or a nearby television going "poltergeist" on them.
Plaintiffs could have done a number of things to further the invoke fear in
the Mark, but they chose a specific event and a specific action.
Defendants, armed with plenty of time to showcase their creativity, chose
the same exact simplicity of a flickering light as Plaintiffs.

6. In Plaintiffs' original work, after a mysterious event with the artifacts, the
Temp summons the Professor using electronic communication
equipment.  In Defendants' work, after a mysterious event with the
artifacts, the Mark also uses electronic communication equipment to
summon the Curator.   Plaintiffs could have had the Temp and Aide
summon the Professor by yelling for him or by having the Professor
watch the Temp and the Aide from a closed-circuit TV.  Plaintiffs did not
and neither did Defendants.

7. In Plaintiffs' original work, physical contact with the pharaoh's coffin
directly leads to physical danger for the Temp.  In Defendants' work, the
touching of the pharaoh's coffin also leads to physical danger for the
Marks.   Plaintiffs could have had the physical contact with the pharaoh's
coffin result in the closed-circuit TV going "poltergeist" or the radio
suddenly go staticky.  Here, Plaintiffs had a number of options at their
disposable.  So, too, did Defendants.  Ironically, however, it is the **same
physical touch** of the pharaoh's coffin that leads to physical danger for
the Marks in Defendants' work as had been the case in Plaintiffs' original
work.

8. As the Mark and Aide continue to interact with the artifacts, the curse is
activated, causing the lights to flicker AND the coffin to shake. In
Defendants' work, the same action is portrayed. Again, the fact that
Defendants' chose to use the exact same devices – flickering lights and
shaking coffin – is no coincidence.

**SCHEDULE VII**

4

Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/13/20   Page 94 of 145   Page ID
#:504
Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/13/20   Page 95 of 97   Page ID
#:562

9.  In Plaintiffs' original work, the penultimate moment is the curse coming
    to life in the form of a mummy "attacking" one of the actors. In the
    Defendants' work, the penultimate moment is the curse coming to life in
    the form of an evil creature "attacking" one of the actors.  Plaintiffs
    could have had each touch of the pharaoh's coffin result in a party
    fainting or an electronic going haywire.  Defendants, armed with so much
    more time than Plaintiffs to create the "scare," could have demonstrated
    more inventiveness, and their inertia in this regard bespeaks their
    mimicry.

10. In Plaintiffs' original work, immediately after the attack, the Temp is
    screaming as she is informed that this is all a prank.  In Defendants'
    work, immediately after the attack, the Marks are screaming as they are
    informed that this is all a prank.  Here, Plaintiffs could have had the
    reveal immediately before the threatened attack.  So, too, could have
    Defendants. Moreover, because of the extra time afforded Defendants,
    Defendants could have had multiple people get attacked, leading a
    heightened state of fear for the Marks.  Alas, Defendants did not.  In
    summary, key story points and specific actions that appear in Plaintiffs'
    original work are copied and utilized in Defendants' episode.  The pivotal
    scenes in the Defendants' work dramatically mimic scenes in Plaintiffs'
    original work, from story genesis through specific actions, characters,
    dialogue, use of props, and the conclusion.

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both
works, these elements appear in the same order or sequence in each work.

For example, the "awakening of the curse" and ensuing attack is deliberately
sequenced late in Plaintiffs' work and appears at an identical time in Defendants'
work, which is right before the prank is revealed.  Plaintiffs did not have time to
have the curse awaken throughout the "scare," but Defendants did.  Defendants
had so many options available to them with regard to sequence.  That their
sequence mimics Plaintiffs can be no coincidence.

**SCHEDULE VII**

5

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product. For example, Plaintiffs could have established that the artifacts have lain dormant for years, with no issues, until a massive storm rolls in the night the Mark happens to be there, resulting in a lightning bolt striking the facility where the artifacts reside, suddenly "energizing" them and triggering a curse. This is not the same sequence that Plaintiffs' work followed, demonstrating Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not. This is all the more surprising given the fact that Defendants had four times as much time to present their sequencing of events. As a result, Defendants' sequence is substantially similar to Plaintiffs' original and is not a coincidence.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. All of the characters in Plaintiffs' original work also appear in Defendants' work. The Marks are young people in their early 20's hired to assist an esteemed Expert (Professor/Curator). There is also a Co-worker/Aide character, and a Monster who is released by the curse. Plaintiffs did not have to employ an esteemed Expert. Plaintiffs could have had utilized a non-expert Ph.D. student whose candidacy depended on the proper inventorying of the Egyptian artifacts. In other words, the "Expert" was not required to create the "scare." Plaintiffs' work also did not require a "mummy-esque" Monster to create the "scare." Rather than a physical "mummy-esque" Monster, Plaintiffs could have had an abstract, ghoulish spirit. Defendants, armed with the luxury of time on their side, could have presented so many ominous features to invoke the "scare." They did not. Instead, they chose the same physical mummy esque Monster as Plaintiffs. Coincidence? I think not.

