Richard L. Charnley (State Bar No. 70430)
Nicole W. Uhlmann (State Bar No. 200783)
**CHARNLEY RIAN LLP**
12121 Wilshire Blvd. Suite 600
Los Angeles, CA 90025
Telephone:   310.321.4300
Facsimile:   310.893.0273
Email:      rlc@charnleyrian.com
            nwu@charnleyrian.com

*Attorneys for Plaintiffs Scott Hallock;*
*WMTI Productions, Inc.; WMTI*
*Productions North, Inc.; and The Next*
*Season Company, Inc.*

## UNTITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SCOTT HALLOCK, and individual, WMTI US, a corporation, WMTI North, Inc., a corporation; TNSCI, Inc., a corporation; The Gifted Show, Inc., a corporation,<br><br>        Plaintiffs,<br><br>        v.<br><br>Kevin Healey, an individual, Propagate Content LLC, a Limited Liability Company, and Does 1 through 50,<br><br>        Defendants. | Case No.: 2:20-cv-02726-CJC-MAA<br><br>Hon. Cormac J. Carney<br><br>**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**<br><br>Date:     9/14/2020<br>Time:     01:30 PM<br>Location: Courtroom 9B |

1

# <u>TABLE OF CONTENTS</u>

2

<u>Page</u>       <u>Contents</u>

3       iii……USE NOTES
4        1……MEMORANDUM
                 INTRODUCTION
5        2……Plaintiffs' Claims
         3……Defendants' Motion to Dismiss and Anti-SLAPP Motion to Strike:
6                Plaintiffs' Approach to Opposition
         4…....ARGUMENT
7                Plaintiffs' Pleading Presents Plausible Claims
         5……CONCLUSION

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# TABLE OF AUTHORITIES

## Cases

*Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005) ..................................... 17, 18
*Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir. 1994).................... 6, 7
*Barker v. Riverside County Office of Ed.* (9th Cir. 2009) 584 F3d 821 ................................ 8
*Bowers v. Baystate Techs. Inc.* (Fed. Cir. 2003) 320 F.3d 1317............................................ 18
*David Zindel v. Fox Searchlight* (2020) ................................................................... 5, 7
*Downing v. Abercrombie & Fitch*, 265 F.3d 994.......................................................... 16
*Edwards v. Comstock Ins.* 205 Cal. App. 3d 1164 (1988)........................................ 21
*L.A. Printex Indus., Inc. v Aeropostale, Inc.*  676 F.3d 841, 848 (9th Cir. 2012) ..................... 6
*Metcalf v. Boscho* 294 F.3d 1069 (9th Cir. 2002)................................................................. 6
*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l* (8th Cir. 1993) 991 F.2d 426................ 18
*Navellier v. Sletten* (2002) 29 Cal.4th 82 .............................................................................. 4
*ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447  (7th Cir.1996) ............................................ 18
*Shaw v. Lindheim* (9th Cir. 1990) 919 F.2d 1353 .......................................................... 7
*Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, (9th Cir. 1993) ......... 17
*Three Boys Music Corp. v. Bolton* (9th  Cir. 2000) 212 F.3d 477 ................................... 7

## Statutes

17 U.S.C. 101 et. seq. ("Copyright Act")................................................. 2, 5, 16, 17, 18, 21, 25

## Other Authorities

3 William F. Patry, Patry on Copyright, Section 9:86.50 (2020) ............................................ 6
4 Nimmer on Copyright (2009) Section 13.03 at 13:67.................................................... 5, 18
Braden v. Wal-Mart Stores, Inc. (8th Cir. 2009) 588 F3d 585 ............................................... 8
Ninth Circuit Rule 36-3.............................................................................................. 5

## Rules

Cal Civ. Code 1638.............................................................................................. 19
Cal. Civ. Code § 1636 (West 2020) ....................................................................... 19
Cal. Civ. Code 1641 ......................................................................................... 19
Cal. Evid. Code § 622 ........................................................................................ 20
F.R.C.P. Rule 12(b)(6) ...................................................................... iii., 1, 4, 8, 16, 24

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

**<u>USE NOTE</u>**

**Defendants' Have Failed to Adhere to Court Orders**

On July 2, 2020, Defendants filed an application for order to file consolidated brief and exhibits in support of their (1) F.R.C.P. Rule 12(b)(6) motion to dismiss Plaintiffs' Copyright Infringement Claims and (2) an anti-SLAPP motion to strike Plaintiffs' state law claims. (Doc.#23).[1]  The Court granted Defendants' application on July 6, 2020, stating, in pertinent part, as follows:

1.    Defendants may file a consolidated brief, not to exceed 40 pages, in support of their separate **motions (1) *to dismiss Plaintiffs' copyright claims* and (2) strike Plaintiffs' state law claims pursuant to California's anti-SLAPP statute** (emphasis added).

2.    Defendants may file a single set of exhibits in support of their separate motions.

This Order does not affect Plaintiffs' ability to file a consolidated or separate opposition brief(s), or Defendants' ability to file a consolidated or separate reply brief(s).  (Doc.#26).

Notably, Defendants' application for a single memorandum was limited to Plaintiffs' federal Copyright Infringement Claim, and this Court's order specifically limited Defendants' consolidated briefing to a motion to dismiss Plaintiffs' Copyright Claims (i.e., First Claim) and a motion to strike Plaintiffs' state law claims..  What this Court did not grant Defendants was an unfettered right to also move to dismiss Plaintiffs' state law claims.  Yet, Defendants'' MTD clearly seeks a dismissal of the state law claims under Rule 12(b)(6).  Even though Defendants received the relief they requested, they have violated the clear ruling of the Court by filing motions that

---

[1] Defendants application stated, in pertinent part, that: "Defendants file this short application asking the Court for leave to file a single, consolidated brief not to exceed 50 pages in support of Defendants' upcoming separate motions to dismiss Plaintiffs' copyright claims pursuant to Federal Rule of Civil Procedure 12(b )( 6) and strike Plaintiffs' state law claims pursuant to California's anti-SLAPP statute, California Code of Civil Procedure §   25.16."  (Doc.#23).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

were not permitted by the Court's order.

Accordingly, this Court should not consider Defendants' MTD as impacting Plaintiffs' state law claims at all.

On their side, the Court did expressly permit Plaintiffs to file separate opposition briefs to Defendants' consolidated brief, and Plaintiffs have done this.  Out of respect for the Court and an abundance of caution, in their opposition to the MTD, Plaintiffs will demonstrate why the state law claims are plausible and not subject to dismissal.[2]

---

[2] Defendants' actual "Motion" was filed under separate cover (Doc.#28).  Notably most of the grounds mentioned in the "Motion" are not covered in Defendants' supporting memorandum (Doc.#31).  Plaintiffs' opposition thus addresses only grounds properly addressed in Defendants' supporting memorandum.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

# **MEMORANDUM**

## **INTRODUCTION**

Plaintiffs are the production companies and copyright holders of a hidden camera television series *Scare Tactics.*  Unlike other audiovisual works, a hidden camera series such as *Scare Tactics* must deliver a high level of "reality" during filming in order to effectively surprise the "mark."  Hence, in creating a series such as *Scare Tactics*, the "set up" of each episode must flow logically from "real world" experiences, settings and interactions or there will be nothing to "reveal" and the effort will fail.

