1  AARON M. WAIS (SBN 250671)
   amw@msk.com
2  GABRIELLA A. NOURAFCHAN (301594)
   gan@msk.com
3  MITCHELL SILBERBERG & KNUPP LLP
   2049 Century Park East, 18th Floor
4  Los Angeles, CA 90067-3120
   Telephone: (310) 312-2000
5  Facsimile: (310) 312-3100

6  Attorneys for Defendants
   Kevin Healey and Propagate Content, LLC
7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10

11 | SCOTT W. HALLOCK, an individual;    | CASE NO. 2:20-cv-02726 CJC (MAAx)
   | WMTI PRODUCTIONS, INC., a           |
12 | California corporation; WMTI        | Honorable Cormac J. Carney
   | PRODUCTIONS NORTH, INC., a          |
13 | Canadian corporation; and THE NEXT  | **COMBINED REPLY
   | SEASON COMPANY, INC., a             | MEMORANDUM IN SUPPORT OF
14 | Canadian corporation,               | DEFENDANTS'
   |                                     | (1) MOTION TO DISMISS
15 |          Plaintiffs,                | PLAINTIFFS' FAC (FRCP 12(b)(6))
   |                                     | AND
16 |     v.                              | (2) MOTION TO STRIKE
   |                                     | PLAINTIFFS' STATE LAW
17 | KEVIN HEALEY, an individual;        | CLAIMS (COAS 2-4) PURSUANT
   | PROPAGATE CONTENT, LLC, a           | TO CALIFORNIA'S ANTI-SLAPP
18 | Delaware Limited Liability Company; | STATUTE (CAL. CODE CIV. P.
   | and DOES 1 through 100, inclusive,  | § 425.16)**
19 |                                     |
   |          Defendants.                |
20 |                                     | Hearing Date: September 14, 2020
   |                                     | Time:         1:30 p.m.
21 |                                     | Location:     Courtroom 9B
22 |                                     | File Date:    March 24, 2020
   |                                     | Trial Date:   TBD
23

24

25

26

27

28

Mitchell
Silberberg &
Knupp LLP

12435476.1

---

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

# **TABLE OF CONTENTS**

**Page**

I.   SUMMARY OF ARGUMENT ...................................................................8

II.   PLAINTIFFS' COPYRIGHT CLAIMS FAIL BECAUSE, AS A
MATTER OF LAW, THERE IS NO SUBSTANTIAL SIMILARITY
BETWEEN *PRANK ENCOUNTERS* AND *SCARE TACTICS*. ...................9

   A.   Courts Can and Do Decide Substantial Similarity on Motions to
Dismiss.........................................................................................9

   B.   After Filtering Out Unprotected Elements, Plaintiffs Have Failed
to Show Substantial Similarity Between *Scare Tactics* and *Prank
Encounters* or Any of the Individual Episodes Complained-Of.........10

      1.   Looking at the Two Series in Their Entirety, *Prank
Encounters* and *Scare* Tactics are Not Substantially Similar
in Protected Expression. ...........................................................11

      2.   The Episodes of *Prank Encounters* and *Scare Tactics* at
Issue are Not Substantially Similar in Protected Expression. ..13

   C.   Plaintiffs' Unpled And Unexplained "Selection and Arrangement"
Theory Cannot Save Any Of Their Copyright Claims. ......................20

III.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED
AND STRICKEN.......................................................................22

   A.   Plaintiffs' State Law Claims Should Be Dismissed. .........................23

      1.   The Court May Properly Consider Defendants' Rule
12(b)(6) Challenges to Plaintiffs' State Law Claims. ..............23

      2.   *Scare Tactics* Claims: Plaintiffs Have Failed To State
Claims For Breach of The Implied Covenant and Tortious
Interference. ............................................................................24

      3.   Hallock's Claim For Breach of the 2012 Agreement Against
Healey Also Fails As A Matter of Law. ...................................31

   B.   Plaintiffs' State Law Claims Should Be Stricken.................................32

# TABLE OF CONTENTS
(continued)

**Page**

    1.    Plaintiffs Fail To Refute That Their State Law Claims Arise from Acts in Furtherance of Defendants' Rights of Free Speech in Connection with Matters of Public Interest. ............33

    2.    Plaintiffs Have Not Shown a Probability of Prevailing on Their State Law Claims. .........................................................37

    3.    Plaintiffs are Not Entitled to Discovery. .................................41

    4.    The Anti-SLAPP Motion is Not Frivolous. ..............................42

IV.    CONCLUSION ..............................................................................42

Mitchell
Silberberg &
Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

CASES

*Altera Corp. v. Clear Logic, Inc.*,
   424 F.3d 1079 (9th Cir. 2005) ....................................................................26, 27

*Arkley v. Aon Risk Servs. Companies, Inc.*,
   2012 WL 12886445 (C.D. Cal. June 13, 2012)................................................35

*Basile v. Warner Bros. Entm't*,
   2016 WL 5867432 (C.D. Cal. Jan. 4, 2016)..............................................11, 14

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ...........................................................................13

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) ...................................................................16, 19

*Bernal v. Paradigm Talent and Lit. Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010)................................................16, 17, 21

*Bowers v. Baystate Techs., Inc.*,
   320 F.3d 1317 (Fed. Cir. 2003) .......................................................................27

*Capcom Co., Ltd. v. MKR Grp., Inc.*,
   2008 WL 4661479 (N.D. Cal. Oct. 20, 2008)..........................................11, 22

*CBS Broad., Inc. v. Am. Broad. Cos., Inc.*,
   2012 WL 13013027 (C.D. Cal. June 21, 2012)................................................12

*Cory Van Rijn, Inc. v. Cal. Raisin Adv. Bd.*,
   697 F. Supp. 1136 (E.D. Cal. 1987) .................................................................11

*Dworkin v. Hustler Magazine Inc.*,
   867 F.2d 1188 (9th Cir. 1989)..........................................................................24

*Edwards v. Comstock Ins.*,
   205 Cal. App. 3d 1164 (1988) .........................................................................29

*Fillmore v. Blumhouse Prods., LLC*,
   2017 WL 4708018 (C.D. Cal. July 7, 2017) ......................................................9

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Funky Films v. Time Warner Entm't Co.*,
   462 F.3d 1072 (9th Cir. 2006) ........................................................................ 13

*Gadh v. Spiegel*,
   2014 WL 1778950 (C.D. Cal. Apr. 2, 2014) ..................................................... 9

*Gallagher v. Lions Gate Entm't Inc.*,
   2015 WL 12481504 (C.D. Cal. Sept. 11, 2015) ............................................. 20

*GN Resound A/S v. Callpod, Inc.*,
   2013 WL 1190651 (N.D. Cal. Mar. 21, 2013) ................................................ 11

*Gray v. Perry*,
   2020 WL 1275221 (C.D. Cal. Mar. 16, 2020) ............................................... 21

*Hall v. Mortgage Inv'rs Grp.*,
   2011 WL 4374995 (E.D. Cal. Sept. 19, 2011) ............................................... 11

*Jackson v. Mayweather*,
   10 Cal. App. 5th 1240, 1263 (2017) ................................................................ 36

*Kouf v. Walt Disney Pictures and Television*,
   16 F.3d 1042 (9th Cir. 1994) .................................................................... 16, 19

*Liberty Mut. Ins. Co. v. Sumo-Nan LLC*,
   2015 WL 6755212 (D. Haw. Nov. 4, 2015) .................................................... 30

*Lichtfield v. Spielberg*,
   736 F.2d 1352 (9th Cir. 1984) ........................................................................ 11

*Masterson v. Walt Disney Co.*,
   -- F. App'x --, 2020 WL 4435103 (9th Cir. Aug. 3, 2020) ............... 8, 10, 21, 22

*Metcalf v. Bochco*,
   294 F.3d 1069 (9th Cir. 2002) .................................................................. 21, 22

*Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l*,
   991 F.2d 426 (8th Cir. 1993) .......................................................................... 27

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*,
   890 F.3d 828 (9th Cir.) ................................................ 23, 24, 37, 38, 41, 42

Mitchell
Silberberg &
Knupp LLP

12435476.1

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*ProCD, Inc. v. Zeidenberg*,
  86 F.3d 1447 (7th Cir. 1996) ............................................................27

*RDF Media Ltd. v. Fox Broad. Co.*,
  372 F. Supp. 2d 556 (C.D. Cal. 2005) ..............................................13

*Rentmeester v. Nike, Inc.*,
  883 F.3d 1111 (9th Cir. 2018) ..........................................................11

*Rice v. Fox Broad. Co.*,
  330 F.3d 1170 (9th Cir. 2003) ..........................................................22

*Robinson v. Nationstar Mortg.*,
  2015 WL 13651767 (C.D. Cal. Apr. 16, 2015) .................................30

*Rogers v. Home Shopping Network, Inc.*,
  57 F. Supp. 2d 973 (C.D. Cal. 1999) ................................................23

*Satava v. Lowry*,
  323 F.3d 805 (9th Cir. 2003) ............................................................20

*Segal v. Rogue Pictures*,
  2011 WL 11512768 (C.D. Cal. Aug. 19, 2011) ..................................9

*Shame on You Prods., Inc. v. Elizabeth Banks*,
  120 F. Supp. 3d 1123 (C.D. Cal. 2015) ............................................22

*Silas v. Home Box Office, Inc.*,
  201 F. Supp. 3d 1158 (C.D. Cal. 2016) .................................9, 14, 22

*Silva v. U.S. Bancorp*,
  2011 WL 7096576 (C.D. Cal. Oct. 6, 2011) ......................................11

*Skidmore v. Zeppelin*,
  952 F.3d 1051 (9th Cir. 2020) ....................................................21, 22

*Survivor Prods. LLC v. Fox Broad. Co.*,
  2001 WL 35829267 (C.D. Cal. June 12, 2001) ................................13

*Symmonds v. Mahoney*,
  31 Cal. App. 5th 1096, 1109 (2019) .................................................34

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Talega Maintenance Corp. v. Standard Pacific Corp.*,
    225 Cal. App. 4th 722 (2014)................................................................38

*Taylor v. Viacom Inc.*,
    2018 WL 4959821 (C.D. Cal. June 5, 2018)..............................33, 34

*Third Laguna Hills Mutual v. Joslin*,
    49 Cal. App. 5th 366 (2020)............................................................38

*Thomas v. Walt Disney Co.*,
    337 F. App'x 694 (9th Cir. 2009)....................................................11

*Zalkind v. Ceradyne, Inc.*,
    194 Cal. App. 4th 1010 (2011)........................................................29

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007)....................................21, 22

*Zindel v. Fox Searchlight Pictures, Inc.*,
    -- F. App'x --, 2020 WL 3412252 (9th Cir. June 22, 2020)..............11

**STATUTES**

Copyright Act ...................................................................................24, 32