SCHEDULE VII

6

Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/29/20   Page 96 of 145   Page ID
#:566
Case 2:20-cv-02726-CJC-MAA   Document 31-1   Filed 05/29/20   Page 97 of 97   Page ID
#:566

## The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same – nighttime at a storage area in a facility housing Egyptian artifacts. The specific setting of Plaintiffs' original work was clearly a creative choice. For example, Plaintiffs could have set the story at a construction site where recent excavation has unearthed cursed artifacts (Mayan, Aztec, Macedonian, Roman) buried/hidden at the site years ago.  Or, Plaintiffs could have had the Egyptian artifacts on the set of a movie production.  The choice of a storage area in a facility housing Egyptian artifacts was the concrete expression selected by Plaintiffs.  Defendants' choice of a "Mummy" in the exact same setting placed in the exact same action does not appear coincidental.

## The Moods Are Substantially Similar

The mood established in Plaintiffs' original work is, appropriately, "mysterious," i.e. from the moment the Mark sees the artifacts and hears about a curse, there is an air of mystery surrounding her work.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "mysterious" mood used by Defendants is identical to Plaintiffs'.

## CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that Defendants' work is an unabashed copy of the original.

SCHEDULE VII

**EX. 1   PG. 96**

# EXHIBIT 2

Richard L. Charnley (SBN 70430)
Nicole W. Uhlmann (SBN 200783)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone:  310.321.4300
Facsimile:   310.893.0273
Email:       rlc@charnleyrian.com
Email:       nwu@charnleyrian.com

*Attorneys for Plaintiffs Scott*
*Hallock; WMTI Productions, Inc.;*
*WMTI Productions North, Inc.; and*
*The Next Season Company, Inc.*

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT W. HALLOCK, an individual; WMTI PRODUCTIONS, INC., a California corporation; WMTI PRODUCTIONS NORTH, INC., a Canadian corporation; and THE NEXT SEASON COMPANY, INC., a Canadian corporation, | Case No.: 2:20-cv-02726-CJC (MAA)<br><br>**NOTICE OF ERRATA REGARDING PLAINTIFFS' AMENDED COMPLAINT** |
| Plaintiffs, | |
| v. | |
| KEVIN HEALEY, an individual; PROPAGATE CONTENT, LLC, a Delaware Limited Liability Company; and DOES 1 through 100, inclusive, | |
| Defendants. | |

Case 2:20-cv-02726-CJC-MAA   Document 21-2   Filed 07/13/20   Page 99 of 145   Page ID
Case 2:20-cv-02726-CJC-MAA   Document 23-2   Filed 07/06/20   Page 2 of 3   Page ID #:398
#:567

TO THE COURT AND TO ALL PARTIES AND THEIR COUNSEL:

The Complaint herein (Doc. #1) contains four claims for relief.  The first paragraphs in the Second, Third and Fourth Claims for Relief incorporated prior allegations by reference.  For example, the Second Claim for Relief incorporated previous paragraphs 1 through 69.

Plaintiffs' Amended Complaint (Doc. #20) also contains four claims for relief. Due to scrivener error, the numbering of the first paragraphs of the Second, Third and Fourth Claims for Relief was not changed from the numbering in the initial Complaint.

By way of this Notice and in lieu of filing an amendment to the Amended Complaint, Plaintiffs advise the Court and parties of the following errata:

Paragraph 72 of the Amended Complaint (Second Claim for Relief) mistakenly incorporates paragraphs 1 through 69 due to error, but should incorporate paragraphs 1 through 71 of the Amended Complaint;

Paragraph 81 of the Amended Complaint (Third Claim for Relief) mistakenly incorporates paragraphs 1 through 78 due to error, but should incorporate paragraphs 1 through 80 of the Amended Complaint; and,

Paragraph 87 of the Amended Complaint (Fourth Claim for Relief) mistakenly incorporates paragraphs 1 through 84 due to error, but should incorporate paragraphs 1 through 86 of the Amended Complaint.