While it may be inviting to argue in a Motion to Dismiss pursuant to FRCP Rule 12(b)(6)[3] that *Scare Tactics* uses "commonplace elements" and perhaps "scenes a faire," this argument misses the point.  In a reality show such as *Scare Tactics* (as opposed to more voyeuristic reality shows such as *Survivor* and *The Bachelor*), it is imperative to "set up the mark" by establishing a "believable reality" for the mark through a creative choice and sequencing of **setting, time of day, pace, dialogue, action and characters, including their interaction, which, when combined and presented to the "mark" during filming, constitute the totality of Plaintiffs' protected concrete expression.**  In fact, the ability of the creators of *Scare Tactics* to create "believable reality" by choosing specific sequencing and unique casting was a major factor in the success of the series.  In short, the "test" is not whether the viewer believes, but whether, and why, the mark "believes" even though some elements may be "commonplace" and flow logically from "every-day experiences."  Setting up "believable reality" for the mark was managed creatively on an episode by episode basis in *Scare Tactics*, and it this "believable blend of elements" that was taken from the Plaintiffs by Defendants --- all of which would be better reviewed by a trier of fact through a lens shaped by discovery and expert testimony.

---

[3] "F.R.C.P. Rules" and "F.R.C.P. Rule 12(b)(6)" will be referred to herein as "Rules", "Rule", "Rule 12(b)(6) Motion" or simply "MTD".

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

**Plaintiffs' Claims**

From 1996 to 2011, Scott Hallock ("Hallock") and Kevin Healey ("Healey") worked as a team to create and produce *Scare Tactics*.  In 2012 they executed a formal separation agreement (the "2012 Agreement") (Doc. #20, ¶18 at 3:10-11, ¶88 at 27:6-8; Doc.#31-4, ¶2 at p. 2, Exh. 1).  In 2016, they executed another agreement settling a dispute over the 2012 Agreement (the "2016 Agreement"). (Doc. #20, ¶ 27 at 5:16-17;).  In the 2016 Agreement, Healey gave to Hallock all of Healey's interest in the companies that produced and owned *Scare Tactics* and any and all interest he had to any and all "Scare Tactics intellectual property" (the "IP") (Doc. #20, ¶¶ 27, 28, 29).  Healey then joined forces with Propagate Content, LLC ("Propagate"), only to produce a *Scare Tactics* reboot named *Prank Encounters* (Doc. #20, ¶34).  There is no doubt that seven of the eight episodes from *Prank Encounters'* first season lift elements directly from, and are substantially similar to, corresponding *Scare Tactics* episodes.[4]

Plaintiffs have filed a claim for infringement of their copyrights – (the "Copyright Claim" or "First Claim").[5]  In bringing this claim, Plaintiffs understand and freely admit that they do not "own" "stories" or "ideas."  Rather, Plaintiffs rightly and specifically allege that the "choices made in how to tell the *Scare Tactics'* stories" constitute "concrete expression" protected by the Copyright Act.  Although Defendants may have "added" some elements to the mix (i.e., a second mark, an intertwined story, and more screen time), there is no question that Defendants' works were designed to be substantially similar to Plaintiffs' and clearly reached that mark.[6]  This was admitted on national late-night TV by the star of *Prank Encounters* and is

---

[4] There is authority (discussed infra) suggesting that a comparison of an infringing work is best done by viewing the original and the copy in "final form" (in this case, video v. video), and to this end, Plaintiffs supplied matching videos as exhibits to the Complaint.  Yet after review of the Complaint, Defendants demanded that Plaintiffs specify the "articulable similarities" between Plaintiffs' episodes and Defendants'.  Plaintiffs complied, attaching seven written schedules that "articulate" the similarities in detail (attached hereto and incorporated herein by this reference as Exhibit B). For purposes of the concurrently filed "anti-SLAPP" motion, Plaintiffs have submitted a declaration by Plaintiff Scott Hallock, who has a 20+ year history in the "hidden camera" field and qualifies as an expert  The declaration is limited to opposing the anti-SLAPP motion.

[5] Defendants do not challenge Plaintiffs'' ownership of the Copyrights in question.

[6] The general public and critics alike voiced their respective opinions as to *Prank Encounters'* substantial similarity to *Scare Tactics*. (Doc.#20, ¶¶53 and 54).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

also detailed in the Schedules that compare Plaintiffs' creative choices with Defendants' on an episode-by-episode basis (Doc.#20, pp. 18-21).

Plaintiffs also filed three "state law claims" (the "State Claims" and the "Second, Third and Fourth Claim(s)"). The Second and Third Claims deal with violation of Plaintiffs' rights under the 2016 Agreement arising from unauthorized and wholesale use by Defendants of *Scare Tactics* intellectual property (the "IP") In support of these two claims, Plaintiffs allege that the "unauthorized use" of the IP is not limited to copyrighted materials but, by the language of the 2016 Agreement, includes use of "unprotected elements" such as underlying *Scare Tactic* stories, format, and the like, all of which Healey ceded to Hallock and the *Scare Tactics* production companies via the 2016 Agreement (Doc. #20, ¶¶ 28, 29 at 5:20-6:15). Plaintiffs allege that Propagate knew that Healey no longer maintained rights in *Scare Tactics* but nonetheless assisted Hallock to reboot of *Scare Tactics* under the name "*Prank Encounter.*" In other words, Hallock and Propagate took from the Plaintiffs exactly what Healey ceded to them when he walked away from *Scare Tactics* in 2016 " (Doc. #20, ¶¶ 30, 31 and 45).

Plaintiffs' Fourth Claim is based on Healey's breach of the 2012 Agreement for failure to "share proceeds" with Hallock that were generated from production of content that the duo had worked on prior to separation. Here, Plaintiffs seek payment from Healey of roughly half of the money he made from "use" of the content but do not claim that the use was unauthorized.

## Defendants' Motion to Dismiss and Anti-SLAPP Motion to Strike: Plaintiffs' Approach to Opposition

Defendants filed a "40-page combined memorandum" that presents a Gordian Knot of legal issues by intertwining of the various burdens of proof applicable to a MTD the Copyright Claim, a MTD the State Claims, and an Anti-SLAPP motion to strike.

Under Rule 12(b)(6), Defendants, not the Plaintiffs, have the burden of proof.

3.

1   To defeat a Rule12(b)(6) Motion, Plaintiffs need only demonstrate a "plausible claim."

2       For dismissal of the Copyright Claim, the "extrinsic filtration test" may

3   arguably be test for plausibility.  Yet there is no authority applying the "extrinsic

4   filtration test" to a MTD a breach of a contract claim based on Defendants usurping the

5   very same package of IP rights that was ceded to Plaintiffs in 2016.

6       In similar fashion, Defendants' Anti-SLAPP motion to strike is gauged by

7   standards differing entirely from a MTD, especially when considering a plaintiff's

8   "second prong" burden to show a probability of prevailing on their claim.   *Navellier v.*

9   *Sletten* (2002) 29 Cal.4th 82, 88, 94.  As with a MTD, there is nothing in the Anti-

10  SLAPP authorities to suggest that the "extrinsic filtration test" defines Plaintiffs'

11  burden on either the Copyright or State Claims.

12      Perhaps even most disturbing, instead of clarifying these problems for the

13  Court, Defendants wait to the final page of their memorandum (most of which focuses

14  on the "extrinsic filtration test") to simply claim "for the reasons explained above" (in

15  pages 38 through 47 of their memorandum), "Plaintiffs cannot establish a reasonable

16  probability of success." (Doc.#31, p.49).  Thus, essentially, Defendants tell the Court

17  and Plaintiffs, "you go figure it out."