**OTHER AUTHORITIES**

Central District of California
    Local Rule 11-3.1.1 ..........................................................................8
    Local Rule 11-6 .................................................................................8
    Local Rule 11-9 .................................................................................8
    Local Rule 83-7 .................................................................................8

Federal Rule of Civil Procedure
    Rule 11.............................................................................................30
    Rule 12.................................................9, 22, 23, 24, 37, 38, 40, 41

4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* ........14

Mitchell
Silberberg &
Knupp LLP

12435476.1

DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE

## I.    SUMMARY OF ARGUMENT[1]

Plaintiffs' Oppositions[2] to Defendants' motion to dismiss and anti-SLAPP motion boil down to them wrongly telling the Court that their legal conclusions, masquerading as allegations, trump the works in question, override the plain language of the contracts at issue, and, standing alone, are all that are needed to move beyond the pleading stage. As to their copyright claims, Plaintiffs tell the Court that their subjective, biased allegations of substantial similarities are presumptively true and that the Court therefore must allow their claims to proceed. This is wrong. What matters are the actual works at issue and, as the Ninth Circuit recently affirmed, judges should use "'judicial experience and common sense'" in "compar[ing] [] two works." *Masterson v. Walt Disney Co.*, -- F. App'x --, 2020 WL 4435103, at *2 (9th Cir. Aug. 3, 2020). If the court concludes that the works are not substantially similar, it should dismiss the copyright claim before discovery and without expert testimony. Watching the episodes at issue and invoking judicial experience and common sense are all that are needed to conclude that Plaintiffs cannot monopolize the concept of a hidden camera prank show and that *Prank Encounters* and *Scare Tactics* are not remotely similar in protectable expression. Plaintiffs' Oppositions do not plausibly argue otherwise.

---

[1] "Plaintiffs" refers collectively to Scott Hallock ("Hallock"), WMTI Productions, Inc. ("WMTI US"), WMTI Productions North, Inc. ("WMTI North"), and The Next Season Company, Inc. ("TNSCI"). WMTI US, WMTI North, and TNSCI are referred to collectively as the "Corporate Plaintiffs." "Defendants" refer to Kevin Healey ("Healey") and Propagate Content, LLC ("Propagate").

[2] Plaintiffs' Oppositions violate multiple Local Rules. Plaintiffs' opposition to the motion to dismiss, **on its face**, is **26 ½ pages** in violation of the **25-page limit** of Local Rule 11-6: one and a half pages of argument are numbered as pages iii and iv, followed by another 25 pages of argument. However, the opposition is actually longer than even that because the opposition uses **13.5-point font** for the body and **10-point font** for the footnotes instead of the "**14-point or larger" font** required by Local Rule 11-3.1.1. The opposition to the anti-SLAPP motion, which purports to be 24 pages, also uses the same improper smaller font size. Had Plaintiffs used the proper font size, the opposition to the motion to dismiss would exceed 25 pages by even more and the opposition to the anti-SLAPP would also exceed 25 pages. Pursuant to Local Rule 11-9 and Local Rule 83-7, the Court can and should sanction Plaintiffs for their attempt to skirt the Local Rules.

As to their state law claims, Plaintiffs barely respond to Defendants' legal arguments but, instead, restate the allegations of the FAC as if repeating the allegations will make them less infirm. Rote recitation, however, cannot save their claims. Plaintiffs' state law claims are simple copycats of their copyright claims that are preempted and otherwise fail as a matter of law. Accordingly, they should be dismissed and also stricken pursuant to California's anti-SLAPP statute.

In sum, neither discovery nor expert testimony is necessary to reach the obvious result here: Plaintiffs' claims should be dismissed with prejudice.

## II.   PLAINTIFFS' COPYRIGHT CLAIMS FAIL BECAUSE, AS A MATTER OF LAW, THERE IS NO SUBSTANTIAL SIMILARITY BETWEEN *PRANK ENCOUNTERS* AND *SCARE TACTICS*.

### A.   Courts Can and Do Decide Substantial Similarity on Motions to Dismiss.

Throughout their Opposition, Plaintiffs scoff at the notion that substantial similarity can be decided at the pleading stage and allude to the need for discovery and expert testimony, without specifying what discovery or expert opinions are purportedly needed. Courts, however, repeatedly dismiss infringement claims with prejudice under Rule 12(b)(6) where, as here, both works are in the record and there is no substantial similarity as a matter of law. *See* Defendants' Consolidated Brief ISO Motions to Dismiss and Strike (Dkt. No. 31) ("Defs. Br.") at 13 & n. 5 (collecting cases); *see also Gadh v. Spiegel*, 2014 WL 1778950, at *3 n.2 (C.D. Cal. Apr. 2, 2014) (granting motion to dismiss for lack of substantial similarity; for "fifty years" courts in Ninth Circuit have dismissed copyright claims at pleading stage); *Fillmore v. Blumhouse Prods., LLC*, 2017 WL 4708018, at *2 (C.D. Cal. July 7, 2017) (granting motion to dismiss; "Court may compare and examine the two works in question and determine 'non-infringement' on a Motion to Dismiss."); *Silas v. Home Box Office, Inc*., 201 F. Supp. 3d 1158, 1184 (C.D. Cal. 2016) (dismissing with prejudice where works "not extrinsically similar and no amendment could possibly cure that defect"); *Segal v. Rogue Pictures*, 2011 WL 11512768, at *8 (C.D. Cal. Aug. 19, 2011) (same).

Plaintiffs' reliance on *Zindel v. Fox Searchlight Pictures, Inc.*, -- F. App'x --, 2020 WL 3412252 (9th Cir. June 22, 2020) to argue otherwise is misplaced. Even *Zindel* expressly acknowledges that dismissal at the pleading stage is appropriate where "[t]he copyrighted and allegedly infringing works [are] presented to the court, such that the works are 'capable of examination and comparison'" and "no additional evidence that would be material to the question of substantial similarity" exists. *Id.* at *1. Indeed, Plaintiffs' suggestion that *Zindel* precludes motions to dismiss is belied by years of precedent, from old, *Thomas v. Walt Disney Co.*, 337 F. App'x 694, 695 (9th Cir. 2009), to brand new, *Masterson, supra*, 2020 WL 4435103. In *Masterson*, decided three weeks ago, the Ninth Circuit affirmed the dismissal of a copyright claim for failure to plausibly allege substantial similarity between two literary works. *See id.* at *1-3. In doing so, the Ninth Circuit expressly held that "the district court did not err by considering substantial similarity in a motion to dismiss" and acknowledged that the Ninth Circuit "has affirmed such dismissals ***repeatedly*** over the past decade." *Id.* at *1 (emphasis added). The Ninth Circuit also rejected the plaintiff's similar arguments that determining substantial similarity requires expert testimony; rather, in certain cases, like here, a court can use its "***judicial experience*** and ***common sense***" to determine whether substantial similarity has or can be plausibly alleged. *Id.* at *2 (emphases added) (citation omitted). In short, whatever the *Zindel* panel's view of the works in that case has no bearing on this Court's ability to compare the works at issue here and dismiss. As in *Masterson*, this Court need only to draw on its extensive judicial experience and common sense in comparing *Prank Encounters* and *Scare Tactics* to conclude there is no substantial similarity between the two.

## B. After Filtering Out Unprotected Elements, Plaintiffs Have Failed to Show Substantial Similarity Between *Scare Tactics* and *Prank Encounters* or Any of the Individual Episodes Complained-Of.

Plaintiffs' Opposition only bolsters the conclusion that they cannot satisfy the extrinsic test for substantial similarity. Plaintiffs do not respond at all to

numerous of Defendants' arguments demonstrating a complete lack of actionable similarities between the *Scare Tactics* and *Prank Encounters* episodes at issue, nor do they address any of Defendants' cases cited in support thereof.[3] Instead, Plaintiffs point the Court to their self-serving allegations and Schedules, which Plaintiffs contend, without any legal authority, "must be 'presumed true.'" Plaintiffs' Opp. to MTD (Dkt. No. 33) ("MTD Opp.") at 8. The law disagrees: the substantial similarity analysis "assess[es] similarities in the objective details of the works" (*Rentmeester v. Nike, Inc.*, 883 F.3d 1111, 1118 (9th Cir. 2018)) and is "based on the works themselves, rather than on [Plaintiffs'] pleadings." *Capcom Co., Ltd. v. MKR Grp., Inc.*, 2008 WL 4661479, at *11 (N.D. Cal. Oct. 20, 2008); *Lichtfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (substantial similarity allegations "inherently subjective and unreliable."); *Basile v. Warner Bros. Entm't*, 2016 WL 5867432, at *2 n.2, *7, *11, *12 (C.D. Cal. Jan. 4, 2016) (rejecting substantial similarity allegations which "contradict the contents" of works at issue); *Cory Van Rijn, Inc. v. Cal. Raisin Adv. Bd.*, 697 F. Supp. 1136, 1139 (E.D. Cal. 1987) ("[W]orks themselves supersede and control any contrary allegations, conclusions or descriptions of the works as contained in the pleadings."). Here, as explained in Defendants' opening brief, comparing *Scare Tactics* and *Prank Encounters* makes clear that they are not substantially similar as a matter of law.

**1.   Looking at the Two Series in Their Entirety, *Prank Encounters* and *Scare* Tactics are Not Substantially Similar in Protected Expression.**

Initially, Plaintiffs come no closer in their Opposition to clarifying whether

---

[3] The matters are conceded. *See Silva v. U.S. Bancorp*, 2011 WL 7096576, at *3 (C.D. Cal. Oct. 6, 2011) ("Plaintiff concedes his recordkeeping claim should be dismissed by failing to address Defendants' arguments in his Opposition"); *GN Resound A/S v. Callpod, Inc.*, 2013 WL 1190651, at *5 (N.D. Cal. Mar. 21, 2013) (when plaintiff failed to oppose motion as to particular issue, "the Court construes as a concession that this claim element [is] not satisf[ied]"); *Hall v. Mortgage Inv'rs Grp.*, 2011 WL 4374995, at *5 (E.D. Cal. Sept. 19, 2011) ("Plaintiff does not oppose Defendants' arguments regarding the statute of limitations in his Opposition. Plaintiff's failure to oppose . . . serves as a concession").

they are contending that the entirety of *Prank Encounters* infringes *Scare Tactics*, or only that certain *Prank Encounters* episodes infringe specific *Scare Tactics* episodes. Neither theory has merit.

As for the series, they are nothing alike, a conclusion Plaintiffs implicitly agree with by conceding numerous of the differences identified by Defendants, including that *Prank Encounters* "'added' some elements" including "a second mark, an intertwined story, and more screen time" (MTD Opp. at 2), and by failing to address numerous other differences raised by Defendants, including the differing roles of the hosts, the many other characters featured in each episode of *Prank Encounters*, and the different formats (collision format of *Prank Encounters* vs. linear format of *Scare Tactics*) (*See* Defs. Br. at 15-18). *See supra*, p. 12, n. 3.