1

Dated:       July 6, 2020            **CHARNLEY RIAN LLP**

2

3

By: _____

4

Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock,*
*WMTI Productions, Inc., WMTI*
*Productions North, Inc., The Next Season*
*Company, Inc. and The Gifted Show, Inc.*

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2.

NOTICE OF ERRATA REGARDING PLAINTIFFS' AMENDED COMPLAINT

# EXHIBIT 3

# EXHIBIT 1

4817-0255-2617, v. 1

**EX. 3    PG. 102**

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "2016 AGREEMENT") is made and entered into between Scott Hallock ("HALLOCK") and Kevin Healey ("HEALEY") as of January 1, 2016 (the "EFFECTIVE DATE").

A.      WHEREAS, since 2012, HALLOCK and HEALEY (collectively "the PARTIES") have been engaged in a business dispute over certain creative and intellectual properties jointly owned by them or their companies;

B.      WHEREAS, the primary creative and intellectual property at issue in the PARTIES' dispute is the *Scare Tactics* television series and any and all intellectual property of any nature or kind whatsoever related to *Scare Tactics,* including but not limited to all ancillary rights, all remake rights, and any and all exploitation rights pertinent thereto (collectively "SCARE TACTICS");

C.      WHEREAS, during their dispute, HALLOCK and HEALEY engaged in a number of mediations, which resulted in a written Settlement Agreement dated August 18, 2012 (the "2012 AGREEMENT");

D.      WHEREAS, as of the EFFECTIVE DATE, HALLOCK and HEALEY are engaged in an Arbitration captioned *Scott Hallock v. Kevin Healey*, IFTA Arbitration No. 15-09 (the "ARBITRATION"), in which the each of the PARTIES has asserted claims related to their ongoing dispute including SCARE TACTICS claims ("the ARBITRATION CLAIMS");

E.      WHEREAS, as of the EFFECTIVE DATE, HALLOCK and HEALEY are also engaged in civil litigation pending in Ventura County Superior Court wherein HALLOCK is a Plaintiff, HEALEY is a Defendant, HEALEY is a Cross-complainant and HALLOCK is a Cross-Defendant, bearing Case Number 56-2-15-00465398-CU-FR-VTA ("the FRAUDULENT CONVEYANCE ACTION ");

F.      WHEREAS, with the exception of the rights and obligations set forth in the 2012 AGREEMENT and this 2016 AGREEMENT, HALLOCK and HEALEY wish to settle all claims, counterclaims and issues in the ARBITRATION, asserted in the ARBITRATION CLAIMS, and alleged or asserted in the FRAUDULENT CONVEYANCE ACTION, and all past, present and future issues concerning SCARE TACTICS;

G.      WHEREAS, it is the intent of HALLOCK and HEALEY that this, the 2016 AGREEMENT shall be supplemental to but, other than as directly set forth herein, shall not nullify or modify the 2012 AGREEMENT; and,

H.      WHEREAS HEALEY has provided notice to HEALEY's spouse, Cara Healey ("CARA") of this 2016 AGREEMENT and the property transfers contemplated hereunder and has represented to HALLOCK that CARA has consented to and will not challenge this 2016 AGREEMENT.

1

Accordingly, for good and valuable consideration as set forth herein, the parties hereby agree as follows:

## Transfer of WMTI US, WMTI NORTH, TNSCI, SCARE TACTICS and IP

1.     As of the EFFECTIVE DATE, HEALEY shall transfer to HALLOCK or to HALLOCK'S designee, all of HEALEY'S direct and indirect rights and ownership interest of any kind or nature whatsoever in and to WMTI Productions, Inc. ("WMTI US"). As of the EFFECTIVE DATE, HEALEY shall resign all director and officer positions in WMTI US. In connection with the transfer of HEALEY's ownership rights in and to WMTI US, HEALEY agrees to deliver to HALLOCK or to HALLOCK'S designee a standalone assignment of HEALEY'S WMTI US shares ("the HEALEY SHARES") in the form attached hereto as Exhibit A. Concurrently with the execution of this 2016 AGREEMENT, HEALEY shall physically endorse the HEALEY SHARES to HALLOCK or HALLOCK's order and shall deliver said endorsed HEALEY SHARES to HALLOCK. HALLOCK and HEALEY waive any and all restrictions on transfer on the HEALEY SHARES including pursuant to the WMTI US Amended and Restated Shareholders Agreement dated as of January 1, 2012 (the "WMTI US Shareholders Agreement") and agree that the WMTI US Shareholders Agreement shall be terminated in full and shall be of no further force or effect as of the EFFECTIVE DATE,.