18      Left with little direction, Plaintiffs have no choice but to unscramble

19  Defendants' argument.  Plaintiffs thus file this memorandum in opposition to

20  Defendants MTD and will file a separate memorandum (supported by evidence) in

21  opposition to Defendants' Anti-SLAPP motion.  Plaintiffs contend that, should the

22  Court deny the MTD12(b)(6), the Anti-SLAPP motion would become moot and would

23  not merit a ruling.

24

25                  **ARGUMENT**

26      **Plaintiffs' Pleading Presents Plausible Claims**

27      In attacking the Copyright Claim,  Defendants follow a tactic recently rejected

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

by the 9th Circuit in its Memorandum on *David Zindel v. Fox Searchlight* (2020).[7]
They conveniently abstract the elements they actually copied from *Scare Tactics*
episodes to "high level ideas" and then mislabel them as "commonplace" and
"unprotectable."  Defendants also claim that episodes of *Prank Encounters* are perhaps
"independently created" because they are "longer" than the *Scare Tactics* episodes and
introduce a second "mark" with a differing/intertwined story.  In doing this,
Defendants ignore the adage: Infringement is not a function of *how much the infringer
has added but rather a function how much the infringer has taken.[8]* Clearly,
Defendants hope to obtain a dismissal through the "extrinsic filtration test" at the
pleading level without the benefit of discovery and expert testimony.  Their hope is
misplaced.

Defendants have also missed the mark on Plaintiffs' State Claims. Attacking the
State Claims based on the 2016 Agreement and the 2012 Agreement, Defendants first
argue that the claims are completely preempted by the Copyright Act.  Defendants
argue further that the claims based on the 2016 Agreement are not plausible because: 1
-- there was no "copying of protectable expression) (i.e. recycling the "anti-similarity
filtration argument"); 2 – copying and rebooting *Scare Tactics* was somehow
permitted by the 2016 Agreement (this is absurd)*; and, 3 --- Plaintiffs' allegations of
damage are not  supported by alleging actual facts showing  a deprivation of Plaintiff's
ability to exploit *Scare Tactics*. (Doc.#31, p.42:3-43:5).   Finally, Defendants contend
that the Fourth Claim (based on the 2012 Agreement) is not supported by proper
allegations and, of course, that Healey has no duty to account to Hallock for copying
content that was specially addressed in the 2012 Agreement.  (Doc.#31, p.44:10-47:5).

---

[7] The Memorandum is attached hereto as Exhibit A.  It is an unpublished decision that is being pursuant to Ninth Circuit Rule 36-3.

[8] [D]efendant will not be immunized from liability by reason of the addition in his work of different characters or additional and varied incidents, nor generally by reason of his work proving more attractive or saleable than the plaintiff's.  4 *Nimmer on Copyright* (2009) Section 13.03 at 13:67.  Indeed, it is not uncommon to expand on a shorter version of a story: the full-length feature *The Birds* from Alfred Hitchcock was based on a short story by Daphne du Maurier; the full-length feature *The Snows of Kilimanjaro* from Henry King and Casey Robinson was based on Hemingway's story of the same name; the full-length feature *The Beast from 20,000 Fathoms* was based on a short story by Ray Bradbury.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

**The Copyright Claim is Plausible ---** Commencing on page 15 of their Memorandum, Defendants unsuccessfully argue that *Prank Encounters* is not "substantially similar" to *Scare Tactics* and therefore is not an unauthorized derivative work (i.e., a reboot).  Doing so, Defendants cry out for application of the "extrinsic filtration  test" *at the pleading stage* --- asking this Court to find, as a matter of law, that there is "no set of facts" to support the plausibility of Plaintiffs' claims.  But, as the Ninth Circuit has warned, "[s]ummary judgment is 'not highly favored' on questions of substantial similarity." (*L.A. Printex Indus., Inc. v Aeropostale, Inc.*  676 F.3d 841, 848 (9th Cir. 2012)).   *Metcalf v. Boscho* 294 F.3d 1069 (9th Cir. 2002).  This being true, it follows logically that this Court must be extremely careful before finding a lack of similarity on at the pleading level.

The true inquiry at this stage of the proceedings is not, as Defendants would have the Court believe, based on peeling back a copyrighted work layer-by-layer until such point as every element of any work can be called an "unprotected generalization." Rather, dismissal at this stage is warranted only where the Court can conclude "as a matter of law" that the "similarities between the two works are **only** in uncopyrightable material or are *de minimis*.  3 William F. Patry, Patry on Copyright, Section 9:86.50 (2020). Defendants cannot come close to this mark.

As a whole, Defendants' approach in seeking dismissal is flawed because it fails in its entirety to address fundamentals truths of all "original storytelling":  it is not the "story" or "idea" but rather the choice of "how to tell the story" that becomes the "concrete expression" protected by copyright; it is not the "elements themselves" but rather the choice of "how to arrange the elements" that becomes the "concrete expression" protected by copyright; and, is it not "specific elements," but rather the artist's "selection and emphasis" of those elements that becomes the "concrete expression" protected by copyright.  *Metcalf, supra* (citing *Apple Computer, Inc. v. Microsoft Corp.,* 35 F.3d 1435, 1446 (9th Cir. 1994).  It is these elements -- choice, selection and arrangement -- that cannot be truly evaluated by a court on its own at the

"extrinsic level." Instead, the evaluation requires the benefit of discovery and expert analysis, which is the standard in the Ninth Circuit. *See Shaw v. Lindheim* (9th Cir. 1990) 919 F.2d 1353, 1357 (expert's analysis of plot similarities sharing "common sequence of sequence and rhythm" precluded summary judgment); *Three Boys Music Corp. v. Bolton* (9th Cir. 2000) 212 F.3d 477, 485 (extrinsic test often requires expert testimony); *Apple Computer, Inc., v. Microsoft Corp.* (9th Cir. 1994) 345 F.3d 1435, 1442 (expert testimony assists in evaluation of "extrinsic prong").

Perhaps the best discussion of the problem with application of "slice and dice" and filtration test for extrinsic similarity at the pleading level was recently provided by the 9th Circuit in the *Zindel* memorandum: where there is a question of "qualitative importance of similarities", [e]ven if the copied portion is a relatively small in proportion to the entire work … the finder of fact may properly find substantial similarity". *Zindel v. Fox Searchlight Pictures, Inc.* (18-56087, Memorandum, ord. not pub. 6/22/20) (Exhibit A hereto).