Plaintiffs nevertheless argue that the two shows are substantially similar because both "'set up the mark' by establishing a 'believable reality' for the mark[.]" MTD Opp. at 1. But this is how a prank works. For a prank to succeed, the mark must be convinced that what is happening is real; otherwise, the mark is in on the joke, she will not be surprised, and there is no prank. Plaintiffs cannot copyright the construct of a prank or the concept of a show in which people are pranked. Defs. Br. at 16-18. Plaintiffs do not reasonably argue otherwise, nor do they cite case law that would support them holding such a monopoly.

Equally unavailing is Plaintiffs' argument that *Prank Encounters* and *Scare Tactics* are substantially similar because they both "lure marks into the prank with a promise of a part time job," which Plaintiffs contend are "virtually identical" in each episode. MTD Opp. at 9-10. The manner in which each show convinces their marks to participate in the show is not copyrightable; it is a production technique and a generic one at that.[4] *See CBS Broad., Inc. v. Am. Broad. Cos., Inc.*, 2012 WL

---

[4] That Plaintiffs seek to copyright a production technique is confirmed by their discussion of behind-the-scenes pre-production work in which Plaintiffs contend that part of selecting the marks is "reviewing background to be sure that a 'mark' does not have familiarity with the 'job' in question." MTD Opp. at 10, n. 11.

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

13013027, at *5 (C.D. Cal. June 21, 2012) (reality show's production techniques, *e.g.*, livestreaming video, contestants being housebound, airing show before final episode is shot, were "procedures and processes ... not within the ambit of copyright protection"). It also stems from the very concept of the show and the need to draw the mark into a situation that she might not otherwise find herself in, while remaining unsuspecting. Moreover, in *Scare Tactics*, a friend or family member sets up the mark, whereas in *Prank Encounters*, there is no accomplice. Finally, Plaintiffs ignore that "only distinctive characters are protectable" (*Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 626 (9th Cir. 2010)), but here, as the episodes make clear, any arguably overlapping jobs are, at best, stock roles, trivial in their similarity, or expressed differently. *E.g.*, *Funky Films v. Time Warner Entm't Co.*, 462 F.3d 1072, 1078-79 (9th Cir. 2006) (no substantial similarity where characters only "similar at the abstract level").

Lacking the ability to point to any actual, articulable similarities between the two shows, Plaintiffs resort to contending that "[t]he general public and critics['] … respective opinions as to *Prank Encounters*' substantial similarity to *Scare Tactics*" is probative of substantial similarity. MTD Opp. at 2, n. 6. However, the public's and critics' views are irrelevant and not admissible evidence of substantial similarity. *See RDF Media Ltd. v. Fox Broad. Co.*, 372 F. Supp. 2d 556, 567 (C.D. Cal. 2005) ("industry commentator" statements "legally irrelevant to [] substantial similarity"); *Survivor Prods. LLC v. Fox Broad. Co.*, 2001 WL 35829267, at *3 (C.D. Cal. June 12, 2001) (articles "legally irrelevant to [] substantial similarity … determination is [] made by the finder of fact, unaided by the opinions of journalists and industry observers."). The two series are not substantially similar.

### 2. The Episodes of *Prank Encounters* and *Scare Tactics* at Issue are Not Substantially Similar in Protected Expression.

Instead of responding to Defendants' analysis and case law, Plaintiffs try to distract from the lack of substantial similarity in the episodes at issue. First,

Plaintiffs try to buttress their claims of similarity by citing to irrelevant material such as the written scripts/beats for *Scare Tactics*. *See, e.g.,* MTD Opp. at 10 ("This is verified in the *Camp Kill* write up/beat sheet"). As Plaintiffs concede,[5] the scripts are irrelevant. *See Silas*, 201 F. Supp. 3d at 1169 ("[C]ourts consider the final version of a film, rather than unpublished scripts, when determining substantial similarity."); *Basile*, 2014 WL 12521340, at *6 ("[T]he court looks only to the final version of the work, and not to elements allegedly found in earlier drafts of the work."); 4 Melville B. Nimmer and David Nimmer, *Nimmer on Copyright* § 13.03[B][1][b] ("[C]ourts [ ] 'routinely rejec[t] requests to consider earlier drafts of the screenplay'" when determining whether the works are substantially similar) (citation omitted).

Plaintiffs also concoct numerous purported "mischaracterizations" of episodes by Defendants. Defendants, however, did not mischaracterize the episodes at issue and, in any event, what is ultimately dispositive is not any party's characterization of the works at issue but the works themselves. And, again, as explained in Defendants' opening brief and further below, the episodes themselves make clear that there is no substantial similarity in protectable expression between any of the *Scare Tactics* and *Prank Encounters* episodes at issue.

### a. "Camp Scarecrow" and "Camp Kill."

Plaintiffs do not address Defendants' arguments and case law showing that the two episodes are not substantially similar. Instead, Plaintiffs accuse Defendants of wrongly referring to the two people, with whom the mark meets in *Scare Tactics'* "Camp Kill," as "owners." MTD Opp. at 10. While Plaintiffs insist that

---

[5] *See* MTD Opp. at 2, n. 4 (arguing that "comparison of an infringing work is best done by viewing the original and the copy in 'final form' (in this case, video v. video)"); *Id.* at 8 ("Plaintiffs again properly assert that the 'best way' to determine Defendants' infringement of protectable elements, is to view and compare the videos themselves"); FAC, ¶ 44d ("the Copyright Holder Plaintiffs' final creation is not a 'script' but rather a completed video of each story... the Copyright Holder Plaintiffs allege that a comparison, for similarity purposes, should by all rights, be based on a review and comparison of the final stories themselves.").

they are only counselors, Travis explicitly says that the two "took over" the camp. Nourafchan Declaration (Dkt. No. 31-2) ("ND") Ex. 5 (at approx. 17:31). Even if they are counselors, Plaintiffs do not (and cannot) rebut that the characters in "Camp Kill" are not distinctive enough to be protectable, the counselors in "Camp Scarecrow" are not substantially similar to them, and the shared use of counselors is a stock element that flows from the unprotected shared premise of being stalked in the woods, which Plaintiffs concede is "not new." FAC, Sch. VI, p. 2.

Plaintiffs also contend, in one breath, that the two episodes are substantially similar because both incorporate someone being attacked in the woods, away from where the mark can see what is happening, only to admit, in the next breath, that this is a "classic example" of storytelling—namely "the monster in your head is worse than the monster actually see[n]." MTD Opp. at 10, n. 12. This is the point—anything arguably similar in the two episodes is similar only in the abstract, is not original, but generic, and is expressed differently.

### b. "Face Fears" and "Dangerous Obsession."

Plaintiffs flatly ignore Defendants' arguments regarding the lack of substantial similarity in the settings and characters of these episodes (Defs. Br. at 23-24) and, instead, try to allege substantial similarity by genericizing the plots. They claim the episodes are substantially similar because both involve men who take an innocent stranger hostage, going so far as to dismiss that "Dangerous Obsession" focuses on "a stalker who chains his obsession to a bed," whereas "Face Fears" focuses on "a deranged doctor who kidnaps a woman and reconstructs her face to replace his wife," as a "distinction without a difference." MTD Opp. at 12. This is ridiculous; it is like saying *Star Wars* and *Star Trek* are the same movie because they both involve spaceships battling in distant galaxies. As Plaintiffs admit in their FAC, the dramatic concept of a woman being kidnapped by a stranger and held against her will is not new and, as Plaintiffs now admit, they are expressed completely differently.  FAC, Sch. I, p. 3.

Plaintiffs also call the statement by the stalker in "Dangerous Obsession" that he will return "probably in 45 minutes" to be "almost identical" to the doctor's statement "I will return very soon" in "Face Fears." MTD Opp. at 12. The two statements are not the same and a scattered line of dialogue consisting only of a common expression cannot support substantial similarity. *See Bernal v. Paradigm Talent and Lit. Agency*, 788 F. Supp. 2d 1043, 1072 (C.D. Cal. 2010) (even though "lines contain[ed] similar words" such as "I miss you," "He's so funny," and "Stay away from this neighborhood," no substantial similarity because dialogue was not the "same" and lines were "common expressions that are not copyrightable").

Plaintiffs also complain that Defendants did not mention the kiss goodbye in "Dangerous Obsession" but a commonplace gesture of affection cannot support substantial similarity. The kisses are also expressed differently; in "Face Fears," the kiss is incidental to Dr. Ritter repeatedly whispering "Theresa" in his "wife's" ear. The remaining similarities identified by Plaintiffs (an accident, threat of a syringe, and the husband leaving for a short period) are also random, trivial similarities that do not demonstrate substantial similarity. *See, e.g.*, *Kouf v. Walt Disney Pictures and Television*, 16 F.3d 1042, 1045-46 (9th Cir. 1994) (court "unimpressed by Kouf's compilation of random similarities … such as a lawnmower scene, a sprinkler scene, the presence of an attic, danger scenes, concerned parents, and kids sleeping outside overnight") (citation omitted); *Berkic v. Crichton*, 761 F.2d 1289, 1294 (9th Cir. 1985) ("small miseries of domestic life, romantic frolics at the beach, and conflicts between ambitious young people and [] conservative or evil bureaucracies" unprotectable).

### c.     "Urgent Scare" and "Satan's Baby."

Plaintiffs do not address Defendants' arguments regarding plot, sequence of events, and characters.[6] Instead, Plaintiffs appear to dispute that the concept of

_____

[6] Again, the concept of something scary coming out of a person's body and attacking people is not new or protectable. Indeed, the 1979 film *Alien*, to which

(…continued)

Mitchell Silberberg & Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

their episode "***Satan's Baby***" is that of a pregnant woman delivering Satan's baby. They do so by contending that, contrary to Defendants' characterization, a woman does not "allud[e] to being made pregnant by Satan." MTD Opp. at 12. The argument is devoid of credibility given the title of the episode and the fact that the host, Tracy Morgan, begins the episode by saying the mark's job is easy "as long as no one tries to put Satan's baby in you." ND Ex. 12 (at approx. 1:05).

Equally lacking credibility is Plaintiffs' complaint that Defendants improperly refer to one of the marks in "Urgent Scare," Jaeda, as a "hospital receptionist"; the episode begins by introducing Jaeda as "Jaeda, hospital receptionist." ND Ex. 11 (at approx. 1:48). And even if both episodes take place at an "urgent care center at night" (MTD Opp. at 12), "commonplace settings" such as medical facilities or times of day are not protected (*Bernal*, 788 F. Supp. 2d at 1071), and thus cannot, on their own, demonstrate substantial similarity. Plaintiffs do not respond to Defendants' case law on this point.