2.     HEALEY agrees to transfer to HALLOCK or his designee all of HEALEY's direct and indirect rights and ownership interest of any kind or nature whatsoever in: (a) WMTI Productions North Inc. ("WMTI NORTH"); and (b) The Next Season Company Inc. ("TNSCI"), provided HALLOCK or his designee maintains the Canadian control of WMTI NORTH and TNSCI pursuant to sections 26 to 28 of the *Investment Canada Act* (in accordance with the CPTC Program Guidelines of the Canadian Audio-Visual Certification Office) (collectively "the CANADIAN COMPANIES" and "the CANADIAN COMPANY TRANSFERS" respectively). The CANADIAN COMPANY TRANSFERS, and the resignation by HEALEY of all member, manager, director and officer positions the CANADIAN COMPANIES, shall be contingent upon HALLOCK providing HEALEY with evidence of consent by at least one "resident Canadian" (as defined in the *Business Corporations Act* (Ontario)) to serve as director of each of CANADIAN COMPANIES. For certainty: all such transfers, resignations and other documentation required for these purposes shall be prepared at the sole initiative and cost of HALLOCK.

3.     As of the EFFECTIVE DATE, HEALEY shall assign and transfer to HALLOCK all of his direct and indirect rights and interest of any kind or nature whatsoever in and to SCARE TACTICS. This assignment and transfer includes, but is not limited to, all of HEALEY's direct and indirect interest of any nature or kind whatsoever in SCARE TACTICS, whether held under U.S. law, Canadian law, or the law of any other sovereign or state, including, but not limited to copyrights trademarks, brands, trade names, and other intellectual property of any kind or nature whatsoever relating to SCARE TACTICS (whether registered or unregistered), and any and all direct and indirect rights to use or exploit such copyrights, trademarks, brands, trade names and other intellectual property of any kind or nature whatsoever relating to SCARE TACTICS throughout the world and the universe in all media, whether existing or developed in the future, for perpetuity, all contractual, promotional and

2

EX. 3    PG. 104

merchandising rights, and all other rights that HEALEY or any Healey Entity (as defined in the 2012 AGREEMENT) (each, a "HEALEY ENTITY") has, may have or would have had to receive any income from the use or exploitation of SCARE TACTICS (collectively "the IP RIGHTS"), with the exception of SCARE TACTICS income that HEALEY and all HEALEY ENTITIES have already received as of the EFFECTIVE DATE. For sake of certainty, the SCARE TACTICS and the IP RIGHTS franchise include, without limitation, the television series, the previously developed movie concepts (which concepts are attached the 2012 Agreement as Schedules "K-1" and "K-2") and all forms of ancillary and derivative exploitation relating thereto such as music publishing, the "Scarewear" clothing line, artwork, e-commerce and social networking sites. For further certainty, the transfer of the rights in this AGREEMENT, including SCARE TACTICS and IP RIGHTS, shall not have the effect of a non-competition clause, and does not prevent HEALEY from pursuing other scary, paranormal-themed or hidden camera shows.

4.　　For certainty, HEALEY acknowledges that, with the exception of HALLOCK's ownership or entitlement to shares of WMTI US and the IP RIGHTS, the transfers and assignments undertaken pursuant to this 2016 AGREEMENT will result in HALLOCK or his designee receiving 100% of all shares in WMTI US, 100% of all ownership of the CANADIAN COMPANIES, and 100% of all ownership in the IP RIGHTS.