**Allegations of Substantial Similarity of Concrete Expression ---** Plaintiffs allege that Defendants' episodes are substantially similar to Plaintiffs' episodes, copying protectable expression in specific, parallel episodes of *Scare Tactics.* (Doc.#20, ¶39,41-45). Plaintiffs allege that they created novel plots in realistic settings that needed to be compressed into a 4-5-minute timeframe, which once again was part of the creative process (Doc.#20, ¶48). Although Defendants pound over and again on Plaintiffs' completely appropriate admissions that the "underlying stories" are not "protectable" per se, this is a ploy to deflect the real claim that Defendants engaged in wholesale use of protectable elements in a virtually identical manner (Doc.#20, ¶¶39, 41-45, 48). Specially, after freely admitting that the stories cannot be protected, Plaintiffs allege that each of the Defendants' targeted 7 episodes uses the same plot, characters, sequencing, setting (even the time of day) and same "scary mechanism," and, in one of these episodes, Defendants even use the "series host" as a "surprise guest" at the "party," which is featured in corresponding *Scare Tactics* and *Prank*

1   *Encounters* episodes (Doc.#20, ¶44; ¶44 at p. 15:28-16:3; See Sched. V).[9]

2       Then, unlike many motion picture copyright claims that ask for comparison of a

3   written work (i.e., script) to a released product (i.e., a film), Plaintiffs again properly

4   assert that the "best way" to determine Defendants' infringement of protectable

5   elements, is to view and compare the videos themselves (Doc.#20, ¶¶42, 48, Exhibits

6   5,8, 14,17,20, 25, 28).  This is because the action incorporated into Plaintiffs' work

7   was based loosely on an underlying set of "story points" or "beats" that were rehearsed

8   with the actors before filming and eventually edited to final form (another creative

9   selection process), but obviously NOT rehearsed with the "mark" (in other words, the

10  beat sheets attached as exhibits do not show the final product).  Yet, in order to

11  demonstrate the level of Defendants' misappropriation of Plaintiffs' protected

12  expression, Plaintiffs provided a further layer of analysis in the form of detailed

13  "schedules" that were incorporated into the FAC (the "Schedules") (Doc.#20, ¶44,

14  Schedules attached to FAC and hereto as Exhibit B).

15      Each of the Schedules follows a specific format that flows from the parallel

16  episodes, addressing both Plaintiffs' and Defendants' episodes.  Each Schedule then

17  proceeds to a "similarity analysis."  These analyses must be "presumed true" unless

18  they are so far afield from the finished product seen on television or streamed on

19  Netflix as to be simply misplaced.  Likewise, any reasonable inferences must be drawn

20  in Plaintiffs' favor in determining whether Plaintiffs' pleading states a valid copyright

21  claim.  *Braden v. Wal-Mart Stores, Inc.* (8th Cir. 2009) 588 F3d 585, 595—"*Twombly*

22  *and Iqbal* did not change this fundamental tenet of Rule 12(b)(6) practice".  *Barker v.*

23  *Riverside County Office of Ed.* (9th Cir. 2009) 584 F3d 821, 824.

24      Although they clearly could have done so, Defendants apparently chose NOT to

25  compare and contrast Plaintiffs' *Scare Tactics* final product and written analyses in

26  Defendants' "anti-similarity argument."  Instead, Defendants chose to gin up their own

27

28  [9] In other words, even though *Westside Story* or *Titanic* may be based on the ageless tale of *Romeo and Juliet* it does
    not follow that the protectable elements of *Westside Story* or *Titanic* are fair game for the plagiarist.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

self-serving summaries of *Prank Encounters* and *Scare Tactics* and then argue that a comparison of these self-serving summaries shows no "copying of protected expression."  (Doc.#31, pp.18-38).[10]

Indeed, by using their own summaries as a basis for demonstrating that they did not copy Plaintiffs' protected expression, Defendants doomed their motion to failure because they are literally asking this Court to come to findings of facts --- to conclude, on one hand, that somehow that Plaintiffs' final aired product and Plaintiffs' summaries, comparisons and allegations of "copied protectable elements" are "inaccurate" or "de minimums" while, on the other hand, concluding that Defendants' summaries and comparisons are "true."  This is a call the Court simply cannot make at this time.

Moreover, Defendants' summaries are so ridden with errors that they are worth little, and the number of critical misstatements and omissions in Defendants' summaries and comparisons demonstrates that Defendants are overstepping and that the entirety of Plaintiffs' copyright claim is "plausible."

Recalling that the question is whether Defendants copied "protected expression" and not how much Defendants may have "added" to their infringing episodes, Plaintiffs provide the following examples of Defendants' overreaching and how Defendants' actually support, rather than undermine, Plaintiffs' choices in telling their stories and thus their allegations of copyright infringement:

**Defendants' Memorandum, Page 17, Lines 21-23** – Defendants assert that "on *Scare Tactics*, the mark is not required to perform elaborate jobs; they are largely passive observers who are scared." **This assertion is wrong.**  In *Scare Tactics*, a choice was made to lure marks into the prank with the promise of a part time job, just as in *Prank Encounters*. Moreover, there is no doubt that the "jobs," *deliberately*

---

[10] It is unclear whether Defendants' ever reviewed the underlying videos and base their "anti-similarity analysis" on review of the final products or on some other material as is suggested by the many errors presented by Defendants' "anti-similarity analysis."  ("[T]he 'ultimate test of **infringement**[is] the film as broadcast rather than the underlying scripts.") (alteration added)); 4-13 *Nimmer on Copyright* § 13.03[B][1][*b*].

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

*chosen by the creators of Scare Tactics,* are virtually identical to the *Prank Encounters'* jobs --- in *Road Kill* and in *End of the Road*, the marks are accident investigators; in *Dangerous Obsession* and *Face Fears*, the marks are caregivers; in *Satan's Baby* and *Urgent Scare,* the marks are both urgent care clinic receptionists; in *Camp Kill* and *Camp Scarecrow*, the marks are camp counselors*;* in *Phantom Power* and *Storage War of the Worlds*, each mark is an electrician's assistant; in *The Mummy* and *Fright at the Museum*, each mark is an assistant helping with artifacts; in *Send in the Clowns* and *It's My Party* and *Split Party*, each mark is a catering/party planning assistant (Compare Doc.#20, Schedules I-VII with Doc.#31, pp.18-38).[11]

**Defendants' Memoradum, Page 21, Lines 9-10** – Defendants summarize that in, *Camp Kill*, the other characters are the owners" - This is intentionally misleading. In *Camp Kill*, as well as in *Camp Fear,* these characters were chosen to act as "counselors" for the purpose of interviewing "new counselors," which explains why they are "interviewing" new counselors. This is verified in the *Camp Kill* write up/beat sheet (Doc.#20, Exh.12, 13).

**Defendants' Memorandum, Page 21, Line 14** – Defendants assert "Further, "Camp Kill" takes place in one cabin." Thus, Defendants actually highlight the importance of the choice of a "setting" in this episode. But Defendants have mischaracterized. The scenes in *Camp Kill* were chosen for dramatic effect to take place in two different cabins and also outside in the woods, where one of the counselors is attacked --- this in order to require communications via radio and thus build tension (i.e., people in the main cabin "wondering" what is going on elsewhere and "waiting" to be attacked). Defendants used Plaintiffs' choice here (Doc.#20, Schedule VI).[12]

---

[11] Notably, part of the "selection" of the "marks" is reviewing background to be sure that a "mark" does not have familiarity with the "job" in question, i.e. an electrician's assistant would not have electrical experience or the gag might be blown by the mark.

[12] This is a classic example of "choices in storytelling," namely "the monster in your head is worse than the monster actually see". Although unnecessary to include in a "pleading," such examples provide exactly the type of analysis that an expert would provide the Court if this case moves past the pleading stage.

10.

**Defendants' Memorandum -- re "Face Fears", commencing on Page 21  --** In Plaintiffs' description of the *Scare Tactics'* video of "Dangerous Obsession", Plaintiffs note a dramatic choice to "signal a problem" by having "the husband" give the victim a "creepy kiss on the forehead", but in Defendants' description of "Face Fears," they conveniently fail to admit copying of the exact same dramatic choice "a creepy lingering kiss on the victim's head" (instead calling it "odd behavior") (Doc.#31, P.22:7).