Finally, Plaintiffs contend that the concept of a "lonely" urgent care clinic was an important creative choice because it "does not give the mark anyone else to reach out to for help." MTD Opp. at 13. The concept of a character being isolated is not protectable and is not even true for "Urgent Scare," where there were *two* marks who could turn to each other.

### d.   "Fright at the Museum" and "The Mummy."

Plaintiffs do not address any of Defendants' arguments regarding the lack of substantial similarity between "Fright at the Museum" and "The Mummy." Instead, their only comment is to admit that "there was a mistake with the exhibits" and that the clip relied on in their FAC "was not supposed to be submitted." MTD Opp. at 12, n. 13. Plaintiffs only reinforce the conclusion that the elements over

---

(…continued)
Plaintiffs refer (MTD Opp. at 15, n. 14), is known for its iconic "chestburster" scene, during which an alien explodes out of a character's abdomen.

Mitchell
Silberberg &
Knupp LLP
12435476.1

1   which they are suing are so generic, overused, and unprotectable that Plaintiffs

2   cannot even keep straight what episode they are saying has been infringed.

3         **e.    "Storage War of the Worlds" and "Phantom Power."**

4         Plaintiffs again ignore numerous of Defendants' arguments regarding these

5   episodes. As for plot, Plaintiffs claim substantial similarity due to both works

6   featuring a "soldier being held against his will" who "will die if electricity is shut

7   down." MTD Opp. at 14. Nothing, however, identifies the victim in "Phantom

8   Power" as a soldier, a concession Plaintiffs eventually make when they admit that,

9   in "Phantom Power," "the victim is not truly identified." *Id.* Further, in "Storage

10  War," electrodes are not keeping the soldier alive, the containment unit is. And, in

11  all respects, such a generalized similarity could not support substantial similarity.

12        Plaintiffs also contend that the settings are substantially similar because both

13  episodes take place in "storage facilit[ies]" in "remote location[s]." MTD Opp. at

14  14-15. Not only is this false, but it is also not protectable. *See* Defs. Br. at 32.

15  Indeed, after taking pains to discuss how the creative choice to have the action take

16  place in a remote facility is a "protected element" because it "heightens the fear of

17  the mark, no place to run, no place to hide, nobody to call," Plaintiffs then admit

18  this is a generic, unoriginal concept by quoting the tagline for the 1979 film,

19  *Aliens*: "In space no one can hear you scream." MTD Opp. at 15, n. 14.

20        **f.    "Split Party," "It's My Party," and "Send in the**

21              **Clowns."**

22        Plaintiffs continue to impermissibly blend separate elements from two *Scare*

23  *Tactics* episodes in an attempt to claim similarity but fail to explain how "Split

24  Party" is substantially similar to either episode on its own. For the reasons already

25  explained by Defendants, there is no substantial similarity in protected expression

26  between them. Defs. Br. at 32-35. And to the extent that Plaintiffs point to trite,

27  random similarities in discussing "Send in the Clowns," namely "daytime, a party,

28  fancy house, trappings of wealth, poisoned desert [*sic*], hired party/catering help,

[and] a creepy-dad who is a demanding host" to demonstrate substantial similarity (MTD Opp. at 15), they ignore that some of these similarities are contrived (e.g., "Send in the Clowns" does not take place in a fancy house and there are no trappings of wealth); others do not exist (there is no poisoned dessert in "Send in the Clowns"); and yet others are so scattered and trivial that they cannot support substantial similarity. *See, e.g.*, *Kouf*, *Berkic*, *supra*, p. 17.

Plaintiffs' reliance on the involvement of the shows' hosts is likewise misplaced; again, a host playing a role in a prank show is not protectable and while Gaten Matarazzo is the guest of honor at the party in "Split Party" and a focus of the poisoning scheme, Tracy Morgan appears only via pre-recorded video to wish the birthday host a happy birthday and to reveal the prank. Defs. Br. at 35.

### g.   "End of the Road" and "Road Kill."

As with the other episodes, Plaintiffs do not respond to numerous arguments made by Defendants and identify only three purported similarities between the two works: an accident involving a government vehicle, the use of a "visible camera," and the use of a "creature." MTD Opp. at 15-16. The discussion of a "department vehicle" and "government regulations" in Plaintiffs' work does not establish that the accident at issue involved a government vehicle and the use of a vehicle is a trivial similarity that does not make the two works substantially similar. The same is true for the use of a "visible camera." *See, e.g.*, *Kouf*, *Berkic*, *supra*, p. 17.

As for the concept of a hairy creature attacking people in the woods, again, this is a commonplace, unprotectable idea. Defs. Br. at 36-37. The idea is also expressed differently with "End of the Road" and "Road Kill" using different, iconic hairy creatures (Bigfoot versus a werewolf). And while Plaintiffs contend that "Bigfoot" is never mentioned in Defendants' episode and "a werewolf" is never mentioned in Plaintiffs' episode (MTD Opp. at 15), this is provably false. At the end of Defendants' episode, the creature is shown and looks like Bigfoot, and one of the marks, Sade', recalls the moment when she saw the creature and thought

1  to herself, "oh my god, it's a Bigfoot." ND Ex. 18 (at approx. 20:18). And in

2  Plaintiffs' episode, Tracy Morgan introduces the prank by saying "don't you hate

3  when a nice drive in the country is messed up by a werewolf" (ND Ex. 19 (at

4  approx. 4:54)), a wolf repeatedly howls and, as the car is attacked, someone

5  screams "wolf" or "werewolf!" *Id*. (at approx. 9:27).

6                            *       *       *

7          In sum, none of the episodes at issue are substantially similar; thus, each and

8  every claim of copyright infringement should be dismissed with prejudice. *See,*

9  *e.g.*, *Gallagher v. Lions Gate Entm't Inc.*, 2015 WL 12481504, at *2, *15 (C.D.

10  Cal. Sept. 11, 2015) ("[W]hen substantial similarity is absent after a review of the

11  works at issue no amendment [can] cure the complaint's deficiencies") (granting

12  motion to dismiss with prejudice based on lack of substantial similarity).[7]

13      **C.    Plaintiffs' Unpled And Unexplained "Selection and Arrangement"**
             **Theory Cannot Save Any Of Their Copyright Claims.**
14

15          Plaintiffs' last-gasp attempt to save their copyright infringement claims is to

16  make passing references to a "selection and arrangement" theory of copyright

17  protection, notwithstanding that such a theory is not alleged in their FAC and not

18  explained at all in their Opposition. *See, e.g.,* MTD Opp. at 14 ("[S]election and

19  arrangement of these choices constitutes protected expression [which] cannot be

20  challenged at the pleading stage."); *see also id.* at 6. Plaintiffs' cursory attempt to

21  argue selection and arrangement avails no more than their other arguments.

22          In the Ninth Circuit, a copyright plaintiff may only allege infringement of

23  otherwise unprotectable elements if those elements are "numerous enough and

24  their selection and arrangement original enough" to warrant protection as "an

25  original work of authorship." *Satava v. Lowry*, 323 F.3d 805, 811 (9th Cir. 2003);

26  _____

27  [7] Different Plaintiffs own copyrights in different, specific episodes (Defs. Br. at 12,
    n. 3 & Ntc. Mtn. (Dkt. No. 28); thus, even if the Court concludes that a claim
    concerning one episode should not be dismissed at the pleading stage, the Court
28  can still dismiss the claims over the other episodes.

*Metcalf v. Bochco*, 294 F.3d 1069, 1074 (9th Cir. 2002) (relied on by Plaintiffs) ("The particular sequence in which an author strings a ***significant*** number of unprotectable elements can itself be a protectable element.") (emphasis added). Importantly, as the Ninth Circuit recently made clear in its *en banc* decision in *Skidmore v. Zeppelin*, since "a selection and arrangement copyright protects … the *particular* way in which the artistic elements form a coherent pattern, synthesis, or design," it is not enough to merely assert "a 'combination of unprotectable elements' without explaining ***how*** these elements are particularly selected and arranged." 952 F.3d 1051, 1075 (9th Cir. 2020) (emphasis added) (presenting a combination theory with such explanation "amounts to nothing more than trying to copyright commonplace elements"); *Gray v. Perry*, 2020 WL 1275221, at *8 (C.D. Cal. Mar. 16, 2020) (same). Plaintiffs have not met this burden.

The FAC does not contain ***any*** allegations regarding any purported protected selection and arrangement of unprotected elements in any *Scare Tactics* episode. Nor do Plaintiffs' conclusory allegations in the Opposition establish such a theory. Plaintiffs' failure to identify a significant number of unprotected elements that they selected and how they arranged those elements in a particular sequence in each episode sufficient to warrant protection is dispositive. *See Bernal*, 788 F. Supp. 2d at 1068 (rejecting theory where "Plaintiff has not pointed to any common pattern of unprotected elements that occur in the same sequence in both works").

Nor can Plaintiffs satisfy this burden because, at best, Plaintiffs have only identified random purported similarities throughout the works. Plaintiffs cannot "cobble [unprotectable similarities] together to make a [selection and arrangement] argument" because "[t]o do so would give Plaintiffs a monopoly over these generic elements." *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1138-39 (C.D. Cal. 2007) (granting motion to dismiss where "selection and arrangement" theory was based on "random similarities," short of "the sort of magnitude contemplated by the *Metcalf* court"); *Masterson*, 2020 WL 4435103, at *3 ("random similarities

1  scattered throughout the works" "fail[s] to plausibly allege" a selection and
2  arrangement theory); *Silas*, 201 F. Supp. 3d at 1184 (dismissing claim where there
3  were "significant differences throughout the works" and "no common pattern from
4  which the works' generic similarities arise."); *Capcom*, 2008 WL 4661479, at *11
5  (granting motion to dismiss where "alleged similarities constitute nothing more
6  than a string of disconnected facts and generic ideas"); *Shame on You Prods., Inc.*
7  *v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1169 (C.D. Cal. 2015) (same).

8      For this reason, to the extent that Plaintiffs attempt to analogize to *Metcalf*,
9  in that case, unlike here, the generic similarities were voluminous, nearly identical,
10  and occurred in the same pattern. 294 F.3d at 1073-75 (discussing "striking"
11  similarities). That decision was also based on the now-overruled inverse ratio rule.
12  *Id.* at 1075; *see also Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1179 (9th Cir. 2003)
13  ("[O]ur decision in *Metcalf* was based on a form of inverse ratio rule analysis: the
14  plaintiff's case was 'strengthened considerably by [defendants'] concession of
15  access to their works.'"). The inverse ratio rule no longer applies. *Zeppelin*, 952
16  F.3d at 1069 ("excis[ing]" the inverse ratio rule from copyright analysis).

17      Finally, while Plaintiffs state—without authority—that a selection and
18  arrangement theory cannot be decided on a motion to dismiss, as the multitude of
19  cases cited directly above make plain, this is not the law. *See Zella*, *Masterson*,
20  *Silas*, *Capcom*, and *Shame on You*, *supra*. In sum, Plaintiffs' attempt to invoke a
21  selection and arrangement theory must be rejected.