5.　　HEALEY hereby represents and warrants to HALLOCK that: (a) he is the sole beneficial and registered owner of the HEALEY SHARES; (b) HEALEY has the full power, authority and right to enter into this 2016 AGREEMENT, to grant the rights granted hereunder to the HEALEY SHARES, all free of any claims, demands, liens and/or encumbrances (subject to the restrictions and contingencies set out in paragraph 2 above in respect of the CANADIAN COMPANIES), and to transfer the legal and beneficial title and ownership of the HEALEY SHARES to HALLOCK or HALLOCK's designee (subject to the restrictions and contingencies set out in paragraph 2 above in respect of the CANADIAN COMPANIES), (c) HEALEY has the power, authority and right to assign and transfer to HALLOCK all of his direct and indirect rights and interest in and to SCARE TACTICS, all free of any claims, demands, liens and/or encumbrances, and to transfer the legal and beneficial title and ownership of SCARE TACTICS to HALLOCK free of any claims, demands, liens or encumbrances, (d) HEALEY is the sole and beneficial registered owner of the CANADIAN ENTITIES, (e) HEALEY has the power, authority and right to deliver ownership of the CANADIAN ENTITIES to HALLOCK or HALLOCK's designee free of any claims, demands, liens and/or encumbrances (subject to the restrictions and contingencies set out in paragraph 2 above), (f) except as disclosed to HALLOCK, HEALEY and/or the HEALEY ENTITIES have neither entered into any agreement (written or oral, implied or express) nor made any promises to any third party in connection with SCARE TACTICS or the IP RIGHTS, (g) that, while HEALEY has had discussions with Tom Daniels regarding SCARE TACTICS, which were disclosed to HALLOCK, HEALEY and/or the HEALEY ENTITIES entered into no agreement with Tom Daniels, and, for certainty, this includes any agreement that HEALEY may have had with Tom Daniels relative to representation of SCARE TACTICS, (h) HEALEY has disclosed to HALLOCK all amounts received either directly or indirectly by HEALEY from the exploitation of SCARE TACTICS or the IP RIGHTS from August 18, 2012 to present, and (i) HEALEY has not in any manner diluted or hypothecated his ownership of, or rights in, either WMTI US, the CANADIAN COMPANIES,

067868/431459-52630812.1

3

SCARE TACTICS or the IP RIGHTS. HALLOCK acknowledges that he is unaware of any direct or indirect failure by HEALEY with respect to HEALEY's representations and warranties in this paragraph 5.

5a.     HALLOCK represents and warrants that he has disclosed to HEALEY all amounts received either directly or indirectly by HALLOCK from the exploitation of SCARE TACTICS or the IP RIGHTS from August 18, 2012 to present. HEALEY acknowledges that he is unaware of any direct or indirect failure by HALLOCK with respect to HALLOCK's representations and warranties in this paragraph 5a.

5b.     HEALEY further represents and warrants to HALLOCK that he has provided notice to CARA of the transfer of the HEALEY SHARES and other property pursuant to this 2016 AGREEMENT, and that CARA has consented to and will not challenge this 2016 AGREEMENT.

## Credits pertaining to of Future SCARE TACTICS episodes

6.     HALLOCK agrees that, in respect of all future episodes of SCARE TACTICS HALLOCK shall use HALLOCK's best efforts to cause the distributors or broadcasters of such future episodes to afford both HALLOCK and HEALEY a prominent "Created by" credit that may include HEALEY in 2nd position to HALLOCK but otherwise on a "most favored nations" basis with HALLOCK in all respects on screen, in billing blocks, in paid advertising, on packaging and for awards. However, HEALEY acknowledges that any such "credits": are subject to broadcaster and distributor approval; are subject to Guild approval; and, in the future may be subject to negotiation with a number of third-parties who cannot be identified at this time. Further, to the extent that HALLOCK develops future "Scare Tactics" content that was not "created by" HEALEY, a "Created by" credit may be neither appropriate nor otherwise available to HEALEY. In recognition of the above limitations on "credits," absent a "created by" credit, HALLOCK will use best efforts to secure credit for HEALEY stating substantially "Based On The Series Created By HALLOCK and HEALEY", with HEALEY in 2nd position to HALLOCK but otherwise on a "most favored nation" as set forth above. Any casual or inadvertent failure to comply with the provision of this paragraph shall not constitute a breach of this 2016 AGREEMENT, nor shall such a failure entitle HEALEY to any relief at law or in equity. Upon notice from HEALEY of a failure to comply with the provisions of this paragraph, HALLOCK shall use best efforts to prospectively cure any failure to accord credit hereunder.

## Dismissal of ARBITRATION

7.     HALLOCK and HEALEY shall, upon execution of this 2016 AGREEMENT by all parties, dismiss the ARBITRATION, with each party to bear its own costs and fees in connection therewith.

## Dismissal of FRAUDULENT CONVEYANCE ACTION

8.     HALLOCK shall, upon execution of this 2016 AGREEMENT dismiss HEALEY as a defendant in the FRAUDULENT CONVEYANCE ACTION. HEALEY shall likewise

EX. 3    PG. 106

dismiss HALLOCK as a cross-defendant in the FRAUDULENT CONVEYANCE ACTION. Such dismissals shall be with prejudice, with both HALLOCK and HEALEY to bear their own costs and fees in connection with the FRAUDULENT CONVEYANCE ACTION.