**Defendants' Memorandum, Page 21, lines 20-22** – Defendants claim that their episode *Face Fears* concerns a plastic surgeon and a woman (supposedly his wife) who is incapacitated "due to surgery."  But in the video of Defendants' story, a "severe accident" is revealed as the "reason" for home care. This is another mischaracterization designed to direct attention from Plaintiffs' dramatic choices in telling the story which are exactly the same.  In *Dangerous Obsession*, Plaintiffs chose to have the "victim" at home, in bed and also incapacitated "due to a serious accident incidental to the husband's stalking." What Defendants omit in their version is the "similarity," which is the "doctor" telling the mark that his victim has had a serious accident to explain why the victim needs "long-term care" and hence a back-up caretaker.  (Doc.#31, p.21:20-22:1).

**Defendants' Memorandum, Page 22, line 20** – Defendants summarize their episode, saying "Dr. Ritter threatens to sedate Dallas and Nick," but again, Defendants conveniently do not tell this Court "how" the threat was made.  (Doc.#31, 22:20).  In both Defendants' work and Plaintiffs' work, the "threat" comes at the same basic plot point --- when the "doctor" threatens both marks by showing the marks a loaded syringe.  The choice of a "loaded syringe" is a creative one, attributable to the Plaintiffs.  Clearly, the choice to use a syringe at this point (instead of a gun or a knife) may indeed signal to the marks that they, too, may be incapacitated and held against their will (whether this is true or not cannot be determined at the pleading stage).

**Defendants' Memorandum, Page 23, Lines 7-9** – Defendants also claim that

11.

Plaintiffs' *Dangerous Obsession* concerns a stalker who chains his obsession to a bed, while Defendants' *Face Fears* involves a deranged doctor who kidnaps a woman and reconstructs her face to replace his wife…." (Doc.#31, p23:7-9).  Yet in context, Defendants' choice of labels is a distinction without a difference --- Defendants' version copies Plaintiffs' character choice but merely changes his title.  Both men are deranged. Both have taken an innocent stranger hostage.  Both are keeping her sedated in their home.  Both lie to the new caretaker about their true motivations.

**Defendants' Memorandum, Page 23, Footnote 17**--- Defendants once again change the landscape.  As the "husband" leaves in *Dangerous Obsession,* Plaintiffs chose to have him tell the mark that he will return "probably in 45 minutes."  In storytelling, this is an important creative choice because it starts the clock ticking and sets a sense of urgency to the ensuing action.  In describing their own episode, *Face Fears,* Defendants omitted the "doctor's" almost identical statement, "I will return very soon," which also "starts the clock" exactly at the same point as in Plaintiffs' exposition.  Whether choosing "when" to start the clock is an element of protected expression is not something to determine at the pleading stage.[13]

**Defendants' Memorandum, Page 28, Lines 3-4** – Defendants claim that *Scare Tactics'* episode *Satan's Baby* commences with a woman (Morgan) alluding to being made pregnant by Satan," but this Episode has no such statement.  (Doc.#31, p.28:3-4).  Defendants properly observe that the mark in Plaintiffs' episode is hired as an urgent care receptionist but improperly claim that the mark in Defendants' episode is hired as a "hospital receptionist."  (Doc.#31, p.28-4-5). The Defendants improperly claim that both episodes take place in a "medical facility." (Doc.#31, p.29:14).  But Plaintiffs' chose a "urgent care center at night", which is the same as Defendants' episode (in this episode Matarazzo actually introduces the setting as "in an urgent care

---

[13] Defendants' Motion at page 25, line 17 - It appears there was a mistake with the exhibits. The clip involving Pedro and Helder was not supposed to be submitted. The clip we're saying was infringed is the second one they describe (line 25) with Allen and Lee Ann.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

facility," we see the sign "urgent care," and we see his "RV control room" pull behind a building marked "Urgent Care"). (Doc.#31, p.28:5; FAC, Doc.#20, Sched. IV). Plaintiffs' purposeful use of an urgent care center at night clearly paved the way for the pregnant woman to enter a "private facility" and give birth without causing undue suspicion (as would be the case in a hospital). Also, there is no way that a "new receptionist" would ever be asked to participate in a "delivery" at a bona fide medical facility or "hospital." Here, Defendants go out of their way to avoid using the term "Urgent Care clinic" when describing Jaeda's duties ("hospital receptionist") and the setting of the prank ("medical facility") - even though the episode is called "Urgent Scare" and the exterior of the building is clearly labeled "Urgent Care." That is because they know using an "out of the way" Urgent Care Clinic was an important creative choice by Plaintiffs for the purposes of the story. The setting of a lonely Urgent Care Clinic at night as opposed to a hospital or a generic "medical facility" was important to the reality of the story. An Urgent Care Clinic could be expected to have a lot of the same diagnostic equipment of a hospital while not being nearly as busy - especially late at night. This also explains the lack of other staff around and does not give the mark anyone else to reach out to for help.

**Defendants' Memorandum, Page 31, Lines 6-8** – In the "summary" of Plaintiffs' *Phantom Power* Defendants claim that Plaintiffs made a creative choice to feature a "homeowner building robots." (Doc.#31, p.31:6-8). Defendants then contrast this "choice" with their choice of a "secret government project keeping aliens alive using human life." *Id.* Here, Defendants again misrepresent Plaintiffs' selection and organization of elements in how to "tell the story." In the *Scare Tactics* episode, the character "Sven" is not displayed as a "homeowner building robots" (Doc.#31,p. 31:6-7), but rather as a "crazed ex-military scientist" who accuses the mark of being "a spy here to steal my tech."(Doc.#20, ¶44."g." "ii", Sched.II). Defendants' version copies Plaintiffs' choice. Also, in summarizing *Phantom Power,* Defendants say that Plaintiffs' summary "grossly mischaracterizes" in its description of the victim.

(Doc.#31, p.31:24). Doing so, Defendants once again call upon the Court to determine in the context of a motion to dismiss whether Plaintiffs' summary or Defendants' summary is correct for purposes of filtering for the "protected elements" that Defendants copied. Here, for example, Defendants refer to Plaintiffs' victim as an "unknown man" while in truth Plaintiffs chose to depict a victim dressed "the ruminants (sic) of a soldier's uniform." (Doc.#31, p.31:25). Either way, the victim is not truly identified, and in both cases the victim will die if electricity is shut down. (See Doc.#20, Sched. II).

**Defendants' Memorandum, Page, 31, Line 26** – In the summary of their *Storage War,* Defendants assert that the victim is not a robot, is not attached to electrodes, and is not electrocuted. (Doc.#31, p. 31, p.31:26-32:1). But again, in Plaintiffs' copied episode, it was never claimed directly that the victim was a robot. In Plaintiffs' original episode, just as in Defendants' copy: the victim is depicted as a soldier being held against his will; the victim is attached to a machine that is controlled in turn by electricity; and the electricity is keeping the victim alive. (See Doc.#20, Sched. II). Whether the selection and arrangement of these choices constitutes protected expression cannot be challenged at the pleading stage.