22  **III.   PLAINTIFFS' STATE LAW CLAIMS SHOULD BE DISMISSED**
23  **AND STRICKEN.**

24      Initially, Plaintiffs do not seem to understand that Defendants' Rule 12(b)(6)
25  motion to dismiss and their anti-SLAPP motion to strike are based on the same
26  legal deficiencies in Plaintiffs' FAC. Moving to strike pursuant to a Rule 12(b)(6)
27  standard is permitted in federal court: "[i]f a defendant makes a special motion to
28  strike based on alleged deficiencies in the plaintiff's complaint, the motion must be

Mitchell
Silberberg &
Knupp LLP
12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

treated in the same manner as a motion under Rule 12(b)(6) except that the attorney's fee provision of § 425.16(c) applies." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. For Med. Progress*, 890 F.3d 828, 834 (9th Cir.), *amended*, 897 F.3d 1224 (9th Cir. 2018) (adopting reasoning of *Rogers v. Home Shopping Network, Inc.,* 57 F. Supp. 2d 973, 983 (C.D. Cal. 1999)). Accordingly, if Defendants' legal challenges support dismissing Plaintiffs' state law claims, they also support striking those claims if the anti-SLAPP statute is found to apply.

This is why Defendants made their legal arguments against Plaintiffs' state law claims once in their consolidated brief. Plaintiffs, however, break up their responsive arguments into two oppositions. In doing so, they repeat arguments. To avoid confusion, Defendants respond to Plaintiffs' overlapping arguments while explaining why dismissal is appropriate (*infra*, pp. 25-33), but also respond separately to Plaintiffs' few additional arguments made in their anti-SLAPP opposition (*infra*, pp. 38-42). The bottom line is, regardless of in which opposition they appear, Plaintiffs' arguments in support of their claims do not avail. Nor do Plaintiffs' attempts to avoid the applicability of the anti-SLAPP statute.

**A.    Plaintiffs' State Law Claims Should Be Dismissed.**

**1.    The Court May Properly Consider Defendants' Rule 12(b)(6) Challenges to Plaintiffs' State Law Claims.**

Rather than respond to the substance of Defendants' legal challenges to their state law claims, Plaintiffs first try to avoid them entirely by arguing that Defendants did not receive permission to move to dismiss Plaintiffs' state law claims when Defendants asked the Court for leave to file a consolidated brief in support of their motions to dismiss and strike. *See* MTD Opp. at iii-iv & 16. A defendant, however, does not have to seek leave of court to move to dismiss; the motion is authorized by Federal Rule of Civil Procedure Rule 12. Moreover, Defendants' request was not directed at *which* motions Defendants could bring but whether they could file a single consolidated memorandum in support of those

Mitchell
Silberberg &
Knupp LLP

12435476.1

23

motions. Dkt. No. 23. The Court granted leave and Defendants complied with the Court's order by filing a forty page consolidated memorandum. Dkt. Nos. 26, 31.

In addition, Plaintiffs' argument is wrong. In their application, Defendants plainly stated that they "also intend to move the Court to strike Plaintiffs' state law claims pursuant to California's anti-SLAPP statute for failure to state a claim, ***or alternatively to dismiss should the Court find the statute inapplicable***." Dkt. No. 23 at 2 (emphasis added). Indeed, the standard applicable to Defendants' motion to dismiss and motion to strike under the anti-SLAPP statute is identical and the relief is the same except for Defendants' entitlement to fees under the anti-SLAPP statute. *See Planned Parenthood*, *supra*, 890 F.3d at 834. Consistent therewith, prior to filing their motions, Defendants met and conferred with Plaintiffs about the legal infirmities of ***all*** of their claims and their intent to challenge ***all*** of Plaintiffs' claims on a Rule 12(b)(6) standard.

Defendants' Rule 12(b)(6) legal challenges are properly considered.[8] Turning to those challenges, Plaintiffs either fail to respond or do so inadequately.

### 2. *Scare Tactics* Claims: Plaintiffs Have Failed To State Claims For Breach of The Implied Covenant and Tortious Interference.

#### a. The Claims are preempted.

Plaintiffs agree that their state law claims concerning *Scare Tactics* are preempted if the works at issue come within the subject matter of copyright and the rights that they seek to assert under state law are equivalent to those protected by the Copyright Act (MTD Opp. at 16-17 (stating standard)), but argue that neither criteria is satisfied here. Plaintiffs' cursory arguments fall flat.

---

[8] Not considering Defendants' legal challenges to Plaintiffs' state law claims now is also highly inefficient because Defendants could just reassert the very same arguments tomorrow in a motion for judgment on the pleadings. *See Dworkin v. Hustler Magazine Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing. [] [T]he motions are functionally identical.").

Mitchell
Silberberg &
Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

1

2

        **(i)**     *Scare Tactics* **falls within the subject matter of copyright.**

3      Plaintiffs first state, without explanation, that their ***copyrighted*** *Scare*

4  *Tactics* episodes somehow do not fall within the subject matter of copyright. MTD

5  Opp. at 17. As Defendants explained in their opening brief, television episodes—

6  and hence the *Scare Tactics* episodes at issue—undoubtedly fall within the subject

7  matter of copyright. Defs. Br., p. 39 (citing 17 U.S.C. § 102(a)(6) (protecting

8  "audiovisual works) and *Endemol Entm't B.V. v. Twentieth Television Inc.*, 1998

9  WL 785300, at *3 (C.D. Cal. Sept. 29, 1998) ("idea, format, and concept" of a

10  television show fall within subject of copyright law)). Plaintiffs do not address

11  Defendants' argument or legal authority at all, nor do they provide contrary

12  authority. Plaintiffs' bare retort of "you are wrong" does not suffice.

13      Plaintiffs' argument also makes no sense. If Plaintiffs are correct, then

14  Plaintiffs committed fraud on the Copyright Office in registering *Scare Tactics*;

15  their copyright registrations are admittedly invalid; and their copyright claims must

16  be dismissed. Plaintiffs cannot have it both ways.

17

18

        **(ii)**    **The rights sought to be asserted by Plaintiffs are equivalent to copyright.**

19      Plaintiffs state next, again without explanation, that their claims do not assert

20  rights equivalent to copyright rights and that their claims are not preempted. MTD

21  Opp. at 17. Plaintiffs do not explain what "extra element" exempts their claims

22  from preemption. Instead, they wrongly accuse Defendants of contending that

23  "every contract related in any way to a copyright is preempted," which is not

24  Defendants' position, before citing Nimmer and case law in an attempt to impose

25  their own categorical rule against preempting breach of contract claims. *See id.* at

26  17-18. There is, however, no categorical rule in either direction; rather, preemption

27  is case-specific and depends on the rights being asserted and the acts being

28  complained of, not the type of claim. Indeed, even Plaintiffs' cases affirm that "at

times, federal regulation may preempt private contract." *See id*. at 18 (citing *Bowers v. Baystate Techs., Inc.*, 320 F.3d 1317, 1323–24 (Fed. Cir. 2003)).

Here, as set forth in Defendants' opening brief (pp. 39-41), the rights that Plaintiffs seek to enforce through their breach of the implied covenant and tortious interference claims are the "direct and indirect rights to use or exploit [their copyrights]" in *Scare Tactics* (FAC ¶ 75 & Ex. 1, ¶ 3) and the acts complained of in their FAC are that Defendants infringed Plaintiffs' copyrights. This is made clear by Plaintiffs repeating and incorporating by reference the allegations supporting their copyright claims into their claims for breach of the implied covenant and tortious interference,[9] as well as their specific allegations in support of those claims, which explicitly allege copyright infringement. *See* Defs. Br. at 40 (quoting FAC ¶¶ 77, 81). Thus, Plaintiffs' claims are preempted, not because of the type of claims asserted, but because, no different than the many cases cited by Defendants, Plaintiffs' claims seek to protect their copyright rights and prevent alleged infringement of those rights. *See* Defs. Br. at 40-41 (collecting cases).

Plaintiffs do not respond to these arguments or cases at all and, thus, they are conceded. *Supra*, p. 12, n. 3. Nor do they explain how this case is similar to the cases that they rely on. Plaintiffs' cases are inapposite because each involves claims arising from breaches of a software license to use a copyrighted work. In *Altera Corp. v. Clear Logic, Inc.*, 424 F.3d 1079 (9th Cir. 2005), for example, the plaintiff sued a competitor, alleging that the license between plaintiff and users of its software only permitted users to use the software for the purpose of programming plaintiff's programming logic devices, but the competitor was inducing users to send the users' "bitstreams" to the competitor in violation of the license. *Altera*, 424 F.3d at 1082. The Ninth Circuit held that plaintiff's tortious interference with contract claim was not preempted because "[t]he right at issue is

---

[9] FAC ¶¶ 72, 81 and Notice of Errata (Dkt. No. 25).

Mitchell
Silberberg &
Knupp LLP
12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

1   not the reproduction of [Plaintiff's] software …, but is more appropriately

2   characterized as the use of the bitstream" in violation of the license between the

3   user and plaintiff. *Id*. at 1089. Plaintiffs' other cases are similarly distinguishable.

4   *See Bowers*, 320 F.3d at 1326 (claims arose out of alleged reverse engineering of

5   software in breach of license that permitted use of software but prohibited reverse

6   engineering); *Nat'l Car Rental Sys., Inc. v. Computer Assocs. Int'l*, 991 F.2d 426,

7   427, 431-32 (8th Cir. 1993) (claims arose out of alleged use of software to process

8   data of third party in breach of license that permitted use of software to process

9   defendant's own data but not third party data); *ProCD, Inc. v. Zeidenberg*, 86 F.3d

10   1447, 1454-55 (7th Cir. 1996) (claims arose out of alleged use of information

11   available through plaintiff's software in breach of license restricting use of

12   information). Thus, in each of those cases, the defendant had the right to use the

13   plaintiff's copyrighted software, but agreed to contractual limits on that use, and

14   the plaintiff sued because the defendant's use allegedly violated a contractual limit.

15   Here, in contrast, Plaintiffs are not suing because Defendants used *Scare*

16   *Tactics* in violation of a license permitting Defendants to use *Scare Tactics* for

17   some limited purpose; rather, as Plaintiffs repeatedly allege, Defendants had no

18   right whatsoever to use *Scare Tactics*. *See, e.g.*, FAC ¶ 29 (Healey "was not to use

19   the assets at all"), ¶ 33 (Plaintiffs own "exclusive exploitation rights"); ¶¶ 73-74.