## **Mutual Releases**

9.     In consideration of the recitals, covenants and agreements set forth in this 2016 AGREEMENT, and other good and valuable consideration receipt of which is hereby acknowledged, as of the EFFECTIVE DATE, and excepting the duties, obligations, representations and warranties set forth in this, the 2016 AGREEMENT and any remaining duties owed under the 2012 AGREEMENT, HALLOCK, on behalf of himself, the HH Entities (as defined in the 2012 AGREEMENT) (each, a "HH ENTITY"), and all other persons, corporations and entities acting on his behalf, hereby releases and discharges HEALEY, all HEALEY ENTITIES and all of his and their agents, attorneys, accountants, advisors, current or former spouses, partners and employees from every and all manner of claim, action, cause of action, debt, due or demand, both in law and equity, related in any way to: (1) WMTI US; (2) WMTI NORTH; (3) TNSCI; (4) SCARE TACTICS; (5) RIVE GAUCHE; (6) 2241156 Ontario, Inc., including any and all claims in the ARBITRATION and the FRAUDULENT CONVEYANCE ACTION ("the HALLOCK RELEASED ITEMS"). It is the specific intent and purpose of this instrument to forever release and discharge any and all claims and causes of action of any kind or nature whatsoever related to any of the HALLOCK RELEASED ITEMS, whether known or unknown, whether specifically mentioned or not, which HALLOCK has now or ever had against HEALEY or any HEALEY ENTITY. HALLOCK acknowledges that, by virtue of this release, he is not a creditor of HEALEY in any manner and is owed no money by HEALEY. For clarity, this release and the HALLOCK RELEASED ITEMS do not include a release by HALLOCK of the FRAUDULENT CONVEYANCE ACTION against CARA.

10.     HALLOCK hereby acknowledges that he may later discover facts different from or in addition to those now known or believed to be true, and expressly agrees that this 2016 AGREEMENT and the release of the HALLOCK RELEASED ITEMS shall remain in full force and effect notwithstanding the discovery or existence of any such different or additional facts. HALLOCK hereby acknowledges that HALLOCK is aware of Section 1542 of the California Civil Code, which states:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HALLOCK hereby waives any and all rights which HALLOCK now has or may have by virtue of Section 1542 of the California Civil Code in connection with the claims released herein.

11.     In consideration of the receipt of 100% of HEALEY's interest in WMTI US and SCARE TACTICS, the transfer of 100% of HEALEY's direct or indirect interest in the CANADIAN ENTITIES, HALLOCK acknowledges and agrees that, as between HALLOCK

and HEALEY, HALLOCK is solely responsible for all future actions, decisions and agreements related to WMTI US, the CANADIAN ENTITIES and SCARE TACTICS that HALLOCK makes or takes after the EFFECTIVE DATE, including sole responsibility for any and all claims, debts or liability, including tax liability, that arise from any actions, decisions or agreements made or taken by HALLOCK or his designees related to WMTI US, the CANADIAN ENTITIES or SCARE TACTICS after the EFFECTIVE DATE.

12.     In consideration of the recitals, covenants and agreements set forth in this 2016 AGREEMENT, and other good and valuable consideration receipt of which is hereby acknowledged, as of the EFFECTIVE DATE, and excepting the duties and obligations set forth in this, the 2016 AGREEMENT and any remaining duties owed under the 2012 AGREEMENT, HEALEY, on behalf of himself, all the Healey Entities (as defined in the 2012 AGREEMENT) (each, a "HEALEY ENTITY"), and all other persons, corporations and entities acting on his behalf, hereby releases and discharges HALLOCK, all HALLOCK ENTITIES and all of his and their agents, attorneys, accountants, advisors, current or former spouses, partners and employees from every and all manner of claim, action, cause of action, debt, due or demand, both in law and equity, related in any way to, or arising out of, the ARBITRATION, the FRAUDULENT CONVEYANCE ACTION and any claims the claims asserted therein, (the "HEALEY RELEASED ITEMS"). It is the specific intent and purpose of this instrument to forever release and discharge any and all claims and causes of action of any kind or nature whatsoever related to any of the HEALEY RELEASED ITEMS, whether known or unknown, whether specifically mentioned or not, which HEALEY has now or ever had against HALLOCK or any HALLOCK ENTITY. For clarity, this release and the HEALEY RELEASED ITEMS do not include a release by CARA of any of her claims against HALLOCK.