**Defendants' Memorandum Page 32, Line 9** – Clearly to downplay their copying of Plaintiffs' work, Defendants summarize *Phantom Power* as taking place in one room of a small home while Defendants' piece takes place in various rooms of an abandoned storage facility. (Doc.#31, p.32:9-10). Yet, Plaintiffs specifically alleged that the storage facility setting for *Phantom Power* was "remote ... in the middle of nowhere." (See Doc.#20, Sched. II). Missing in Defendants' summary of Plaintiffs' work is any discussion of the time of day, the exterior lighting, the interior lighting, the "one large room," in which the action takes place or the concept of loneliness. (See Doc.#20, Sched. II). Defendants fail to talk about the "confusion" and "mystery" created by Plaintiffs' setting. (See Doc.#20, Sched. II). Whether the choice to have the action take place in a remote storage facility is a "protected element" is, once

14.

again, not for determination at the pleading stage --- i.e., a remote location heightens the fear of the mark, no place to run, no place to hide, nobody to call --- a creative choice.[14]

**Defendants' Memorandum, Page 34, Lines 12-14** --- In Defendants' summary of *Split Party*," they claim that the host, who has a split personality, serves poisoned cupcakes due to a dark desire to harm Gaten Matarazzo, with whom he is obsessed." (Doc.#31, p.34:12-14).  But none of these traits are clearly laid out the body of Defendants' episode --- i.e., it is never clear whether the "host" has a split personality or is just crazy; likewise, with the "host's" desire to kill Gaten Matarazzo. In similar fashion, Defendants' summarize Plaintiffs' *Send in the Clowns,* by claiming that the "host" is obsessed with clowns and sets up a party specifically to kidnap clowns for his entertainment (the "reason" for hosting the party is never explained in the Plaintiffs' video either).  (Doc. #31, p.34:21).  In the context of these misdirections, Defendants conveniently overlook a collection of creative choices (daytime, a party, fancy house, trappings of wealth, poisoned desert, hired party/catering help, a creepy-dad who is demanding host who talks about a "daughter who does not exist" who appears at the end of both episodes dressed in a young girl's clothes).  (Doc. #20, Sched. V). In addition, both episodes feature the host of the series (Tracy Morgan and Gaten Matarazzo) as participants in the festivities. Id.

**Defendants' Memorandum, Page 37, lines 8-10** --- Defendants write: "Plaintiffs try to point to the use of a "creature" but again the creatures at issue are unprotectable elements and different: one is a werewolf, the other, Bigfoot."  (Doc. 331, p.37:8-10).  However, "Bigfoot" is never mentioned in Defendants' episodeand "a werewolf" is never mentioned in Plaintiffs' episode.  (Doc.#20, Sched. III).  There is mention in both pieces of a large hairy creature, but once again, Plaintiffs chose to leave the nature of the creature to the mark's imagination, a choice clearly copied by Defendants (i.e. the "creature", whatever it is, is a mystery and causes fear in the

---

[14] "In space no one can hear you scream," *Alien,* 1979.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

mark). *Id.* Likewise, Defendants claim that the mark in Plaintiffs' episode works for an "unidentified company." (Doc.#31, p. 37:11-12).  This is misdirection.  In the opening dialogue of Plaintiffs' episode (not referenced by Defendants), the mark is told, "Anytime there's an accident with a <u>department</u> (i.e., government) vehicle, we have to go in and file a report. And because of <u>government</u> regulations Claudio has to video it." (Doc.#20, Sched. III).  Hence, there was a decision by Plaintiffs to place a "visible camera" in the scene that is actually recording the events.  One way to accomplish this was to tell the mark that it was required by "regulations."  Amazingly, Defendants insert a "visible camera" into their episode for the purposes of filming the mark as well.[15]

   In all, there is little doubt that this is a case with multiple episodes involving multiple instances of substantial similarity, which collectively and separately deserve to be evaluated in a different setting than this Motion to Dismiss because at this stage reasonable minds can, and apparently do, differ on whether substantial similarity exists.

   **The State Claims Are Not Subject To a Rule 12(b)(6) Motion ---**  As discussed above, Defendants did not seek (or receive) any right to pursue a Motion to Dismiss Plaintiffs' state law claims, thus waiving the right to bring such a motion.  However, out of respect for the Court, Plaintiffs herein provide ample reasons why the Motion to Dismiss must be denied.

   **Copyright Preemption Does Not Warrant Dismissal of State Claims  ---** Two conditions must be met for the Copyright Act to preempt a state law.  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137, 1150 (9th Cir. 2008)). "'First, the content of the protected right must fall within the subject matter of copyright as described in 17 U.S.C. §§ 102 and 103. Second, the right asserted under state law must be equivalent to the exclusive rights contained in section 106 of the Copyright Act.'"  *Id.* (*quoting Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1003

---

[15] Of all the episodes in question, both Plaintiffs' and Defendants', a "visible" camera is used only in these two.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

(9th Cir. 2001). In other words, "[i]f a state law claim includes an 'extra element' that makes the right asserted qualitatively different from those protected under the Copyright Act, the state law claim is not preempted by the Copyright Act." *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079, 1089 (9th Cir. 2005). The extra element in the state law must effectively change "the nature of the action so that it is qualitatively different from a copyright infringement claim." *Id.* (*citing Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1440 (9th Cir. 1993) (quotations and edits omitted)).

Defendants are wrong to assert that the first condition is satisfied because "[t]elevision episodes like the *Scare Tactics* episodes [ ] unquestionably fall within the 'subject matter of copyright.'" (Doc.#31, 39:6-8).  Defendants are also wrong to assert that the second condition is satisfied because "Plaintiffs' claims do nothing more than seek to hold Defendants liable for alleged copyright infringement" (Doc.#31, 39:18-19) and that "Plaintiffs' claims do not seek to protect rights qualitatively different from their rights protected by copyright." (Doc.#31, 40:23-41:1).

As with their "extrinsic filtration" claims, without any analysis whatsoever, Defendants erroneously conclude that Plaintiffs' state law contract claims are preempted.  This lack of analysis apparently led the Defendant to quote Professor Nimmer entirely out of context (apparently to imply, without basis, that every contract related in any way to a copyright is preempted.  (Doc.#31, 40:4-9)).  Contrary to Defendants' assertions, Professor Nimmer repeatedly observes the opposite, to wit: *"Although the preemption language of the Act is arguably broad enough to refer to breach of contract causes of action, because contract rights are founded on promises, they are not equivalent to copyright."* Nimmer § 1.01[B][1][a], p. 1-15, fn. 68.1

> *"[A] breach of contract action ... is not predicated upon a right that is 'equivalent to any of the exclusive rights within the general scope of copyright ....' This for the reason that a contract right may not be claimed unless there exists an element in addition to the mere acts of*

1  *reproduction, performance, distribution or display. That additional*

2  *element is a promise (express or implied) upon the part of the*

3  *defendant."*

4  4 Nimmer on Copyright (2002) § 16.04[C], p. 16-25, fns. omitted.

5  Indeed, "[m]ost courts have held that the Copyright Act does not preempt the

6  enforcement of contractual rights." *Altera Corp. v. Clear Logic, Inc.* (9th Cir. 2005)

7  424 F.3d 1079 (*citing Bowers v. Baystate Techs. Inc.* (Fed. Cir. 2003) 320 F.3d 1317,

8  1323-24; *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l* (8th Cir. 1993) 991 F.2d

9  426, 431 ("National's use of the licensed programs constitutes an extra element in

10  addition to the copyright rights …").   This holds true for interference with contract as

11  well.  See *Altera Corp., supra, Altera Corp. v. Clear Logic, Inc. ,* 424 F.3d 1079, 1089

12  (9th Cir.2005) (The Ninth Circuit held that the Copyright Act did not preempt the

13  plaintiff's intentional interference claims based on the 'sole use' provision… included

14  an 'extra element' not included within the Copyright Act's protections."); *Bowers,*

15  *supra*, (*citing ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1455 (7th Cir.1996) ("contractual

16  restraints" are an "additional element").