20   Instead, Plaintiffs are suing Defendants for their alleged unauthorized copying or

21   reproduction of *Scare Tactics* in *Prank Encounters*. *Id*. ¶¶ 76-77, 81, 83-84. The

22   allegation that Defendants copied Plaintiffs' copyrighted works without permission

23   is the *sin qua non* of copyright infringement; thus, their breach of implied covenant

24   and tortious interference claims are preempted.

                        **b.   Plaintiffs have not otherwise alleged facts to state a
25                             claim for breach of the implied covenant.**

26

27   Even if not preempted, Plaintiffs have not otherwise stated a claim for

28   breach of the implied covenant and Plaintiffs' bare recitation of their deficient

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

1    allegations in opposition cannot save their claim.

2                **(i)    Plaintiffs' claim contradicts the explicit terms of**
                 **the 2016 Agreement.**
3

4            Plaintiffs concede that, in the same paragraph of the 2016 Agreement in

5    which Healey gave up his rights in *Scare Tactics*, the parties also agreed that "[f]or

6    [] certainty, the transfer of rights in this AGREEMENT, including SCARE

7    TACTICS and IP RIGHTS, shall not have the effect of a non-competition clause,

8    and does not prevent HEALEY from pursuing other scary, paranormal-themed, or

9    hidden camera shows" (FAC Ex. 1, ¶ 3). MTD Opp. at 20. They nevertheless argue

10   that this provision does not actually permit Healey to pursue another scary or

11   paranormal-themed, hidden camera prank show like *Prank Encounters*. To get

12   there, they repeat their mistaken conclusory contention that *Prank Encounters* is a

13   copy or derivative (a "reboot" to use Plaintiffs' parlance) of *Scare Tactics* and rely

14   on a tortured interpretation of the 2016 Agreement.

15           That *Prank Encounters* is not a "reboot" of *Scare Tactics* has been

16   repeatedly addressed and needs no further elaboration. Defs. Br. at 12-38; *supra*,

17   pp. 11-23.[10] Thus, to the extent that Plaintiffs' arguments depend on the conclusion

18   that *Prank Encounters* **is** *Scare Tactics*, the arguments can be summarily rejected.

19           As to their interpretation of the 2016 Agreement, Plaintiffs cite basic

20   California law that a contract cannot be interpreted so as to lead to an absurd result

21   (MTD Opp. at 19) and then do just that. Again, Plaintiffs cannot ignore the 2016

22   Agreement's explicit statement that Healey's transfer of rights, including in *Scare*

23   *Tactics*, "***shall not have the effect of a non-competition clause, and does not***

24   ***prevent HEALEY from pursuing other scary, paranormal-themed, or hidden***

25   _____

26   [10] Plaintiffs argue that the Court should not determine whether Defendants
     allegedly breached the contract by copying protectable expression from *Scare*
     *Tactics* pursuant to the copyright standard of substantial similarity. Plaintiffs,
27   however, offer no alternative. Because Plaintiffs argue that Defendants breached a
     contract by copying "protectable expression," which is a copyright concept, the
28   copyright standard should apply (if the claim is somehow not preempted).

1  *camera shows*." FAC Ex. 1, ¶ 3 (emphasis added). So, instead, Plaintiffs latch onto

2  the use of the conjunction "or" to argue that this provision only permits Healey to

3  create another "scary" show, "paranormal" show, *or* "hidden camera" show, but

4  not a show that incorporates two or more of these elements. MTD Opp. at 20-21.

5      Plaintiffs cite no legal support for their baseless position.[11] It is a basic tenet

6  of contract interpretation that "[t]o the extent practicable, the meaning of a contract

7  must be derived from reading the whole of the contract, with individual provisions

8  interpreted together, in order to give effect to all provisions and to avoid rendering

9  some meaningless." *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1027

10  (2011). Here, Plaintiffs' labored interpretation would impermissibly excise the

11  phrase "shall not have the effect of a non-competition clause" from the 2016

12  Agreement by preventing Healey from developing a show that competes with

13  *Scare Tactics*; i.e., a hidden camera show that uses scary or paranormal themed

14  pranks. The language of Paragraph 3 of the 2016 Agreement is unambiguous and

15  the parties' intent obvious. Plaintiffs bargained to receive full ownership of and the

16  exclusive right to exploit *Scare Tactics*. Healey, in turn, received the right to move

17  on with his career and develop new shows, even if those shows **compete** with

18  *Scare Tactics* by incorporating scary, paranormal, or hidden-camera elements.

19  There is no other reasonable interpretation.[12]

20

21  ───────────────

    [11] The only case that Plaintiffs cite is *Edwards v. Comstock Ins.*, 205 Cal. App. 3d
22  1164, 1167 (1988) but it is not clear why. *Edwards* concerned the enforcement of a
    general release and whether plaintiffs could introduce parole evidence of their
23  undisclosed intention in signing the release to contradict the agreement's plain
    language. The court concluded plaintiffs could not and that "[t]he only reasonable
24  meaning of the release" was the interpretation advanced by the defendants. *Id.* at
    1169. Here, the only "reasonable meaning" of the provision at issue is also the one
25  advanced by Defendants. *Supra*, pp. 29-30; Defs. Br. at 42-43.

26  [12] The absurdity of Plaintiffs' position is further laid bare by the thought exercise of
    what argument Plaintiffs would make if the inverse were true and the conjunction
27  "and" had been used. Plaintiffs would no doubt argue that "and" means that Healey
    is only permitted to develop a show that is scary, paranormal, **and** used hidden
28  cameras; any less than all three would breach the contract. This is an equally
    unreasonable position.

**(ii)    Plaintiffs have not pled with the requisite specificity any interference with their rights.**

Plaintiffs tacitly concede that, to state a claim for breach, they must allege an actual deprivation of benefits under the 2016 Agreement, but come no closer in their Opposition to identifying any ***actual*** deprivation of a benefit.

While Plaintiffs try to allege a deprivation of rights by artificially expanding their rights under the 2016 Agreement to include exclusive use of "unprotected elements," such as the "format" of *Scare Tactics* (MTD Opp. 3, 22), the contract does not afford such protection. The contract says nothing about protecting "unprotected elements" (whatever that means) or "format"; instead, it speaks of a transfer of rights protected by law, including "copyrights, trademarks, brands, trade names, and other intellectual property … relating to SCARE TACTICS." FAC, Ex. 1, ¶ 3. The contract also explicitly permits Healey to compete with *Scare Tactics* by creating a show using the same format—e.g., a hidden camera show that uses scary or paranormal pranks.

Moreover, while Plaintiffs also argue that "Defendants' acts have caused confusion with the public at large … diluting its pecuniary and non-pecuniary strength" and that "*Prank Encounters* leveraged the popularity of *Scare Tactics* to [its] detriment" (MTD Opp. 22), such contentions are not in the FAC and, in any event, are insufficient, vague assertions of unspecified harm. *See, e.g.*, *Robinson v. Nationstar Mortg.*, 2015 WL 13651767, *11 (C.D. Cal. Apr. 16, 2015) (dismissing plaintiffs' breach of implied covenant claim because plaintiffs "[did] not support [their] conclusory and vague allegations of misconduct with specific facts . . . ."); *Liberty Mut. Ins. Co. v. Sumo-Nan LLC*, 2015 WL 6755212, at *3 (D. Haw. Nov. 4, 2015) (dismissing breach of implied covenant claim because allegations of deprivation of benefits under the agreement were "insufficiently vague").

Again, if, consistent with Rule 11, Plaintiffs want to aver that Healey's development of *Prank Encounters* has prevented them—in some articulable way—

1  from enjoying a benefit under the 2016 Agreement, they must so allege it.

2  Otherwise, the bottom line is that Plaintiffs still have not identified, with

3  specificity, *how* they were deprived of any benefit under the 2016 Agreement.

4  Insisting that they were, without explanation, is not enough to state a claim.

### c.  Plaintiffs have not alleged facts sufficient to state a tortious interference claim.

7  Plaintiffs do not dispute that if Healey did not breach the implied covenant

8  inherent in the 2016 Agreement, then Propagate cannot be deemed to have caused

9  Healey to breach the implied covenant and no tortious interference claim is stated.

10  Instead, Plaintiffs' sole response is to repeat their insufficient allegations and argue

11  that they have stated a claim for tortious interference. For example, Plaintiffs point

12  to their allegation that Hallock told Owens about his ownership of *Scare Tactics*

13  but do not address the fact that the communication on which Plaintiffs rely makes

14  no mention of the 2016 Agreement, which is legally fatal to their claim. Def. Br.

15  at 43, n. 29 (collecting cases). For the reasons set forth in Defendants' opening

16  brief, Plaintiffs' allegations do not support a tortious interference claim.[13]

### 3.  Hallock's Claim For Breach of the 2012 Agreement Against Healey Also Fails As A Matter of Law.

19  Healey's attempt to save his deficient claim for alleged breach of the 2012

20  Agreement is largely to parrot the allegations of the FAC and to clarify that the

21  *only* breach he is alleging is that Healey failed to pay a "net fee" to Hallock for his

22  alleged exploitation of the *Freak Encounters* episode, "Werewolf." MTD Opp. at

23  23-24. Yet, this assumes that Healey exploited "Werewolf," which, as explained in

---

[13] Plaintiffs do not respond, thereby conceding (*supra*, p. 12, n. 3), that only Hallock may assert a claim for breach of the implied covenant and that the claim can only be against Healey. They also do not respond, thereby conceding, that only Hallock may assert a claim for tortious interference against Propagate. Thus, even if the Court determines that a claim is stated, it must still dismiss any claim by another Plaintiff and any claim for breach of the implied covenant against Propagate.

Mitchell
Silberberg &
Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

1  Defendants' opening brief, Healey clearly did not. Defs. Br. at 44-47. Rather,

2  Healey developed a new series, *Prank Encounters*, which is made plain by

3  watching the two shows. *Compare* ND Ex. 19 *with* Ex. 20.

4      Further, Hallock does not respond to Defendants' contention that, to the

5  extent that Hallock asserts a breach by alleging that "End of the Road" copies

6  protectable expression from "Werewolf"—which is **all** the FAC alleges[14]—he has

7  not identified any provision of the 2012 Agreement that prohibits the copying of

8  protectable expression. Nor does he respond to the argument that, if there were

9  such a provision, it would do nothing more than protect Hallock's rights under the

10 Copyright Act and, thus, the claim would be preempted. Defs. Br. at 38-40, 46.

11 These issues are conceded. *Supra*, p. 12, n. 3.

12     Finally, beyond rotely repeating that "End of the Road" copies "Werewolf,"

13 Hallock does not explain what is copied. To wit, Hallock does not identify any

14 protected expression in "Werewolf"; identifies no similarities between "Werewolf"

15 and "End of the Road"; does not respond to the obvious illogic of their contention

16 that "End of the Road" copies the same supposedly protected expression in

17 "Werewolf" and *Scare Tactics* episode, "Road Kill"; and does not respond to

18 Defendants' analysis of why the two episodes are dissimilar, not substantially

19 similar. Defs. Br. at 46-47. The issue is conceded. *Supra*, p. 12, n. 3.