13.     HEALEY hereby acknowledges that he may later discover facts different from or in addition to those now known or believed to be true, and expressly agrees that this 2016 AGREEMENT and the releases of the HEALEY RELEASED ITEMS herein shall remain in full force and effect notwithstanding the discovery or existence of any such different or additional facts. HEALEY hereby acknowledges that he is aware of Section 1542 of the California Civil Code, which states:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HEALEY hereby waives any and all rights which he now has or may have by virtue of Section 1542 of the California Civil Code in connection with the claims released herein.

### Indemnity

14.     HALLOCK, for himself and on behalf of the HALLOCK ENTITIES, hereby agrees to jointly and severally defend, indemnify and save harmless HEALEY and all HEALEY ENTITIES from and against all third party claims, actions, causes of action, demands, suits,

067868/431459-52630812.1

6

**EX. 3     PG. 108**

proceedings or any other form of remedy or relief of whatsoever nature, character or kind, liabilities, contingent or otherwise, dues, debts, sums of money and accounts of whatsoever nature, character or kind, all damages, fines, penalties, deficiencies, losses, liabilities, costs, fees and expenses (including interest, court costs and reasonable fees and expenses of outside attorneys, accountants and other experts and professionals) incurred by HEALEY directly or indirectly arising out of or resulting from any actions, decisions or agreements made or taken by HALLOCK or his designees related to WMTI US, the CANADIAN ENTITIES or SCARE TACTICS after the EFFECTIVE DATE, or from any material breach of any term of this 2016 AGREEMENT by HALLOCK or the HALLOCK ENTITIES. This indemnity does not cover any actions, statements or omissions by HEALEY after the EFFECTIVE DATE.

15.     HEALEY for himself and on behalf of the HEALEY ENTITIES, hereby agrees to jointly and severally defend, indemnify and save harmless HALLOCK and all HALLOCK ENTITIES from and against all third party claims, actions, causes of action, demands, suits, proceedings or any other form of remedy or relief of whatsoever nature, character or kind, liabilities, contingent or otherwise, dues, debts, sums of money and accounts of whatsoever nature, character or kind, all damages, fines, penalties, deficiencies, losses, liabilities, costs, fees and expenses (including interest, court costs and reasonable fees and expenses of outside attorneys, accountants and other experts and professionals) (collectively, "CLAIMS") incurred by HALLOCK directly or indirectly arising out of or resulting from any material breach of any term of this 2016 AGREEMENT, including without limitation, a breach of any representation, warranty, covenant and/or undertaking set forth herein by HEALEY and/or the HEALEY ENTITIES. Further, HEALEY and the HEALEY ENTITIES hereby agree to jointly and severally defend, indemnify and save harmless HALLOCK and all HALLOCK ENTITIES from and against any CLAIMS by CARA or her designees or agents in respect of any legal interest in the HEALEY SHARES or that attempt to, or do, interfere with any of the representations or covenants by HEALEY herein.

## Miscellaneous

16.     This 2016 AGREEMENT is intended to, and does, supersede and replace, in their entirety, all paragraphs and provisions in the 2012 AGREEMENT which address ownership or control of WMTI US or the SCARE TACTICS franchise, including paragraphs 2, 10 and 11, which paragraphs shall no longer have any effect. This 2016 AGREEMENT is also intended to, and does, supersede and replace, in its entirety, paragraph 12 of the 2012 AGREEMENT (concerning 2241156 Ontario Inc.), which paragraph shall no longer have any effect. The paragraphs and provisions of the 2012 AGREEMENT which do not address or affect: (1) ownership or control of WMTI US, WMTI NORTH or TNSCI; (2) SCARE TACTICS; or (3) 2241156 Ontario Inc. are unaffected by this 2016 AGREEMENT and remain in full force and effect.

17.     This 2016 AGREEMENT constitutes the entire agreement between the parties related to transfer/assignment of the WMTI US shares, transfer/assignment of the CANADIAN COMPANIES, transfer/assignment of SCARE TACTICS and transfer/assignment of the IP RIGHTS, and supersedes all prior or contemporaneous negotiations, representations, understandings or agreements concerning SCARE TACTICS, whether oral or written, including

all provisions in the 2012 AGREEMENT that concern SCARE TACTICS. No supplement, modification, waiver, or termination or nullification of this 2016 AGREEMENT shall be binding or enforceable unless executed in writing by the parties.

18.     This AGREEMENT shall be governed by and interpreted in accordance with the laws of the State of California, except to the extent that the laws of the country of Canada may impact upon and control the CANADIAN COMPANIES and any of the IP RIGHTS that are subject to Canadian jurisdiction or legal process.