17      **Plaintiff Has Alleged the Elements Required for Contractual Breach of**

18  **Covenant of Good Faith and Fair Dealing ---** The conduct supporting Plaintiffs'

19  second state-law claim for breach of the covenant of good faith and fair dealing is

20  grounded in breach of the 2016 Agreement.[1]  Here, Plaintiffs have alleged:  (1)

21  Healey's failure to transfer all tangible, physical assets of *Scare Tactics* to Plaintiffs

22  (Doc.#20, ¶¶29-31 at 6:16-23); (2) Healey's failure to transfer all intangible assets of

23  *Scare Tactics* to Plaintiffs; and (3) Healey's failure to honor the express language of

24  the 2016 Agreement to pursue "other" scary, paranormal-themed *or* hidden camera

25  shows (i.e. **not** to knock off, copy or reboot *Scare Tactics* or its related IP).

26      **The 2016 Settlement Agreement Expressly Forbids Defendants from**

27  **Producing "Prank Encounters" ---** Defendants erroneously claim that the 2016

28

---

[1] The 2016 Agreement is fully integrated CITE PARAGRAPH 17)

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Agreement "explicitly permitted Healey to develop and exploit *Prank Encounters.*" (Doc.#31, 42:11-12).  Such a reading defies logic.  Certainly, Hallock would not bargain for Defendants' explicit authorization to knockoff, copy, or reboot *Scare Tactics*.

In California, the language of a contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. Cal. Civ. Code § 1636 (West 2020).[2]  An interpretation such as that sponsored by the Defendants cannot lead to an absurd conclusion.  Cal Civ. Code 1638.  Moreover, when the contract is in writing, the intention of the parties is to be ascertained from the whole of the writing, thus giving effect to every part of it.  Cal.Civ.Code 1638, Cal. Civ. Code 1641.

When read in its entirety, the 2016 Settlement Agreement is a total and complete walkaway by Healey, thus giving Plaintiffs full and unfettered to exploitation of *Scare Tactics* and related IP in all forms whatsoever.  There can be no argument about this:

First, the parties to the 2016 Settlement Agreement clearly recite that the "primary creative and intellectual property at issue ... is the *Scare Tactics* television series and any and all intellectual property of any nature or kind whatsoever related to *Scare Tactics*, including but not limited to all ancillary rights, all remake rights, and any and all exploitation rights pertinent thereto" (here the parties combine all of these rights into the short form SCARE TACTICS and use that form throughout the remainder of the 2016 Agreement) (Doc. #31-2, p.103)

Second, the parties recite that in "in entering into" the 2016 Settlement Agreement, it was their express "wish … to settle all claims, counterclaims and issues … and all past, present and **future** issues concerning SCARE TACTICS." (Doc. #20, Exh. 1, ¶ "F", p. 1) (emphasis added).  These recitals are **conclusively presumed** to be

---

[2] As specified in paragraph 18 of the 2016 Agreement, California law governs the agreement, including California laws of contractual interpretation.  (Doc.#20, Exhibit 1; Doc.#31-2,p.110).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

1    true between the parties.  Cal. Evid. Code § 622.

2         Third, the 2016 Settlement Agreement states specially that Healey is ceding all

3    of his direct and indirect rights and interest of any kind in and to SCARE

4    TACTICS (the defined term), including, **but not limited to**, copyrights, trademarks,

5    brands, trade names, and other intellectual property of any kind or nature whatsoever

6    … and any and all direct rights to **use or exploit such copyrights, trademarks,**

7    **brands, trade names and other intellectual property of any kind or nature**

8    **whatsoever relating to SCARE TACTICS.”**  (Doc. #31-2, pp.104-105).

9         Fourth, Healey, “for the sake of certainty,” went even further and agreed that the

10   SCARE TACTICS and the IP RIGHTS **franchise** included, without limitation, the

11   [entire] television series, previously developed movie concepts, and **all forms of**

12   **ancillary and derivative exploitation relating thereto ---** (Doc. #31-2, p.103).

13   (emphasis added).

14        Fifth … only AFTER the binding Recitals, the multiple ceding by Healey of all

15   rights in SCARE TACTICS and the IP, and agreeing to the “for sake of certainty” did

16   the parties agree that Healey’s total "walk away” from SCARE TACTICS and ALL IP,

17   does not prohibit Healey from pursuing “**other** scary, paranormal-themed or hidden

18   camera shows.” *Id.*

19        But even though the 2016 Settlement Agreement clearly divests Healey from

20   the use or exploitation of the entire *Scare Tactics* television series and “any and all

21   intellectual property of any nature or kind whatsoever related to *Scare Tactics*,

22   including but not limited to all ancillary rights, all remake rights, and any and all

23   exploitation rights pertinent thereto,” Defendants nonetheless twist the clear language

24   of the 2016 Agreement to claim that the clause “**other** scary, paranormal-themed **or**

25   hidden camera shows” actually permits Healey to steal back all of the transferred

26   rights by simply remaking or copying specific *Scare Tactics* episodes, rebooting the

27   entire series and/or exploiting the IP apparently in any manner he chooses as long as

28   he gives the knockoff a different name: “*Prank Encounters*.” This, of course, is the

1    foundation of Plaintiffs' bad faith breach of contract claim --- literally taking back,

2    without permission, all of the very benefits transferred as the heart of the 2016

3    Settlement Agreement.

4        Making this argument, what Defendants really want is for the Court to re-write

5    the 2016 Settlement Agreement to eliminate the conjunction "or" and in its place insert

6    the conjunction "and."  Defendants want this unauthorized re-write to state that

7    Healey's transfer of all rights whatsoever "does not prevent Healey from pursuing

8    **other** scary, paranormal-themed **and** hidden camera shows".  This re-write, if adopted

9    would eliminate any effect of the words "**other**" and "**or**" to effectively read that the

10   2016 Settlement Agreement "does not prevent Healey from pursuing [other] scary,

11   paranormal-themed **and** hidden camera shows."  Of course, this approach has

12   historically been rejected by the California courts. *See Edwards v. Comstock Ins.* 205

13   Cal. App. 3d 1164, 1167 (1988).

14       Defendants' argument not only leads to an absurd result, but also expressly

15   ignores the parties' conclusively presumed intent to resolve "all past, present and

16   future issues" concerning SCARE TACTICS, the IP, including matters that may not

17   fall within protection of the Copyright Act, such as "the franchise" ("protected

18   expression" under a copyright analysis) (Doc. #31-2, p.104-105).  Clearly, no reading

19   of the 2016 Settlement Agreement possibly supports this position.

20       Admittedly, the 2016 Settlement Agreement does permit Healey to pursue

21   "'*other*' "scary, paranormal-themed *or* hidden camera shows" but not SCARE

22   TACTICS or the IP (Doc.#31-2, p. 105) (emphasis added), a view supported by the

23   definition of "other" in the Oxford English Dictionary -- "denoting a person or thing

24   that is different or distinct from one already mentioned or known about [, i.e., *Scare*

25   *Tactics*]."

26       While the 2016 Settlement Agreement does not have the effect of a non-

27   competition clause, the language accepted by Healey seeks a balance by ensuring that

28   Plaintiffs' rights were left intact while Healey was advised, essentially, "Do whatever

you want, just don't do *Scare Tactics*."