20     **B.**   **Plaintiffs' State Law Claims Should Be Stricken.**

21     Turning to Plaintiffs' opposition to Defendants' anti-SLAPP motion, as to

22 the first prong, Plaintiffs misstate the applicable legal standards and offer only the

23 barest of arguments against application of the anti-SLAPP statute, which do not

24 persuade. As to the second prong, Plaintiffs offer little beyond the unavailing

25 arguments of their opposition to the motion to dismiss in trying to show a

26 probability that they will prevail on their state law claims.

27 _____

28 [14] *See* FAC ¶ 92 ("Healey exploited 'Werewolf' by using protected elements in the 'Werewolf' episode.").

1          **1.      Plaintiffs Fail To Refute That Their State Law Claims Arise
2                  from Acts in Furtherance of Defendants' Rights of Free
                   Speech in Connection with Matters of Public Interest.**

3          Plaintiffs attack the length of Defendants' analysis of prong one to suggest it

4    means "Defendants lack a true understanding of their obligation" to satisfy prong

5    one. Plaintiffs' Opp. to Anti-SLAPP Motion (Dkt. No. 35) ("Anti-SLAPP Opp.")

6    at 7. Defendants' analysis, however, is brief because there is no need to waste time

7    explaining what is so clear: the first prong is easily satisfied.

8          There is no debate over the standard; Plaintiffs themselves agree what it is:

9    Defendants bear the burden to make a prima facie showing that each of Plaintiffs'

10   state law claims arise from an act by Defendants made in furtherance of their free

11   speech rights and in connection with a matter of public interest. Defs. Br. at 47

12   (citing *Sarver v. Chartier*, 813 F.3d 891, 901 (9th Cir. 2016)); Anti-SLAPP Opp.

13   at 7 (collecting cases). Defendants have met their burden.

14         ***First***, Plaintiffs concede that "*Prank Encounters* amounts to an act or course

15   of conduct [] in furtherance of Defendants' right of free speech" (Anti-SLAPP

16   Opp. at 7) and tacitly concede that the creation, production, and distribution of

17   *Prank Encounters* are also acts in furtherance of Defendants' free speech rights by

18   failing to address, much less rebut, Defendants' ample authority for this

19   proposition (Defs. Br. at 48 (collecting cases)). *See also Taylor v. Viacom Inc.*,

20   2018 WL 4959821, at *3 (C.D. Cal. June 5, 2018) ("[C]asting decisions related to

21   the production of a television program are sufficient to meet the first step's

22   threshold [of showing defendant's conduct qualifies as a protected activity].").

23   *Supra*, p. 12, n. 3.

24         ***Second***, Plaintiffs do not dispute that the public interest requirement is

25   broadly defined and offer no argument as to why pranks, prank shows, Gaten

26   Matarazzo, and *Prank Encounters* itself are not matters of public interest. The

27   issue is conceded. *Supra*, p. 12, n. 3. Instead, Plaintiffs' sole challenge is to argue

28   that Defendants' evidence of the public interest in the above topics is hearsay. Not

Mitchell
Silberberg &
Knupp LLP

12435476.1

33

so. The articles and other evidence relied on by Defendants are not being introduced to prove the truth of the matters stated therein, but to establish that a plethora of websites, articles, and other sources exist discussing pranks, prank shows, Matarazzo, and *Prank Encounters*, thereby establishing the public's interest in those topics. As an example, Exhibits 6, 7, and 20 to the Berkley Declaration are articles ranking various popular hidden camera/prank shows over the years. Defendants do not use these articles to prove that *Candid Camera* is, in fact, the best hidden camera show of all time but as evidence of the public's interest in prank shows (why else would the media and public write articles about the shows and rank them).[15] Courts regularly accept such sources as proof of the public's interest in a topic. *See, e.g.*, *Taylor*, 2018 WL 4959821, at *4 (relying on "ratings for the [television] series in addition to various news articles about the show and its cast members" as proof of public interest in series); *Symmonds v. Mahoney*, 31 Cal. App. 5th 1096, 1109 (2019) (relying on news articles covering defendant and defendant's social media following as proof of public interest in same).

**Third**, Plaintiffs try to argue that their claims do not arise from protected activity by misstating the law and the basis for their claims. Initially, Plaintiffs spend multiple pages discussing cases standing for the unremarkable proposition that the first prong focuses only on those acts giving rise to the challenged causes of action and not acts incidental thereto (Anti-SLAPP Opp. at 8-9), but fail to explain the relevance of such cases here. Instead, Plaintiffs' only argument pursuant to these authorities is to contend that Defendants were obligated to rotely identify "(1) the elements of the challenged claims and (2) what actions they did that supply the elements of said challenged claims" or the motion must be denied. Anti-SLAPP Opp. at 7-9. Then, by focusing solely on the last three pages of

---

[15] Plaintiffs' evidentiary objections fail for additional reasons. *See* Defendants' Response to Plaintiffs' Evidentiary Objections. For example, Hallock's admission that pranks are "one of the oldest tricks in the book" is a party admission. *Id*. at 5, 6.

1   Defendants' consolidated brief, they make the absurd contention that Defendants

2   fail to identify what state law claims Plaintiffs have asserted, the elements of those

3   claims, or the acts that give rise to those claims. Anti-SLAPP Opp. at 9-10.

4          Initially, there is no requirement that Defendants mechanically recite the

5   claims at issue, their elements, and the acts giving rise to those claims or have their

6   motion automatically denied. The cases cited certainly do not say so. Nor is there

7   any confusion as to what state law claims are being challenged by Defendants or

8   the elements of those claims. The claims are plainly stated in Plaintiffs' FAC. The

9   claims and their elements are repeatedly identified by Defendants in their motion

10  to strike (Dkt. No. 29 at 2-3) and their consolidated supporting brief (Defs. Br. at

11  10, 12, 38-47, 40, n. 25) (setting forth elements of a claim for breach of the implied

12  covenant and intentional interference with contract). Plaintiffs cannot claim

13  ignorance of what claims they have asserted; nor can they pretend to have missed

14  the repeated arguments against them in Defendants' moving papers. Equally

15  baseless is Plaintiffs' contention that Defendants have not identified the acts from

16  which Plaintiffs' state law claims arise. Defendants repeatedly refer to the acts

17  alleged in Plaintiffs' FAC from which Plaintiffs claims arise—namely the alleged

18  use of protected expression in *Scare Tactics* or *Freak Encounters* in creating,

19  producing, and distributing *Prank Encounters*. *See, e.g.*, Defs. Br. at 48 (citing

20  FAC ¶¶ 76, 81, 92).

21          Plaintiffs only other argument to try and avoid the application of the anti-

22  SLAPP statute is to make the confused argument that the only act in furtherance of

23  free speech at issue is the "final product of *Prank Encounters*," but none of

24  Plaintiffs' claims arise from *Prank Encounters* because the show itself is not

25  required to prove Plaintiffs' state law claims. Anti-SLAPP Opp. at 10-11. In this

26  regard, Plaintiffs argue that they are not suing because Netflix made *Prank*

27  *Encounters* available to stream, but for various acts in producing *Prank*

28  *Encounters*. *Id*. While the argument is hard to parse, Plaintiffs seem to suggest that

only the "airing" of *Prank Encounters* is an act in furtherance of free speech and because, according to Plaintiffs, the airing of *Prank Encounters* is only incidental to their claims, the anti-SLAPP statute does not apply. This, however, ignores the allegations of the FAC and the law.

To be sure, *Prank Encounters*, like any television show, is free speech protected by the anti-SLAPP statute. The statute, however, does not protect free speech alone; it also protects acts *in furtherance* of free speech. As explained—and not rebutted by Plaintiffs—the creation, production, and distribution of a television show are acts *in furtherance* of free speech. *Supra*, p. 34, 34, n.15; Defs. Br. at 48 (collecting cases). And, as Defendants clearly spelled out in their opening brief, Plaintiffs' claims arise from Defendants' acts of creating, producing, and distributing *Prank Encounters*. More specifically, as to Plaintiffs' second and third causes of action, which concern *Scare Tactics*, Plaintiffs expressly allege that Defendants breached the implied covenant of good faith and fair dealing inherent in the 2016 Agreement and interfered with it by allegedly "cop[ying] protected expression" from *Scare* in creating *Prank Encounters*, which was then distributed through Netflix. Similarly, Plaintiffs' fourth cause of action concerning *Freak Encounters* expressly arises from Defendants' alleged copying of protected expression in *Werewolf* in creating *Prank Encounters*, which again was then distributed. Thus, all of Plaintiffs' state law claims arise from protected activity—namely the creation, production, and distribution of *Prank Encounters*.

The other examples of alleged misconduct pointed to by Plaintiffs—which are entirely absent from the FAC and thus irrelevant to the inquiry[16]—only bolster this conclusion. Plaintiffs contend that their second claim for breach of the implied

---

[16] *See Arkley v. Aon Risk Servs. Companies, Inc.*, 2012 WL 12886445, at *5 (C.D. Cal. June 13, 2012) (declining to consider "alternative bases" to support plaintiffs' intentional interference claim, which were not found in plaintiffs' complaint and stated for first time in opposition); *Jackson v. Mayweather*, 10 Cal. App. 5th 1240, 1263 (2017), as modified (Apr. 19, 2017) (in deciding anti-SLAPP motion, "we must take the complaint as it is").

Mitchell
Silberberg &
Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

covenant *arises from* acts such as Healey's alleged "decision to use any part of the *Scare Tactics* assets" *in creating Prank Encounters*; or two *Prank Encounters* writers, who also wrote episodes of *Scare Tactics*, failing to ensure that they did not copy *Scare Tactics* **in writing their Prank Encounters episodes**; or the alleged failure of the *Prank Encounters* casting director to not use *Scare Tactics*' purported "proprietary casting method" *in casting for Prank Encounters*. Anti-SLAPP Opp. at 10-11. Again, creating, writing, and casting a television episode are all act in furtherance of free speech. *Supra*, p. 34.

In sum, the anti-SLAPP statute applies and Plaintiffs bear the burden to show that they have alleged facts sufficient to state a claim. They have not.

### 2. Plaintiffs Have Not Shown a Probability of Prevailing on Their State Law Claims.

Rather than responding to the substance of Defendants' legal challenges to their claims and explaining why they have stated a claim, Plaintiffs largely try to avoid Defendants' arguments by wrongly contending that the Court may not consider the same.

Initially, Plaintiffs contend that the Court cannot consider Defendants' legal challenges to Plaintiffs' claims on the anti-SLAPP motion because the arguments were not explicitly set forth in the section of Defendants' consolidated brief addressing the anti-SLAPP motion, but only incorporated therein. This is absurd. The whole point of a consolidated brief is to avoid redundancy and it is entirely appropriate to incorporate by reference the arguments made on a motion to dismiss into a concurrent anti-SLAPP motion. *See Planned Parenthood*, 890 F.3d at 834 ("Defendants' Motion to Strike explicitly incorporated by reference the arguments in Defendants' Motion to Dismiss.").

Next, Plaintiffs make the incredible argument that the Court cannot consider Defendants' Rule 12(b)(6) challenges to Plaintiffs' claims in deciding prong two because "Defendants' proffer of facts, law and argument may only be considered

Mitchell
Silberberg &
Knupp LLP

12435476.1

**DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF MOTIONS TO DISMISS AND STRIKE**

for purposes of determining what conduct by Defendants is actually being challenged" (i.e., the first prong analysis). Anti-SLAPP Opp. at 12-13, 15-16. To support this false premise, Plaintiffs egregiously misstate *Third Laguna Hills Mutual v. Joslin*, 49 Cal. App. 5th 366 (2020) and *Talega Maintenance Corp. v. Standard Pacific Corp.*, 225 Cal. App. 4th 722 (2014). Neither case stands for the proposition contended by Plaintiffs; in fact, neither even addressed the second prong at all. Instead, both solely concerned appeals from district court decisions denying anti-SLAPP motions on the ground that Defendants failed their burden on the first prong of proving the application of the anti-SLAPP statute. *See Third Laguna Hills Mutual*, 49 Cal. App. 5th at 370 ("[T]he trial court denied the anti-SLAPP motion 'because the [HOA] has not met the first prong; i.e., that the [HOA] was engaged in protected activity.'"); *Talega Maintenance Corp.*, 225 Cal. App. 4th at 457-58 (affirming denial of motion because first prong not satisfied).

Plaintiffs' argument not only lacks legal support but is logically unsound. How else can a defendant make a motion to strike except by "proffer[ing] [] law and argument"? If there was any doubt (there is not), the case law makes clear that a Defendants' Rule 12(b)(6) legal challenges to a Plaintiffs' state law claims are not only properly considered on an anti-SLAPP motion, but can lead to granting the motion. *See, e.g.*, *Planned Parenthood*, 890 F.3d at 894 (affirming grant of anti-SLAPP motion based on legal challenges to plaintiffs' claims).

To the extent that Plaintiffs do respond to Defendants' legal challenges, their paltry attempts to support their state law claims fail. Initially, their arguments are largely redundant of those made in opposition to Defendants' motion to dismiss, which Defendants have addressed above and incorporate here. *Supra*, pp. 26-33. Moreover, to the extent, in their anti-SLAPP Opposition, that Plaintiffs make additional arguments or rely on Hallock's declaration to argue that their claims should move forward, their arguments and evidence are equally unavailing. Specifically:

**a.    Plaintiffs have not stated a claim for breach of the implied covenant of good faith and fair dealing.**

In opposing Defendants' anti-SLAPP motion, Plaintiffs largely rehash their arguments opposing Defendants' motion to dismiss, including regurgitating their conclusory statement that their ability to exploit *Scare Tactics* has been damaged by *Prank Encounters*. Anti-SLAPP Opp. at 14-16. Yet, despite submitting a declaration from Hallock, Plaintiffs still do not identify even one way in which *Prank Encounters* has prevented Plaintiffs from exploiting *Scare Tactics*, which dooms the claim. *Supra*, pp. 31-32. Instead, Hallock confirms that he was not hindered in his ability to exploit *Scare Tactics* by admitting that Plaintiffs were able to secure a licensing agreement with Netflix, notwithstanding that *Prank Encounters* was already in production. Hallock Decl. ¶ 23 (deal was in March 2019, seven months before the release of *Prank Encounters*). And while Hallock also states that Netflix has an option to "pick up" additional episodes but, to date, has not picked up new episodes, *id.*, he does not state that Netflix's option has come due, that they are refusing to ***ever*** pick up the option, or that they are not picking up the option because of *Prank Encounters.* Nor is such a statement in the FAC, which is all that is at issue on Defendants' motion. *See supra*, p. 36 n.16, (citing *Arkley* and *Jackson*). Absent alleged ***facts*** (not legal conclusions) that *Prank Encounters* damaged the market for *Scare Tactics*, no claim is stated. *Supra*, pp. 28-32 (collecting cases).

Plaintiffs also point to other alleged conduct that they claim supports the claim (*see, e.g.*, Healey's failure to monitor Doug Perkins and David Storrs's script writing (Anti-SLAPP Opp. at 15 n. 10)) but none of these so-called facts are alleged in their FAC or even referenced in Hallock's declaration. The "facts" are simply conjured out of thin air as if Defendants and the Court have any idea what Plaintiffs are talking about. As any analysis is constrained to that which was actually pled by Plaintiffs, *supra*, p. 37 n.17, these references are irrelevant and

Mitchell
Silberberg &
Knupp LLP

12435476.1

1  properly ignored. (Nor would the conduct support a claim because it all hinges on

2  whether Defendants copied *Scare Tactics*, which they plainly did not).

### b.    Plaintiffs have not stated a claim for tortious interference.

5  No different than in opposing Defendants' motion to dismiss, Plaintiffs

6  attempt to prop up their tortious interference claim by simply restating their

7  insufficient conclusory allegations (Anti-SLAPP Opp. at 16-17), but they do not

8  explain why those allegations suffice. As explained in Defendants' moving papers

9  and above, Plaintiffs have not stated a claim for tortious interference.

### c.    Plaintiffs have not stated a claim for breach of the 2012 Agreement.

12  Again, Plaintiffs do not respond to any of Defendants' arguments but,

13  instead, merely point to the same allegations that Defendants have already shown

14  are legally deficient. Anti-SLAPP Opp. at 17-18. Defendants' arguments are

15  conceded. *Supra*, p. 12, n. 3.

### d.    The "evidence" submitted is irrelevant on a Rule 12(b)(6) standard and does not evidence that any of Plaintiffs' claims have minimal merit.

18  After making cursory, but insufficient, attempts to support their state law

19  claims, Plaintiffs try to support their claims by spending over four pages reciting

20  Hallock's declaration (Anti-SLAPP Opp. at 19-23), which itself largely repeats

21  verbatim the allegations of the FAC. *Compare* Hallock Decl. ¶ 22 (either referring

22  to himself in third person or mimicking the FAC: "On May 11, 2016, Hallock

23  informed Howard Owens, the founder and co-CEO of Propagate…") *with* FAC

24  ¶ 35 ("On May 11, 2016, Howard Owens, the founder and co-CEO of Propagate

25  was advised that Hallock…"). This showing is deficient for several reasons:

26  ***First***, Plaintiffs' evidence is irrelevant. Plaintiffs spend pages arguing about

27  the evidentiary standards that California state courts apply in analyzing the second

28  prong. Anti-SLAPP Opp. at 12-14. This, however, ignores that Defendants only

1  challenge Plaintiffs' claims based on the FAC and judicially noticeable materials.

2  As such, "the motion must be treated in the same manner as a motion under Rule

3  12(b)(6)..." (*Planned Parenthood*, 890 F.3d at 834), meaning state court

4  evidentiary standards and Plaintiffs' attempted evidentiary showing are irrelevant.[17]

5      **Second**, Hallock's declaration says nothing beyond what the FAC says and,

6  thus, comes no closer to supporting Plaintiffs' state law claims.

7      **Third**, Plaintiffs do not tie any piece of evidence to a specific claim or show

8  how their evidence makes it probable that Plaintiffs will prevail on any of their

9  claims, which was their burden. In fact, Hallock's declaration actually supports

10 dismissal. *See, e.g., supra*, p. 40 (Hallock admits to exploitation of *Scare Tactics*

11 on Netflix, thereby rebutting his conclusory allegation that Healey's development

12 of *Prank Encounters* somehow impeded the market for *Scare Tactics*).

13     **Fourth**, much of Hallock's declaration is inadmissible. *See* Defs. Evid. Objs.

14 In particular, Plaintiffs try to present Hallock as an expert on substantial similarity,

15 apparently on the premise that, if the Court analyzes whether *Prank Encounters*

16 copies protected expression in *Scare Tactics* to decide the state law claims, it

17 should consider his "expert testimony." MTD Opp. at 2, n. 4. No expert testimony,

18 however, is necessary to conclude that *Prank Encounters* and *Scare Tactics* are not

19 substantially similar. *Supra*, pp. 10-23. Moreover, Hallock does not even opine on

20 substantial similarity; instead, he merely authenticates the schedules to the FAC,

21 without stating that the analysis or opinions are his. Hallock Decl. ¶ 18. And even

22 if he had, Plaintiffs do not sufficiently qualify Hallock to serve as an expert.

23            ### 3.    Plaintiffs are Not Entitled to Discovery.

24     Relying on state law, Plaintiffs state, without explanation, that they should

25 receive discovery before granting Defendants' motion. Anti-SLAPP Opp. at 23.

26

27 [17] In this regard, the declaration of Jim Berkley was not presented to disprove
Plaintiffs' claims but, rather, as evidence that the first prong's public interest
28 requirement was met. *See* Defs. Rsp. Evid. Obj., pp. 3-5.

1    Again, Defendants' motion is predicated on a Rule 12(b)(6) standard and, thus, no

2    evidence is relevant and no discovery should be afforded. *Cf. Planned Parenthood*,

3    890 F.3d at 894. Further, Plaintiffs do not even identify what discovery they

4    believe is necessary or why there is "good cause" to order such discovery.[18]

5    **4.**     **The Anti-SLAPP Motion is Not Frivolous.**

6    Plaintiffs request fees "should this Court determine that [the] anti-SLAPP

7    motion is frivolous" (Anti-SLAPP Opp. at 23-24), but make no argument as to why

8    it is frivolous. The motion is meritorious but, even if denied, it is nowhere close to

9    being frivolous.

10 **IV.    CONCLUSION**

11    For the reasons set forth in their moving papers and as further explained

12    above, Defendants respectfully request that the Court grant their motion to dismiss

13    and their anti-SLAPP motion to strike.

14

15    DATED: August 24, 2020        MITCHELL SILBERBERG & KNUPP LLP

16

17                          By:_____/s/ Aaron M. Wais_____

                               Aaron M. Wais (SBN 250671)

18                                Gabriella A. Nourafchan (301594)

                               Attorneys for Defendants Kevin Healey

19                                and Propagate Content, LLC

20

21

22

23

24

25

---

26   [18] Plaintiffs wrongly contend that denial of Defendants' motion to dismiss would moot the anti-SLAPP motion. Not so. The Court should still analyze the first prong

27   and decide whether the anti-SLAPP encompasses Plaintiffs' state law claims. If yes, denial would be without prejudice to Defendants' appellate rights or to

28   bringing another motion at the summary judgment stage supported by evidence.