19.     In the event of any litigation arising from any alleged breach of this Agreement, the substantially prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs incurred including court costs and attorneys' fees, and all other related expenses incurred in such litigation.

20.     Each of the parties agrees that it shall at all times, acting reasonably and in good faith, and on a timely basis, negotiate, prepare, execute, acknowledge and deliver all such acts, deeds and agreements as may be reasonably necessary or desirable to give effect to the terms and provisions of this Agreement.

21.     In entering into this AGREEMENT, the parties represent that they have each relied on the advice of their respective attorneys, and that they had equal ability and opportunity to participate in the negotiation and drafting of this Agreement, such that if a court finds any ambiguities herein they shall not be construed against either party.

22.     This AGREEMENT may be executed in one or more counterparts, which together shall constitute one Agreement upon the receipt by both parties of all signed counterparts. Scanned or faxed signature pages shall have the same effect as original signature pages.

IN WITNESS WHEREOF, the parties have caused this document to be executed and as of the dates set forth below:

**SCOTT HALLOCK**

Date: 3/21/2016

**KEVIN HEALEY**

Date: 3/22/2016

067868/431459-52630812.1

8

SWH KH

**EX. 3     PG. 110**

**WMTI PRODUCTIONS, INC.,**
**a California corporation**

### STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED,** the undersigned hereby assigns and transfers to Scott W. Hallock and Nicole L.C. Hallock, as Co-Trustees of the Hallock Family Trust dated May 15, 2006, One Hundred (100) shares of issued and outstanding common stock of WMTI PRODUCTIONS, INC., a California corporation, standing in the name of Kevin Healey (and, in any event, all of the shares he owns) on the books of said Corporation and does hereby irrevocably constitute and appoint Scott Hallock, President, to transfer the said stock on the books of the within named Corporation with full power of substitution.


KEVIN HEALEY
Dated: March 2 1 , 2016

# EXHIBIT 4

# **Nourafchan Declaration Exhibit 4**

Lodged Video:
*Prank Encounters* Episode "Camp Scarecrow"

# EXHIBIT 5

# <u>Nourafchan Declaration Exhibit 5</u>

Lodged Video:
*Scare Tactics* Episode 101

# EXHIBIT 6

# **Nourafchan Declaration Exhibit 6**

Lodged Video:
*Prank Encounters* Episode "Face Fears"

# EXHIBIT 7

# **Nourafchan Declaration Exhibit 7**

Lodged Video:
*Scare Tactics* Episode 117

# EXHIBIT 8

# <u>Nourafchan Declaration Exhibit 8</u>

Lodged Video:
*Prank Encounters* Episode "Fright at the Museum"

# EXHIBIT 9

# **Nourafchan Declaration Exhibit 9**

Lodged Video:
*Scare Tactics* "The Mummy"

# EXHIBIT 10

# <u>Nourafchan Declaration Exhibit 10</u>

Lodged Video:
*Scare Tactics* Episode 206

# EXHIBIT 11

# **Nourafchan Declaration Exhibit 11**

Lodged Video:
*Prank Encounters* Episode "Urgent Scare"

# EXHIBIT 12

# **Nourafchan Declaration Exhibit 12**

Lodged Video:
*Scare Tactics* Episode 301

# EXHIBIT 13

# **Nourafchan Declaration Exhibit 13**

## Lodged Video:
*Prank Encounters* Episode "Storage War of the Worlds"

# EXHIBIT 14

# **Nourafchan Declaration Exhibit 14**

Lodged Video:
*Scare Tactics* Episode 305

# EXHIBIT 15

# **Nourafchan Declaration Exhibit 15**

Lodged Video:
*Prank Encounters* Episode "Split Party"

# EXHIBIT 16

# **Nourafchan Declaration Exhibit 16**

Lodged Video:
*Scare Tactics* Episode 401

# EXHIBIT 17

# <u>Nourafchan Declaration Exhibit 17</u>

Lodged Video:
*Scare Tactics* Episode 509

# EXHIBIT 18

# **Nourafchan Declaration Exhibit 18**

Lodged Video:
*Prank Encounters* Episode "End of the Road"

# EXHIBIT 19

# <u>Nourafchan Declaration Exhibit 19</u>

Lodged Video:
*Scare Tactics* Episode 405

# EXHIBIT 20

# **Nourafchan Declaration Exhibit 20**

Lodged Video:
*Freak Encounters* Episode "Werewolf"