**The Other Elements of Contractual Bad Faith Breach Are Properly Alleged ---** As their only remaining argument `Defendants also argue that "Plaintiffs do not actually allege any facts showing a deprivation of Plaintiffs' ability to exploit *Scare Tactics*," and hence "no breach" (Doc.#31, 43:4-5).  Yet, in demonstrating that the acts complained of interfere with Plaintiffs' reaping the benefits of the 2016 Settlement Agreement, Plaintiffs are not limited to showing a deprivation of Plaintiffs' ability to exploit *Scare Tactics*.  Plaintiffs assert that Defendants' acts have "destroyed the Copyright Holder Plaintiffs' ability to realize the full extent of returns on their significant financial investment [of $40,000,000.00]." (Doc.#20, ¶ 46, at 16:16-22).   Plaintiffs allege that the Defendants deprived Plaintiffs of all of the benefits conveyed, including use of copyrights as wall as "unprotected elements," including format and exploitation of the Franchise (Doc.#20, ¶¶ 76-77) **"other rights to exploit the franchise").** Plaintiffs further assert that Defendants' acts have caused confusion with the public at large (Doc.#20, ¶50, at 18:4-6), diluting its pecuniary and non-pecuniary strength, and that *Prank Encounters* leveraged the popularity of *Scare Tactics* to *Scare Tactics'* detriment. (Doc.#20, ¶ 51, at 18:7-15).  Plaintiffs also allege that they have sustained consequential and special damages in an amount to be proven at trial **(**Doc. #20, ¶ 80, 25:27-28**).**  As such, Defendants have failed to meet their burden to establish that Plaintiffs' second claim for breach of covenant of good faith and fair dealing fails submit any facts to support a plausible claim.

**Plaintiffs Have Alleged the Elements Required to Establish a Plausible Claim For Interference With the 2016 Agreement ---** Although not specifically attacked by Defendants (who attack the Second and Third Claims with identical argument) Plaintiffs have clearly stated a plausible claim of interference with contract. Here, Defendants' only attacks are "Copyright preemption", "Healey's permission to knockoff and reboot the very assets he ceded to Plaintiffs via the 2016 Agreement" and a "lack of specificity" in alleging damages.  Yet as with their attack on the Second

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Claim, Defendants'' arguments again fall woefully short.  In support of a plausible claim: (1) Plaintiffs have alleged the existence and  of the 2016 Settlement Agreement (Doc.#20, ¶82, 26:6-10) (element 1); Plaintiffs have alleged (and attached actual proof) that Propagate' s knowledge that Hallock was the sole owner of the rights to *Scare Tactics* (Doc.#20, ¶35 at 7:8-15; ¶37 at 7:23-25; ¶38 at 7:27-8:10; ¶83, 26:11-13) (element 2); (3) Plaintiffs have alleged that Propagate intentionally did acts that induced breach, such as "commenc[ing], supervis[ing] and complet[ing] production and delivery to the online streaming company Netflix of an allegedly "new" *Scare Tactics* television series []" (Doc.#20, ¶38 at 8:1-3; ¶39 at 8:6-10; ¶84 at 26:14-17); (4) Plaintiffs have alleged that Defendants, including Propagate, promoted to Netflix the creation of a "new" *Scare Tactics* that Propagate would fund and that former *Scare Tactics* creator, writer, director and producer, Kevin Healey, would create, albeit under a "new" name, *Prank Encounters* (Doc.#20, ¶84, 26:14-17); (5) Plaintiffs have alleged that Propagate caused and enabled Healey to breach the 2016 Agreement (i.e. facilitated the breach) (Doc.#20, ¶85 at 26:18-20); and, (6) Plaintiffs have demonstrated that they've suffered damages (Doc.#20, ¶86 at 26:21-25); (7) Plaintiffs have alleged a breach of the 2016 Agreement, "by supporting and funding Healey's producing of *Prank Encounters* …  Propagate knew that Healey would, thereby breach the covenant of good faith and fair dealing in the 2016 Agreement (Doc. #31-2, ¶¶ 78-79, p.33).

Having the burden here, Defendants have again failed to meet it, seeming to base their entire position on the argument that Plaintiffs failed to allege an underlying breach.  (Doc.#31, 43:2-3).  However, as reference above, there *is* an allegation of breach.

Hence, Defendants failed in their endeavor to establish that Plaintiffs' third claim is implausible.

**Plaintiffs Have Alleged the Elements Required to Establish a Plausible Claim Against Healey For Breach of the 2012 Agreement ---** Defendants attempt to

satisfy their Rule 12(b)(6) burden to dismiss Plaintiffs' Fourth Claim for Breach of Contract solely against plaintiff Healey by recycling the same arguments that failed against the Second and Fourth Claims.  But clearly Plaintiffs have alleged facts in support of a plausible claim.

Here, Plaintiffs allege that Hallock and Healey, through a production company named "The Gifted Show, Inc., ("Gifted"), produced a show on Animal Planet called *Freak Encounters* Plaintiffs further allege that via the 2012 Agreement, Hallock became the 100% owner of Gifted.  Plaintiffs then allege that under the terms of the 2012 Agreement, either Healey of Hallock was authorized to seek opportunities to, and could, exploit *Freak Encounters* subject to certain conditions (Doc.31-2, ¶90, p.35).

Among other things, if Healey found an opportunity to develop, produce and exploit *Freak Encounters*, he was required to obtain Hallock's approval.  *Id.*

Plaintiffs do not allege damages because Healey failed to advise Hallock or obtain Hallock's approval when Healey produced a knockoff within the *Prank Encounters* series, nor do Plaintiffs allege that making the knockoff was necessarily prohibited or otherwise constituted a breach of the 2012 Agreement.  And, contrary to Defendants' misunderstanding, Healey is NOT being sued for failure to obtain Hallock's approval prior to producing a knockoff of a *Freak Encounters* werewolf episode, and, Healey is not being sued for copyright infringement.

Instead, Healey is being sued because produced a copy of a *Freak Encounters* episode and ***he did not pay Hallock a "net fee" as mandated by the 2012 Agreement (generally 50% of all budgeted fees less a 5% off the top payment)***.  (Doc.31-2, ¶96, p. 36).

Hence, as with the Second and Third Claims, the Fourth Claim is not subject to copyright preemption (extra element), and it is not subject to the "extrinsic filtration analysis), but another/differing standard of review (if any) that would apply in the context of a Motion to Dismiss a non-copyright claim.

**CONCLUSION**

Defendants' reliance on the extrinsic similarity filtration test is misplaced. First, there are a number of substantial protected elements in *Scare Tactics* that were lifted by Defendants and substantially copied into *Prank Encounters*. Second, it is clear that undertaking an extrinsic filtration test to seek out "protected v. unprotected elements" at this early stage of the proceedings is not the proper way to meet the challenge. It cannot be questioned that discovery and expert testimony are truly needed to give Plaintiffs their due process prior to dismissal.

Defendants' reliance on the preemptive power of the Copyright Act is inappropriate because each of the three "state claims" contains an extra element that overrides preemption.

Finally, Defendants attempt to gain dismissal by suggesting that Plaintiffs' have not alleged needed elements with sufficient particularity is negated by Plaintiffs' actual pleading and, once again, is not within the pleading requirements applicable to such claims.

Hence, the motion to dismiss must be denied in its entirety.

Dated: August 3, 2020

CHARNLEY RIAN LLP

By: _____
Richard L. Charnley
Nicole W. Uhlmann
*Attorneys for Plaintiffs Scott Hallock;*
*WMTI Productions, Inc.; WMTI*
*Productions North, Inc.; and The Next*
*Season Company, Inc.*

4852-8616-0692, v. 2

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT