1 | **BALABAN & SPIELBERGER, LLP**
11999 San Vicente Blvd., Suite 345
2 | Los Angeles, CA  90049
Tel:    (424) 832-7677
3 | Fax:    (424) 832-7702
Daniel K. Balaban, State Bar No. 243652
4 | Andrew J. Spielberger, State Bar No. 120231
Kahren Harutyunyan, State Bar No. 298449
5 | Vanessa L. Loftus-Brewer, State Bar No. 265213

6 | Attorney for Defendant,
SCOTT W. HALLOCK, an individual et al.

7 |

8 | **UNITED STATES DISTRICT COURT**

9 | **CENTRAL DISTRICT OF CALIFORNIA**

10 | SCOTT W. HALLOCK, an individual;
WMTI PRODUCTIONS, INC., a California
11 | corporation; WMTI PRODUCTIONS
NORTH, INC., a Canadian corporation; and
12 | THE NEXT SEASON COMPANY, INC., a
Canadian corporation,
13 |

14 |                 Plaintiffs,

15 |         v.

16 | KEVIN HEALEY, an individual;
PROPAGATE CONTENT, LLC, a
17 | Delaware Limited Liability Company; and
DOES 1 through 100, inclusive,
18 |

19 |                 Defendants.

Case No. 2:20-cv-02726 CJC (MAAx)

[Honorable Cormac J. Carney]

**SECOND AMENDED COMPLAINT FOR:**
**1)  COPYRIGHT INFRINGEMENT**

**DEMAND FOR JURY TRIAL**

**SPOLIATION NOTICE**

**[Non-Paper Exhibits Have Been Sent To The Court For Lodging Pursuant to *COVID-19 Notice*]**

**[Identical Copies Of Lodged Exhibits Will Be Served Along With The Second Amended Complaint]**

*Left margin, vertical text:* BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

Plaintiffs SCOTT HALLOCK, an individual, WMTI Productions, Inc., a California corporation, WMTI Productions North, Inc., a Canadian corporation, and THE NEXT SEASON COMPANY, Inc., a Canadian corporation, allege

## <u>THE PARTIES, JURISDICTION, AND VENUE</u>

### *Plaintiff Parties*

1. Plaintiff Scott Hallock ("Hallock") is an individual residing in Ventura County, California.

2. Plaintiff WMTI Productions, Inc. ("WMTI US") is a duly licensed California corporation with its principal place of business in Encino, California.

3. Plaintiff WMTI Productions North, Inc. ("WMTI North") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada. WMTI North is qualified to do business in California.

4. Plaintiff The Next Season Company, Inc. ("TNSCI") is a duly licensed Canadian corporation with its principal place of business in Toronto, ON, Canada. TNSCI is qualified to do business in California.

5. Collectively, WMTI US, WMTI North and TNSCI are referred to herein as "Copyright Holder Plaintiffs."

6. Collectively, Hallock, WMTI US, WMTI North and TNSCI are referred to herein as "Plaintiffs."

### *Defendant Parties*

7. On information and belief, Defendant Kevin Healey ("Healey") is an individual who resides in Los Angeles County, California.

8. On information and belief, Defendant Propagate Content, LLC ("Propagate") is a Delaware limited liability company that is licensed to do business in the state of California and maintains principal offices at 6381 Hollywood Blvd, Floor 4, Los Angeles, CA 90028.

9. On information and belief, at all times relevant hereto, Healey has been, and is, a senior vice president, employee and agent of Propagate.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

10.  On information and belief, at all times relevant hereto, Propagate has been Healey's employer.

11.  On information and belief, at all times relevant hereto, Healey has acted within the scope and course of his agency and employment for Propagate.

12.  On information and belief, at all times relevant hereto, Propagate has authorized, endorsed, and supported Healey's work as an employee and agent of Propagate.

13.  Plaintiffs are unaware of the names and capacities of the Defendants named herein as Does 1 through 100 and sue such Defendants by their fictitious names. Plaintiffs will seek leave of court to amend this pleading and set forth the true names and capacities of such Defendants if and when such information has been more fully ascertained.

14.  Plaintiffs are  informed and believes, and on that basis alleges, that ALL Defendants, and the fictitious Doe Defendants 1-100, were at all relevant times acting as actual agents, captive agents or brokers, conspirators, ostensible agents, partners, brokers, subsidiaries, assignees and/or joint venturers and employees of all other Defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, contractual relationship, partnership, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants. Additionally, to the claims below, Plaintiffs allege that at all relevant times, Defendants were also contributory infringers having actual and constructive knowledge of the infringing activity and at all times encouraging and/or assisting with the copyright infringement. Furthermore, Plaintiffs allege that at all relevant times, Defendants, were successors in interest to their predecessors. However, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

*Jurisdiction*

15.  This case arises, in part, under 17 U.S.C. Section 101, et seq.  (herein the "Copyright Claims"), such that jurisdiction to adjudicate this case is exclusively vested in this Court pursuant to 28 U.S.C. Section 1331 (federal question) and 28 U.S.C. Section 1338(a) (copyright).

16.  This case also arises, in part, under the laws of the state of California (herein the "State Claims"), which State Claims are so related to the Copyright Claims that they form part of the same case or controversy, such that this Court may exercise supplemental jurisdiction over the State Claims pursuant to 28 U.S.C. Section 1367.

*Venue*

17.  Defendant Healey resides within the geographical boundaries of the United States District Court, Central District of California.  Hence, this Court is the proper venue for adjudication of this case.

18.  Defendant Propagate is a Delaware limited liability company that is licensed to do business in the state of California and that maintains principal offices at 6381 Hollywood Blvd., Floor 4, Los Angeles, CA 90028, which is within the geographic boundaries of this Court.  As such, this Court is the proper venue for adjudication of this case.

*Overview of Developments and Brief Summary of Current Infringements*

19.  In November 2019, Hallock viewed 8 episodes of *Prank Encounters* Season 1 for the first time.  Unlike the general viewers who saw *Scare Tactics* and *Prank Encounters* as perhaps "very similar," due to: (a) Hallock's familiarity with the entire *Scare Tactics* portfolio, (b) Hallock's knowledge of Healey's involvement in both *Scare Tactics* and *Prank Encounters*, and (c) the specifics of the 2016 Agreement, Hallock concluded that by producing and releasing *Prank Encounters* as a "reboot" of the Franchise, Healey had not only directly, knowingly and willfully deprived Hallock of the benefits of the 2016 Agreement, but also directly, knowingly and willfully infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

*Tactics* stories.

20.   *Prank Encounters Season 1 Infringements*: To be precise, the episode "Camp Scarecrow" from Prank Encounters Season 1 infringed on the original Scare Tactics episode "Camp Kill." Similarly, the Prank Encounters episode "Face Fears" infringed on the Scare Tactic episode "My Heart Belongs to Misery aka Dangerous Obsession." Then again, the Prank Encounter episode "End of the Road" infringed on the Scare Tactic episode "Road Kill." Fourth, the Prank Encounter episode "Split Party" from Prank Encounters Season 1 infringed on the Scare Tactics episode "Send in the Clowns."

21.   On or about September 24, 2020, this Court denied in part Defendants' Motion to Dismiss and Motion to Strike ruling there was substantial similarities to meet the burden to oppose the Defendants motion as to the copyright infringement of four separate episodes of Scare Tactics as listed above, nevertheless, Defendants have infringed on Plaintiffs' copyright protections through the release of additional infringing materials as contained in Prank Encounters Season 2, which premiered on or about April 1, 2021 on Netflix.

22.   *Prank Encounters Season 2 Infringements:* After April 1, 2021, Hallock viewed the episode "Graveyard Shift" from Prank Encounters Season 2, which continues to infringe upon the protections afforded the Scare Tactics, specifically by infringing upon, the Scare Tactics episode "Bicentennialien." Additionally, the Defendants created a sequel episode named "Re Face Fears" which appears to further infringe upon the original Scare Tactics episode "My Heart Belongs to Misery aka Dangerous Obsession" and even shows clips from the infringing episode "Face Fears," which was released in Prank Encounters Season 1.

23.   In addition to the violations found in Prank Encounters Season 1 and Prank Encounters Season 2, Defendants Healey and Propagate engaged a Propagate Company to produce a show by the name Double Cross with Blake Griffin, which premiered on the comedy cable television network TruTv on March 19, 2021.  Shortly

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

after the release of Double Cross with Blake Griffin in March 2021, Hallock viewed the show and it appeared Defendants were again infringing on the copyright protections afforded Scare Tactics.

24. *Double Cross with Blake Griffin Infringements:* Specifically, to date, the Double Cross with Blake Griffin episode "Open House" infringed upon the Scare Tactics original work "Fear Antics: Room with a View."

25. At its core, the infringements being alleged in this action are summarized for this Court's convenience in the following chart:

| SCARE TACTICS ORIGINAL WORKS | PRANK ENCOUNTERS SEASON 1 - INFRINGING EPISODES | PRANK ENCOUNTERS SEASON 2 – INFRINGING EPISODES | BLAKE GRIFFIN - DOUBLE CROSS – INFRINGING EPISODES |
|---|---|---|---|
| Camp Kill | Camp Scarecrow | | |
| My Heart Belongs to Misery aka Dangerous Obsession | Face Fears | Secondary – Sequel Re Face Your Fears (Sequel that shows infringing clips from Season 1) | |
| Road Kill | End of the Road | | |
| Send in the Clowns (No Violation for It's Party) | Split Party | | |
| Bicentennialien | | Graveyard Shift | |

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

| Room with a View | | | Open House |
|---|---|---|---|
| | | | |

## FIRST CLAIM FOR RELIEF

### *(Copyright Infringement 17 U.S.C. §§ 106, Et Seq.*
### *Direct, Contributory and Vicarious)*
### *Against Healey, Propagate and Does 1-30, inclusive*
### <u>*Hallock and Healey Create* Scare Tactics</u>

26.    Working as creative partners and producers, Hallock and Healey wrote, developed and produced a number of television series.  Of these, the most successful was *Scare Tactics*.  *Scare Tactics* is an American scripted comedy horror hidden camera television show that began production in 2002 and ran for five seasons[1] on the SYFY Channel (aka the SciFi Channel) pursuant to a license agreement between WMTI US and SYFY.  The *Scare Tactics* series was produced and owned by three companies: WMTI US (Seasons 1, 2, 3, 6 (the 22 "best of" episodes) and a one-hour Halloween special); WMTI North (Season 4); and TNSCI (Season 5).

27.    *Scare Tactics* was broadcast in half-hour episodes.  Each episode featured four compact short stories setting forth, among other things: specific action points; specific dialogue/talking points; specific character mannerisms; specific stage instructions; specific wardrobe/costumes; specific locations; specific special effects; the introduction of a carefully selected temporary newcomer (the "Mark") to the group of actors who interact with the Mark in a seemingly safe setting per the instructions of the producers; and the pre-set addition of strange occurrences to the mix for the purpose of capturing the Mark's authentic reactions on "hidden cameras."

28.    Over the course of the five seasons, Hallock and Healey produced 93 original episodes of *Scare Tactics*, consisting of over 372 original separate short stories, which

---

[1] A "sixth" season is comprised of the "best of" episodes of *Scare Tactics*.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

aired domestically (on SYFY) as well as internationally in over 70 territories[2] on six continents (North America, South America, Europe, Africa, Australia/Oceania and Asia).  In addition, Hallock and Healey produced a one-hour Halloween Special for SYFY as well as a sixth season, which was comprised of the "best of" episodes of *Scare Tactics*.

29.   Hallock and Healey commenced the creative process for the individual *Scare Tactics* short stories by retaining a group of writers, who, under the supervision of Hallock and Healey, wrote the stories as "works for hire" in a "collaborative writing room."  The ensuing stories were reviewed and edited by Hallock and Healey until they were satisfied that the individual stories were appropriate.

30.   Based on the final stories, Hallock and Healey physically produced individual stories, choosing and casting the characters (including the "Mark"), selecting individual locations, building specific sets, choosing and adapting props, hiring actors, rehearsing with the actors and the camera operators so that they knew their specific lines and the timing thereof,  timing the specific "action points" or "plot points" that the actors were required to achieve, and instructing the actors how they were expected to interact with the Mark.

31.   When the stories were fully developed and the rehearsals were undertaken to satisfaction, Hallock and Healey filmed each story (sometimes several times with different Marks), selecting and editing one for eventual airing on television.  When broadcast as a full half-hour show, individual stories, each approximately 5 minutes

---

[2] *Scare Tactics* entered into a distribution agreement with Rive Gauche, which licensed *Scare Tactics* episodes internationally to the following territories: Algeria, Alto Adige, Armenia, Australia, Austria, Azerbaijan, Bahrain, Belarus, Belgium, Canada, Capo D'Istria, Caribbean, Central America, Chad, Channel Islands, Denmark, Djibouti, Dom Toms, Dominican Republic, Egypt, England, English Europe, France, Germany, Greece, Iceland, Indonesia, Iran, Iraq, Isle of Man, Israel, Italy, Japan, Jordan, Kazakhstan, Kuwait, Kyrgyzstan, Lebanon, Libya, Liechtenstein, Luxembourg, Malaysia, Mauritania, Mexico, Monaco, Morocco, Netherlands, New Zealand, Northern Ireland, Oman, Papua New Guinea, Philippines, Qatar, Republic of Yemen, Russia, San Marino, Saudi Arabia, Scotland, Singapore, Somalia, South Korea, Sudan, Syria, Switzerland, Tunisia, Thailand, Turkey, Ukraine, Uzbekistan, United Arab Emirates, Wales and Vatican City.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

long were "introduced" by a celebrity host who was also provided a script written in the "writers room." The entire process, from the initial writing of a story through the physical production through editing and delivery resulted in what is sometimes referred to herein as the "Protected Expression."

32. Each of the final stories in film form that was broadcast was registered with the United States Copyright Office.

33. *Scare Tactics* garnered accolades, including being the most watched non-news, primetime cable program in adults 18-49 and the best ever rating for a series premiere in SYFY history. It is, therefore, not surprising that *Scare Tactics* has been seen in over seventy territories all over the world.

<em><u>Hallock and Healey Have Disputes</u></em>

34. Despite the overwhelming success of *Scare Tactics*, in and around 2011, disputes between Hallock and Healey arose that ultimately resulted in Healey divesting himself of *Scare Tactics*, as more particularly described hereinafter.

35. These disputes were settled, first, via a settlement agreement executed in 2012 (the "2012 Agreement")[3] and, second, via a settlement agreement executed in 2016 (the "2016 Agreement")[4]. A true and correct copy of the 2016 Agreement is attached hereto and incorporated herein by reference as **Exhibit 1**.

36. As a result of the 2016 Agreement, Healey agreed to, and did, "assign and transfer to HALLOCK all of his direct and indirect rights and interests of any kind or nature whatsoever in and to SCARE TACTICS." (See Exhibit 1). This was accomplished by:

      a. Healey transferring to Hallock any and all possible ownership Healey had in WMTI US, which held title in and to various *Scare Tactics*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

---

[3] The 2012 Agreement contains a provision that arguably renders that agreement "confidential." The 2012 Agreement will be filed under seal if and when necessary.

[4] The 2016 Agreement is not "confidential."

intellectual property;

b. Healey transferring to Hallock and Hallock's designee any and all possible ownership Healey had in WMTI North and TNSCI, which held title in and to various *Scare Tactics* intellectual property; and

c. To further ensure that Healey was severing every possible claim in and to *Scare Tactics* intellectual property, Healey agreed to, and did, transfer to Hallock, personally, all of Healey's interest in and to copyrights, trademarks, brands, trade names, the "series," previously developed movie concepts, and the direct and indirect rights to exploit any and all intellectual property relating to *Scare Tactics*.

(Collectively, the bundle of productions, the brand, the intellectual property and other ancillary rights, both direct and indirect of any kind regarding *Scare Tactics* are sometimes referred to herein as the "Franchise.")

37. In other words, in accordance with the 2016 Agreement, Healey was to divest himself completely of all *Scare Tactics* assets – both tangible and intangible – and was not to use the assets at all.

38. Plaintiffs are informed and believe, and thereon allege, that notwithstanding the clear mandate set forth in the 2016 Agreement (that Healey divest himself of all assets pertaining to *Scare Tactics* and transfer the same to Plaintiffs), to this day, Healey has failed to divest himself of the tangible, physical assets relating to *Scare Tactics*, and, thus, has failed to transfer the same to Plaintiffs.

39. Plaintiffs are further informed and believe, and thereon allege, that, to this day, Healey has retained the tangible, physical assets related to *Scare Tactics*.

40. Plaintiffs, as 100% owners of the Franchise, are entitled to exploit the Franchise and reap all of the benefits incident thereto – both pecuniary and non-pecuniary.

41. As a result of the foregoing, among other transactions, WMTI US holds exclusive exploitation rights worldwide to *Scare Tactics* seasons 1 through 3, the

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

"best ofs" and the Halloween Special, and, via license from WMTI North and TNSCI, exclusive worldwide exploitation rights (other than Canada) to seasons 4 and 5.

### *Healey Joins Propagate*

42.  Shortly after executing the 2016 Agreement, knowing that he had no rights to exploit the Franchise in any manner whatsoever, Healey joined Propagate as its vice president.

43.  On or about May 11, 2016, Howard Owens ("Owens"), a senior executive with Propagate was advised that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights."  (A true and correct copy of a Facebook messenger exchange between Hallock and Owens, dated May 11, 2016, which evidences Owens' express knowledge that Hallock was the "exclusive owner of the *Scare Tactics* franchise," which included "worldwide format [and] media rights," is attached hereto and incorporated herein by reference as **Exhibit 2**).

44.  Healey's knowledge and background relevant to the Franchise, including specifically the fact that Healey divested himself of the Franchise (including the right to remake, sequelize, spinoff or reboot the Franchise in any manner whatsoever), is and was imputed to Propagate as Healey's principal per California Civil Code Section 2332.

45.  Likewise, Howard Owens' knowledge (that he knew Hallock was the "exclusive owner of the *Scare Tactics* franchise") is and was imputed to Propagate as Owens' principal per California Civil Code Section 2332.

### *Healey and Propagate "Reboot"* Scare Tactics

46.  Notwithstanding the fact that (1) Healey had actual knowledge that he had no rights in the Franchise and (2) Propagate had imputed knowledge of the same, on information and belief, Healey and Propagate nonetheless commenced, supervised and completed production and delivery to the online streaming company Netflix of an allegedly "new" *Scare Tactics* television series, which Healey and Propagate

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

named *Prank Encounters*.  The resulting "new" series is sometimes referred to herein as the "Reboot."

47. To date, on information and belief, Healey and Propagate have released two seasons of episodes in the Reboot, so obviously not all of the *Scare Tactics* stories have been copied by Healey and Propagate; however, a number of specifically identifiable *Scare Tactics* stories have been copied by Healey and Propagate in the Reboot.

48. In November 2019, Hallock viewed 8 episodes of Prank Encounters Season 1 for the first time.  Unlike the general viewers who saw Scare Tactics and Prank Encounters as perhaps "very similar," due to: (a) Hallock's familiarity with the entire Scare Tactics portfolio, (b) Hallock's knowledge of Healey's involvement in both Scare Tactics and Prank Encounters, and (c) the specifics of the 2016 Agreement, Hallock concluded that by producing and releasing Prank Encounters as a "reboot" of the Franchise, Healey had not only directly, knowingly and willfully deprived Hallock of the benefits of the 2016 Agreement, but also directly, knowingly and willfully infringed upon the Copyright Holder Plaintiffs' copyrights in specific Scare Tactics stories.

49. *Prank Encounters Season 1 Infringements*: To be precise, the episode "Camp Scarecrow" from Prank Encounters Season 1 infringed on the original Scare Tactics episode "Camp Kill." Similarly, the Prank Encounters episode "Face Fears" infringed on the Scare Tactic episode "My Heart Belongs to Misery aka Dangerous Obsession." Then again, the Prank Encounters episode "End of the Road" infringed on the Scare Tactic episode "Road Kill." Fourth, the Prank Encounters episode "Split Party" from Prank Encounters Season 1 infringed on the Scare Tactics episode "Send in the Clowns."

50. On or about September 24, 2020, this Court denied in part Defendants' Motion to Dismiss and Motion to Strike ruling there was substantial similarities to meet the burden to oppose the Defendants motion as to the copyright infringement of

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

four separate episodes of Scare Tactics as listed above, nevertheless, Defendants have infringed on Plaintiffs' copyright protections through the release of additional infringing materials as contained in Prank Encounters Season 2, which premiered on or about April 1, 2021 on Netflix.

51. *Prank Encounters Season 2 Infringements*: After April 1, 2021, Hallock viewed the episode "Graveyard Shift" from Prank Encounters Season 2, which infringed upon the protections held by Scare Tactics, specifically by infringing upon, the Scare Tactics episode "Bicentennialien." Additionally, the Defendants created a sequel episode named "Re Face Fears" which appears to further infringe upon the original Scare Tactics episode "My Heart Belongs to Misery aka Dangerous Obsession" and even shows clips from the infringing episode "Face Fears," which was released in Prank Encounters Season 1.

52. More along that point, Prank Encounters Season 2 borrowed heavily from the genesis of three Scare Tactics episodes including the following: 1) Prank Encounters Season 2, episode 2 the "Missing Missing Link" pulled from the genesis of Scare Tactics' "Ice Man" episode 304; 2) Prank Encounters Season 2, episode 3 "Spider Mansion" pulled from the genesis of Scare Tactics' "Web of Evil" episode 117; and Prank Encounters Season 2, episode 4 "Mind Field" pulled from the genesis of Scare Tactics' "The Mind Game" episode 301 and the videos of these episodes are attached for review. (A true and correct copy of the genesis episodes are attached hereto, lodged, and incorporated herein by reference as **Exhibit 3**). Although these three Prank Encounter Season 2 episodes pull from the genesis of the original three Scare Tactics episodes, these episodes have been set forth to show that Prank Encounters Seasons 2 is pulling heavily from the genesis of Scare Tactics in both permissible acts and as set forth below as part of an impermissible infringement.

53. In addition to the violations found in Prank Encounters Season 1 and Prank Encounters Season 2, Defendants Healey and Propagate engaged a Propagate Company to produce a show by the name Double Cross with Blake Griffin, which

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

premiered on the comedy cable television network TruTv on March 19, 2021.  After the release of Double Cross with Blake Griffin in March 2021, Hallock viewed the show and it appeared Defendants were again infringing on the copyright protections afforded Scare Tactics.

54. *Double Cross with Blake Griffin Infringements*: Specifically, to date, the Double Cross with Blake Griffin episode "Open House" infringed upon the Scare Tactics original work "Fear Antics: Room with a View."

55. At this point, at issue in the Copyright Holder Plaintiffs' Copyright Claims against Defendants, and each of them, are the following *Scare Tactics* copyrights:

a. "Camp Kill" -- "*Scare Tactics*" episode 101, U.S. Copyright No. PA 0001912469.  Claimant WMTI US.

b. "My Heart Belongs to Misery" aka "Dangerous Obsession" -- "*Scare Tactics*" episode 117, U.S. Copyright No. PA 0001912469.   Claimant WMTI US.

c. "Road Kill" -- "*Scare Tactics*" episode 405, U.S. Copyright No. PA 0001817863.  Claimant WMTI NORTH.

d. "Send In the Clowns" -- "*Scare Tactics*" episode 509, U.S. Copyright No. PA 0001831682.  Claimant TNSCI.

e. "Bicentennialien" – "*Scare Tactics*" episode 504, U.S. Copyright No. PA0001831614 Claimant TNSCI.

f. "Room with a View" – "*Scare Tactics*" episode 211, U.S. Copyright No. PA0001912453 Claimant WMTI US.

56.  Defendants' works that infringed upon the Copyright Holder Plaintiffs' copyrights in the above-referenced stories and misappropriated other intellectual property rights belonging to the Copyright Holder Plaintiffs include the following stories:

a. Prank Encounters Season 1, Episode "End of the Road";

b. Prank Encounters Season 1, Episode "Split Party";

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

c.  Prank Encounters Season 1, Episode "Face Fears"; and

d.  Prank Encounters Season 1, Episode "Camp Scarecrow"

e.  Prank Encounters Season 2, Episode "Graveyard Shift"

    i.  Additionally, Defendants further infringed on the copyright protections enjoyed by Scare Tactics by releasing a sequel to an infringing episode in Prank Encounters Season 1, "Face Fears" by releasing the episode "Re-Face Fears" as episode 6 in Prank Encounters Season 2, which even plays clips of the infringing episode.

f.  Double Cross Season 1, Episode "Open House."

57.  Specifically, Defendants' infringe upon the Copyright Holder Plaintiffs' copyright in specific *Scare Tactics* stories, as follows:

a.  Defendants' story  "End of the Road" infringes on the Copyright Holder Plaintiffs' copyright in  "Road Kill," as is evidenced, in part, by:

    i.  the written story for "Road Kill" (**Exhibit 4**);

    ii.  the final "Road Kill" story seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 5**); and

    iii.  the final "End of the Road" story seen on Netflix (**Exhibit 6**).

b.  Defendants' story "Face Fears" infringes on the Copyright Holder Plaintiffs' copyright in "My Heart Belongs to Misery" aka "Dangerous Obsession," as is evidenced, in part, by:

    i.  the written story for "My Heart Belongs to Misery" aka "Dangerous Obsession" (**Exhibit 7**); and

    ii.  the final "My Heart Belongs to Misery" aka "Dangerous Obsession" story seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 8**);

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

   iii. the final "Face Fears" story seen on Netflix (**Exhibit 9**); and

   iv. Additionally, the Prank Encounters Season 2 episode 6 "Re-Face Fears" is a subsequent sequel to Face Fears, which shows clips from the infringing episode. (**Exhibit 10**)

 c. Defendants' story "Camp Scarecrow" infringes on the Copyright Holder Plaintiffs' copyright in "Camp Kill," as is evidenced, in part, by:

   i. the written story for "Camp Kill" (**Exhibit11**);

   ii. the final story for "Camp Kill," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibit 12**); and

   iii. the final "Camp Scarecrow" story seen on Netflix (**Exhibit 13**).

 d. Defendants' story "Split Party" infringes on the Copyright Holder Plaintiffs' copyright in "Send in the Clowns," as is evidenced, in part, by:

   i. the written stories for "Send in the Clowns" (**Exhibits 14**);

   ii. the final stories for "Send in the Clowns," as seen on television, representing the Copyright Holder Plaintiffs' protected expression (**Exhibits 15**); and

   iii. the final "Split Party" story seen on Netflix (**Exhibit 16**).

 e. Defendants' story "Graveyard Shift" infringes on the Copyright Holder Plaintiffs' copyright in "Bicentennialien," as is evidenced in part, by:

   i. the written stores for "Bicentennialien" (**Exhibit 17**);

   ii. the "host script" (**Exhibit 18**);

   iii. the final story for "Bicentennialien," as seen on television, representing the Copyright Holder Plaintiffs' protected express (**Exhibit 19**); and

   iv. the final "Graveyard Shift" story seen on Netflix (**Exhibit 20).**

f.  Defendants' story "Open House" infringes on the Copyright Holder Plaintiffs' copyright in "Room with A View," as is evidenced in part, by:

i.  the written stores for "Room with A View" (**Exhibit 21**);

ii.  the "host script" (**Exhibit 22**);

iii.  the final copy for "Room with A View," as seen on television, representing the Copyright Holder Plaintiffs' protected express (**Exhibit 23**); and

iv.  the final "Open House" story seen on TruTV (**Exhibit 24**).

58. For purposes of illustration, the Copyright Holder Plaintiffs have selected a typically unique *Scare Tactics* story named "Wood You Chip Up This Body." This story is not part of the instant claim but demonstrates the Copyright Holder Plaintiffs' protected expression.  Materials submitted include:

a.  the "written story" (**Exhibit 25**);

b.  the "host script" (**Exhibit 26**); and

c.  an actual copy of the story, i.e. the Copyright Holder Plaintiffs' protected expression that was eventually filmed and released on television (**Exhibit 27**).

Combined, these exhibits show that the resulting final story that was broadcast was an actual rendering of ideas in the form of protectable expression of articulable concrete elements reflecting a particularized expression of the underlying concept.

59. The Defendants' stories identified above copy the protectable expression in the Copyright Holder Plaintiffs' original stories by, among other things, using, without permission or license, the actual concrete elements that make up the total sequence of events, the relationships among the major characters, and the settings and mood.  In other words, there is a high degree of similarity of plot, sequencing, characters, setting, and mood in the Copyright Holder Plaintiffs' original work and

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

1   Defendants' work.

2       a.  Both the Copyright Holder Plaintiffs' works and Defendants' works are

3           essentially "short stories" (as opposed to full-length works such as

4           feature films) concerned with a single effect conveyed in a few

5           significant scenes.

6       b.  While the Copyright Holder Plaintiffs' and Defendants' stories fall

7           within the "horror/scary" genre and indeed present the same "story arc,"

8           for each of the subject 6 stories, the *Scare Tactics* creators approached

9           matters in a distinct manner, creating a novel plot and populating the plot

10          with, among other things, a specific creative sequencing, characters,

11          setting, and mood.  And, Plaintiffs had to be judicious in their choices as

12          they had to accomplish the "scare" within the 4-5 minute timeframe.

13          Defendants, armed with four times the amount of time than Plaintiffs to

14          accomplish the "scare," failed to similarly approach matters in a distinct

15          manner, creating a novel plot and populating the plot with, among other

16          things, a specific creative sequencing, characters, setting, and mood.

17          Instead, Defendants merely copied the Copyright Holder Plaintiffs'

18          works in a virtually identical manner, making their works substantially

19          similar to Plaintiffs' original works.

20      c.  Because the Copyright Holder Plaintiffs' final creation is not a "script"

21          but rather a completed video of each story, the Copyright Holder

22          Plaintiffs allege that a comparison, for similarity purposes, should, by all

23          rights, be based on a review and comparison of the final stories

24          themselves.

25      d.  The Copyright Holder Plaintiffs further allege that such a review and

26          comparison reveals that, with respect to the Copyright Holder Plaintiffs'

27          works, each of Defendants' 6 episodes contain: the same plot; the same

28          characters; the same sequencing; the same setting (and time of day); and

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

SECOND AMENDED COMPLAINT

even the same "scary mechanism."   In addition to the foregoing substantial similarities, there is even the blatant similarity of utilizing the series host as a "surprise guest."[5]

e. The Copyright Holder Plaintiffs further allege that Defendants' copying, as alleged above, was intentional and not coincidental, i.e., Defendants engaged in outright copying of a massive amount of intellectual property that was owned by the Copyright Holder Plaintiffs as well as Hallock individually.   Defendants did so not by cherry-picking a few of Plaintiffs' original stories, but by copying, without authorization or license, the entire *Scare Tactics* Franchise and simply changing the name to "Prank Encounters."

f. Although the Copyright Holder Plaintiffs allege that the most appropriate "comparison" between their original works and Defendants' works is in the video versions themselves (supplied as Exhibits to this Amended Complaint), the Copyright Holder Plaintiffs have taken the additional step of evaluating and comparing each of their proffered individual stories to those of Defendants' stories.   The comparisons are attached to this Amended Complaint as Schedules I through IV for violations pertaining to Prank Encounters Season 1, Schedules V-VI for violations pertaining to Prank Encounters Season 2, and Schedule VII for violations pertaining to Double Cross with Blake Griffin.   In each individual schedule, the Copyright Holder Plaintiffs set out the substantial similarities of articulable elements (often virtually identical) appearing in both the Copyright Holder Plaintiffs' original works and Defendants' copies.   In the Schedules, the Copyright Holder Plaintiffs also support

---

[5] In one story involving a "birthday party," the Copyright Holder Plaintiffs featured the "Scare Tactics" series host as a "surprise guest" at the birthday party, which the Defendants unabashedly copy (i.e., Defendants' series host is also a "surprise guest" at a birthday party).

and demonstrate: the highly creative aspect of their work through use of unusual, not commonplace choices made when bringing their various short stories to life; how the Copyright Holder Plaintiffs' specific decisions regarding plot, characters, sequencing, settings and mood could have been approached differently; and how Defendants' chose to copy, without authorization, the Copyright Holder Plaintiffs' unique creative decisions and expressions.

   i. Schedule I provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Dangerous Obsession," and Defendants' copy, "Face Fears."

   ii. Schedule II provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Road Kill," and Defendants' copy, "End of the Road."

   iii. Schedule III provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Send In the Clowns" and Defendants' copy, "Split Party."

   iv. Schedule IV provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Camp Kill," and Defendants' copy, "Camp Scarecrow."

   v. Schedule V provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Bicentennialien" and Defendants' copy, "Graveyard Shift."

   vi. Schedule VI provides some discussion of the infringing clips of Copyright Holder Plaintiffs' original work, "Face Fears" and Defendants' sequel copy, "Re-Face-Fears" as shown in Prank Encounters, Season 2 episode 6.

20

vii. Schedule VII provides a detailed analysis of the substantial similarities between the Copyright Holder Plaintiffs' original work, "Room with View" and Defendants copy, "Open House."

60. The specific instances of copying, alleged above, illustrate not only Healey's blatant poaching of the Copyright Holder Plaintiffs' copyrights in the subject specific *Scare Tactics* stories but also Propagate's flagrant ratification thereof. Moreover, the cited instances evidence Healey's utter disregard of his contractual obligations to Hallock pursuant to the 2016 Agreement.

61. The Copyright Holder Plaintiffs spent countless number of hours and an estimated Forty Million Dollars ($40,000,000) to develop, produce and deliver the *Scare Tactics* episodes. Development, production and delivery of content is expensive and by infringing upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as herein alleged, Defendants have effectively destroyed the Copyright Holder Plaintiffs' ability to realize the full extent of returns on their significant financial investment.

62. The Copyright Holder Plaintiffs, are informed and believe, and thereon allege, that in order to accomplish the unauthorized Reboot of the Franchise, Healey and Propagate used *Scare Tactics* personnel, including:

    a. *Scare Tactics* writers, including Doug Perkins, David Storrs and Kevin Healey;

    b. *Scare Tactics* actors, including David Storrs, Sven Holmberg and Gabriel Pimentel;

    c. *Scare Tactics* technical supervisor Steve Canas;

    d. *Scare Tactics* producers, including Hilary Frimond, Doug Perkins, David Storrs, and, of course, Healey;

    e. *Scare Tactics* production designer Joe Warson and construction manager Brad Franks;

///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

f. *Scare Tactics* talent casting director Suzanne Broderick; and, of course;

g. *Scare Tactics* former creative partner and executive producer, Healey, who, on information and belief, directed the "writers' room" for Propagate's *Prank Encounters*, for which Healey has screen credit, and directed the actors.

63. Attached hereto for inclusive purposes as **Exhibit 28** (submitted in electronic media as a flash drive and incorporated herein by reference) is what Plaintiffs believe to be a full set of each "Scare Tactics" Episode in which a copied "Scare Tactics" short story appears (not just individual short stories). Plaintiffs provide the "start time" for each subject "short story" in each "Episode", which is designated by a time code (i.e. Copyright Plaintiffs' story "Road Kill" is found at ST Episode 405 at 5:06). Also included (directly following the applicable "Scare Tactics" episode in the submitted electronic media) is the entire episode of Defendants' corresponding episode (i.e. S1E2 "End of the Road").

### *The Public Decries the Reboot*

64. The Reboot started streaming in the United States on Netflix on or about October 25, 2019. Almost immediately, it was clear that Propagate and Healey's attempt to reboot the Franchise by "changing the name" fooled no one.

65. Given Healey's in-depth, firsthand familiarity with the Franchise, it is no surprise that viewers, as well as reviewers, recognized *Prank Encounters* as nothing more than a "knock off" or "re-boot" of the Franchise.

66. But, from the start, Propagate/Healey's clear intent was to leverage the popularity of the Franchise by producing content (albeit under a different name) that was and is so substantially similar to the Franchise that it had the effect of not only attracting the same *Scare Tactics* audience but also confusing the audience as to the origins of the Reboot. In making the Reboot, Propagate and Healey deliberately damaged the Franchise, thereby depriving not only the Copyright Holder Plaintiffs of the rights and benefits to which they were and are entitled under the Copyright Act

but also Hallock of the rights and benefits to which he was and is entitled under the 2016 Agreement.

67. On information and belief, in furtherance of this intent and strategy, Defendants "went public," to wit:

a. The "host" of *Prank Encounters*, Gaten Matarazzo, stated on national network television that when he was initially approached to "host" *Prank Encounters*, he was told that the intent was to "make a show like *Scare Tactics* that hadn't been on the air in a while"; and,

b. Healey personally posted on social media that, in 2019, he had been "working hard" and was "almost done" with "a show that will thrill fans of #scaretactics"; and

c. Healey also touted that he had created *Scare Tactics* and that "[*Prank Encounters*] takes [*Scare Tactics*] to another level."

(True and correct copies of Healey's comments are attached hereto and incorporated herein by reference as **Exhibit 29**.)

68. Indeed, the public immediately took to social media to deride the Reboot, commenting, as follows:

a. How about "Taking the entire concept of SCARE TACTICS..." ???;

b. "What in the "*Scare Tactics*" (sic) rip off is going on" (dated October 15, 2019);

c. "Basically *Scare Tactics* 2.0";

d. "Sounds like that show scare tactics";

e. "Puts you in the mind of *Scare Tactics* … ";

f. "You should check out *Prank Encounters* .. It's like *Scare Tactics* on steroids," and, in response, "Nah, they basically just stole this exact episode";

g. "This is exactly like *Scare Tactics*";

h. "This is just an off-brand version of *Scare Tactics*";

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

i.  "Their (i.e. *Scare Tactics*) new episodes are under the name *Prank Encounters* on Netflix which recently came out";

j.  "Isn't this called SCARE TACTICS or wait PUNK'D? Where have all the original ideas gone…";

k.  Replying to a comment of a "HUGE fan of *Scare Tactics*, "Said the same thing they even have one of the same scare actor in it";

l.  "*Prank Encounters* reminds me of how awesome show *Scare Tactics* was back in the day"; and

m.  "Scare Tactics vibes. #PrankEncounters."

(Collectively, the above-referenced comments are attached hereto and incorporated herein by reference as **Exhibit 30**).

69.  In addition to the general public, critics provided reportage, as follows:

a.  <u>IMDb</u> wrote: "<u>Very similar</u> to the show "*Scare Tactics*" that was on Sci-Fi, except in that show people were set up by someone they knew and with "*Prank Encounters*" the targets don't know each other (emphasis added);

b.  Jacqueline Gualtieri of <u>Distractify.com</u> wrote: "The [ ] complaint that has come out so far about the [*Prank Encounters*] series is that it sounds *incredibly similar* to *Scare Tactics*, which was on Syfy and Chiller from 2003 to 2013. On *Scare Tactics*, regular people encountered monsters and supernatural creatures in creepy pranks on a hidden camera show, which sounds <u>remarkably similar</u> to *Prank Encounters* (emphasis added);

c.  Andy Denhart of <u>Reality Blurred</u> wrote: "Netflix's attempt to create its own *Scare Tactics* is mostly embarrassing … ".

d.  For <u>Film Daily</u>, Bec Heim wrote: *Scare Tactics* (2003 – 2013) aired on Syfy for five seasons and over 100 episodes. The show, hosted in its last three seasons by Tracy Morgan, sends friends and family ("the

accomplice") of the mark ("the victim") on a one-off job … The basic concept is <u>identical</u> to *Prank Encounters*. The differences: just one victim; family and friends nominate the victim; and each 30-minute episode usually has multiple scenarios. *Prank Encounters* has two victims, no nominations are mentioned, and just one scenario per episode. Either way, both *Scare Tactics* and *Prank Encounters* lure victims with a fake job and intend to scare them."

e. For Netflixlife.com, Courtney Mroch writes in reviewing *Prank Encounters*: "*Prank Encounters* is very similar to [*Scare Tactics*]."

(Collectively, the reportage referenced immediately above are attached hereto and incorporated herein by reference as **Exhibit 31**).

70. In November 2019, Hallock viewed 8 episodes of *Prank Encounters* Season 1 for the first time. Unlike the general viewers who saw *Scare Tactics* and *Prank Encounters* as perhaps "very similar," due to: (a) Hallock's familiarity with the entire *Scare Tactics* portfolio, (b) Hallock's knowledge of Healey's involvement in both *Scare Tactics* and *Prank Encounters*, and (c) the specifics of the 2016 Agreement, Hallock concluded that by producing and releasing *Prank Encounters* as a "reboot" of the Franchise, Healey had not only directly, knowingly and willfully deprived Hallock of the benefits of the 2016 Agreement, but also directly, knowingly and willfully infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

71. *Prank Encounters Season 1 Infringements*: To be precise, the episode "Camp Scarecrow" from Prank Encounters Season 1 infringed on the original Scare Tactics episode "Camp Kill." Similarly, the Prank Encounter episode "Face Fears" infringed on the Scare Tactic episode "My Heart Belongs to Misery aka Dangerous Obsession." Then again, the Prank Encounters episode "End of the Road" infringed on the Scare Tactic episode "Road Kill." Fourth, the Prank Encounter episode "Split Party" from Prank Encounters Season 1 infringed on the Scare Tactics episode "Send in the

Clowns."

72.   On or about September 24, 2020, this Court denied in part Defendants' Motion to Dismiss and Motion to Strike ruling there was substantial similarities to meet the burden to oppose the Defendants motion as to the copyright infringement of four separate episodes of Scare Tactics as listed above, nevertheless, Defendants have infringed on Plaintiffs' copyright protections through the release of additional infringing materials as contained in Prank Encounters Season 2, which premiered on or about April 1, 2021 on Netflix.

73.   *Prank Encounters Season 2 Infringements:* After April 1, 2021, Hallock viewed the episode "Graveyard Shift" from Prank Encounters Season 2, which continues to infringe upon the protections afforded the Scare Tactics, specifically by infringing upon, the episode "Bicentennialien." Additionally, the Defendants created a sequel episode named "Re Face Fears" which appears to further infringe upon the original Scare Tactics episode "My Heart Belongs to Misery aka Dangerous Obsession" and even shows clips from the infringing episode "Face Fears," which was released in Prank Encounters Season 1. In addition to the violations found in Prank Encounters Season 1 and Prank Encounters Season 2, Defendants Healey and Propagate engaged a Propagate Company to produce a show by the name Double Cross with Blake Griffin, which premiered on the comedy cable television show TruTv on March 19, 2021.  Shortly after the release of Double Cross with Blake Griffin in March 2021, Hallock viewed the show and it appeared Defendants were again infringing on the copyright protections afforded Scare Tactics.

74.   *Double Cross with Blake Griffin Infringements:* Specifically, to date, the Double Cross with Blake Griffin episode "Open House" infringed upon the Scare Tactics original work "Fear Antics: Room with a View."

75.   The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that Healey knew or should have known that the Reboot infringed, and continues to infringe, upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics*

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

stories.

76.   Plaintiffs are informed and believe, and thereon allege, that Healey's conduct in creating, developing, producing and releasing the Reboot amounts not only to an effective "taking" by Healey of the very Franchise that he had agreed, contractually, to divest himself of and transfer to Plaintiffs, thereby depriving them of the benefits of their bargain under the 2016 Agreement, but also a taking of the protections imbued to them under the Copyright Act.

77.   The Copyright Holder Plaintiffs are informed and believe, and thereon allege, that by producing the Reboot when it knew or should have known that doing so infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, Propagate, too, directly infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

78.   The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate also contributorily infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, as evidenced by the following:

a.  Propagate supervised and/or had the ability to supervise Healey;

b.  Propagate, as Healey's principal, knew or should have known that the Franchise belonged to the Copyright Holder Plaintiffs;

c.  Propagate knew or should have known that Healey and Hallock had entered into the 2016 Agreement, which resulted in Healey having been divested of all right, title and interest in and to the Franchise;

d.  Propagate knew or should have known that the Reboot infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories;

e.  Propagate facilitated the production of the Reboot by financing it;

f.  Propagate facilitated the release of the Reboot by entering into distribution agreement(s) related thereto; and

///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

g. Propagate knew or should have known that Healey was contractually barred from pursing any *Scare Tactics* creative endeavor after ceding the Franchise to the Copyright Holder Plaintiffs.

79. The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that the foregoing conduct by Propagate caused, allowed, induced and encouraged Healey to infringe upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories and that such contributed in a significant way to Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

80. The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate failed, and continues to fail, to take steps to prevent and/or limit Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.[6]

81. The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that Propagate reaped a direct financial interest as a result of Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

82. The Copyright Holder Plaintiffs are further informed and believe, and thereon allege, that, in addition to reaping pecuniary benefits, Propagate also reaped non-pecuniary benefits from Healey's infringement of the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactic* stories.

83. On information and belief, and as set forth above, *Prank Encounters* started streaming over Netflix in late October 2019 in the United States. However, again on information and belief, Netflix has the capacity to stream in over 190 countries, and has already streamed, or will be streaming, *Prank Encounters* to viewers in a majority

---

[6] In December 2019, Plaintiff's counsel sent Defendants a letter regarding the destruction of electronically stored information and advised them that suit was imminent.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

of these territories.

84.     Through the Reboot, Defendants have produced, reproduced, prepared copies and derivative works based upon, distributed, and publicly displayed the Copyright Holder Plaintiffs' copyrighted works without their consent.  In so doing, Defendants have violated the Copyright Holder Plaintiffs' exclusive rights under 17 U.S.C. §§ 106 and 501.

85.     Through the Reboot, Defendants have deprived the Copyright Holder Plaintiffs of the benefits of full exploitation[7] of the Franchise.

86.     Defendants' infringements have been undertaken knowingly and with intent to financially gain from the Copyright Holder Plaintiffs' protected copyrighted work.

87.     Even though Propagate knew that the Copyright Holder Plaintiffs held exclusive rights in and to the Franchise, including, among other things, the copyrighted works and the format, Propagate nonetheless failed to exercise its right and ability to supervise persons within its control, including but not limited to Healey, so as to prevent the subject infringement, and Propagate did so with intent to further its financial interest.

88.     Accordingly, Defendants have directly, contributorily and vicariously infringed upon the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories.

89.     Because of Defendants' willfulness and recklessness in infringing on the Copyright Holder Plaintiffs' copyrights in specific *Scare Tactics* stories, the Copyright Holder Plaintiffs are entitled to their actual damages as well as Defendants' attributable profits in an amount to be proven at trial.  Further, the Copyright Holder

---

[7] Full exploitation includes global licensing of TV formats, which is a multi-billion dollar business. According to one industry report, "the production volume generated by traded TV formats was €9.3 billion ($10.3 billion USD) for the years 2006-2008, with 445 original formats traded among fourteen countries." Format Recognition & Prot. Ass'n.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

1  Plaintiffs are entitled to all other relief allowed under the Copyright Act.

2       90.     Defendants' infringement has caused, and will continue to cause,

3  irreparable harm to the Copyright Holder Plaintiffs, for which the Copyright Holder

4  Plaintiffs have no adequate remedy at law.  Unless Defendants' conduct is restrained,

5  harm will continue to occur into the future, such that the Copyright Holder Plaintiffs

6  are entitled, upon further application, to issuance of preliminary and permanent

7  injunctive relief.

8  ///

9  ///

10 ///

11 ///

12 ///

13 ///

14 ///

15 ///

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD, STE. 345
LOS ANGELES, CA 90049

SECOND AMENDED COMPLAINT

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand Judgment be entered in their favor jointly and severally against all Defendants, as follows:

    a.  Ordering Defendants to account for all gains, profits and advantages derived from their wrongful acts;

    b.  Ordering all gains, profits and advantages derived from Defendants' wrongful acts be held in constructive trust for the benefit of Plaintiffs;

    c.  Awarding actual damages suffered by Plaintiffs and any profits attributable to Defendants' wrongful acts;

    d.  Awarding Plaintiffs statutory damages;

    e.  Awarding Plaintiffs compensatory, special and non-economic damages;

    f.  Awarding Plaintiffs attorney's fees, interest and costs; and

    g.  Awarding Plaintiffs such other and further relief as the Court deems just and proper under the circumstances.

DATED:  September 30, 2021      BALABAN & SPIELBERGER, LLP

                      By:  /s/ *Andrew J. Spielberger*
                              Daniel K. Balaban
                              Andrew J. Spielberger
                              Kahren Harutyunyan
                              Vanessa L. Loftus-Brewer
                              Attorneys for Plaintiffs,
                              SCOTT W. HALLOCK, an individual et al.

BALABAN & SPIELBERGER LLP
11999 SAN VICENTE BLVD. STE. 345
LOS ANGELES, CA 90049

# EXHIBIT 1

## SETTLEMENT AGREEMENT AND MUTUAL RELEASE

This Settlement Agreement and Mutual Release (the "2016 AGREEMENT") is made and entered into between Scott Hallock ("HALLOCK") and Kevin Healey ("HEALEY") as of January 1, 2016 (the "EFFECTIVE DATE").

A.     WHEREAS, since 2012, HALLOCK and HEALEY (collectively "the PARTIES") have been engaged in a business dispute over certain creative and intellectual properties jointly owned by them or their companies;

B.     WHEREAS, the primary creative and intellectual property at issue in the PARTIES' dispute is the *Scare Tactics* television series and any and all intellectual property of any nature or kind whatsoever related to *Scare Tactics,* including but not limited to all ancillary rights, all remake rights, and any and all exploitation rights pertinent thereto (collectively "SCARE TACTICS");

C.     WHEREAS, during their dispute, HALLOCK and HEALEY engaged in a number of mediations, which resulted in a written Settlement Agreement dated August 18, 2012 (the "2012 AGREEMENT");

D.     WHEREAS, as of the EFFECTIVE DATE, HALLOCK and HEALEY are engaged in an Arbitration captioned *Scott Hallock v. Kevin Healey*, IFTA Arbitration No. 15-09 (the "ARBITRATION"), in which the each of the PARTIES has asserted claims related to their ongoing dispute including SCARE TACTICS claims ("the ARBITRATION CLAIMS");

E.     WHEREAS, as of the EFFECTIVE DATE, HALLOCK and HEALEY are also engaged in civil litigation pending in Ventura County Superior Court wherein HALLOCK is a Plaintiff, HEALEY is a Defendant, HEALEY is a Cross-complainant and HALLOCK is a Cross-Defendant, bearing Case Number 56-2-15-00465398-CU-FR-VTA ("the FRAUDULENT CONVEYANCE ACTION ");

F.     WHEREAS, with the exception of the rights and obligations set forth in the 2012 AGREEMENT and this 2016 AGREEMENT, HALLOCK and HEALEY wish to settle all claims, counterclaims and issues in the ARBITRATION, asserted in the ARBITRATION CLAIMS, and alleged or asserted in the FRAUDULENT CONVEYANCE ACTION, and all past, present and future issues concerning SCARE TACTICS;

G.     WHEREAS, it is the intent of HALLOCK and HEALEY that this, the 2016 AGREEMENT shall be supplemental to but, other than as directly set forth herein, shall not nullify or modify the 2012 AGREEMENT; and,

H.     WHEREAS HEALEY has provided notice to HEALEY's spouse, Cara Healey ("CARA") of this 2016 AGREEMENT and the property transfers contemplated hereunder and has represented to HALLOCK that CARA has consented to and will not challenge this 2016 AGREEMENT.

1

Accordingly, for good and valuable consideration as set forth herein, the parties hereby agree as follows:

## Transfer of WMTI US, WMTI NORTH, TNSCI, SCARE TACTICS and IP

1.      As of the EFFECTIVE DATE, HEALEY shall transfer to HALLOCK or to HALLOCK'S designee, all of HEALEY'S direct and indirect rights and ownership interest of any kind or nature whatsoever in and to WMTI Productions, Inc. ("WMTI US"). As of the EFFECTIVE DATE, HEALEY shall resign all director and officer positions in WMTI US. In connection with the transfer of HEALEY's ownership rights in and to WMTI US, HEALEY agrees to deliver to HALLOCK or to HALLOCK'S designee a standalone assignment of HEALEY'S WMTI US shares ("the HEALEY SHARES") in the form attached hereto as Exhibit A. Concurrently with the execution of this 2016 AGREEMENT, HEALEY shall physically endorse the HEALEY SHARES to HALLOCK or HALLOCK's order and shall deliver said endorsed HEALEY SHARES to HALLOCK. HALLOCK and HEALEY waive any and all restrictions on transfer on the HEALEY SHARES including pursuant to the WMTI US Amended and Restated Shareholders Agreement dated as of January 1, 2012 (the "WMTI US Shareholders Agreement") and agree that the WMTI US Shareholders Agreement shall be terminated in full and shall be of no further force or effect as of the EFFECTIVE DATE,.

2.      HEALEY agrees to transfer to HALLOCK or his designee all of HEALEY's direct and indirect rights and ownership interest of any kind or nature whatsoever in: (a) WMTI Productions North Inc. ("WMTI NORTH"); and (b) The Next Season Company Inc. ("TNSCI"), provided HALLOCK or his designee maintains the Canadian control of WMTI NORTH and TNSCI pursuant to sections 26 to 28 of the *Investment Canada Act* (in accordance with the CPTC Program Guidelines of the Canadian Audio-Visual Certification Office) (collectively "the CANADIAN COMPANIES" and "the CANADIAN COMPANY TRANSFERS" respectively). The CANADIAN COMPANY TRANSFERS, and the resignation by HEALEY of all member, manager, director and officer positions the CANADIAN COMPANIES, shall be contingent upon HALLOCK providing HEALEY with evidence of consent by at least one "resident Canadian" (as defined in the *Business Corporations Act* (Ontario)) to serve as director of each of CANADIAN COMPANIES. For certainty: all such transfers, resignations and other documentation required for these purposes shall be prepared at the sole initiative and cost of HALLOCK.

3.      As of the EFFECTIVE DATE, HEALEY shall assign and transfer to HALLOCK all of his direct and indirect rights and interest of any kind or nature whatsoever in and to SCARE TACTICS. This assignment and transfer includes, but is not limited to, all of HEALEY's direct and indirect interest of any nature or kind whatsoever in SCARE TACTICS, whether held under U.S. law, Canadian law, or the law of any other sovereign or state, including, but not limited to copyrights trademarks, brands, trade names, and other intellectual property of any kind or nature whatsoever relating to SCARE TACTICS (whether registered or unregistered), and any and all direct and indirect rights to use or exploit such copyrights, trademarks, brands, trade names and other intellectual property of any kind or nature whatsoever relating to SCARE TACTICS throughout the world and the universe in all media, whether existing or developed in the future, for perpetuity, all contractual, promotional and

2

merchandising rights, and all other rights that HEALEY or any Healey Entity (as defined in the 2012 AGREEMENT) (each, a "HEALEY ENTITY") has, may have or would have had to receive any income from the use or exploitation of SCARE TACTICS (collectively "the IP RIGHTS"), with the exception of SCARE TACTICS income that HEALEY and all HEALEY ENTITIES have already received as of the EFFECTIVE DATE. For sake of certainty, the SCARE TACTICS and the IP RIGHTS franchise include, without limitation, the television series, the previously developed movie concepts (which concepts are attached the 2012 Agreement as Schedules "K-1" and "K-2") and all forms of ancillary and derivative exploitation relating thereto such as music publishing, the "Scarewear" clothing line, artwork, e-commerce and social networking sites. For further certainty, the transfer of the rights in this AGREEMENT, including SCARE TACTICS and IP RIGHTS, shall not have the effect of a non-competition clause, and does not prevent HEALEY from pursuing other scary, paranormal-themed or hidden camera shows.

4.     For certainty, HEALEY acknowledges that, with the exception of HALLOCK's ownership or entitlement to shares of WMTI US and the IP RIGHTS, the transfers and assignments undertaken pursuant to this 2016 AGREEMENT will result in HALLOCK or his designee receiving 100% of all shares in WMTI US, 100% of all ownership of the CANADIAN COMPANIES, and 100% of all ownership in the IP RIGHTS.

5.     HEALEY hereby represents and warrants to HALLOCK that: (a) he is the sole beneficial and registered owner of the HEALEY SHARES; (b) HEALEY has the full power, authority and right to enter into this 2016 AGREEMENT, to grant the rights granted hereunder to the HEALEY SHARES, all free of any claims, demands, liens and/or encumbrances (subject to the restrictions and contingencies set out in paragraph 2 above in respect of the CANADIAN COMPANIES), and to transfer the legal and beneficial title and ownership of the HEALEY SHARES to HALLOCK or HALLOCK's designee (subject to the restrictions and contingencies set out in paragraph 2 above in respect of the CANADIAN COMPANIES), (c) HEALEY has the power, authority and right to assign and transfer to HALLOCK all of his direct and indirect rights and interest in and to SCARE TACTICS, all free of any claims, demands, liens and/or encumbrances, and to transfer the legal and beneficial title and ownership of SCARE TACTICS to HALLOCK free of any claims, demands, liens or encumbrances, (d) HEALEY is the sole and beneficial registered owner of the CANADIAN ENTITIES, (e) HEALEY has the power, authority and right to deliver ownership of the CANADIAN ENTITIES to HALLOCK or HALLOCK's designee free of any claims, demands, liens and/or encumbrances (subject to the restrictions and contingencies set out in paragraph 2 above), (f) except as disclosed to HALLOCK, HEALEY and/or the HEALEY ENTITIES have neither entered into any agreement (written or oral, implied or express) nor made any promises to any third party in connection with SCARE TACTICS or the IP RIGHTS, (g) that, while HEALEY has had discussions with Tom Daniels regarding SCARE TACTICS, which were disclosed to HALLOCK, HEALEY and/or the HEALEY ENTITIES entered into no agreement with Tom Daniels, and, for certainty, this includes any agreement that HEALEY may have had with Tom Daniels relative to representation of SCARE TACTICS, (h) HEALEY has disclosed to HALLOCK all amounts received either directly or indirectly by HEALEY from the exploitation of SCARE TACTICS or the IP RIGHTS from August 18, 2012 to present, and (i) HEALEY has not in any manner diluted or hypothecated his ownership of, or rights in, either WMTI US, the CANADIAN COMPANIES,

SCARE TACTICS or the IP RIGHTS. HALLOCK acknowledges that he is unaware of any direct or indirect failure by HEALEY with respect to HEALEY's representations and warranties in this paragraph 5.

5a.     HALLOCK represents and warrants that he has disclosed to HEALEY all amounts received either directly or indirectly by HALLOCK from the exploitation of SCARE TACTICS or the IP RIGHTS from August 18, 2012 to present. HEALEY acknowledges that he is unaware of any direct or indirect failure by HALLOCK with respect to HALLOCK's representations and warranties in this paragraph 5a.

5b.     HEALEY further represents and warrants to HALLOCK that he has provided notice to CARA of the transfer of the HEALEY SHARES and other property pursuant to this 2016 AGREEMENT, and that CARA has consented to and will not challenge this 2016 AGREEMENT.

## Credits pertaining to of Future SCARE TACTICS episodes

6.     HALLOCK agrees that, in respect of all future episodes of SCARE TACTICS HALLOCK shall use HALLOCK's best efforts to cause the distributors or broadcasters of such future episodes to afford both HALLOCK and HEALEY a prominent "Created by" credit that may include HEALEY in 2nd position to HALLOCK but otherwise on a "most favored nations" basis with HALLOCK in all respects on screen, in billing blocks, in paid advertising, on packaging and for awards. However, HEALEY acknowledges that any such "credits": are subject to broadcaster and distributor approval; are subject to Guild approval; and, in the future may be subject to negotiation with a number of third-parties who cannot be identified at this time. Further, to the extent that HALLOCK develops future "Scare Tactics" content that was not "created by" HEALEY, a "Created by" credit may be neither appropriate nor otherwise available to HEALEY. In recognition of the above limitations on "credits," absent a "created by" credit, HALLOCK will use best efforts to secure credit for HEALEY stating substantially "Based On The Series Created By HALLOCK and HEALEY", with HEALEY in 2nd position to HALLOCK but otherwise on a "most favored nation" as set forth above. Any casual or inadvertent failure to comply with the provision of this paragraph shall not constitute a breach of this 2016 AGREEMENT, nor shall such a failure entitle HEALEY to any relief at law or in equity. Upon notice from HEALEY of a failure to comply with the provisions of this paragraph, HALLOCK shall use best efforts to prospectively cure any failure to accord credit hereunder.

## Dismissal of ARBITRATION

7.     HALLOCK and HEALEY shall, upon execution of this 2016 AGREEMENT by all parties, dismiss the ARBITRATION, with each party to bear its own costs and fees in connection therewith.

## Dismissal of FRAUDULENT CONVEYANCE ACTION

8.     HALLOCK shall, upon execution of this 2016 AGREEMENT dismiss HEALEY as a defendant in the FRAUDULENT CONVEYANCE ACTION. HEALEY shall likewise

4

dismiss HALLOCK as a cross-defendant in the FRAUDULENT CONVEYANCE ACTION. Such dismissals shall be with prejudice, with both HALLOCK and HEALEY to bear their own costs and fees in connection with the FRAUDULENT CONVEYANCE ACTION.

## **Mutual Releases**

9.      In consideration of the recitals, covenants and agreements set forth in this 2016 AGREEMENT, and other good and valuable consideration receipt of which is hereby acknowledged, as of the EFFECTIVE DATE, and excepting the duties, obligations, representations and warranties set forth in this, the 2016 AGREEMENT and any remaining duties owed under the 2012 AGREEMENT, HALLOCK, on behalf of himself, the HH Entities (as defined in the 2012 AGREEMENT) (each, a "HH ENTITY"), and all other persons, corporations and entities acting on his behalf, hereby releases and discharges HEALEY, all HEALEY ENTITIES and all of his and their agents, attorneys, accountants, advisors, current or former spouses, partners and employees from every and all manner of claim, action, cause of action, debt, due or demand, both in law and equity, related in any way to: (1) WMTI US; (2) WMTI NORTH; (3) TNSCI; (4) SCARE TACTICS; (5) RIVE GAUCHE; (6) 2241156 Ontario, Inc., including any and all claims in the ARBITRATION and the FRAUDULENT CONVEYANCE ACTION ("the HALLOCK RELEASED ITEMS"). It is the specific intent and purpose of this instrument to forever release and discharge any and all claims and causes of action of any kind or nature whatsoever related to any of the HALLOCK RELEASED ITEMS, whether known or unknown, whether specifically mentioned or not, which HALLOCK has now or ever had against HEALEY or any HEALEY ENTITY. HALLOCK acknowledges that, by virtue of this release, he is not a creditor of HEALEY in any manner and is owed no money by HEALEY. For clarity, this release and the HALLOCK RELEASED ITEMS do not include a release by HALLOCK of the FRAUDULENT CONVEYANCE ACTION against CARA.

10.     HALLOCK hereby acknowledges that he may later discover facts different from or in addition to those now known or believed to be true, and expressly agrees that this 2016 AGREEMENT and the release of the HALLOCK RELEASED ITEMS shall remain in full force and effect notwithstanding the discovery or existence of any such different or additional facts. HALLOCK hereby acknowledges that HALLOCK is aware of Section 1542 of the California Civil Code, which states:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HALLOCK hereby waives any and all rights which HALLOCK now has or may have by virtue of Section 1542 of the California Civil Code in connection with the claims released herein.

11.     In consideration of the receipt of 100% of HEALEY's interest in WMTI US and SCARE TACTICS, the transfer of 100% of HEALEY's direct or indirect interest in the CANADIAN ENTITIES, HALLOCK acknowledges and agrees that, as between HALLOCK

5

and HEALEY, HALLOCK is solely responsible for all future actions, decisions and agreements related to WMTI US, the CANADIAN ENTITIES and SCARE TACTICS that HALLOCK makes or takes after the EFFECTIVE DATE, including sole responsibility for any and all claims, debts or liability, including tax liability, that arise from any actions, decisions or agreements made or taken by HALLOCK or his designees related to WMTI US, the CANADIAN ENTITIES or SCARE TACTICS after the EFFECTIVE DATE.

12.     In consideration of the recitals, covenants and agreements set forth in this 2016 AGREEMENT, and other good and valuable consideration receipt of which is hereby acknowledged, as of the EFFECTIVE DATE, and excepting the duties and obligations set forth in this, the 2016 AGREEMENT and any remaining duties owed under the 2012 AGREEMENT, HEALEY, on behalf of himself, all the Healey Entities (as defined in the 2012 AGREEMENT) (each, a "HEALEY ENTITY"), and all other persons, corporations and entities acting on his behalf, hereby releases and discharges HALLOCK, all HALLOCK ENTITIES and all of his and their agents, attorneys, accountants, advisors, current or former spouses, partners and employees from every and all manner of claim, action, cause of action, debt, due or demand, both in law and equity, related in any way to, or arising out of, the ARBITRATION, the FRAUDULENT CONVEYANCE ACTION and any claims the claims asserted therein, (the "HEALEY RELEASED ITEMS"). It is the specific intent and purpose of this instrument to forever release and discharge any and all claims and causes of action of any kind or nature whatsoever related to any of the HEALEY RELEASED ITEMS, whether known or unknown, whether specifically mentioned or not, which HEALEY has now or ever had against HALLOCK or any HALLOCK ENTITY. For clarity, this release and the HEALEY RELEASED ITEMS do not include a release by CARA of any of her claims against HALLOCK.

13.     HEALEY hereby acknowledges that he may later discover facts different from or in addition to those now known or believed to be true, and expressly agrees that this 2016 AGREEMENT and the releases of the HEALEY RELEASED ITEMS herein shall remain in full force and effect notwithstanding the discovery or existence of any such different or additional facts. HEALEY hereby acknowledges that he is aware of Section 1542 of the California Civil Code, which states:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER MUST HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR.

HEALEY hereby waives any and all rights which he now has or may have by virtue of Section 1542 of the California Civil Code in connection with the claims released herein.

## Indemnity

14.     HALLOCK, for himself and on behalf of the HALLOCK ENTITIES, hereby agrees to jointly and severally defend, indemnify and save harmless HEALEY and all HEALEY ENTITIES from and against all third party claims, actions, causes of action, demands, suits,

proceedings or any other form of remedy or relief of whatsoever nature, character or kind, liabilities, contingent or otherwise, dues, debts, sums of money and accounts of whatsoever nature, character or kind, all damages, fines, penalties, deficiencies, losses, liabilities, costs, fees and expenses (including interest, court costs and reasonable fees and expenses of outside attorneys, accountants and other experts and professionals) incurred by HEALEY directly or indirectly arising out of or resulting from any actions, decisions or agreements made or taken by HALLOCK or his designees related to WMTI US, the CANADIAN ENTITIES or SCARE TACTICS after the EFFECTIVE DATE, or from any material breach of any term of this 2016 AGREEMENT by HALLOCK or the HALLOCK ENTITIES. This indemnity does not cover any actions, statements or omissions by HEALEY after the EFFECTIVE DATE.

15.    HEALEY for himself and on behalf of the HEALEY ENTITIES, hereby agrees to jointly and severally defend, indemnify and save harmless HALLOCK and all HALLOCK ENTITIES from and against all third party claims, actions, causes of action, demands, suits, proceedings or any other form of remedy or relief of whatsoever nature, character or kind, liabilities, contingent or otherwise, dues, debts, sums of money and accounts of whatsoever nature, character or kind, all damages, fines, penalties, deficiencies, losses, liabilities, costs, fees and expenses (including interest, court costs and reasonable fees and expenses of outside attorneys, accountants and other experts and professionals) (collectively, "CLAIMS") incurred by HALLOCK directly or indirectly arising out of or resulting from any material breach of any term of this 2016 AGREEMENT, including without limitation, a breach of any representation, warranty, covenant and/or undertaking set forth herein by HEALEY and/or the HEALEY ENTITIES. Further, HEALEY and the HEALEY ENTITIES hereby agree to jointly and severally defend, indemnify and save harmless HALLOCK and all HALLOCK ENTITIES from and against any CLAIMS by CARA or her designees or agents in respect of any legal interest in the HEALEY SHARES or that attempt to, or do, interfere with any of the representations or covenants by HEALEY herein.

## Miscellaneous

16.    This 2016 AGREEMENT is intended to, and does, supersede and replace, in their entirety, all paragraphs and provisions in the 2012 AGREEMENT which address ownership or control of WMTI US or the SCARE TACTICS franchise, including paragraphs 2, 10 and 11, which paragraphs shall no longer have any effect. This 2016 AGREEMENT is also intended to, and does, supersede and replace, in its entirety, paragraph 12 of the 2012 AGREEMENT (concerning 2241156 Ontario Inc.), which paragraph shall no longer have any effect. The paragraphs and provisions of the 2012 AGREEMENT which do not address or affect: (1) ownership or control of WMTI US, WMTI NORTH or TNSCI; (2) SCARE TACTICS; or (3) 2241156 Ontario Inc. are unaffected by this 2016 AGREEMENT and remain in full force and effect.

17.    This 2016 AGREEMENT constitutes the entire agreement between the parties related to transfer/assignment of the WMTI US shares, transfer/assignment of the CANADIAN COMPANIES, transfer/assignment of SCARE TACTICS and transfer/assignment of the IP RIGHTS, and supersedes all prior or contemporaneous negotiations, representations, understandings or agreements concerning SCARE TACTICS, whether oral or written, including

all provisions in the 2012 AGREEMENT that concern SCARE TACTICS. No supplement, modification, waiver, or termination or nullification of this 2016 AGREEMENT shall be binding or enforceable unless executed in writing by the parties.

18.     This AGREEMENT shall be governed by and interpreted in accordance with the laws of the State of California, except to the extent that the laws of the country of Canada may impact upon and control the CANADIAN COMPANIES and any of the IP RIGHTS that are subject to Canadian jurisdiction or legal process.

19.     In the event of any litigation arising from any alleged breach of this Agreement, the substantially prevailing party shall be entitled to recover from the non-prevailing party all reasonable costs incurred including court costs and attorneys' fees, and all other related expenses incurred in such litigation.

20.     Each of the parties agrees that it shall at all times, acting reasonably and in good faith, and on a timely basis, negotiate, prepare, execute, acknowledge and deliver all such acts, deeds and agreements as may be reasonably necessary or desirable to give effect to the terms and provisions of this Agreement.

21.     In entering into this AGREEMENT, the parties represent that they have each relied on the advice of their respective attorneys, and that they had equal ability and opportunity to participate in the negotiation and drafting of this Agreement, such that if a court finds any ambiguities herein they shall not be construed against either party.

22.     This AGREEMENT may be executed in one or more counterparts, which together shall constitute one Agreement upon the receipt by both parties of all signed counterparts. Scanned or faxed signature pages shall have the same effect as original signature pages.

          IN WITNESS WHEREOF, the parties have caused this document to be executed and as of the dates set forth below:

**SCOTT HALLOCK**

Date: 3/21/2016

**KEVIN HEALEY**

Date: 3/22/2016

067868/431459-52630812.1

8

**WMTI PRODUCTIONS, INC.,**
**a California corporation**

### STOCK ASSIGNMENT SEPARATE FROM CERTIFICATE

**FOR VALUE RECEIVED,** the undersigned hereby assigns and transfers to Scott W. Hallock and Nicole L.C. Hallock, as Co-Trustees of the Hallock Family Trust dated May 15, 2006, One Hundred (100) shares of issued and outstanding common stock of WMTI PRODUCTIONS, INC., a California corporation, standing in the name of Kevin Healey (and, in any event, all of the shares he owns) on the books of said Corporation and does hereby irrevocably constitute and appoint Scott Hallock, President, to transfer the said stock on the books of the within named Corporation with full power of substitution.

KEVIN HEALEY
Dated: March 2 1          , 2016

# EXHIBIT 2



**Howard Owens**

1 of 1 results for "howard"                                                                 Close

**Howard Owens**
442 people like this including Chachi Senior and 8 friends
Producer

5/11/16, 4:27 PM

HT - How do I get a hold of you these days?  Is this still your cell?  818-919-9427  Lots happening to fill you in on.  I am the exclusive owner of the Scare Tactics franchise now - including 116 episodes and worldwide format/media rights.

5/12/16, 6:14 PM

Hey, congratulations! Here's my work email:
==Howard==@propagatecontent.com

Thanks, pal.  Just sent you an email from my company address: scott@likeminedid.com

**Howard Owens**

OPTIONS

Search in Conversation

MESSENGER LINK

m.me/1611823199140414

PRIVACY & SUPPORT

# EXHIBIT 3

Lodged Video

# EXHIBIT 4

**TITLE:** ROAD KILL

**SEGMENT #:** 4017

**GENRE:** CREATURE

**SUMMARY**:  The MARK is helping out the city road department on a road kill detail. But when he comes face to face with howling half man/half beast, will he think he's about to be road kill?

- The MARK is helping out the city road department on a road kill detail.  Together with a supervisor, he will be finding, bagging and documenting what type of animals they find and where they find them.

- The supervisor explains the reason for this added detail is that the amount of road kill is on the rise.  "We're not sure why.  More and more cars are veering off the road in this area, and therefore more and more woodland creatures are suffering the ultimate fate."

- At the first trouble spot, the MARK locates a small animal.  It has the telltale tire marks.  The critter is bagged and documented.

- They move further down the road when a car speeds up from behind them.  The driver gets out.  "Hey, I hit something back there.  Watch out.  It was huge!"  The driver then shows the smudge on his bumper.  It's got a small bit of blood and fur.  The supervisor asks the MARK to interview the man about what happened, what type of animal, etc.

- The driver rants about something with fur that leapt out from the darkness.  "I hit it, but it didn't even flinch.  It kept in running across the road into the woods."

- After his interview, the driver continues on his way, and the MARK and supervisor move further up the road on foot.  Howls are heard in the distance. The supervisor is curious, but shakes it off.  They find a few more road kills, and get back into their van.

- They drive up the dark, desolate country road in the same direction at the man who stopped to show him the damage to his bumper.   They hear a more howls.

- As they round the corner the see some smoke.  The car belonging to the man who stopped is now in a ditch and the driver's side door is missing.  The supervisor stops the van.  He and the MARK get out to inspect.  The door is missing and the driver's side seat has massive claw marks.  There is also a red liquid substance on the seat and floor mats.

- The supervisor walkies headquarters for assistance.  Just then, the man stumbles out of the woods.  His clothes are tattered.  His face clawed.  "Help.  Help me."

© 2010 WMTI PRODUCTIONS NORTH, INC.

- The driver and MARK approach.  They ask him what happened.  "I don't know.  That, that thing attacked me.  So big, so strong."  We hear another howl.

- The supervisor says, "Get him in the back of the van.  We've got to get him some help."  They load him in and take their seats.

- But, the man is becoming more and more agitated. "It burns, it burns." he scratches at his flesh.  "What is happening to me?"

- Just then a loud bang on the roof of the van.   Then, a howl.  Then, a furry beast shatters the driver's side window with his clawed hand.  The driver is grabbed and he screams.

- The man in the back of the van shouts.  "I'm so scared!  Are you scared?  You shouldn't be.  You're on Scare Tactics!"

© 2010 WMTI PRODUCTIONS NORTH, INC.

# EXHIBIT 5

Lodged Video

# EXHIBIT 6

Lodged Video

# EXHIBIT 7

**REVISED A/O 7-8-03**

ST: 1124
TITLE: "MY HEART BELONGS TO MISERY"

**GENRE:** HORROR/THRILLER/PARODY

**SUMMARY:** MARK is hired to take care of a bed-ridden woman. When left alone the MARK finds out that the sick woman is being held against her will by a crazed man. When the crazed man finds the MARK assisting in the woman's escape it looks as if there's no way out.

**EXECUTION:**

- A caretaker (ACTOR) hires a MARK to help care for his bed-ridden wife (ACTOR). The caretaker explains that she had an accident right after they were married and had some head trauma because of that. He explains that because of the trauma, she's now mentally ill. The MARK hears of how she gets a little crazy sometimes as well as having wonderful moments of lucidity as well as moments where it's like nothing ever happened and they are a happy married couple (He really gets into his description of marital bliss).

- The caretaker takes the MARK into his wife's room and gives her the medication that should keep her calm for the duration of his outing. He bends over and kisses his sleeping wife on the forehead for a very long time.

- The caretaker leaves. Once the coast is clear the bed-ridden woman sits up quickly and spits out the medication. She starts out by cussing out the caretaker, who's gone, "That sick motherfucker!" She asks the MARK – "What did he tell you?"

- She tells the MARK that she was a showgirl from *NUDES ON FIRE* and this crazy guy asked her out on a date and she turned him down. She tells a story of a stalker who crossed the line ending with her waking up here about a month ago. She tells the MARK that the caretaker is the crazy stalker. She has him open a closet that is set up as a wicked shrine to the sick love he has for her.

- She tells the MARK to lift her covers if he doesn't believe her. She tells the MARK that she wants to prove it to him. Under the covers she's shackled to the bed. She directs the MARK to go look for a large ring of keys in the front room. Check all the drawers and everything, this is the first opportunity she's had to escape.

- When the MARK walks back into the room, the door slams behind him. It is the caretaker. He rushes over and gives the woman a shot in her IV. She cusses him out until she falls asleep. The caretaker notices that the closet has been opened and that means that the MARK was looking at his shrine.

- The caretaker turns to the MARK –"What did my wife tell you?"  After the MARK explains the caretaker tells the MARK that he's seen way too much.

**REVEAL:**

- The caretaker tells the MARK that he'll take care of him too.  He'll have a bed just for him where he can be safe, safe from evil.  "Safe from ever being scared again.  Would you like to never be scared again?"  The woman jumps up in her bed – "You're on Scare Tactics!"

# EXHIBIT 8

Lodged Video

# EXHIBIT 9

Lodged Video

# EXHIBIT 10

Lodged Video

EXHIBIT 11

1

**\*\*REVISED A/O 2/25/03\*\***

**TITLE:** "CAMP KILL"

**GENRE:** HORROR/THRILLER/STARTLE

**SUMMARY:** Out in the middle of nowhere, camp counselors-in-training are terrorized by a masked, homicidal maniac.

**EXECUTION:**

- Two young women (MARK & ACCOMPLICE) drive out to a remote campground for a summer camp counselor orientation.  In one of the cabins, they meet the lead counselor (ACTOR), the assistant lead counselor (ACTRESS), and a couple other counselors-in-training (2 ACTRESSES).

- The lead counselor addresses the MARK & the rest, announcing that he's excited for this year's camp since the camp had to be closed for the previous summer.  He alludes to the fact that there was some "trouble" last year, but is hushed by the assistant and told by her not too exaggerate.

- The lead counselor leaves the MARK & other CIT's in the care of the assistant lead counselor.  He exits to get some orientation material from the camp office, taking a flashlight & walkie-talkie with him.

- Some strange noises are heard outside the cabin, alarming a few of the girls.  The assistant assures them that the lead counselor is probably just goofing on them and the best thing to do is ignore him.

- The lead counselor radios in and admonishes the assistant for leaving the office door wide open.  She didn't realize she had done so and also chides the lead counselor for trying to freak them out.  He doesn't know what she's talking about.

- A shadow passes by one of the cabin windows.  Some more strange scratchings and noises.  Time passes and the lead counselor radios in again.  "Very funny" he tells the girls.  "Which one of you is out here trying to scare me."  Now it is the girls who don't know what he's talking about.

- The MARK & the others peer out the cabin window but see nothing.  Suddenly, they hear the lead counselor on the radio.  He is running and yelling for them to lock the door.  A scuffle is heard.  A scream.  The radio goes dead.  (We will view this in B-ROLL, shot with night vision cameras.)

- The counselors are getting very frightened now.  A flashlight beam passes across the window.  It must be the lead counselor!  The assistant opens the door and is

startled when the bloody, lifeless body of the lead counselor collapses into the
cabin, a knife sticking out of his back.  She slams the door shut and re-locks it.

- The assistant radios the local ranger station and reports the danger.  The voice on
the other end of the radio assures them all to remain calm and that help is on the
way.  All is quiet for few moments.

- Without warning, a large masked man (ACTOR) brandishing a bloody knife
appears in the window, startling them all.  His hand busts through the wall and
grabs the assistant.  She manages to get free.  The killer disappears from view.

- The killer tries opening the locked door, then begins pounding violently on it to
be let in.

**REVEAL:**

- The terrified assistant lead counselor asks the MARK if she is scared.  Trust me,
she is.  She's on "Scare Tactics."

# EXHIBIT 12

Lodged Video

# EXHIBIT 13

Lodged Video

# EXHIBIT 14

**TITLE:** "SEND IN THE CLOWNS"

**SEGMENT #:**

**GENRE:** HORROR/KILLER

**SUMMARY:** The MARK thinks he's performing at a 5 year old's birthday, but when he gets into his clown suit, he discovers that the father of the house has no children, and that he's not the only one who has fallen into the psycho's clown trap. Now the MARK has to perform his way out, or be trapped inside the DADDY's childish birthday fantasy…forever!

**EXECUTION:**

- The MARK arrives with the ACCOMPLICE at a home in the country. He has been hired to help out with a children's birthday party.

- He goes to the front door, and is greeted by the FATHER of the house. He says that's it's his daughter's 5 year old birthday, and he's trying to make it extra special since her mother passed away in the last year. He tells the MARK that he needs him to help serve drinks and cake, but also get dressed up in a clown costume for the kids and do a little performance for them.

- He leads the MARK into the living room to change. Outside you can hear sounds of kids laughing and playing. He gives the MARK the clown suit and says he'll be back in a couple minutes with the kids for the show.  He takes the ACCOMPLICE with him to find another costume that he can wear for the party.

- The MARK puts on the clown suit. After they have it on, they hear a sound from the closet in the room. A door opens and out falls an emaciated woman in similar clown suit, that is now torn and filthy. She tells him that she's been trapped here for months, and that the FATHER is crazy, thinking that everyday is his daughter's birthday.

- He asks the MARK to help, but as he does, the FATHER comes into the room, dressed in a pink dress and blond wig. He drags in a large box on wheels.

© 2011 The Next Season Company INC.

- He is holding a tape recorder of the sounds of laughing children, and he stops the tape, making an eerie silence in the room.  He also has a large knife.  "I have a knife to cut the cake. Yay!"

- He tells the MARK that his daddy promised him that there would be a show for his birthday. He tells him if she show is good, the clown gets to go home. If it's bad, he has to stay here and practice.

- The KIDNAPPED CLOWN warns the MARK to do a good show, because she tried and failed many times. He is her only hope to get out of there.

- The FATHER sits down on the ground and begins clapping his hands, screaming like an excited child for the show to begin.

- The MARK is told to perform an improvised clown act.

- The FATHER gives the MARK some bean bags and asks him to juggle. When he fails he boos and cries. He asks the MARK to make balloon animals and gives him some balloons.

- The KIDNAPPED CLOWN warns him not to make worms or snakes, do something really big with the balloons. The MARK tries and fails.

- The FATHER throws a tantrum and screams.  "I hate my party!  And this other stupid clown won't wake up!"  The FATHER opens the BOX he wheeled in and out spills the ACCOMPLICE, unconscious in clown makeup.


**REVEAL:**

If you can't make me happy, there's only one thing I can do!  I'm going to have to put you on SCARE TACTICS!

© 2011 The Next Season Company INC.

# EXHIBIT 15

Lodged Video

# EXHIBIT 16

Lodged Video

EXHIBIT 17

**TITLE:** BICENTENNIALIEN

**SEGMENT #:**

**GENRE:** UFO/TRUTHISODES

**SUMMARY:**  In 1812 an alien crash-landed in a small farming town, was cared for and later buried by the townspeople.  Now, 200 years later, can the MARK dig it up and prove UFOs are real - before he's stopped by local hillbilly-alien hybrids?!

- The MARK arrives near a small-town graveyard and meets the TRUTHISODES crew - a UFOLOGIST and a CAMERAMAN. The UFOLOGIST is very excited.

- The UFOLOGIST tells the MARK about a local legend: 200 years ago a strange "airship" crash-landed.  A small being survived.   It lived among the townspeople but died a few weeks later.  They buried it in this graveyard.  The UFOLOGIST feels this could finally be the smoking gun – actual proof that aliens exist!

- The UFOLOGIST has learned that after several attempts by other UFO enthusiasts to locate the alleged alien grave, it is being moved to another location.  And it's happening tonight!

- The UFOLOGIST, the CAMERAMAN and the MARK grab what they need out of the van; film gear; a metal detector and several shovels.  They march through the graveyard at a brisk pace until they come within thirty feet of a large plot that has been dug up.  The UFOLOGIST spots two HILLBILLIES – workers in overalls - who are busy digging.  He pulls the MARK and the CAMERAMAN behind a large tombstone to hide.

- The UFOLOGIST whispers, "We can't let them see us.  We'll never get another chance!"  They hide and watch as these HILLBILLIES haul earth out of the ground.  They work hard, but after a few minutes they take a break, put down their shovels and walk away.

- The UFOLOGIST is thrilled, "Now's our chance!"  They grab their gear and under cover of darkness, head to the open grave.  The MARK uses the metal detector and gets a strong hit.  The UFOLOGIST shouts, "It's here!"

- They begin to dig.  A few inches under the dirt, they strike something, hard.  They brush away the dirt to reveal a simple wooden coffin.  There are strange hieroglyphics etched in to the lid.  The UFOLOGIST is shaking with excitement.  He's crazed.  He looks at the MARK, wild-eyed, "Finally…the truth!"

- Using a crowbar they open the coffin.  Inside the rotten box, among some scraps of a strange silver fabric are indeed THE BONES OF AN ALIEN BEING!  (Including the most telling evidence of all - an oversized alien skull!)

- The UFOLOGIST lays the bones out on the ground and has the CAMERAMAN film them.  But no sooner has the CAMERAMAN turned on his light, they hear someone yell: "Hey!"  The UFOLOGIST quickly wraps up the bones and stashes them inside a bag, which he then gives to the MARK to hold!

- Moments later, the two HILLBILLIES return, carrying some half-eaten sandwiches and a thermos.  When they see the TRUTHISODES crew and the open coffin on the ground, they become enraged.  Up close we can see that these are no ordinary hillbillies.  They have strange flat noses, and their eyes are almost…otherworldly.

- They shout, "What have you done?  Give it back!"  The UFOLOGIST denies it.  He says there was nothing in the coffin.  The WORKERS don't believe him.  They say, "You can conceal the remains from us, but not from Zeke."

- The WORKER calls out, "Zeke! Git over here, now."  Another very large hillbilly walks out of the darkness.  He looks as though he is almost lobotomized.  He moves slowly, and doesn't speak.  He has a red-checkered hat pulled down over his head.  As he steps into the light he removes the hat and we see that he is an alien-hybrid!  Even more so than the others ZEKE has pale skin, a very flat nose with the nostrils on top and very large, dark, almond-shaped eyes.

- The WORKER says, "Zeke.  Find it!" ZEKE uses some kind of mental power to 'scan' the TRUTHISODES crew.  It causes the UFOLOGIST, then the CAMERAMAN to drop to their knees with throbbing headaches.  The

UFOLOGIST screams: "He's in my HEAD!"

- ZEKE is about to give the MARK a headache too but suddenly stops and points at the MARK's bag.  The WORKER tells the MARK to hand it over.  Then the WORKER says, "ZEKE… attack!"

- ZEKE starts to laugh and snort like a deranged hyena.  It's almost like a scene out of *Deliverance*.   Zeke grabs the CAMERAMAN by the throat, lifts him in the air, and drops him to the ground, dead.  Red goo leaks out his ear.  ZEKE holds his hand up again and the UFOLOGIST's chest and his heart EXPLODES!  The UFOLOGIST drops to the ground, dead.

- Now the MARK is all alone.  The WORKER says, "You made a big mistake coming here.  No one can know our secret."  ZEKE points to the freshly dug grave.

- The WORKER tells the MARK. "We need to bury our secret.  Get in the hole."

**REVEAL:**

Oh, and we have another secret too!  And this one is about you.  You're on Scare Tactics."

# EXHIBIT 18

<u>SCARE TACTICS – EPISODE #504</u>
<u>Tracy INTRO – "BICENTENNIALIEN" – ITEM #1</u>
(Tracy)

<u>INT. SET</u>

                    TRACY

          What's up, people?  It's time for

          another episode of Scare Tactics – –

          The only place where you can hide a

          camera, make a girl scream and NOT get

          arrested. (PAUSE) Put your hands

          together and welcome Rachel.

VTPB: IMAGE OF RACQUEL

                    TRACY (CONT'D)

          Rachel's best friend Karen thinks

          she's "out there," so she put her in

          touch with our alien hunter.

VTPB: ACCOMPLICE INTERVIEW

                    ACCOMPLICE

          One point for Karen, zero for Raquel.

                    TRACY

          Rachel's about to trespass on the

          sacred land of a secret society in

          search of 200 year old alien bones.

          Obviously, we're out of ideas 'cause I

          just don't see how this can go bad...

VTPB: BICENTENNIALIEN

                                        9/29/11

2.

<u>SCARE TACTICS – EPISODE #504</u>
<u>Tracy TEASE – "BOMBING THE AUDITION" – ITEM #2</u>
                                        (Tracy)

                RACQUEL

     Tracy Morgan, you bad man.

<u>INT. SET</u>

                TRACY

     Rachel!  I'm not a bad man.  If I

     were, I would have had that alien

     hybrid blast you, too.  'Cuz he

     listens to me.

     Coming up... (BEAT) What's worse than

     bombing your audition?  (PAUSE)

VTPB: BOMBING THE AUDITION

                TRACY (CONT'D)

     Bombing the judges!

                                        <u>FADE OUT:</u>

                                        9/29/11

# EXHIBIT 19

Lodged Video

# EXHIBIT 20

Lodged Video

# EXHIBIT 21

**\*\*REVISED A/O 3-8-04\*\***                                        **1st REVISION**

**TITLE:** "FEAR ANTICS: ROOM WITH A VIEW"

**ST#:**   2004

**GENRE:** HORROR/THRILLER

**SUMMARY:** The MARK comes to a house to be the star of a new hidden camera show, Fear
Antics.  But the tables are turned when he is to blame when a worker falls out a second story
window.

**EXECUTION:**

- The MARK is invited over to a house to be the star of a brand new hidden camera show,
  FEAR ANTICS.  The MARK will pose as the homeowner.

- The host (TRAVIS) tells the MARK that they are going to be playing a trick on these
  two carpenters (ACTORS) that he knows.  These guys are known for overcharging their
  customers, so it is time they get theirs.

- Travis takes the MARK to a room on the 2nd floor where he has a fake body hidden in
  the closet.  He tells the MARK to be overly protective of the closet. "I just need the
  room fixed so don't go in the closets."  When the carpenters do open the door to the
  closet to get to what they need to fix, they are shocked by the dead body. The MARK is
  going to run in with a fake knife and war paint on.

- The carpenters arrive and Travis hides.  The MARK takes them to the room, and tells
  them not to go into the closet for any reason.  The MARK leaves the room to get ready.

- The carpenters open the closet door to reveal the body.  Travis cues the MARK to enter
  the room.  The MARK runs in with the fake knife and war paint, yelling and screaming
  like a mania.  One of the carpenters gets scared and quickly backs up.  The Carpenter
  backs right through the 2nd floor screen-window and falls out.

- The other carpenter grabs his hammer and tells the MARK to put the knife down or he's
  in for a fight.  The MARK tries to tell the carpenter that it was a joke. The carpenter
  looks out the window and doesn't like what he sees.  The bloody body of the other
  carpenter is sprawled out on the ground.

- The carpenter persuades the MARK to follow him outside to check up on his buddy.
  "You better hope he's okay or your going away for a long time."  The carpenter checks
  on his friend.  Uh oh, no pulse.  The carpenter is upset to no ends with the MARK.  He
  asks the MARK if his buddy being dead is a joke.

**REVEAL:**
- The carpenter hits a peak of rage and decides to take care of this right here and right now
  by placing the MARK on SCARE TACTICS

# EXHIBIT 22

SCARE TACTICS - EPISODE #211
STEPHEN TEASE - "FA: ROOM WITH A VIEW" - ITEM #7
(STEPHEN)

INT-VIRTUAL SET

                    STEPHEN
     Way to keep it cool Alex, and not rat
     out the family. Criminals need to
     stick together, you know with those
     speeding tickets and all.

                    STEPHEN (CONT'D)
     Coming up(BEAT)... an aspiring actor
     gives someone else their big break.

VTPB: FA: ROOM WITH A VIEW


                                        CUT TO:

8.

INT. VIRTUAL SET

ANGLE ON: STEPHEN

                    STEPHEN

It's time for another installment of
Fear Antics. The show where we hire an
actor, and that actor becomes the
victim. That's right, we turn the
tables on them, all for your
amusement.

VTPB: IMAGE OF ADAM

                    STEPHEN (CONT'D)

Brad thought his buddy Adam would be
perfect for the role of a crazed
Colombian bodyguard with a flare for
interior decorating.

VTPB: ACCOMPLICE INTERVIEW

                    STEPHEN (CONT'D)

Sit back and enjoy as Adam goes from
shocker to shock-ee!

VTPB: FA: ROOM WITH A VIEW

                              CUT TO:

First Revision 5/10/21

9.

<u>SCARE TACTICS – EPISODE #211</u>
<u>STEPHEN TAG/GOODNIGHT – ITEM #9</u>
(STEPHEN)

<u>INT. VIRTUAL SET</u>

                        STEPHEN

        Well Adam, you're no actor. Bad news

        for you, more work for me. Well,

        that's all for now, but remember.


VTPB: CLOSING CLIP PACKAGE

                        STEPHEN (CONT'D)

        Don't freak out...(BEAT)it's only

        SCARE TACTICS.

<u>FADE OUT.</u>

                                                First Revision 5/10/21

# EXHIBIT 23

Lodged Video

# EXHIBIT 24

Lodged Video

# EXHIBIT 25

**TITLE**: Wood You Chip Up This Body?          REVISION #1 A/O 3/10/08

ST# 3023

**GENRE**: Horror

**SUMMARY**: A MARK is hired to work at a mulching company, throwing dead trees into the wood chipper. Unfortunately, they discover that trees aren't the only dead things the orchard owner wants chipped up.

**EXECUTION**:

- The MARK arrives at the worksite and is greeted by the Owner (ACTOR). The orchard owner introduces the MARK to the Boss (ACTOR) and another worker (ACTOR) who will be assisting the MARK in throwing piles of dead trees into a wood chipper. He tells them to get to work in the back barn, the main chipper isn't working right now.. He has some other things to do and will check in on them later. The boss asks the owner where his partner is at today. The owner angrily replies to mind his own business, and stomps off. Wow what an A Hole.

- The chipper exists inside a barn, and the refuse chute is outside the barn. The Boss tells the MARK and the worker that the owner doesn't know what he is talking about. The chipper works fine, you just have to know how to work it. They will do the back barn later, the main chipper is were all the woods at.

- The other worker and the MARK begin to work on chipping up the pile of wood. The worker asks the MARK if they have every worked here before? The worker tells the MARK that they came on the wrong day. They have to work with the owner that is a real jerk. Bob, the other guy that owns this place, is pretty cool.

- They turn the machine on to start chipping wood. Something is wrong with the chipper. It shakes violently. The Boss stops it and restarts it, but the shaking stays the same. He tells the MARK and the worker to go to the back and see if they can find out what is going on.

- The worker tells the MARK to reach into the machine and pull out whatever is obstructing it. When the MARK refuses to do that. The worker tells the MARK that he'll do it. As the worker is looking inside he sees something in the machinery. It's an arm, and enough of the name tag of the shirt to reveal that Bob, the missing guy.  The machine suddenly starts back up again. There is a loud scream and blood shoots out. (probably in B Roll)

- From inside the barn the boss yells for help. The worker and the MARK run back into the barn. They are shocked when they see the boss stuck halfway into the machine, with just his lower torso hanging out.

- Just as all of this is happening, the owner emerges from the shadows and quietly. taps the worker on the shoulder.  "Everything going smoothly?"

- The worker blurts out that they saw the human arm. He says they will not tell anyone about the orchard owner's secret. The owner tells them that it's a little late for that. Just like his ex partner, the MARK is nosy. What is he suppose to do with

nosy people. He asks the MARK why they are at this chipper, when he specifically told them to use the other.

**REVEAL:**

- Now the owner is left with no choice, but to put them on Scare Tactics.

# EXHIBIT 26

4.

<u>SCARE TACTICS – EPISODE #301</u>
<u>Tracy INTRO – "WOOD YOU CHIP UP THIS BODY" –</u>
<u>ITEM #4</u>
(Tracy)

<u>INT. SET</u>

<u>ANGLE ON: TRACY</u>

                    TRACY

        Check out my boy, Tim.

VTPB: IMAGE OF TIM

                    TRACY (CONT'D)

        He says he's done some work on a farm

        before, but not a farm like this.

VTPB: ACCOMPLICE INTERVIEW

                    TRACY (CONT'D)

        All right, Tim.  All you gotta do, is

        keep your head down, work hard, and

        try not to get shoved in the wood

        chipper.

VTPB: WOOD YOU CHIP UP THIS BODY

                                CUT TO:

                                        First Revision 5/1/08

5.

<u>SCARE TACTICS – EPISODE #301</u>
<u>Tracy TEASE – "SCANNERS" – ITEM #5</u>
(Tracy)

<u>INT. SET</u>

                    TRACY

       Aw, did you hear that.  Tim said "you

       guys are good."  Thanks, Tim.  And,

       for anyone who doesn't believe him,

       just check Tim's pants.

                    TRACY (CONT'D)

       Up next...this next bit may cause your

       head to explode!

VTPB: SCANNERS

                                        CUT TO:

# EXHIBIT 27

Lodged Video

# EXHIBIT 28

Lodged Video

# EXHIBIT 29



@thekevinhealey13

Working hard and almost done with a show that will thrill fans of #scaretactics and #getout and #thewalkingdead . Premieres this fall on big streamer near you! #hiddencamera has been reinvented!

 HOLLYWOOD

♥ 40          💬 7                              10 months ago

← → C ⌂  🔒 youtube.com/watch?v=kz32KVRZtvQ

▦ Apps  ★ Bookmarks  Craigslist  GoodGopher.com -...  Reddit  Full Documentary Li...  Film Drunk  Trump  LikeMineDid  Clima

≡  ▶ YouTube                          prank encounters

▮ 5  ▼    REPLY

**Bill 'I Did Not Bang That Woman' Clinton** 4 months ago
Only with faker reactions

👍 4  ▼    REPLY

**Brandon Reed** 4 months ago (edited)
@Howyaduing it's actually on Netflix. They have 4 seasons.

👍 3  ▼    REPLY

**Time Is Money** 4 months ago
They copied from scare tactics

👍 8  ▼    REPLY

**kevinhealey** 4 months ago
I created that show.  And, this one, well, takes it to another level.  We've got a new way of pulling these pranks.  We hope you like it!

👍 5  ▼    REPLY

**eric whatley** 4 months ago
This looks like the handicap version of Scare Tactics

👍 3  ▼    REPLY

**mylongstoryshortned** 4 months ago
@John8Jon_ uhhh everything's been done b4...

👍 ▼    REPLY

**JacobOlli** 4 months ago
Or Punk'D

👍 2  ▼    REPLY

# EXHIBIT 30



MANNERS
MAKE TH
MAN

≡ MENU          NEWS REVIEWS TRAILERS POSTERS RELEASE DATES

**whenamymetsalad** Oct 10

Looks like another scripted reality prank show. Pass.

👍 👎   Share  Reply                                                ⚐   · ·

---

**AndIAmLars** Oct 10

I like stranger things and all but these kids are starting to get annoying

👍 **1** 👎   Share  Reply                                          ⚐   · ·

---

D    **Dach** Oct 10

"Taking cues from shows like PUNK'D and IMPRACTICAL JOKERS..."

How about "Taking the entire concept of SCARE TACTICS..." ???

👍 **2** 👎   Share  Reply                                          ⚐   · ·

Load more comments





Me and Joey over here weak laughing!! Y'all need to watch Prank Encounters on Netflix, it's basically Scare Tactics 2.0! This lady is for real, why they gotta mess with her like this...i won't spoil the scare, but listen to her!! 😂😂😂😂 #prankencounters #prankencountersnetflix

 50  💬 3                    2 months ago



@lawrencetheduke

3 months ago

When I tell you...so these peeps are on this horror prank show called Prank Encounters on Netflix with ole dude from Stranger Things as the host. Puts you in the mind of Scare Tactics but with 2 victims instead of 1. Well, ole dude did NOT think it was funny at the end...look...at...his...face 😂😹😂😹 #PrankEncounters #PrankEncountersNetflix #StrangerThings #gatenmatarazzo #LookAtHisFace





# Comments

same thing.

9h    **Reply**

 **_.orlando** This is exactly like scare tactics 

1d    **Reply**

 **natgut24** This is just an off brand version of scare tactics 

1d    **Reply**

 **ethmegdav** Why are all the male victims in this show gay? Why are you 

     

 Add a comment...



DEADLINE

TIP US

## 1 Comment

Comments On Deadline Hollywood are monitored. So don't go off topic, don't impersonate anyone, and don't get your facts wrong.

Enter your comment here

POST COMMENT

This site uses Akismet to reduce spam. Learn how your comment data is processed.

**Anonymous** *on October 10, 2019 7:57 am*                                    REPLY

Isn't this called SCARE TACTICS or wait PUNK'D? Where have all the original ideas gone...



https://twitter.com/its_Mitch_

Hatty Daddy (@its_Mitch_) | T... ×

Clio - Dashboard

For the best Twitter experience, please use Microsoft Edge, or install the Twitter app from Microsoft Store.

Home    Moments

Search Twitter

Have an account? Log in

**Hatty Daddy**
@its_Mitch_

| Tweets | Following | Followers | Likes |
|--------|-----------|-----------|-------|
| 18.3K  | 801       | 853       | 26.8K |

Follow

1

**Hatty Daddy** @its_Mitch_ · Feb 19
Prank Encounters reminds me of how awesome the show Scare Tactics was back in the day

2



**Stephanie**
@Stephan37520062

## Scare tactics vibes! #PrankEncounters

◉ SLEE! 🔫 🖤 🙏 @Dontsleeponslee · Nov 5, 2019

Dear @netflix @GatenM123 as a HUGE fan of Scare Tactics back in the day, I loved #PrankEncounters & if you guys shoot a season 2 I would Love to be apart

Show this thread

5:35 PM · Nov 5, 2019 · Twitter for iPhone

**2** Retweets   **5** Likes

**Adriana Bernabel** @AdriEvalisse88 · Feb 13
Replying to @Stephan37520062
Said the same thing they even have one of the same scare actor in it

# EXHIBIT 31

Prank Encounters (2019– ) - Trivia - IMDb





### Prank Encounters (2019– )

## Trivia

Edit

Showing one item

Very similar to the show "Scare Tactics" that was on Sci-Fi, except in that show people were set up by someone they knew and with "Prank Encounters" the targets don't know each other.

4 of 7 found this interesting | Share this

## See also

Goofs | Crazy Credits | Quotes | Alternate Versions | Connections | Soundtracks

## Contribute to This Page

Getting Started | Contributor Zone »

Edit page



ad feedback

**Prank Encounters** (TV Series)

**Did You Know?**

Trivia
Goofs
Crazy Credits
Quotes
Alternate Versions
Connections
Soundtracks

**Explore More**

## User Lists

Create a list »

Related lists from IMDb users



**Favorites**
a list of 37 titles
created 14 Mar 2018

**Third level list, Maybe or not**
a list of 32 titles
created 13 May 2018

**Netflix Originals**
a list of 39 titles
created 27 Jun 2017

**Series**
a list of 42 titles
created 08 Aug 2013

**Shows I've seen**
a list of 35 titles
created 23 Aug 2012

Home · Business ⌄ · News · Shopping · Lifestyle ⌄ · Entertainment ⌄ · Upload Video

Ni Vipi? · Account ⌄

**Amazing**    **Bizarre**    **Cute**    **Fails**    **Funny**

⊖ Login    👤 Register          👤 SIGN UP

**Intriguing**    **LOL**    **Memes**    **News**    **OMG**    **Quizze**

# Dustin From 'Stranger Things' Is Coming to Prank You in Netflix's 'Prank Encounters'

  by **admin** — October 21, 2019  in **Amazing**

👍 238    👎 15    💬 0

**415** SHARES    **2.3k** VIEWS

f  **Share on Facebook**          🐦  **Share on Twitter**          G+   ↱



DISTRACTIFY

Accept ✖  Browsers may block some cookies by default. Click accept to allow advertising partners to use cookies and serve more relevant ads. Visit our privacy policy page for more information.



Source: NETFLIX

By Jacqueline Gualtieri



Case 2:20-cv-02726-CJC-MAA   Document 95   Filed 10/26/21   Page 108 of 207   Page ID #:2163

54 minutes ago

If you've watched *Stranger Things*, you know just how adorable Gaten Matarazzo is. Since Season 1, Gaten, who plays Dustin, has been a fan favorite. And Netflix knows that, which is why they are giving him his own show. Here's everything you need to know about *Prank Encounters* on Netflix and why some people aren't exactly thrilled with the supernatural scare show.



Source: NETFLIX

## What's *Prank Encounters* on Netflix about?

The new prank show isn't about doing ordinary pranks. Considering Gaten is known for *Stranger Things*, you can expect that it's going to get a little strange. The show is about doing supernatural pranks on unsuspecting people. Gaten stars as the host, in a similar vein to Ashton Kutcher hosting *Punk'd*. Oh and, by the way, Gaten, who is only 17, is also an executive producer on the show.

The show follows two regular people who are told that they're hired for a part time job and they come to work to find their work conditions a lot more supernatural than they're expecting. Aside from Gaten, the rest of the cast of the show is on hand to bring those supernatural occurrences to life.

[embedded content]

## So what's the controversy?

Not everyone is very excited about the premise. Mainly, the issue is the fact that the people who are being pranked are looking for work and they're told that they were hired for the day. But instead of a job, they're actually hired to be a part of a terrifying nightmare.

There's been quite a bit of backlash online with people claiming that the show is taking advantage of people who are struggling to find work and are already in an emotionally fragile state. Some of Gaten's fans are even telling him to back out of the show as it'll be something that will reflect poorly on him for the rest of his career.



Source: NETFLIX

A Netflix spokesperson addressed the controversy in a statement released to *TIME*. He stated that, "All participants came in with the expectation this was a one-day, hourly gig and everyone got paid for their time." So even though they didn't get the gig they were quite expecting they still were paid for their time with *Prank Encounters*.

The other complaint that has come out so far about the series is that it sounds incredibly similar to *Scare Tactics*, which was on Syfy and Chiller from 2003 to 2013. On *Scare Tactics*, regular people encountered monsters and supernatural creatures in creepy pranks on a hidden camera show, which sounds remarkably similar to *Prank Encounters*.



Source: NETFLIX

# When is it out?

Controversy or no controversy, it's hard to ignore Gaten's adorable appeal. If you want to watch Dustin scare the bejeezus out of people, the show is releasing eight episodes on Oct. 25, so you can binge-watch all Halloween long. *Prank Encounters* is a part of Netflix's Halloween lineup so it'll be out just in time to scare the pants off of you for All Hallow's Eve.

# More From Distractify

' && window.scrollY > killableAd.offsetTop + killableAd.offsetHeight + window.innerHeight * scrollLoadOffset) { killableAd.style.height = killableAd.offsetHeight + 'px'; killableAd.innerHTML = ''; if (window.prdgm.debug) { var id = killableAd.id.split('-'); id.pop(); id = id.join('-'); if (window.prdgm.ads[id]) { window.prdgm.debug('KILLED ' + window.prdgm.ads[id].adUnitPath); } } } } } var lastScrollTop = null; clearInterval(handlePaginatorScroll.interval); handlePaginatorScroll.interval = setInterval(function () { var scrollTop = window.scrollY; if (scrollTop !== lastScrollTop) { if (loadNext()) { lastScrollTop = scrollTop; } killAds(); } }, 100); }; handlePaginatorScroll.pages = { length: 6, viewPercentages: [ 50, 75 ] }; handlePaginatorScroll()

READ ORIGINAL ARTICLE HERE

**Tags:** ENTERTAINMENT

# Discussion about this post



# Netflix's Prank Encounters is neither scary nor funny, just embarrassing and boring

by Andy Dehnart, realityblurred.com                    October 26, 2019 09:50 PM

I will admit that, when a teddy bear came to life and ran across a balcony in the first episode of **Prank Encounters**, I laughed: it was quite the image.

But Netflix's attempt to create its own **Scare Tactics** is mostly embarrassing, for Netflix and everyone involved in creating such a dull, unconvincing mess. The marks may have been momentarily freaked out during the climax of the scares, but the only frightening thing about **Prank Encounters** is that it exists. Maybe the actual prank is on us?

First, a disclaimer: I'm not the biggest fan of scary or cruel prank shows, in part because their stars have not consented, in advance, to being subjected to emotional distress.

That's why I was surprised to learn, from **Scare Tactics** creator Scott Hallock, that on his show, all of the marks had previously applied to be on reality shows *before* they were filmed, and thus they were actually cast as a result of their application. They still didn't know they were on a show, of course, but they also weren't just random people seeking a part-time job who then got tricked into becoming entertainment.

**Prank Encounters** producer Kevin Healey told EW's Lynette Rice suggests that something similar might have happened here, saying that "we go through a process for them to do a one-day gig." He's not more specific than that, and his vagary isn't challenged (#journalism), nor is his claim that everyone "left super happy."

I sure didn't, and I only watched half of the eight episodes. What crept up on me in each episode was boredom, and once I even heard unconsciousness scratching at my door, which was probably my brain trying to rescue me.

**Scare Tactics** usually did four scares in about 21 minutes; **Prank Encounters** episodes last for between 20 and 25 minutes, and have just one scare that entire time.

That's blood-curdling: watching your life disappear in 25-minute increments of a show from Netflix, a company that once was trying to produce better versions of popular unscripted shows.

This mess was produced for Netflix by Propagate, which previously embarrassed themselves producing a reality show for a giant tech company with a knock-off of another show, **Shark Tank** (theirs was called **Planet of the Apps**).

The show got a lot of pushback when it was announced because Netflix initially described it as a show where "two complete strangers who each think they're starting their first day at a new job" were pranked and their "part-time jobs turn into full-time nightmares."

That made it seem cruel. What it ended up being, though, is a bad idea ineptly produced.

The first prank, which I have to assume is what Netflix thinks is the best episode to keep people watching, is both convoluted and boring.

A mark is hired by a woman to babysit. Meanwhile, a second mark is hired to help collect toys for a charity. The kid, who's an actor, insists her sister died because a teddy bear pushed her off the balcony. Charming!

Eventually the bear comes to life and pushes an actor off the balcony, after the actor spends a suspicious amount of time leaning over the railing.

Yet none of this is scary.

## Stranger Things' Gaten Matarazzo is doing some strange things

Stranger Things star and Prank Encounters host Gaten Matarazzo allegedly giving actors direction from an alleged control room. (Photo by Netflix)
Gaten Matarazzo's on-camera involvement is, well, odd. He's in charge of letting everyone know they're on a prank show no one has heard of, though he also says "Netflix" and presumably people have heard of that.

Before that moment, though, he spends the episodes sitting in an alleged RV/control truck that has more choreographed blinking lights than the Starship Enterprise.

Matarazzo's acting doesn't serve him well here, whether in voice over or asides. ("How are we doing at the other location," he says in episode two, leaning back in his chair like people do in control rooms. "All right, guys. Let's do this," he says in another episode, with all the same passion I would employ in saying, *All right, Netflix. Order another season of this*.)

He periodically talks to the actors, presumably through some kind of earpieces, and either 1) he's doing that in the most unconvincing way imaginable and/or the editing is making it look completely fake, or 2) all of his host segments were filmed after the fact and wedged into the episode.

Whether or not he's actually talking to the actors, there sure are a lot of them, an excessive number of people wandering around (including, in episode two, an actual camera operator, pretending to be an employee, I suppose).

They hang around for the jobs the marks are supposed to have been hired to do. In that first episode, "Teddy Scare," there's a maid who works at the house and basically stays with the mark the whole time. Why is a babysitter necessary? Why is the maid wearing the most stereotypical maid outfit possible?

The "alien baby pops out of a man's stomach while a temp assists with surgery" episode, "Urgent Scare," has two government agents who run in and yell about a lockdown, but they could have screamed, *We're actors! And we're really bad at acting!* and they would have been less conspicuous.

Many of the actors keep issuing irrational instructions and exposition, answering' the marks questions with weak answers. This may not be the kind of thing someone would notice in the moment, but it clutters the scenes and diminishes the believability.

All of this reaches the point of *holy shit, we really didn't plan well for this* when one of the two "Teddy Scare" marks desperately tries to wrestle a phone from one of the actors to call 911—she is a sane, rational human being—and he refuses to give it to her, so the other mark comes in to help fight him for the phone.

Part of what works with **Scare Tactics** is the low-budget minimalism, both in set design and other humans. The marks were sometimes left alone, or with just one other person, when they encountered something weird. Also, it was gleefully cheap and ridiculous.

Everything **Prank Encounters** does is overwrought, including its environments, which are like what would happen if you gave a middle school production a lot of money for their set design.

In "Teddy Scare," the house is full of odd, mirror-covered furniture (where the cameras are hidden, of course). Episode two, "End of the Road," mostly takes place on a road which reminded me of the old interior scenes of Test Track at Epcot.

Its climax occurs with the marks and several actors in a van that has so much bright and excess lighting that one of the marks keeps shading her eyes just to be able to see. If only I'd decided to spend an hour shining a bright light in my face instead of watching **Prank Encounters**.

# Forget the controversy: 5 reasons to watch 'Prank Encounters'

filmdaily.co/reviews/wtn/prank-encounters/

October 30, 2019

Watch it now



1938 Views

by: Bec Heim

Netflix is no stranger to courting controversy. In fact, they actively seem to welcome it at times with a clear embrace of the old adage "all publicity is good publicity". From *13 Reasons Why* to *Insatiable,* the streaming giant had gotten people up in arms in recent years. In its first foray into the hidden-camera reality show, *Prank Encounters*, the streaming giant definitely has its fair share of detractors.

Hosted by *Stranger Things* star Gaten Matarazzo, Netflix's *Prank Encounters* follows two strangers at separate one-night jobs and during the course of the night their paths collide in a real-life horror movie.

Viewers were up in arms over unsuspecting people looking for work getting pranked.
Matarazzo was harassed online for his part in the series, despite being underaged and not
in a position to make employment decisions based on a sophisticated ethical standpoint.
(Feel free to bash his manager and/or parents, but a kid? Come on, dude.)



*Prank Encounters* was released this weekend, and we watched every episode of it to tell you
that it ain't bad. It's not high art or anything; it's just a prank show in the vein of *Candid
Camera, Punk'd*, or (especially) *Scare Tactics.* Matarazzo appears at the top of the episodes to
tell you that the people are compensated for their time and aren't promised full-time
employment at their "temp" jobs.

Let's forget about the controversy and talk about why you should check out  *Prank
Encounters* now. Anyways, the whole uproar could very well be an underhanded marketing
tactic for all we know. If so, bravo, Netflix: mission accomplished!



## If you liked *Scare Tactics*, you will love *Prank Encounters*

*Scare Tactics* (2003 – 2013) aired on Syfy for five seasons and over 100 episodes. The show, hosted in its last three seasons by Tracy Morgan, sends friends and family ("the accomplice") of the mark ("the victim") on a one-off job which devolves into real-life horror movies.

The basic concept is identical to *Prank Encounters*. The differences: just one victim; family and friends nominate the victim; and each 30-minute episode usually has multiple scenarios. *Prank Encounters* has two victims, no nominations are mentioned, and just one scenario per episode.

Either way, both *Scare Tactics* and *Prank Encounters* lure victims with a fake job and intend to scare them. *Scare Tactics* proved pretty successful for the Syfy channel. As of 2017, Blumhouse planned to revive the series in some capacity. In fact, *Scare Tactics* has two seasons available for viewing on Netflix if you want to check out both shows and judge for yourself.



## Gaten Matarazzo is a pretty good host

We don't entirely believe that Matarazzo is orchestrating the prank from a command center nearby. What we do believe, however, is that the kid is a pretty good host. He's just as charming as on *Stranger Things* and ends pranks before the marks get too scared.

He's actually involved with the pranks in a way reminiscent of Ashton Kutcher on *Punk'd*. Over the first season, he played several guys on the phone, a random kid in a car, and himself in the season finale. The funniest moment was when he broke the prank and one of the victims stared for a beat before yelling "Is that the kid from *Stranger Things*?!" Classic.



## It's perfect mindless television

For those that need noise when you work, it's usually the time you throw on something in the background you don't need to pay serious attention to. *Prank Encounters* is the perfect sort of show if you're folding laundry or trolling snowflakes on Twitter from the couch.

An astronaut returning from space feeling ill, a serial killer running around a campground, and killer Bigfoot in the woods are some of the plots featured on *Prank Encounters*. Anyone with a passing familiarity with the horror genre knows where these stories go.

Watching a show like *Prank Encounters* is more about kicking back or folding that laundry with your brain firmly turned off. Sometimes our minds just need a break from the really challenging stuff.



## Fun scenarios

For the part of the population that enjoys haunted houses and scary movies, *Prank Encounters* has scenarios you'll love. Its tropes are pretty obvious even for people who don't like scary movies.

Still, making the scenario as immersive as *Prank Encounters*'s is impressive. There are multiple moving parts and different locales that need to be kept in line for the marks to fully believe it's really happening. The show does it admirably.

There should really be an actual service that lets horror fans live out such scenarios in real time. That would make a killing! *You heard it here first.*



## You feel for the people getting pranked

While many of the scenarios on *Prank Encounters* are based on horror movies we've seen a
billion times, it doesn't make them any less fun. How many times have you imagined you
could survive a situation in one of those movies?

*Prank Encounters* puts real people in those scenarios; time to see if a real person can handle
it! We viewers can't help but root for them. Their reactions to the situations are so visceral.
When the ruse is revealed, we laugh with them. While their laughter is of relief, ours is that
of the vicarious peeping tom on the prank. That cathartic moment is what drives people to
watch these kinds of shows in the first place.

The victims are also paid for their "work"; we can't necessarily say the same for the other
hidden-camera prank shows that we've mentioned on this list.

# Why Stranger Things fans should give Prank Encounters a chance

netflixlife.com/2020/03/09/stranger-things-fans-watch-prank-encounters/

by, Courtney Mroch, 2 days ago, Follow @CourtneyMroch, by Bryce Olin, by, by Sandy C., by Bryce Olin

March 9, 2020



Stranger Things- Credit: Netflix

## *Prank Encounters* was panned by most critics and met with some controversy, but here's why *Stranger Things* fans, especially those who like Gaten Matarazzo, might like it.

Are you going through *Stranger Things* withdrawals too and need something to tide you over until season 4 releases? (Hopefully, our wait will be over around Christmas 2020. ) Have you watched *Prank Encounters* yet?

I'm not sure how I missed it. It released on Netflix in October 2019. Clearly, I was too busy binge-watching *Daybreak*.

It took four months before *Prank Encounters* hit my Netflix radar and found its way into my queue, but when it did, it was go time. Go meaning binge.

It wasn't hard to do. As noted in "5 good shows to binge on Leap Day," each episode of Prank Encounters is less than 30 minutes long.

The only thing is, you must have a bit of a macabre sense of humor. Apparently some people didn't get that memo. I'll get to that controversy later.

## Scary Hidden Camera Show

If you ever watched *Scare Tactics* (which is also currently streaming on Netflix), *Prank Encounters* is very similar to that. (In fact, there's even at least one actor who appears on both shows.)

RELATED PRODUCT

Stranger Things hand-numbered edition uncoated lithograph



Unsuspecting people are set up in horrifying situations that end up being a joke they're eventually let in on. Eventually.

However, in *Scare Tactics* the unsuspecting victims were set up by friends or family members. In *Prank Encounters* two strangers are hired for two separate jobs that both end up relating to the prank.

Take the first episode for example, "Teddy Scareee!" One lady is hired as a babysitter while another guy is hired to help pick up charity collections. They both get the fright of their lives when it turns out the little girl in the story isn't lying. The teddy bear is alive, as evidenced when it comes to life and starts attacking and killing the other people in the house.

The babysitter's and charity collector's reactions are hilarious. The situation is completely outlandish. Truly, a *Stranger Things* horror movie scenario playing out in real life. It's easy to think, "This is so far-fetched. How can they possibly believe any of this is real?"

That's the beauty of it. The actors who are all in on the prank guide what they call the "targets" so perfectly they have no choice but to think what's happening is real.

Also, there's the matter of the targets wanting to do what any new hire on their first day wants to do: make a good impression. They'll go along with just about anything –until it gets too crazy and they're about to lose it, which is about the time Gaten Matarazzo shows up to let them know they're on his new Netflix show and it's all just been a giant prank.

That's what some people had an issue with. It stirred up a bit of <u>a controversy</u> actually.

## The Controversy

Some viewers didn't understand the targets were hired for temp assignments. They thought these poor people would find out they were the butt of a joke twice: once for being pranked, and again to find out the job they thought they had was not a job at all and they'd have to find work again.

Which was sort of true, except all victims were compensated for their time and they had only signed on for short-term, one-time gigs anyway.

There is a bit of an inherent mean factor in any prank show, but all the targets were laughing at the end when they were finally let in on the joke. I also don't think any of them were scarred for life. If anything, they ended up with a great payment: starring in a TV show and meeting a *Stranger Things* actor. What a great story to tell!

## The Episodes

The thing that's fun about this prank show is that each of the eight episodes are in some way sci-fi or horror-themed.

Perhaps the two most *Stranger Things*-ish episodes were the fourth one, "Urgent Scare," and the sixth one, "Storage War of the Worlds." It's not quite a journey to the Upside Down for the unsuspecting victims, but having aliens suddenly appear in different ways in both episodes certainly turned their worlds upside down.

Oh, and the last episode, "Split Party," is one *Stranger Things* fans will especially like. It's where Matarazzo plays himself. Like I said, he does show up at some point in all the episodes. In all cases at the end to reveal the prank, but sometimes he also plays along as an extra.

But in the last episode, an assistant is hired to help him for the day. She's one of the targets.  The other is hired to help an events company set up for a little girl's birthday party. The little girl wrote to Matarazzo to say that she's his biggest fan and how no one showed up to her party last year. It would really make her day even more special if he came this year. Being the cool guy he is, Matarazzo accepts her invitation.

It goes south in a spectacular way with poisoned cupcakes and a crazy father. It's elaborate

and funny, but for me, the episode with the biggest laughs was episode 7, "Fright at the Museum." The targets' reactions in that one were so over the top "Nope! I'm not dealing with this!" that I couldn't stop laughing.

I was a huge fan of *Scare Tactics*. I would've loved to be on that show. That's why I was excited to discover *Prank Encounters,* especially when I found out "Dustin" was hosting it. I wasn't sure how he'd do, but he brought an enthusiasm to it that added to the fun. Also, I couldn't help but chuckle along with him as he orchestrated the scenes and directed the actors to hit their marks.

If you like *Stranger Things*, horror movies and hidden camera shows also and haven't given *Prank Encounters* a watch yet, I recommend giving it a try.

If you've seen the show, I'd love to know your thoughts. Which episodes did you like best?

Next: Stranger Things 4 possible release dates

# SCHEDULE I

## PLAINTIFFS' ORIGINAL WORK, "DANGEROUS OBSESSION"

The story begins with a compassionate" Husband" hiring a temporary home Caregiver (the "Mark"), to watch over his Wife, who he claims has been injured in an accident and lives in a comatose state [everyone in the episode, but for the Caregiver, is an actor who rehearsed lines and action under direction prior to filming].

The Husband discusses how much he loves his Wife, then shows the Caregiver, a young woman, how to give his Wife medication, then she is told to sit with the Wife and read an article from a magazine to her, as it supposedly helps keep the Wife calm.

The Husband says he will be leaving for 45 minutes.  Before leaving, he kisses his Wife on the forehead and says, "Goodbye, my angel."  The "kiss" is "long, lingering and creepy."

After the Husband leaves, the Wife suddenly wakes up and spits the pills out, shocking the Caregiver.

The Wife claims she has been kidnapped by the Husband and that the Husband is actually a fan who is obsessed with her.  She orders the Caretaker to open a nearby closet.

Inside, the Caregiver discovers a shrine that has been built to "honor" the Wife.  The Wife then pulls back her blankets to reveal her legs are chained.  She tells the Caregiver to retrieve keys that are stored in another room as the Wife starts to dial the police.

The Caregiver finds the keys, and the Wife is about to be freed when the Husband suddenly appears (back early and unexpectedly).  He injects his Wife with a hypodermic needle and the Wife quickly slumps back into bed.

The Husband claims that whatever his Wife said is not to be believed, as the drugs make her "delusional."

The Caregiver begs to leave, but the Husband picks up another needle and indicates he is going to inject the Caregiver as well.  The Caregiver is really afraid

SCHEDULE I

and does not know what to do next.   But, before the Husband can inject the Caregiver, the Wife rises up and informs the Caregiver that she is on "Scare Tactics."

## DEFENDANTS' WORK, "FACE FEARS"

The Defendants' work is roughly four and a half times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.   These added elements involve another Mark who believes he is helping a Private Detective search for a missing woman.  This filler does not materially change Plaintiffs' original story.

The Defendants' work begins with a young woman (the "Caregiver" -- "Mark"), who is starting a new job as a Caregiver.  The Caregiver  is helped by a male nurse (the "Nurse") who tells the new Caregiver that they have both been hired by a famous plastic surgeon (the "Surgeon") to care for the man's Wife, who has had "some work done."

The Caregiver is then introduced to the Surgeon, who claims that his Wife has recently had an accident and is sedated to help with the pain.  He says that his Wife is disoriented, and sometimes says "non-sensical" things, and, thus, anything she says should be dismissed.

The Caregiver is then shown the Wife, who lies seemingly unconscious in a bed.  After professing his love for his Wife, the Surgeon proudly gestures to a "shrine" (his words) that he has constructed for her above a nearby chest of drawers.

The Surgeon then indicates a nearby trove of morphine and fentanyl, which he tells the Caregiver and Nurse to administer if his Wife awakens and becomes agitated.  The Surgeon then kisses his Wife on the forehead, and tells her he loves her, ending with "goodbye my sweet".   The "kiss" is "long, lingering and creepy." He then informs the Caregiver and the Nurse that he is leaving.

The Nurse steps out to go to the bathroom, leaving the Caregiver alone.  The Caregiver picks up a magazine and tells the Wife she will find a good article to read to her.  But, before Caregiver can, the Wife suddenly startles herself "awake," and mumbles, "I'm not supposed to be here" and "not mine" before falling unconscious again.

SCHEDULE I

The Nurse then returns, and the Caregiver catches him up to date.  The Wife suddenly awakens again. Nurse claims it is agitation, and he supposedly injects morphine into the Wife to calm her.

At this point, an added B story (a second mark helping a private detective) crosses the original story.  Supposedly following a clue as to the whereabouts of a "missing woman," the second mark and the detective enter the room.  They hypothesize that the woman in the bed is not who the Surgeon claims, but instead a missing woman from another state.

At this point, the Caregiver starts to understand that the Wife in the bed is not who the Surgeon claimed and that the Surgeon has changed her appearance with plastic surgery, as well as removing a tattoo on her arm that could be an identifying feature.

The Nurse returns just as the Wife becomes agitated again, and this time, the Nurse gives her some calming medication. He is brought up to speed on the theory regarding the about the Wife that they have been discussing.  A phone call from a "police detective" convinces them they are correct about their theory.

The Surgeon calls and tells the Caregiver he is on his way home.  Moments later, he arrives early and unexpectedly and asks what is going on.  The second mark and the "PI" tell him their theory, which the Surgeon rejects. The Surgeon then says he wants to talk to the PI alone, and they step away.  Shortly after, there is a loud off-screen "thud" (someone falling to the floor?).

The Wife awakens and says she is not supposed to there and claims she has been kidnapped. Just as the police are being summoned via telephone, the Surgeon returns and, using an incapacitating agent, renders the Nurse unconscious.  The Caregiver and the "investigator mark" are on their own and in danger.

The Surgeon has blood on his shirt and scratches on his face, implying he killed the PI offscreen.  He then threatens the Caretaker and the other mark with a hypodermic needle.  They are really scared.  It is at this point that the marks are told they are on "Prank Encounters."

## SIMILARITY ANALYSIS

The dramatic concept of a woman being kidnapped by a stranger and held against her will is not new.  However, in this case, Plaintiffs' idea is developed and expressed concretely through a skillful use of dialogue, settings, machinations,

SCHEDULE I

characters, and actors that expand the concept into an original and fresh story. These concrete elements, established in the Plaintiffs' original work, "Dangerous Obsession," also appear in the Defendants' alleged copycat work, "Face Fears."

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' copycat work.

### The Plots Are Substantially Similar

1. In Plaintiffs' original work, a man kidnaps a woman and holds her against her will in a bed, keeping her sedated.  He hires a caregiver to watch over the woman, who he claims is his wife, while he leaves the house for a short time.  This exact set up is the basis for Defendants' work "Face Fears."  Plaintiffs made an executive decision in deciding to portray a seemingly loving Husband care for his incapacitated Wife.  Plaintiffs could have presented a patient/nurse caretaking situation or a Rockstar/groupie situation.  Among the myriad options available to Plaintiffs ultimately made the executive decision to have a Husband character with an incapacitated Wife.  Defendants' executive decision, here, is not one of creativity; rather, it is one of copying.

2. In Plaintiffs' original work, the Husband tells the caregiver that his wife was in a serious accident and that he has been caring for her at home.  This element also appears in the Defendants' work.

3. In Plaintiffs' original work, the Husband claims the woman is the love of his life, and has built a "shrine" to her, which understandably concerns the caregiver.  These story elements also appear in Defendants' work.

4. In Plaintiffs' original work, the Husband tells the caregiver that the woman is unconscious and heavily medicated, thus anything she might utter should not be taken seriously.  This story element also appears in Defendants' work.

SCHEDULE I

4

5.  In Plaintiffs' original work, the Husband leaves, but not before whispering
    "Goodbye, my angel" and giving the woman a creepy kiss on the forehead.
    These story elements appear in the Defendants' work.

6.  In Plaintiffs' original work, the Caregiver reads an article from a magazine
    to the woman, as the sound of voices soothes her.  In Defendants' work, the
    caregiver undertakes the same task.

7.  In Plaintiffs' original work, the woman awakens and tells the Caregiver her
    plight.  In the Defendants' work, the woman stirs and tells the Caregiver she
    does not belong here.  The same basic incidents generate the same fear and
    questioning in both stories: the Caregiver in each case is now wary of the
    tale she has been told and is starting to fear for her own safety.

8.  In Plaintiffs' original work, the Husband returns home unexpectedly and
    becomes aware that his scheme has been discovered.  In the Defendants'
    work, the also Husband returns sooner than expected and is equally unhappy
    that his scheme has been exposed.

9.  In Plaintiffs' original work, the Husband produces a hypodermic needle and
    threatens the Caregiver, implying she will soon be unconscious and thus
    unable to summon help.  In the Defendants' work, the Husband also reveals
    a hypodermic needle and, by his actions, also implies harm to the caregiver.
    Here, Plaintiffs could have had the Husband wield a knife.  Defendants
    could have had the Husband wield a scalpel.  Instead, the Plaintiffs
    conceived of a hypodermic needle.  This creativity was then copied by
    Defendants.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the
Plaintiffs' original work, from story genesis through specific actions, characters,
dialogue, use of props, and the conclusion.

### The Sequencing Is Substantially Similar

In addition to the same, virtually identical plot elements appearing in both
works, these elements appear in the same order or sequence in each work.

As the "original", Plaintiffs' story could have been told through a different
play-by-play lineup of plot elements while delivering the same finished scary
product.

SCHEDULE I

For instance, Plaintiffs could have started the story showing the Husband alone in the room with his unconscious wife, making everything "perfect" by touching up the "shrine" before going downstairs to meet the caregiver.  This is not the same sequence that Plaintiffs' original work followed, demonstrating the Plaintiffs' sequence was a unique expression of the underlying story concept chosen by the creators.  Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

### The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line.  In Plaintiffs' work, there are three characters, the Husband, the "injured/comatose" Wife, and the Caregiver (Mark).  These three characters are used identically in Defendants' work.

### The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' work was designed to take place in an upscale, well-maintained private home.  The story takes place during the night.  These were obviously creative choices as there are different "settings" that could have been selected to create a different mood (i.e. a rundown apartment in a blighted place of town could create a different mood for the viewer, as would heavy security locks on doors and bars on windows). But the choice of a low security "private home" supports the apparent ability of the Husband to keep his "bride" in true comfort and to afford the costs of a private nurse and nice surroundings for his "wife."  The setting in Defendants' work is virtually identical (even to the point of using a two-story house).  And, Defendants' work also takes place at "night".

### The Moods Are Substantially Similar

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the readers. Mood is developed in a literary piece

SCHEDULE I

6

through various methods, including setting, theme, tone and diction. Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and; intense romantic.  In the case of Plaintiffs' works, this may include fearful; tense; anxious, suspenseful; ghoulish; macabre, grim; and scary.

The mood in Dangerous Obsession is ambivalence, in that, from the outset, there is a sense that something is "not quite right" with the unconscious "wife" and the husband's message to the "caregiver."  The mood in Face Fears is the same.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of Plaintiffs' original.

SCHEDULE I

# SCHEDULE II

## PLAINTIFFS' ORIGINAL WORK, "ROAD KILL"

In this story, an Assistant (the Mark) is hired to help a Government Investigator (an actor) look into a series of accidents involving government vehicles. A Videographer (also an actor) rides with them to make a video record of everything they find.  The three travel at night to a spot on an isolated, rural road and come upon an accident scene, including debris from a wrecked car.

The Assistant finds a car part, the grille of the wrecked car covered in blood and hair.  As the investigation continues, a local Farmer appears and tells them that three weeks ago, he saw "something very big" shoot across the road.  Suddenly there is a "howl" from the woods.  The Assistant thinks it was from wolves.  The Farmer leaves quickly.

The team returns to their car, where they hear another howl and then the sound of a car crash.  They investigate and discover another vehicle on the road, this time a wrecked van. The Driver of the van is missing, and there is blood and scratch marks inside and outside the van.  When the Investigator goes to look at the van, the frightened Assistant stays behind.

The missing van Driver then appears at their car seeking help.

The Drive joins the Assistant and the Videographer in their car, leaving the Investigator outside.  Suddenly, they see the Investigator attacked and pulled away by a mysterious Creature.  The Driver wants to start the car to flee but is unable to do so.

The three are stuck in the car when a large hairy Creature suddenly reaches into the car and attempts to pull the Driver out through the window.  At this point, with the Mark begging to leave, the Driver informs the Mark that he is on "Scare Tactics."

## DEFENDANTS' WORK, "END OF THE ROAD"

The Defendants' work is roughly four and a half times the length of Plaintiffs' and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the two Marks eventually end up in

SCHEDULE II

the same "scare" as in Plaintiffs' work.  Mark 1 is hired by a government agency to investigate a series of car accidents.  She is accompanied by a Government Investigator and a Videographer.  Joining them is a Naturalist.  Mark 2 is hired by an Agent from an insurance company to investigate the same accidents.

Traveling along an isolated rural road at night, Mark 1 and her team come upon the remains of an accident scene. While looking over the debris, they discover remnants/car parts from the accident covered in blood and hair.   Meanwhile, while traveling to the same site, Mark 2 and the Agent come across a man who claims his friend has gone missing in the woods.

When the two Marks finally meet up, they discuss what they have discovered so far, but then they hear an animal noise – a "growl" -- coming from the woods.  An "unexpected" car approaches on the rural road. There are two Young Men inside. Asking for instructions, they are told that they are far from their destination. The car drives off down the road.  Moments later, everyone hears the sound of an car crash down the road.

Rushing to the scene, they discover the same car.  The young male Driver is injured.  His passenger is missing.

The Marks see what they think is fur embedded in the wreckage.  Deciding they need to take the injured Driver to a hospital, everyone except the Naturalist and the Videographer climb into a nearby government van that will not start.

Then, while scanning for the missing passenger, the Naturalist is attacked by a big hairy Creature, as is another person who is looking for his missing hiking partner.  The Creature then attacks the government van and attempts to drag the injured Driver out a window, but fails.  The missing young Passenger then runs up and tells the Marks, who are supposedly terrified, that they are on "Prank Encounters."

**SIMILARITY ANALYSIS**

There are elements and characters appearing in Defendants' work that do not appear in Plaintiffs' original; however, in this case, Plaintiffs' concept is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story. These concrete elements established in Plaintiffs' original work, "Road Kill," also appear in the Defendants' alleged work, "End of the Road."

SCHEDULE II

2

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' original work and "re-appears" in the Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a Mark is hired by a government agency to investigate car accidents involving government vehicles.  In Defendants' copy, Mark 1 is hired by a government agency to investigate car accidents. Defendants' set up is identical to Plaintiffs'.  Plaintiffs didn't have to employ government agency characters.  Plaintiffs could have employed insurance agents instead.  Or, Plaintiffs could have had investigators working for the district attorney's office.  Defendants, armed with so much more time than Plaintiffs, had countless options as far as their choice of characters goes. Yet, Defendants chose the same government agency characters.

2. In Plaintiffs' original work, a Videographer joins the team to record the investigation. In Defendants' work a Videographer is also on board.  The Videographer is an add on character not completely necessary for the plot. Yet, both Plaintiffs and Defendants have the Videographer.

3. In Plaintiffs' original work, the incident occurs at night on an isolated, rural road.  Again, Defendants use an identical setting.  Plaintiffs could have had the investigative location be at a church parking lot or a college campus or a campground.  Plaintiffs did not and neither did Defendants.

4. In Plaintiffs' original work, there is debris from a car wreck - a car part covered in blood and hair.  In Defendants' work, there is debris from a car wreck - a car part covered in blood and hair.  Plaintiffs may have decided to have the car part covered in blood and hair because they were up against a limited timeframe.  Defendants, however, were not.  Defendants had ample opportunity to elicit the notion that a hairy and scary Creature lurked nearby.

SCHEDULE II

They had license to create a "build-up" of sorts, yet they chose to take the same "shortcut" as Plaintiffs.

5. In Plaintiffs' original work, the Mark and a Farmer/Animal Expert examine mysterious hair on the wreckage. The Farmer says he doesn't know what it is. In Defendants' work, the "Farmer" part is played by a Naturalist/Animal Expert who also examines mysterious hair on the wreckage and has no answers. Defendants' use of a "Naturalist" instead of a "Farmer" is not a real change in the Animal Expert character. In fact, this is a method used by many screen writers to mask their copying of work by another writer. This character is completely unnecessary to both Plaintiffs' story and Defendants' story. No doubt Plaintiffs' and Defendants' Animal Expert character played by the Farmer and Naturalist, respectively, foreshadows a threat of some sort. Both Plaintiffs' story and Defendants' story would have accomplished the "scare" without the Animal Expert. Yet, both stories include this unnecessary character.

6. In Plaintiffs' original work, the Farmer gives an eyewitness account of a mysterious Creature he could not identify that was moving too quickly moving across the road. In the Defendants' work, the Mark is shown security camera footage of a mysterious Creature quickly very moving across the road and learns (just as the Farmer) that the Naturalist could not identify the Creature.

7. In Plaintiffs original work, scary howls are heard from the nearby woods. Clearly similar, in Defendants' work scary growls are heard from the nearby woods. Plaintiffs' use of howls may have been necessitated by the time limit constraints. Defendants didn't have such time constraints. Thus, Defendants could have employed numerous other option to elicit the existence of a scary Creature lurking about.

8. In Plaintiff's original work, the Mark and his team hear, and then investigate, a second car crash down the road. In Defendants' work, the Marks also hear, and then investigate, a second car crash down the road. This "live" car crash is completely unnecessary to establish the existence of a scary Creature

SCHEDULE II

4

lurking about.  Yet, both Plaintiffs and Defendants have such a "live" car crash.

9. In Plaintiffs' original work, the Driver of the wrecked car is missing, and there is blood and hair on the vehicle.  In Defendants' work, the Passenger is missing, and there is also blood and hair on the vehicle.  Here, Defendants had the opportunity to have multiple characters go missing.  Yet, Defendants kept to the script – Plaintiffs' script, that is.

10. In Plaintiffs' original work, the Investigator, while looking for the missing Driver, is attacked by a Creature and disappears.  In Defendants' work, while looking for a missing passenger, the Naturalist is attacked by a Creature and disappears.   Again, Defendants, armed with four times the amount of time as Plaintiffs, chose to do as Plaintiffs had done.

11. In Plaintiffs' original work, the Mark stays inside the car and is joined by the missing Driver.  In Defendants' work, the Marks also stay inside the car and are joined by the injured Driver.   The similarities are simply uncanny.

12. In Plaintiffs' original work, the frightened Mark wants to leave, but the vehicle won't start. In Defendants' work, the frightened Marks want to leave, but the vehicle won't start.  Plaintiffs could have had the car's mobility be thwarted by a fallen tree.  Plaintiffs seems, instead, to have chosen ignition problems.  Defendants, armed with ample time, could have had the car start, only to have a tire spin-out or any number of other calamities befall the car and its occupants.

13. In Plaintiffs' original work, the Creature attacks the vehicle and attempts to drag the injured Driver away through a window.  In Defendants' work, the Creature also attacks the vehicle and attempts to drag the injured Driver away through a window.  Defendants had ample time to be a bit more creative than Plaintiffs here.  Yet, Defendants chose the shortcut; they chose Plaintiffs' version.

SCHEDULE II

14. In Plaintiffs' original work, the attack fails, and the Mark is then told he is on "Scare Tactics."  In Defendants' work, the attack also fails, and the Marks are then told they are on "Prank Encounters."

As clearly evidenced, Defendants' work mimics content in Plaintiffs' original work and, in some cases, wholly appropriates key scenes, and situations from Plaintiffs' original work.  These include not only specific actions, but also characters, use of props, and large hairy Creatures.

The basic and original story line of Plaintiffs' "Road Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "End of the Road."

**Sequencing Is Substantially Similar**

In addition to the virtually identical plot elements appearing in both Plaintiffs' work and Defendants' work, these elements appear in the same order or sequence in each work.

For example, the convention of creating a second car accident in each episode is deliberately sequenced late Plaintiffs' work and appears at an identical time in Defendants' work.  In both cases, the "late second car crash" is followed directly by the Creature attack and is used to drive home the possibility of a dangerous creature in the area.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For instance, the Mark in Plaintiffs' original work could have come upon the accident scene through a completely different set-up, say as a new employee mapping the road, or looking for dead animals. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead, Plaintiffs chose to have the Mark hired by the government to help in the investigation of car accidents, the exact same set up used by Defendants.

SCHEDULE II

Rather than copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or Creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Mark who is hired to assist an Investigator, but not just any Investigator.  No, the Mark is hired to assist a Government Investigator.  They are accompanied by a Videographer.  The Videographer is not a "stock" character.  At one point, a local Farmer appears (familiar with wildlife), and near the end of the story, the Driver of a crashed auto also appears.  The second car crash victim is certainly not a "stock" character necessary to accomplish the "scare."

In Defendants' work, the Mark is hired to help the Investigator and they are joined by a Videographer (the same characters).  The "Naturalist" plays the same role as the "Farmer". Then there is the Driver of the crashed vehicle.  Counting the Creature, the five characters are virtually identical to those in Plaintiffs' original work.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same - cars travel on a country road, night, debris from a car wreck, work lights set up, hearing a second "crash" and going to that spot where they get into a car to leave.  The choice of a country road to investigate an auto vs. animal accident was a creative option selected by Plaintiffs.  Notably, auto vs. animal accidents also occur on busy highways and secondary roads all too frequently (i.e. mountain lions in Southern California; deer and elk in Colorado).

SCHEDULE II

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is essentially "helpful," i.e. from the onset, everyone is trying jointly to solve the puzzle.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "helpful" mood used by Defendants is identical to Plaintiffs'.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work I s an almost identical copy of the original.

SCHEDULE II

## SCHEDULE III

**PLAINTIFFS' ORIGINAL WORK, "SEND IN THE CLOWNS"**

Plaintiffs' "Send in the Clowns" begins when a Temporary Helper (the Mark) is hired by a Creepy Dad to help at his young Daughter's birthday party.  The Temporary Helper will work with another Assistant.  They are instructed to blow up balloons and put together gift bags, and later, they will perform a clown show.

Creepy Dad leaves to get his "Daughter" and the Temporary Helper and the Assistant dress as clowns. They hear muffled cries coming from a nearby closet where they discover a Woman, also dressed as a clown, her hands bound with rope. She tells them that there is no party, no Daughter, that the Creepy Dad is insane and that they have to leave.

The Woman rushes to leave but is intercepted by the Creepy Dad, now dressed as a little girl, complete with wig.  He uses a mallet to knock the Woman out, then orders the Mark and the Assistant to create balloon animals.

Getting angrier, the Creepy Dad orders the Assistant to shake his hand.  She does, and a hidden handheld joy buzzer electrocutes her.  The Temporary Helper races out of the room, but he is stopped and told he is on "Scare Tactics.

**DEFENDANTS' WORK, "SPLIT PARTY"**

Defendants' work is roughly four and a half times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.

"Split Party" deals with two Marks, who both meet a rich Creepy Dad, who is holding a birthday party for his young "Daughter" at his mansion.  Mark # 1 takes a different dramatic path to reach the party, and the events that happen to her before she arrives at the mansion are simply "filler" to help inform her reality, but do not materially affect the underlying concept and telling of the prank as the two Marks eventually end up in the same "scare" as in Plaintiffs' work.

Mark 2, a Temporary Helper, arrives at the mansion to meet a Caterer whom she will help along with another Assistant.  The Temporary Helper and the other Assistant are both introduced to a Creepy Dad, who tells them he wants the perfect party for his young "Daughter".  He calls for his Daughter to "come meet the help", but she does not respond.

Mark # 1, a Van Passenger, arrives in a van along with a Celebrity Guest (the Host, playing himself), who is supposedly making a surprise appearance for the little girl.  The Celebrity's Manager is with them.

The Creepy Dad disposes of a birthday cake that the Caterer had brought, and instead, shows the Celebrity Guest "special cupcakes" he claims the Daughter baked in his honor. He encourages the Celebrity Guest to consume one as he fetches his Daughter for the big surprise.

The Celebrity Guest eats a cupcake, as does his Manager.  Both immediately fall ill, as the treats have been poisoned.  A man, whose hands are bound with rope, rushes in.  He is the Gardener.  He claims that the Creepy Dad is insane and that they should leave.  The Creepy Dad re-appears, now dressed in a little girl's outfit, and subdues the Gardener with poison cake.

With both the Celebrity Guest and the Manager now foaming at the mouth from the poison, the Creepy Dad insists that everyone have a bite of the cupcakes.  The Temporary Helper and the Van Passenger resist, and the threat from the Creepy Dad is ended when the Celebrity Guest suddenly awakens and shoves one of the supposedly poisoned cupcakes into the Creepy Dad's mouth, rendering him unconscious.  It is here where the Temporary Worker and the Van Passenger are informed they are on "Prank Encounters".

**SIMILARITY ANALYSIS**:

Although Defendants' work has story elements and characters not appearing in Plaintiffs' episode, these changes do not alter the basic concept, dramatic thrust and concrete elements exhibited in Plaintiffs' work and utilized in Defendants' copycat work.

Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements, established in Plaintiffs' original work, "Send in the Clowns", also appear in Defendants' alleged copycat work, "Split Party".

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work "Send in the Clowns", the Dad is portrayed as
   creepy and odd.  In Defendant's copycat work, the character of the Dad is also
   creepy and odd.  Plaintiffs could have had the creepy character be a mother or
   grandmother or sister or nanny.  Plaintiffs' choice among the many choices
   shows Plaintiffs' executive, creative input.  Defendants, too, had countless
   choices with regard the character employed to accomplish the "scare."  Yet,
   unlike Plaintiffs, who made a choice, an executive creative decision,
   Defendants simply copied Plaintiffs' creative input with regard to the Dad–
   lock, stock and barrel.

2. In Plaintiffs' original work, "Send in the Clowns", Plaintiffs have the Creepy
   Dad exhibit his "creepiness" by making it clear that the Creepy Dad likes
   things done a certain way, with an exacting standard that renders him
   "creepy".  For example, when the Creepy Dad discovers the workers have
   done something that he does not like, he gets irrationally upset. In Defendants'
   work, the same action occurs.  Plaintiffs could have had the Creepy Dad
   exhibit his "creepiness" by exhibition of a tic, fits of laughter or alternating
   fits of laughter and tears.  Plaintiffs did not.  Defendants, too, could have
   exhibited the Creepy Dad's "creepiness" in a variety of ways, but Defendants
   did not.  Instead, Defendants' story has Creepy Dad exhibit his "creepiness" in
   the same manner as Plaintiffs' work.

3. In Plaintiffs' original work, "Send in the Clowns", the young Daughter
   constantly referenced by the Creepy Dad does not, in fact, exist.  In
   Defendants' work, the young Daughter also constantly referenced by the
   Creepy Dad also does not exist.  Plaintiffs could have the Creepy Dad have an
   actual daughter or son or the party could have been for the Creepy Dad's wife,
   girlfriend, mother or any other person or animal.  Plaintiffs did not.  Neither
   did Defendants.  The choice by Plaintiffs to have Creepy Dad have a non-
   existent daughter is the creative input and election among the myriad of
   choice articulated by Plaintiffs.  The fact that Defendants have the same
   Creepy Dad with the same non-existent daughter shows that Defendants made
   no such executive choice and offered no such creative input.

4. In Plaintiffs' original work, "Send in the Clowns", a character with wrists
   bound by rope who has clearly been abducted appears and warns that the
   Creepy Dad is insane and that they should get "out of here" immediately.  But

before anyone can escape, this character is rendered unconscious by the Dad.
In the Defendants' work, the same action occurs.  This character is not
necessary to invoke the fear in the Mark or the audience.  Plaintiffs chose to
include this character, nonetheless.  So did Defendants.

5. In Plaintiffs' original work, "Send in the Clowns", the Creepy Dad surprises
everyone by appearing dressed as a little girl and claiming to be the
aforementioned "Daughter".  In Defendants' copycat episode, the same action
occurs.  There was enough "creepiness" in Plaintiffs' original work to invoke
fear in the Mark and audience.  Plaintiffs did not have to present the Creepy
Dad dressed as a little girl.  Neither did Defendants.   But they both did.

6. In Plaintiffs' original work, 'Send in the Clowns", it is implied that the Mark
will be harmed if he does not do exactly what the Creepy Dad asks. In the
Defendants' work, the same action occurs.  Plaintiffs could have implied that
the Creepy Dad would kill the pet dog or the Creepy Dad's elderly 100-year
mother.  Plaintiffs did not.  This portrays Plaintiffs' decision – creative
decision – among the many choices available to Plaintiffs.  Defendants could
have had the Creepy Dad do any number of things.  Defendants did not.
Instead, Defendants did as Plaintiffs had done.

It is clear that key original elements from Plaintiffs' "Send in the Clowns"
appear in Defendants' episode, "Split Party".  These include specific actions,
settings, costumes, props, use of poison, an imaginary Daughter, and threat to
Marks.  The dramatic spine of Plaintiffs' works clearly form the dramatic spine of
the Defendants' work.

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both
works, these elements appear in the same order or sequence in each work.

For example, the plot point about the creepy Dad appearing as his non-existent
daughter in Plaintiffs' work appears at an identical time in Defendants' work -
right before the prank is revealed.

The sequencing of Plaintiffs' original works was clearly a creative choice even
though Plaintiffs' stories could have been told through a different play-by-play
lineup of plot elements while delivering the same finished scary product.  For
example, the creepy dad could have been throwing a graduation party instead of a
birthday party. Also, the Plaintiffs could have created a story where the little girl

does exist but is tied up in an upstairs bedroom while her insane dad pretends to be
the birthday girl.  The options available to Plaintiffs are limitless.  The choice
Plaintiffs make is Plaintiffs' creative decision.  Defendants could have
demonstrated their creative input by choosing an alternate sequencing.

These are not the same sequences that Plaintiffs' work followed, demonstrating
the Plaintiffs' creative story choices and sequencing of elements (whether
protected or not) are unique and concrete expressions of the underlying story
concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have
adjusted their sequencing, but they did not.  As a result, Defendants' sequence is
substantially similar to Plaintiffs' original.

### The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform
action and speak dialogue, moving the story along a plot line. Most of the
characters in the Defendants' work are the same as in Plaintiffs' original works: we
see the Temporary Helper and the Van Passenger who are young people in their
early 20's hired to assist in throwing parties. They work with a Caterer and fellow
Assistants. There is a Creepy Dad who is obsessive about his party plan. There is a
character who has clearly been tied up and kidnapped by the Creepy Dad. This
character adds flavor to the story, but this character is by no means necessary to
accomplish the intended result – fear in the Mark.  To emphasize, the fact that
Plaintiffs add this character, among the myriad of choices available to them, is in
and of itself a creative input.  Plaintiffs demonstrate their arrangement of
characters to create their story.  This is their creativity.  Also, there is an oft-
mentioned young Daughter who does not exist. Plaintiffs did not need to have a
daughter and certainly did not need to have that Daughter be non-existent.  There is
a Creepy Dad who also appears dressed as and assuming the character of his non-
existent Daughter. The dress-up by the Creepy Dad in Plaintiffs' work add to the
Creepy Dad's "creepiness," but it is by no means required to scare the Mark.
Likewise, Defendants' work did not need to have the Creepy Dad dress up.  But,
Defendants did – just like Plaintiffs.  Plaintiffs had many choices available to them,
but their decision among the many choices is a creative input on Plaintiffs' part.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same – a birthday party at a mansion in the middle of the day. Every other Prank Encounters episode takes place at night. The overwhelming majority of the pranks in Scare Tactics episodes take place at night. The specific setting of Plaintiffs' original works was clearly a creative choice. The fact that it was set during the day was a concrete expression selected by Plaintiffs. The unusual choice of Defendants to copy the plot, character, and "setting" of a Scare Tactics prank set during the day cannot be mere coincidence.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "unnerved," i.e. from the moment the Mark meets the Creepy Dad, to the reveal of the Dad dressed as his non-existent Daughter, the Mark is clearly unnerved. Considering that Defendants used Plaintiffs' plot, characters, and settings, it should be no surprise that the "unnerved" mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, unique daytime setting, and mood, it is abundantly clear that the Defendants' work is an undeniable copy of the original.

# SCHEDULE IV

## PLAINTIFFS' ORIGINAL WORK, "CAMP KILL"

In Plaintiffs' story, "Camp Kill", a Mark arrives as a New Camp Counselor at a camp for kids located in the remote woods. It is nighttime.  The New Counselor is told that the camp is re-opening after an "incident" forced it to shut down last year.  The New Camp Counselor is meeting with two Supervisors (one Male, one Female) along with some other counselors. The Male Supervisor leaves to get some papers from another cabin, taking a two-way radio to stay in touch.

After he is gone, the New Camp Counselor sees a Menacing Figure that is wearing a mask and carrying a machete pass by a window.  Meanwhile, the Male Supervisor screams over the two-way radio, apparently getting attacked and being left for dead (which is not seen by the New Camp Counselor/Mark).  The other Counselors (all women) start to become very scared.  As the New Camp Counselor's fear level rises, the Male Supervisor stumbles in, bloodied and injured, telling everyone, including the New Camp Counselor that there is a maniac out there.

Suddenly, the Menacing Figure breaks a window and struggles to get inside. This is when the actors reveal that the Mark is on "Scare Tactics."

## DEFENDANTS' WORK, "CAMP SCARECROW"

Defendants' episode, "Camp Scarecrow," is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the Marks eventually end up in the same "scare" as in Plaintiffs' original work.

In "Camp Scarecrow," two Marks, a new Male Camp Counselor and a new Female Camp Counselor, arrive at a camp for kids located in the remote woods. It is nighttime.  They are told the camp is re-opening after an "incident" forced it to shut down last year.  The Male Camp Counselor and the Female Camp Counselor meet separately with two Supervisors (one Male, one Female) along with some other counselors.

The Female Supervisor points out to the Female Camp Counselor that the camp uses two-way radios to communicate.  The Female Camp Counselor then uses a radio to talk to the Male Camp Counselor, who is in a different cabin with Male Supervisors.  A Male Supervisor informs the women (by radio) that the men are going out to search for an Assistant Supervisor who left earlier and has not been heard from.

The Female Camp Counselor suddenly sees a Menacing Figure, wearing a mask and carrying a scythe, pass by a window in the cabin she is in.  The Female Supervisor tells her about a Groundskeeper who was arrested in connection with the "incident" that led to the forced "shutdown."

The Male Camp Counselor and others come upon the Assistant Supervisor who had not been heard from since leaving the cabin.  He has been injured.  He was attacked (an action not seen by either Mark) and is woozy.  The Groundskeeper suddenly appears and is arrested by a Park Ranger for the attack.

The Female and Male Camp Counselors again see the Menacing Figure outside a window.  They use the two-way radio to call the Park Ranger for help.  He tells them that the Groundskeeper has escaped his custody.  Both the Male Camp Counselor and the Female Camp Counselor, now together in one cabin, see different people attacked outside by the Menacing Figure, who then breaks a window and yanks a Supervisor outside.  The Menacing Figure tries to get in but is stopped when the Host of the show enters and reveals to the Marks that they are on "Prank Encounters."


**SIMILARITY ANALYSIS**:

The concept of a mad man menacing people at a cabin in the woods is not new.  However, in this case, Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in the Plaintiffs' original work, "Camp Kill," also appear in the Defendants' alleged copycat work, "Camp Scarecrow."

SCHEDULE IV

2

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and that "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a new Female Camp Counselor arrives at night at a kids' camp located in the remote woods where she has been hired to be a camp counselor.   This is the same setup utilized in Defendants' work, with the exception that two Marks are hired, one Male, the other Female. Plaintiffs did not have to have the Mark be a camp counselor.  Plaintiffs could have had the Mark be a cook, a prospective parent or person scouting camps on behalf of another.  The same is true for Defendants.

2. In Plaintiffs' original work, the new Female Camp Counselor is informed by the Supervisors that the camp is just now re-opening after being closed due to an unfortunate incident. In Defendants' work, the Marks are also informed by their respective Supervisors that the camp is just now re-opening after an unfortunate incident. Defendants could have had the new Camp Counselors at the inaugural season of camp.  There did not have to be an "incident" at all.  Or, Plaintiffs could have presented the Marks with a story that the camp had formerly been a facility for the criminally insane.  There are a number of avenues to set the stage to invoke fear.  Plaintiffs chose an "incident" so terrible that it caused the camp to have been shut down.  Defendants chose the same "incident" theory.

3. In Plaintiffs' original work, it is established by a Supervisor that the camp uses two-way radios to communicate. In Defendants' work, the same use of two-way radios is established by the Supervisors.  In today's age of unlimited advanced digital communication technology, that Plaintiffs chose a rather archaic two-way radio system to communicate is deliberate.  It was not necessary to create the "scare."  Plaintiffs could have had the Assistant

SCHEDULE IV

3

Supervisor be outfitted with a company cell phone with "location" fixed in an "on" position, but that happens to yield no information as to the whereabouts of the Assistant Supervisor.  That would have been ominous.  There was no artistic benefit for Plaintiffs to have employed two-way radios.  Two-way radios were, in no way, necessary to Plaintiffs' scare.  Similarly, Defendants' use of two-way radios was of no consequence to the scare in Defendants' episode.  Given the plethora of communication options available to Defendants, it is surprising that they chose two-way radios.

4.  In Plaintiffs' original work, a Supervisor leaves to get paperwork from another cabin, taking a radio with him.  In Defendants' work, a Supervisor also leaves a cabin to check something, and also carries a radio.   Defendants could have had the Supervisor forget the radio device and have that Supervisor's radio emit strange noises.  Instead, Defendants chose the same plot point as Plaintiffs.

5.  In Plaintiffs' original work, a Menacing Figure with a weapon is outside.  The figure walks by a window and the actors inside the cabin are positioned so only the Mark can see the figure out the window. In the Defendants' work, the exact same action occurs.  Plaintiffs could have had the Mark see the Menacing Figure while en route from the dining hall to the Mark's cabin, or from the pool area to the dining hall.  So, too, could Defendants.  Plaintiff did not and neither did Defendants.

6.  In Plaintiffs' original work, the Supervisor is attacked by a Menacing Figure, an incident not seen by the Mark.  In Defendants' copycat work, the Supervisor is attacked, an incident also not seen by either of the Marks.  It could have been the camp dog that got attacked in Plaintiffs' story or the cook.  It was not.  And, as we know, Defendants could have had the Menacing Figure attack anyone.  They instead chose to have the Menacing Figure attack a supervising male camp counselor.

7.  In Plaintiffs' original work, the injured Supervisor returns to the cabin and explains the attack.  In Defendants' work, the injured Supervisor also returns to a cabin and explains the attack. Plaintiffs could have had the camp counselors, including the New Camp Counselor, come upon the injured

SCHEDULE IV

4

Supervisor the next morning.  Plaintiffs did not.  Defendants could have had the Marks learn about an attack on a person or animal, such as the "camp" dog, in a variety of ways.  The discovery of the injured Supervisor was instead the same as in Plaintiffs' work.

8. In Plaintiffs' original work, there is a moment of calm right before the Menacing Figure breaks a window in an attempt to attack people inside the cabin.  In Defendants' episode, there is also a moment of calm right before the Menacing Figure breaks a window to attack people inside the cabin. Plaintiffs could have had the Menacing Figure appear behind a post or a tree while the counselors, and Mark, walked the grounds.  Defendants could have presented the Menacing Figure's threatened attack on the counselors and Marks in a variety of ways.  They did not.  They chose instead to mimic the presentation in Plaintiffs' original work.

9. In Plaintiffs' original work, just as it appears the Menacing Figure is coming back, the New Camp Counselor is informed she is on TV.  In Defendants' episode, just as it appears the Menacing Figure is coming back, the Host of the show appears to inform the Marks they are on TV.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

The basic and original story line of Plaintiffs' "Camp Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "Camp Scarecrow."

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the "Menacing Figure" breaking through the window to attack people inside the cabin is deliberately sequenced late in Plaintiffs' work and

appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For example, Plaintiffs could have told the same story by having the Mark be hired as part of a cleaning crew or a person scouting the camp, and not as a camp counselor; Plaintiffs could have had the camp be fully operational, and not re-opening after something bad happened last season. And, the whole thing could have taken place during daylight hours. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Mark who is hired to be a Camp Counselor. They meet with two Camp Supervisors and other Counselors.  At one point, they see a Menacing Figure outside.  In Defendants' work, the Marks are also hired to be Camp Counselors. Defendants could have had the Marks be clean-up crew or a parent or sibling interested in "scouting" the camp or a city inspector.  They did not.  As with Plaintiffs' Mark, Defendants' Marks meet with two Camp Supervisors and other Counselors.  Defendants Marks could have, instead, met with an inspector, parents interested in checking out the camp, or owners of the property.  The options are virtually endless.  Plaintiffs' work includes a Menacing Figure outside. Plaintiffs could have had a rabid dog, wolf, bobcat or even an alien or a character that rises from the dead.  Again, the options available to Plaintiffs and Defendants are

SCHEDULE IV

limitless.  Despite the plethora of options, Defendants' characters are virtually
identical to those in Plaintiffs' original work.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The
definition of setting can also include social status, weather, historical period, and
details about immediate surroundings. The setting provides the backdrop to the
story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants'
work are the same – a kids' summer camp in the remote woods at night. The
specific setting of Plaintiffs' original work was clearly a creative choice. For
example, Plaintiffs could have set the concept at a kids' sports camp in a gym
during the day.  The gym could have been located at a major sports complex used
by professional athletes. In fact, when things start going wrong at such an upscale
facility, it might be even scarier. But the choice of an abandoned kids' summer
camp in the remote woods at night was a concrete expression selected by Plaintiffs.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "worried,"
i.e. from the moment the Camp Supervisors describe having to shut the camp down
due to a mysterious "incident" to the appearance of a Menacing Figure outside,
everyone in the cabins is on edge and worried.  Considering that Defendants used
Plaintiffs' plot, characters and settings, it should be no surprise that the "worried"
mood used by Defendants is identical to Plaintiffs'.

## CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story,
including an articulation of the actual concrete elements including plot,
sequencing, characters, setting, and mood, it is abundantly clear that the
Defendants' work is an unabashed copy of the original.

SCHEDULE IV

# SCHEDULE V

**PLAINTIFFS' ORIGINAL WORK, "BICENTENNIALIEN"**

The story is set at night, in a rural area, on an isolated plot of land. It begins with the main Historian (an actor) giving a brief history of the location (a graveyard) to the Assistant (the "Mark"), while the Videographer (an actor) is filming.

The Videographer continues to film at this graveyard, while the Historian explains they are about to enter what is believed to be a "burial ground" for a paranormal society from approximately 200 hundred years ago. The Assistant is told she will be helping to excavate the "burial ground" located on "scared land" and this effort is being taped for a paranormal-themed show called "Truthisodes."

The Assistant is given a Metal Detector to help and receives a "hit" that leads both the Assistant and the Historian to start digging to uncover the metal item.  After digging, the Historian and Assistant unearth a Small Coffin.

They discover a Strange Symbol on the exterior lid of the Coffin. The Historian explains to the Assistant that the Symbol is associated with a paranormal history. Opening the coffin, they find Bones that the Mark is told belong to an alien that crashed on the planet and who later spawned a hybrid civilization.

As the Historian and Assistant bundle up the bones and remove them from their original location, a Guardian of the land appears and demands to know who "dares trespass on this sacred land?" The Guardian has a symbol on his neck that matches the symbol on the Small Coffin. He is accompanied by three other Guardians.

When a fellow Guardian reports that the Assistant and the crew have "taken the bones", the Guardian summons a Paranormal Guardian to confront them.

The angered Paranormal Guardian lifts his arm and emits an invisible force at the Videographer.  The Videographer screams, shakes, and then his chest explodes in a big blood splatter and he collapses to the ground.  At this point, when the Assistant is at her most scared, the main Guardian informs the Assistant she is on Scare Tactics.

## DEFENDANTS' WORK, "GRAVEYARD SHIFT"

The Defendants' work is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  Specifically, the back story about the development of the property for condos and the locating of a historical spoon are filler.  This filler and minor alterations do not materially change Plaintiffs' original story.

The Defendants' work also opens at night, in a rural area, on an isolated plot of land, only now there are two Marks.  One Mark is working with a construction crew and one Mark is a Historian Assistant.  Both have been recruited to help excavate what they are later told is a "burial ground" (aka graveyard, hence the title of the episode) located on "sacred land".

The Historian has a conversation with the Assistant about a paranormal civilization that used to live at the burial site in the 1700s.  The Historian describes a Strange Symbol associated with the paranormal civilization.

The Assistant is taken to the burial site where the crew is digging.  The Assistant reviews the items uncovered on the table and approves the removal of bones from the burial ground.

The Construction Assistant is given a Metal Detector to help and receives a "hit" that leads both Marks to start digging to uncover the metal item.  After digging, the Marks unearth a Small Coffin. A Strange Symbol is etched onto the exterior lid of the coffin.

The Assistants are informed that the site is a burial ground and was used by an ancient paranormal civilization that existed hundreds of years ago. The main Historian provides an explanation of the paranormal beings that once inhabited this land. She indicated they were "standing on a sacred burial ground."

Shortly after the bones are removed, a Paranormal Guardian appears, aided by two other Paranormal Guardians.  The Paranormal Guardian has a symbol on his neck that matches the symbol on the Small Coffin. Angered at hearing that bones have been disturbed, the Paranormal Guardian lifts his arm and emits an invisible force toward one crew member whose leg catches fire and toward another who screams, shakes, and then his chest explodes in a big blood splatter. At this point, when the Assistants are at their most scared, the host appears to inform the Assistants they are on Prank Encounters.

**SIMILARITY ANALYSIS**:

The dramatic concept of Paranormal Guardians at a burial site is not new. However, in this case, Plaintiffs' ideas are developed and expressed concretely through a skillful use of dialogue, setting, machinations, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in Plaintiffs' original work "Bicentennialien" also appear in Defendants' alleged copycat work, "Graveyard Shift."

The fact that Defendants use additional characters, scenes, and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and "re-appear" in the Defendants' alleged copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' copycat work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, the prank takes place at night in an isolated rural area, established as the burial grounds of a paranormal society that is 100s of years old. This exact situation is used in Defendants' episode.

2. In Plaintiffs' original work, an Assistant (the "Mark") is recruited to aid in an excavation of the burial site. In Defendant's episode, two Assistants are recruited to aid in the excavation of the burial site.

3. In Plaintiffs' original work, an Assistant  is given a Metal Detector to aid in the excavation.  In Defendants' episode, a Metal Detector is also used by an Assistant to aid in the excavation.

4. In Plaintiffs' original work, immediately after getting a hit from the metal detector, the Assistant & Historian begin digging with small garden tools.  In Defendants' episode, these same story elements appear.

5. In Plaintiffs' original work, the metal detector hit quickly leads to the excavation of a Small Coffin. In Defendants' episode, the exact same sequence occurs.

6. In Plaintiffs' original work, a Strange Symbol is immediately revealed to be etched into the exterior lid of the Small Coffin. In Defendants' episode, the exact same story element occurs.

7. In Plaintiffs' original work, there is a description of the symbol as well as its link to the paranormal civilization.  In Defendants' episode, there is also a discussion about the paranormal civilization after the uncovering the coffin and seeing the symbol.

8. In Plaintiffs' original work, bones found at the excavation site are bundled up and removed.  In Defendants' episode, bones are also bundled up and removed.

9. In Plaintiffs' original work, the Historian indicates that she does not think they should leave after the Guardians appear.  This story element also appears in Defendants' work.

11. In Plaintiffs' original work, four Guardians appear, demanding to know who "has dared trespassed" on this sacred site.  Learning that bones were moved triggers the Guardian's anger.  In Defendants' episode, three Paranormal Guardians appear, also angered at the trespassing and bone removal.

12. In Plaintiffs' original work, the Historian notices that one of the main Guardians has a symbol on his neck that matches the symbol on the coffin. In Defendants' episode, the main Guardian has a symbol on his neck that matches the symbol on the coffin.

13. In Plaintiffs' original work, one of the Guardians, a clearly Paranormal Guardian, turns his anger on one of the crew. Using supernatural power, he lifts his arm and emits an invisible force causing the man to scream, shake, and then his chest explodes in a big blood splatter and he collapses to the ground. In Defendants' work, a Paranormal Guardian also uses supernatural powers to attack the crew member who screams, shakes, his chest explodes with blood splatter and he collapses.

14. In Plaintiffs' original work, following the "chest exploding", when the Mark is at her most scared, an actor reveals that she is on Scare Tactics. In Defendants' work, the host's reveal also follows right after the chest exploding.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

**The Sequencing is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

As the "original", Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.

The sequencing of Plaintiffs' original work was clearly a creative choice. Plaintiffs' original story could have started by the crew seeing "lights in the sky" that lead them to a remote field where they discover a mysterious piece of metal that belongs to an alien space craft. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line.  In Plaintiffs' work, there is an Assistant (also known as the "Mark"), a Historian, and a Crew Member who is attacked.  Further, there are Paranormal Guardians that use supernatural powers to intimidate the Mark.  These characters are used identically in Defendants' work.

**The Settings are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' work was designed to take place in a rural area, on an isolated plot of land. Further, this land is actually a sacred burial ground belonging to a paranormal society hundreds of years old. These were obviously creative choices as there are different "settings" that could have been selected to create a different mood (i.e. a lonely road in the middle of the desert could create a different mood for the viewer). But the choice of a remote burial ground supports the apparent existence

of paranormal beings.  The setting in Defendants' work is virtually identical and Defendants' work also takes place at "night".

**The Moods Are Substantially Similar**

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the viewers.  Mood is developed in a literary piece through various methods, including setting, theme, tone, and diction.  Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and excited.  In the case of Plaintiffs' work, this may include fearful, suspenseful, tense, creepy, ghoulish, scary, dark, paranormal, frightful, otherworldly, spooky, supernatural, and hair-raising.

The overall mood in Bicentennialien is mysterious, in that, from the outset there is a sense that there is something paranormal and historical to be uncovered with the civilizations that are 100s of years old, the burial ground, and the search for a historical artifact. The mood in Graveyard Shift is exactly the same.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of their original story, including an articulation of the actual concrete elements of plot points, sequencing, characters, props, special effects, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of the original.

**SCHEDULE VI**

**ANALYSIS OF "DANGEROUS OBSESSION" AND "RE-FACE FEARS" SEQUEL**

Defendants' episode entitled "Re-Face Fears" is, quite simply, a direct sequel to their first season episode called "Face Fears," which was itself a copy of Plaintiffs' original work "Dangerous Obsession."

The Defendants do not even try to hide the episode's copycat origins, as the Host refers to it as a "sequel," and Netflix promotes the copycat work as a "continuation" of the Defendants' first season episode, "Face Fears." Even the title, "Re-Face Fears", is a dead giveaway that this is an unauthorized sequel of the infringing work, "Face Fears."

Defendants also utilize about a minute worth of clips from the infringing work, "Face Fears", to set the scene for the sequel. The clips themselves showcase elements copied from Plaintiffs' original work.

There is no reason to summarize the story line of Defendants' "Re-Face Fears," as Plaintiff never made a sequel to their original work "Dangerous Obsession"; thus, there are no plot points to compare.

However, Defendants' "Re-Face Fears" uses the same horror show theme, story elements, and characters as in their original copycat work, which was copied from the themes, story elements, and character types first established in Plaintiffs' original work, "Dangerous Obsession."

"Re-Face Fears" returns two of the exact same characters from Defendants' copycat work "Face Fears": a "Doctor" and his "Victim." A third character, a "private investigator," claims to be the brother of the investigator murdered by the Doctor in Defendants' first copycat work.

Additionally, the two new prank targets (also known as "Marks") are assigned the same roles as in the first copycat episode. One is a female "assistant" instructed to keep an eye on the health of her new boss (as was the case in the first copycat episode), the other is a male "aide" to the private investigator, also handed down from the first copycat episode.

Defendants' "Re-Face Fears" is clearly a sequel to their first copycat work, which itself would not exist without utilizing the original material created by the Plaintiff's work "Dangerous Obsession."

# SCHEDULE VII

**PLAINTIFFS' ORIGINAL WORK, "FEAR ANTICS" SERIES**

"Fear Antics" is a fictional show featured in the reality comedy prank series, "Scare Tactics."  What sets it apart from ordinary prank shows is that the person who thinks they are pulling a prank are in fact the Victim of the prank; similar to a reverse sting.  This is a unique and original take on the concept of prank shows.

**PLAINTIFF'S ORIGINAL WORK, "FEAR ANTICS: ROOM WITH A VIEW"**

This episode of "Fear Antics" begins with a young man telling the audience that a pal of his needs to be taken down a notch.  We then meet his friend, hereafter known as the Mark.  The Mark thinks he's going to prank two innocent "construction workers" for the benefit of a hidden camera show called "Fear Antics."  He's told the set-up by the "Host/Producer" of the fabricated show: the house they are in is being re-modeled, and the workers are coming to start the job.

The Producer shows the Mark a Closet, and tells him he must warn the workers about entering it; no one goes inside!

When the workers arrive, the Mark emphatically warns them about not entering the Closet, then leaves so they can begin work.  The two construction workers speculate about what could be inside the closet as the Mark meets up with the Host, who applies Scary Makeup to the Mark's face.

The workers eventually decide to peek inside the Closet.  When they open the door, they discover it leads to a bathroom, where a dead body slumps on a chair, wrapped in plastic.  As they recoil in fear and horror, the Mark bursts into the room, his face smeared with Makeup, wielding a knife.

A construction worker is so terrified he rapidly backs up, "accidentally" falling out a Window.  The man plummets to the ground a story below.  The Mark, stunned at the turn of events, rushes downstairs with the other worker.

Outside, they discover the man who fell lying on the pavement, apparently badly injured, possibly dying.  The Mark freaks out, screaming that it's not his fault.  It is here that the Mark learns the workers are actors/stuntmen, his friend set him up, and that he is the victim of a reverse prank.

**DEFENDANTS' WORK "OPEN HOUSE OF HORRORS"**

This episode of Defendants' copycat series "Double Cross" opens with a young woman telling the audience that she and her boyfriend enjoy practical jokes, and she wants to "one- up" him by turning the tables.

We then meet the Mark, and we are led to believe that he's going to pull a prank on his girlfriend, standing inside a home that is supposedly for sale. The Host/Producer of the prank show tells the Mark that the girlfriend has been summoned to see the property as part of an "open house."

When the Mark shares his concern that the girlfriend will not believe they could buy such a nice property, the Producer tells him to say that the reason the house is priced so reasonably is that a murder occurred here, thus driving down the cost. The Producer then informs the Mark that once the girlfriend arrives and begins touring the property, the Mark will make an excuse to go upstairs, where he will have Scary Makeup applied to his face, as well as being partially swathed in a straightjacket. The plan is to jump out of a Closet when the girlfriend enters the upstairs bedroom and scare her.

The Mark calls down to his girlfriend to come upstairs, then hides in the Closet. Hearing someone arrive, and thinking it's his girlfriend, the Mark leaps out.  But it's not the girlfriend, it's a "Female Realtor" who, startled and terrified, "accidentally" backs out of the Window, plummeting below.

The Producer rushes in, supposedly unaware of what has happened. The shaken Mark screams that the woman who he pranked was not his girlfriend but the realtor. Thinking she has died, they rush downstairs.

Once outside, they find the "realtor" lying on top of a car, apparently badly injured. The Mark's girlfriend asks what happened, and the Mark, claiming it's not his fault, explains that it was a prank that backfired. It's here that the Mark learns that the realtor is an actor/stuntwoman, his girlfriend was in on the deception, and that he is the victim of the prank.

**SIMILARITY ANALYSIS**:

Plaintiffs' idea is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story. These concrete elements established in Plaintiffs'

original work "Fear Antics: Room with a View", also appear in the Defendants'
alleged copycat work, "Open House of Horrors".

The two concepts, Plaintiffs original work "Fear Antics" and Defendant's work
"Double Cross", are so similar they are essentially the same idea.  The original and
unique idea of "pranking the prankster" or "reverse sting" as established in "Fear
Antics" is so distinctive as to render the copycat concept "Double Cross" as nearly
identical.

It's as if someone wanted to replicate "the Voice", but instead of turning the judges
backs to the singers, the judges face the contestants but are blindfolded.  The result
is exactly the same: the judges do not get to see the faces of the singers.  In this
case, the only difference between the set up of the copycat "Double Cross" and
Plaintiffs' original work "Fear Antics" is the amount of participation of the Mark's
friends in pulling off the prank.  In "Fear Antics", the Mark's friend passively sets
up the prank, but does not appear in the prank; whereas in "Double Cross", the
Mark's girlfriend is an active participant behind the scenes and on camera. Aside
from that one small difference, the concept, tone, setting, dramatic thrust and shock
elements are essentially indistinguishable, as identified below.


**The Plots Are Substantially Similar**

    1.      The original concept of "pranking the prankster" is established in
    Plaintiffs' original work, "Fear Antics."  This unique and original concept is
    utilized in Defendants' copycat work, "Double Cross".

    2.      The setting for the reverse prank in Plaintiffs' original work, "Room
    with a View" is an unoccupied house in transition, in this case being
    remodeled.  In "Open House of Horrors", it's an unoccupied house that is up
    for sale.

    3.      In Plaintiffs' original work, the "Prankster/Mark" meets a producer
    who walks him through the house and explains the whole setup of the prank.
    Defendants' work utilizes this element in the exact same way.

    4.      In Plaintiffs' original work, the prank involves a murdered body.  In
    Defendants' work, the setting for the prank is supposedly a home where a
    murder occurred.  Both episodes share a "murder house" as a backdrop.

5.      In Plaintiffs' original work, the Mark hides in a closet to scare someone.  In Defendants' work, the exact same situation occurs.

6.      In Plaintiffs' original work, spooky makeup is applied to the Mark's face to aid in the shock. Defendants' episode copies the same beat.

7.      In Plaintiffs' original work, an "unsuspecting person" is frightened by the Mark, and "accidentally" crashes through an upstairs window in terror. The exact same situation, an unsuspecting person falling from an upstairs window, is copied in the Defendants' episode.

8.      In Plaintiffs' original work, the Mark rushes downstairs to find the "innocent" writhing in pain.  Defendants copy the same beat in their episode.

9.      In Plaintiffs' original work, the Mark learns that the "unsuspecting person" is actually a stunt person and is uninjured.  Defendants copy the same element in their episode.

10.      In Plaintiffs' original work, the Mark is informed that he is the victim of a reverse prank, and exhales relief.  The same reveal is copied in Defendants' work.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from the story genesis through specific actions, dialogue, use of props and set up, as well as the conclusion. In some cases, Defendants' work wholly appropriates key scenes, and situations from Plaintiffs' original work.


**The Sequencing Is Substantially Similar**

In addition to the virtually identical plot elements appearing in both Plaintiffs' work and Defendants' work, these elements appear in the same order or sequence in each work.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For instance, the Mark in Plaintiffs' original work could have come into a house where the workers were already inside. Then, the Mark could have lured the workers outside for a different scary prank. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing

of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

In Plaintiffs' original work, the first story element is that the Mark is misled to believe they are the masters of a prank.  This is the first story element of Defendants' copycat work.

In Plaintiffs' original work, the Mark is then coached by a Producer on what to say to the supposed victims of the prank.  This occurs at exactly the same point in Defendants' episode.

In Plaintiffs' original work, once the setup has been established, the Mark disappears to have spooky makeup applied as he hides.  This sequence appears at the same story junction in Defendants' work.

In Plaintiffs' original work, the Mark leaps into the room and frightens an "innocent" so badly the person falls through an upstairs window.  This action is duplicated at the same point in the story in Defendants' copycat episode.

In Plaintiffs' original work, the Mark rushes downstairs to find the innocent lying injured. The exact same beat follows at the same juncture in Defendants' episode.

In Plaintiffs' original work, the truth is finally revealed to the Mark in as he frets over the "injured" party.  This exact story beat is duplicated at the exact same time in Defendants' copycat work.

Rather than copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line.  In Plaintiffs' work, there are four main characters: the Accomplice (friend who set up the Mark), the "Mark/Prankster," the "Producer" and the "stunt actor".  These four characters are used identically in Defendants' work.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details

about immediate surroundings. The setting provides the backdrop to the story and
helps create mood.

In Plaintiffs' original work, the prank takes place in an unoccupied two-story house
supposedly being remodeled, so there is no one around save the prank participants.
In Defendants' episode, the prank is set in an unoccupied two-story house
supposedly for sale, and thus again, no one is around except the prank participants.
Both houses have the aura of "murder" surrounding them. Both employ hiding
their Mark behind a closed door in a Closet so the Mark can jump out and scare an
unsuspecting person. And both employ stunts where someone supposedly falls
from an second story window.

**The Moods Are Substantially Similar**

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional
setting that surrounds the viewers. Mood is developed in a literary piece through
various methods, including setting, theme, tone, and diction. Although the
list is long, some common words to describe mood may include cheerful; gloomy;
reflective; and excited. In the case of Plaintiffs' works, this may include: surprise,
shock, tense, and anxious. The mood in Room With A View is suspenseful, in that,
from the outset, the prankster is waiting to scare an unsuspecting person in an
unoccupied house where something is "not quite right" and where a murder took
place.  The mood in Open House is the same.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story,
including an articulation of the actual concrete elements including plot points,
sequencing, characters, setting, and mood, it is abundantly clear that the
Defendants' work is a blatant copy of the original.

**SCHEDULE I**


**PLAINTIFFS' ORIGINAL WORK, "DANGEROUS OBSESSION"**

The story begins with a compassionate" Husband" hiring a temporary home
Caregiver (the "Mark"), to watch over his Wife, who he claims has been injured in
an accident and lives in a comatose state [everyone in the episode, but for the
Caregiver, is an actor who rehearsed lines and action under direction prior to
filming].

The Husband discusses how much he loves his Wife, then shows the
Caregiver, a young woman, how to give his Wife medication, then she is told to sit
with the Wife and read an article from a magazine to her, as it supposedly helps
keep the Wife calm.

The Husband says he will be leaving for 45 minutes.  Before leaving, he
kisses his Wife on the forehead and says, "Goodbye, my angel."  The "kiss" is
"long, lingering and creepy."

After the Husband leaves, the Wife suddenly wakes up and spits the pills
out, shocking the Caregiver.

The Wife claims she has been kidnapped by the Husband and that the
Husband is actually a fan who is obsessed with her.  She orders the Caretaker to
open a nearby closet.

Inside, the Caregiver discovers a shrine that has been built to "honor" the
Wife.  The Wife then pulls back her blankets to reveal her legs are chained.  She
tells the Caregiver to retrieve keys that are stored in another room as the Wife
starts to dial the police.

The Caregiver finds the keys, and the Wife is about to be freed when the
Husband suddenly appears (back early and unexpectedly).  He injects his Wife
with a hypodermic needle and the Wife quickly slumps back into bed.

The Husband claims that whatever his Wife said is not to be believed, as the
drugs make her "delusional."

The Caregiver begs to leave, but the Husband picks up another needle and
indicates he is going to inject the Caregiver as well.  The Caregiver is really afraid

SCHEDULE I

1

and does not know what to do next.   But, before the Husband can inject the Caregiver, the Wife rises up and informs the Caregiver that she is on "Scare Tactics."

**DEFENDANTS' WORK, "FACE FEARS"**

The Defendants' work is roughly four and a half times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.   These added elements involve another Mark who believes he is helping a Private Detective search for a missing woman.  This filler does not materially change Plaintiffs' original story.

The Defendants' work begins with a young woman (the "Caregiver" -- "Mark"), who is starting a new job as a Caregiver.  The Caregiver  is helped by a male nurse (the "Nurse") who tells the new Caregiver that they have both been hired by a famous plastic surgeon (the "Surgeon") to care for the man's Wife, who has had "some work done."

The Caregiver is then introduced to the Surgeon, who claims that his Wife has recently had an accident and is sedated to help with the pain.  He says that his Wife is disoriented, and sometimes says "non-sensical" things, and, thus, anything she says should be dismissed.

The Caregiver is then shown the Wife, who lies seemingly unconscious in a bed.  After professing his love for his Wife, the Surgeon proudly gestures to a "shrine" (his words) that he has constructed for her above a nearby chest of drawers.

The Surgeon then indicates a nearby trove of morphine and fentanyl, which he tells the Caregiver and Nurse to administer if his Wife awakens and becomes agitated.  The Surgeon then kisses his Wife on the forehead, and tells her he loves her, ending with "goodbye my sweet".   The "kiss" is "long, lingering and creepy." He then informs the Caregiver and the Nurse that he is leaving.

The Nurse steps out to go to the bathroom, leaving the Caregiver alone.  The Caregiver picks up a magazine and tells the Wife she will find a good article to read to her.  But, before Caregiver can, the Wife suddenly startles herself "awake," and mumbles, "I'm not supposed to be here" and "not mine" before falling unconscious again.

SCHEDULE I

The Nurse then returns, and the Caregiver catches him up to date.  The Wife suddenly awakens again. Nurse claims it is agitation, and he supposedly injects morphine into the Wife to calm her.

At this point, an added B story (a second mark helping a private detective) crosses the original story.  Supposedly following a clue as to the whereabouts of a "missing woman," the second mark and the detective enter the room.  They hypothesize that the woman in the bed is not who the Surgeon claims, but instead a missing woman from another state.

At this point, the Caregiver starts to understand that the Wife in the bed is not who the Surgeon claimed and that the Surgeon has changed her appearance with plastic surgery, as well as removing a tattoo on her arm that could be an identifying feature.

The Nurse returns just as the Wife becomes agitated again, and this time, the Nurse gives her some calming medication. He is brought up to speed on the theory regarding the about the Wife that they have been discussing.  A phone call from a "police detective" convinces them they are correct about their theory.

The Surgeon calls and tells the Caregiver he is on his way home.  Moments later, he arrives early and unexpectedly and asks what is going on.  The second mark and the "PI" tell him their theory, which the Surgeon rejects. The Surgeon then says he wants to talk to the PI alone, and they step away.  Shortly after, there is a loud off-screen "thud" (someone falling to the floor?).

The Wife awakens and says she is not supposed to there and claims she has been kidnapped. Just as the police are being summoned via telephone, the Surgeon returns and, using an incapacitating agent, renders the Nurse unconscious.  The Caregiver and the "investigator mark" are on their own and in danger.

The Surgeon has blood on his shirt and scratches on his face, implying he killed the PI offscreen.  He then threatens the Caretaker and the other mark with a hypodermic needle.  They are really scared.  It is at this point that the marks are told they are on "Prank Encounters."

## SIMILARITY ANALYSIS

The dramatic concept of a woman being kidnapped by a stranger and held against her will is not new.  However, in this case, Plaintiffs' idea is developed and expressed concretely through a skillful use of dialogue, settings, machinations,

characters, and actors that expand the concept into an original and fresh story. These concrete elements, established in the Plaintiffs' original work, "Dangerous Obsession," also appear in the Defendants' alleged copycat work, "Face Fears."

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' copycat work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a man kidnaps a woman and holds her against her will in a bed, keeping her sedated.  He hires a caregiver to watch over the woman, who he claims is his wife, while he leaves the house for a short time.  This exact set up is the basis for Defendants' work "Face Fears." Plaintiffs made an executive decision in deciding to portray a seemingly loving Husband care for his incapacitated Wife.  Plaintiffs could have presented a patient/nurse caretaking situation or a Rockstar/groupie situation.  Among the myriad options available to Plaintiffs ultimately made the executive decision to have a Husband character with an incapacitated Wife.  Defendants' executive decision, here, is not one of creativity; rather, it is one of copying.

2. In Plaintiffs' original work, the Husband tells the caregiver that his wife was in a serious accident and that he has been caring for her at home.  This element also appears in the Defendants' work.

3. In Plaintiffs' original work, the Husband claims the woman is the love of his life, and has built a "shrine" to her, which understandably concerns the caregiver.  These story elements also appear in Defendants' work.

4. In Plaintiffs' original work, the Husband tells the caregiver that the woman is unconscious and heavily medicated, thus anything she might utter should not be taken seriously.  This story element also appears in Defendants' work.

SCHEDULE I

5.  In Plaintiffs' original work, the Husband leaves, but not before whispering "Goodbye, my angel" and giving the woman a creepy kiss on the forehead. These story elements appear in the Defendants' work.

6.  In Plaintiffs' original work, the Caregiver reads an article from a magazine to the woman, as the sound of voices soothes her.  In Defendants' work, the caregiver undertakes the same task.

7.  In Plaintiffs' original work, the woman awakens and tells the Caregiver her plight.  In the Defendants' work, the woman stirs and tells the Caregiver she does not belong here.  The same basic incidents generate the same fear and questioning in both stories: the Caregiver in each case is now wary of the tale she has been told and is starting to fear for her own safety.

8.  In Plaintiffs' original work, the Husband returns home unexpectedly and becomes aware that his scheme has been discovered.  In the Defendants' work, the also Husband returns sooner than expected and is equally unhappy that his scheme has been exposed.

9.  In Plaintiffs' original work, the Husband produces a hypodermic needle and threatens the Caregiver, implying she will soon be unconscious and thus unable to summon help.  In the Defendants' work, the Husband also reveals a hypodermic needle and, by his actions, also implies harm to the caregiver. Here, Plaintiffs could have had the Husband wield a knife.  Defendants could have had the Husband wield a scalpel.  Instead, the Plaintiffs conceived of a hypodermic needle.  This creativity was then copied by Defendants.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

### The Sequencing Is Substantially Similar

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

As the "original", Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.

SCHEDULE I

For instance, Plaintiffs could have started the story showing the Husband alone in the room with his unconscious wife, making everything "perfect" by touching up the "shrine" before going downstairs to meet the caregiver. This is not the same sequence that Plaintiffs' original work followed, demonstrating the Plaintiffs' sequence was a unique expression of the underlying story concept chosen by the creators. Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not. As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

### The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' work, there are three characters, the Husband, the "injured/comatose" Wife, and the Caregiver (Mark). These three characters are used identically in Defendants' work.

### The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' work was designed to take place in an upscale, well-maintained private home. The story takes place during the night. These were obviously creative choices as there are different "settings" that could have been selected to create a different mood (i.e. a rundown apartment in a blighted place of town could create a different mood for the viewer, as would heavy security locks on doors and bars on windows). But the choice of a low security "private home" supports the apparent ability of the Husband to keep his "bride" in true comfort and to afford the costs of a private nurse and nice surroundings for his "wife." The setting in Defendants' work is virtually identical (even to the point of using a two-story house). And, Defendants' work also takes place at "night".

### The Moods Are Substantially Similar

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the readers. Mood is developed in a literary piece

SCHEDULE I

through various methods, including setting, theme, tone and diction. Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and; intense romantic.  In the case of Plaintiffs' works, this may include fearful; tense; anxious, suspenseful; ghoulish; macabre, grim; and scary.

The mood in Dangerous Obsession is ambivalence, in that, from the outset, there is a sense that something is "not quite right" with the unconscious "wife" and the husband's message to the "caregiver."  The mood in Face Fears is the same.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of Plaintiffs' original.

SCHEDULE I

7

# SCHEDULE II

## PLAINTIFFS' ORIGINAL WORK, "ROAD KILL"

In this story, an Assistant (the Mark) is hired to help a Government Investigator (an actor) look into a series of accidents involving government vehicles. A Videographer (also an actor) rides with them to make a video record of everything they find.  The three travel at night to a spot on an isolated, rural road and come upon an accident scene, including debris from a wrecked car.

The Assistant finds a car part, the grille of the wrecked car covered in blood and hair.  As the investigation continues, a local Farmer appears and tells them that three weeks ago, he saw "something very big" shoot across the road.  Suddenly there is a "howl" from the woods.  The Assistant thinks it was from wolves.  The Farmer leaves quickly.

The team returns to their car, where they hear another howl and then the sound of a car crash.  They investigate and discover another vehicle on the road, this time a wrecked van. The Driver of the van is missing, and there is blood and scratch marks inside and outside the van.  When the Investigator goes to look at the van, the frightened Assistant stays behind.

The missing van Driver then appears at their car seeking help.

The Drive joins the Assistant and the Videographer in their car, leaving the Investigator outside.  Suddenly, they see the Investigator attacked and pulled away by a mysterious Creature.  The Driver wants to start the car to flee but is unable to do so.

The three are stuck in the car when a large hairy Creature suddenly reaches into the car and attempts to pull the Driver out through the window.  At this point, with the Mark begging to leave, the Driver informs the Mark that he is on "Scare Tactics."

## DEFENDANTS' WORK, "END OF THE ROAD"

The Defendants' work is roughly four and a half times the length of Plaintiffs' and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the two Marks eventually end up in

the same "scare" as in Plaintiffs' work.  Mark 1 is hired by a government agency to investigate a series of car accidents.  She is accompanied by a Government Investigator and a Videographer.  Joining them is a Naturalist.  Mark 2 is hired by an Agent from an insurance company to investigate the same accidents.

Traveling along an isolated rural road at night, Mark 1 and her team come upon the remains of an accident scene. While looking over the debris, they discover remnants/car parts from the accident covered in blood and hair.   Meanwhile, while traveling to the same site, Mark 2 and the Agent come across a man who claims his friend has gone missing in the woods.

When the two Marks finally meet up, they discuss what they have discovered so far, but then they hear an animal noise – a "growl" -- coming from the woods.  An "unexpected" car approaches on the rural road. There are two Young Men inside. Asking for instructions, they are told that they are far from their destination. The car drives off down the road.  Moments later, everyone hears the sound of an car crash down the road.

Rushing to the scene, they discover the same car.  The young male Driver is injured.  His passenger is missing.

The Marks see what they think is fur embedded in the wreckage.  Deciding they need to take the injured Driver to a hospital, everyone except the Naturalist and the Videographer climb into a nearby government van that will not start.

Then, while scanning for the missing passenger, the Naturalist is attacked by a big hairy Creature, as is another person who is looking for his missing hiking partner.  The Creature then attacks the government van and attempts to drag the injured Driver out a window, but fails.  The missing young Passenger then runs up and tells the Marks, who are supposedly terrified, that they are on "Prank Encounters."

## SIMILARITY ANALYSIS

There are elements and characters appearing in Defendants' work that do not appear in Plaintiffs' original; however, in this case, Plaintiffs' concept is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story. These concrete elements established in Plaintiffs' original work, "Road Kill," also appear in the Defendants' alleged work, "End of the Road."

SCHEDULE II

2

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' original work and "re-appears" in the Defendants' work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, a Mark is hired by a government agency to investigate car accidents involving government vehicles.  In Defendants' copy, Mark 1 is hired by a government agency to investigate car accidents. Defendants' set up is identical to Plaintiffs'.  Plaintiffs didn't have to employ government agency characters.  Plaintiffs could have employed insurance agents instead.  Or, Plaintiffs could have had investigators working for the district attorney's office.  Defendants, armed with so much more time than Plaintiffs, had countless options as far as their choice of characters goes. Yet, Defendants chose the same government agency characters.

2. In Plaintiffs' original work, a Videographer joins the team to record the investigation. In Defendants' work a Videographer is also on board.  The Videographer is an add on character not completely necessary for the plot. Yet, both Plaintiffs and Defendants have the Videographer.

3. In Plaintiffs' original work, the incident occurs at night on an isolated, rural road.  Again, Defendants use an identical setting.  Plaintiffs could have had the investigative location be at a church parking lot or a college campus or a campground.  Plaintiffs did not and neither did Defendants.

4. In Plaintiffs' original work, there is debris from a car wreck - a car part covered in blood and hair.  In Defendants' work, there is debris from a car wreck - a car part covered in blood and hair.  Plaintiffs may have decided to have the car part covered in blood and hair because they were up against a limited timeframe.  Defendants, however, were not.  Defendants had ample opportunity to elicit the notion that a hairy and scary Creature lurked nearby.

SCHEDULE II

3

They had license to create a "build-up" of sorts, yet they chose to take the same "shortcut" as Plaintiffs.

5. In Plaintiffs' original work, the Mark and a Farmer/Animal Expert examine mysterious hair on the wreckage. The Farmer says he doesn't know what it is. In Defendants' work, the "Farmer" part is played by a Naturalist/Animal Expert who also examines mysterious hair on the wreckage and has no answers. Defendants' use of a "Naturalist" instead of a "Farmer" is not a real change in the Animal Expert character. In fact, this is a method used by many screen writers to mask their copying of work by another writer. This character is completely unnecessary to both Plaintiffs' story and Defendants' story. No doubt Plaintiffs' and Defendants' Animal Expert character played by the Farmer and Naturalist, respectively, foreshadows a threat of some sort. Both Plaintiffs' story and Defendants' story would have accomplished the "scare" without the Animal Expert. Yet, both stories include this unnecessary character.

6. In Plaintiffs' original work, the Farmer gives an eyewitness account of a mysterious Creature he could not identify that was moving too quickly moving across the road. In the Defendants' work, the Mark is shown security camera footage of a mysterious Creature quickly very moving across the road and learns (just as the Farmer) that the Naturalist could not identify the Creature.

7. In Plaintiffs original work, scary howls are heard from the nearby woods. Clearly similar, in Defendants' work scary growls are heard from the nearby woods. Plaintiffs' use of howls may have been necessitated by the time limit constraints. Defendants didn't have such time constraints. Thus, Defendants could have employed numerous other option to elicit the existence of a scary Creature lurking about.

8. In Plaintiff's original work, the Mark and his team hear, and then investigate, a second car crash down the road. In Defendants' work, the Marks also hear, and then investigate, a second car crash down the road. This "live" car crash is completely unnecessary to establish the existence of a scary Creature

SCHEDULE II

4

lurking about.  Yet, both Plaintiffs and Defendants have such a "live" car crash.

9. In Plaintiffs' original work, the Driver of the wrecked car is missing, and there is blood and hair on the vehicle.  In Defendants' work, the Passenger is missing, and there is also blood and hair on the vehicle.  Here, Defendants had the opportunity to have multiple characters go missing.  Yet, Defendants kept to the script – Plaintiffs' script, that is.

10. In Plaintiffs' original work, the Investigator, while looking for the missing Driver, is attacked by a Creature and disappears.  In Defendants' work, while looking for a missing passenger, the Naturalist is attacked by a Creature and disappears.   Again, Defendants, armed with four times the amount of time as Plaintiffs, chose to do as Plaintiffs had done.

11. In Plaintiffs' original work, the Mark stays inside the car and is joined by the missing Driver.  In Defendants' work, the Marks also stay inside the car and are joined by the injured Driver.   The similarities are simply uncanny.

12. In Plaintiffs' original work, the frightened Mark wants to leave, but the vehicle won't start. In Defendants' work, the frightened Marks want to leave, but the vehicle won't start.  Plaintiffs could have had the car's mobility be thwarted by a fallen tree.  Plaintiffs seems, instead, to have chosen ignition problems.  Defendants, armed with ample time, could have had the car start, only to have a tire spin-out or any number of other calamities befall the car and its occupants.

13. In Plaintiffs' original work, the Creature attacks the vehicle and attempts to drag the injured Driver away through a window.  In Defendants' work, the Creature also attacks the vehicle and attempts to drag the injured Driver away through a window.  Defendants had ample time to be a bit more creative than Plaintiffs here.  Yet, Defendants chose the shortcut; they chose Plaintiffs' version.

SCHEDULE II

14. In Plaintiffs' original work, the attack fails, and the Mark is then told he is on "Scare Tactics."  In Defendants' work, the attack also fails, and the Marks are then told they are on "Prank Encounters."

As clearly evidenced, Defendants' work mimics content in Plaintiffs' original work and, in some cases, wholly appropriates key scenes, and situations from Plaintiffs' original work.  These include not only specific actions, but also characters, use of props, and large hairy Creatures.

The basic and original story line of Plaintiffs' "Road Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "End of the Road."

**Sequencing Is Substantially Similar**

In addition to the virtually identical plot elements appearing in both Plaintiffs' work and Defendants' work, these elements appear in the same order or sequence in each work.

For example, the convention of creating a second car accident in each episode is deliberately sequenced late Plaintiffs' work and appears at an identical time in Defendants' work.  In both cases, the "late second car crash" is followed directly by the Creature attack and is used to drive home the possibility of a dangerous creature in the area.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For instance, the Mark in Plaintiffs' original work could have come upon the accident scene through a completely different set-up, say as a new employee mapping the road, or looking for dead animals. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead, Plaintiffs chose to have the Mark hired by the government to help in the investigation of car accidents, the exact same set up used by Defendants.

SCHEDULE II

Rather than copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or Creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Mark who is hired to assist an Investigator, but not just any Investigator.  No, the Mark is hired to assist a Government Investigator.  They are accompanied by a Videographer.  The Videographer is not a "stock" character.  At one point, a local Farmer appears (familiar with wildlife), and near the end of the story, the Driver of a crashed auto also appears.  The second car crash victim is certainly not a "stock" character necessary to accomplish the "scare."

In Defendants' work, the Mark is hired to help the Investigator and they are joined by a Videographer (the same characters).  The "Naturalist" plays the same role as the "Farmer". Then there is the Driver of the crashed vehicle.  Counting the Creature, the five characters are virtually identical to those in Plaintiffs' original work.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place.  The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same - cars travel on a country road, night, debris from a car wreck, work lights set up, hearing a second "crash" and going to that spot where they get into a car to leave.  The choice of a country road to investigate an auto vs. animal accident was a creative option selected by Plaintiffs.  Notably, auto vs. animal accidents also occur on busy highways and secondary roads all too frequently (i.e. mountain lions in Southern California; deer and elk in Colorado).

SCHEDULE II

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is essentially "helpful," i.e. from the onset, everyone is trying jointly to solve the puzzle.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "helpful" mood used by Defendants is identical to Plaintiffs'.

CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work I s an almost identical copy of the original.

SCHEDULE II

# SCHEDULE III

## PLAINTIFFS' ORIGINAL WORK, "SEND IN THE CLOWNS"

Plaintiffs' "Send in the Clowns" begins when a Temporary Helper (the Mark) is hired by a Creepy Dad to help at his young Daughter's birthday party.  The Temporary Helper will work with another Assistant.  They are instructed to blow up balloons and put together gift bags, and later, they will perform a clown show.

Creepy Dad leaves to get his "Daughter" and the Temporary Helper and the Assistant dress as clowns. They hear muffled cries coming from a nearby closet where they discover a Woman, also dressed as a clown, her hands bound with rope. She tells them that there is no party, no Daughter, that the Creepy Dad is insane and that they have to leave.

The Woman rushes to leave but is intercepted by the Creepy Dad, now dressed as a little girl, complete with wig.  He uses a mallet to knock the Woman out, then orders the Mark and the Assistant to create balloon animals.

Getting angrier, the Creepy Dad orders the Assistant to shake his hand.  She does, and a hidden handheld joy buzzer electrocutes her.  The Temporary Helper races out of the room, but he is stopped and told he is on "Scare Tactics.

## DEFENDANTS' WORK, "SPLIT PARTY"

Defendants' work is roughly four and a half times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.

"Split Party" deals with two Marks, who both meet a rich Creepy Dad, who is holding a birthday party for his young "Daughter" at his mansion.  Mark # 1 takes a different dramatic path to reach the party, and the events that happen to her before she arrives at the mansion are simply "filler" to help inform her reality, but do not materially affect the underlying concept and telling of the prank as the two Marks eventually end up in the same "scare" as in Plaintiffs' work.

Mark 2, a Temporary Helper, arrives at the mansion to meet a Caterer whom she will help along with another Assistant.  The Temporary Helper and the other Assistant are both introduced to a Creepy Dad, who tells them he wants the perfect party for his young "Daughter".  He calls for his Daughter to "come meet the help", but she does not respond.

Mark # 1, a Van Passenger, arrives in a van along with a Celebrity Guest (the Host, playing himself), who is supposedly making a surprise appearance for the little girl.  The Celebrity's Manager is with them.

The Creepy Dad disposes of a birthday cake that the Caterer had brought, and instead, shows the Celebrity Guest "special cupcakes" he claims the Daughter baked in his honor. He encourages the Celebrity Guest to consume one as he fetches his Daughter for the big surprise.

The Celebrity Guest eats a cupcake, as does his Manager.  Both immediately fall ill, as the treats have been poisoned.  A man, whose hands are bound with rope, rushes in.  He is the Gardener.  He claims that the Creepy Dad is insane and that they should leave.  The Creepy Dad re-appears, now dressed in a little girl's outfit, and subdues the Gardener with poison cake.

With both the Celebrity Guest and the Manager now foaming at the mouth from the poison, the Creepy Dad insists that everyone have a bite of the cupcakes.  The Temporary Helper and the Van Passenger resist, and the threat from the Creepy Dad is ended when the Celebrity Guest suddenly awakens and shoves one of the supposedly poisoned cupcakes into the Creepy Dad's mouth, rendering him unconscious.  It is here where the Temporary Worker and the Van Passenger are informed they are on "Prank Encounters".

## SIMILARITY ANALYSIS:

Although Defendants' work has story elements and characters not appearing in Plaintiffs' episode, these changes do not alter the basic concept, dramatic thrust and concrete elements exhibited in Plaintiffs' work and utilized in Defendants' copycat work.

Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements, established in Plaintiffs' original work, "Send in the Clowns", also appear in Defendants' alleged copycat work, "Split Party".

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work "Send in the Clowns", the Dad is portrayed as creepy and odd.  In Defendant's copycat work, the character of the Dad is also creepy and odd.  Plaintiffs could have had the creepy character be a mother or grandmother or sister or nanny.  Plaintiffs' choice among the many choices shows Plaintiffs' executive, creative input.  Defendants, too, had countless choices with regard the character employed to accomplish the "scare."  Yet, unlike Plaintiffs, who made a choice, an executive creative decision, Defendants simply copied Plaintiffs' creative input with regard to the Dad– lock, stock and barrel.

2. In Plaintiffs' original work, "Send in the Clowns", Plaintiffs have the Creepy Dad exhibit his "creepiness" by making it clear that the Creepy Dad likes things done a certain way, with an exacting standard that renders him "creepy".  For example, when the Creepy Dad discovers the workers have done something that he does not like, he gets irrationally upset. In Defendants' work, the same action occurs.  Plaintiffs could have had the Creepy Dad exhibit his "creepiness" by exhibition of a tic, fits of laughter or alternating fits of laughter and tears.  Plaintiffs did not.  Defendants, too, could have exhibited the Creepy Dad's "creepiness" in a variety of ways, but Defendants did not.  Instead, Defendants' story has Creepy Dad exhibit his "creepiness" in the same manner as Plaintiffs' work.

3. In Plaintiffs' original work, "Send in the Clowns", the young Daughter constantly referenced by the Creepy Dad does not, in fact, exist.  In Defendants' work, the young Daughter also constantly referenced by the Creepy Dad also does not exist.  Plaintiffs could have the Creepy Dad have an actual daughter or son or the party could have been for the Creepy Dad's wife, girlfriend, mother or any other person or animal.  Plaintiffs did not.  Neither did Defendants.  The choice by Plaintiffs to have Creepy Dad have a non-existent daughter is the creative input and election among the myriad of choice articulated by Plaintiffs.  The fact that Defendants have the same Creepy Dad with the same non-existent daughter shows that Defendants made no such executive choice and offered no such creative input.

4. In Plaintiffs' original work, "Send in the Clowns", a character with wrists bound by rope who has clearly been abducted appears and warns that the Creepy Dad is insane and that they should get "out of here" immediately.  But

before anyone can escape, this character is rendered unconscious by the Dad. In the Defendants' work, the same action occurs. This character is not necessary to invoke the fear in the Mark or the audience. Plaintiffs chose to include this character, nonetheless. So did Defendants.

5. In Plaintiffs' original work, "Send in the Clowns", the Creepy Dad surprises everyone by appearing dressed as a little girl and claiming to be the aforementioned "Daughter". In Defendants' copycat episode, the same action occurs. There was enough "creepiness" in Plaintiffs' original work to invoke fear in the Mark and audience. Plaintiffs did not have to present the Creepy Dad dressed as a little girl. Neither did Defendants. But they both did.

6. In Plaintiffs' original work, 'Send in the Clowns", it is implied that the Mark will be harmed if he does not do exactly what the Creepy Dad asks. In the Defendants' work, the same action occurs. Plaintiffs could have implied that the Creepy Dad would kill the pet dog or the Creepy Dad's elderly 100-year mother. Plaintiffs did not. This portrays Plaintiffs' decision – creative decision – among the many choices available to Plaintiffs. Defendants could have had the Creepy Dad do any number of things. Defendants did not. Instead, Defendants did as Plaintiffs had done.

It is clear that key original elements from Plaintiffs' "Send in the Clowns" appear in Defendants' episode, "Split Party". These include specific actions, settings, costumes, props, use of poison, an imaginary Daughter, and threat to Marks. The dramatic spine of Plaintiffs' works clearly form the dramatic spine of the Defendants' work.

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the plot point about the creepy Dad appearing as his non-existent daughter in Plaintiffs' work appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original works was clearly a creative choice even though Plaintiffs' stories could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product. For example, the creepy dad could have been throwing a graduation party instead of a birthday party. Also, the Plaintiffs could have created a story where the little girl

does exist but is tied up in an upstairs bedroom while her insane dad pretends to be the birthday girl.  The options available to Plaintiffs are limitless.  The choice Plaintiffs make is Plaintiffs' creative decision.  Defendants could have demonstrated their creative input by choosing an alternate sequencing.

These are not the same sequences that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. Most of the characters in the Defendants' work are the same as in Plaintiffs' original works: we see the Temporary Helper and the Van Passenger who are young people in their early 20's hired to assist in throwing parties. They work with a Caterer and fellow Assistants. There is a Creepy Dad who is obsessive about his party plan. There is a character who has clearly been tied up and kidnapped by the Creepy Dad. This character adds flavor to the story, but this character is by no means necessary to accomplish the intended result – fear in the Mark.  To emphasize, the fact that Plaintiffs add this character, among the myriad of choices available to them, is in and of itself a creative input.  Plaintiffs demonstrate their arrangement of characters to create their story.  This is their creativity.  Also, there is an oft-mentioned young Daughter who does not exist. Plaintiffs did not need to have a daughter and certainly did not need to have that Daughter be non-existent.  There is a Creepy Dad who also appears dressed as and assuming the character of his non-existent Daughter. The dress-up by the Creepy Dad in Plaintiffs' work add to the Creepy Dad's "creepiness," but it is by no means required to scare the Mark.  Likewise, Defendants' work did not need to have the Creepy Dad dress up.  But, Defendants did – just like Plaintiffs.  Plaintiffs had many choices available to them, but their decision among the many choices is a creative input on Plaintiffs' part.

**The Settings Are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same – a birthday party at a mansion in the middle of the day. Every other Prank Encounters episode takes place at night. The overwhelming majority of the pranks in Scare Tactics episodes take place at night. The specific setting of Plaintiffs' original works was clearly a creative choice. The fact that it was set during the day was a concrete expression selected by Plaintiffs. The unusual choice of Defendants to copy the plot, character, and "setting" of a Scare Tactics prank set during the day cannot be mere coincidence.

**The Moods Are Substantially Similar**

The mood established in Plaintiffs' original work is, appropriately, "unnerved," i.e. from the moment the Mark meets the Creepy Dad, to the reveal of the Dad dressed as his non-existent Daughter, the Mark is clearly unnerved.  Considering that Defendants used Plaintiffs' plot, characters, and settings, it should be no surprise that the "unnerved" mood used by Defendants is identical to Plaintiffs'.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, unique daytime setting, and mood, it is abundantly clear that the Defendants' work is an undeniable copy of the original.

## SCHEDULE IV


**PLAINTIFFS' ORIGINAL WORK, "CAMP KILL"**

In Plaintiffs' story, "Camp Kill", a Mark arrives as a New Camp Counselor at a camp for kids located in the remote woods. It is nighttime.  The New Counselor is told that the camp is re-opening after an "incident" forced it to shut down last year. The New Camp Counselor is meeting with two Supervisors (one Male, one Female) along with some other counselors. The Male Supervisor leaves to get some papers from another cabin, taking a two-way radio to stay in touch.

After he is gone, the New Camp Counselor sees a Menacing Figure that is wearing a mask and carrying a machete pass by a window.  Meanwhile, the Male Supervisor screams over the two-way radio, apparently getting attacked and being left for dead (which is not seen by the New Camp Counselor/Mark).  The other Counselors (all women) start to become very scared.  As the New Camp Counselor's fear level rises, the Male Supervisor stumbles in, bloodied and injured, telling everyone, including the New Camp Counselor that there is a maniac out there.

Suddenly, the Menacing Figure breaks a window and struggles to get inside. This is when the actors reveal that the Mark is on "Scare Tactics."

**DEFENDANTS' WORK, "CAMP SCARECROW"**

Defendants' episode, "Camp Scarecrow," is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  This filler does not materially change Plaintiffs' original story as the Marks eventually end up in the same "scare" as in Plaintiffs' original work.

In "Camp Scarecrow," two Marks, a new Male Camp Counselor and a new Female Camp Counselor, arrive at a camp for kids located in the remote woods. It is nighttime.  They are told the camp is re-opening after an "incident" forced it to shut down last year.  The Male Camp Counselor and the Female Camp Counselor meet separately with two Supervisors (one Male, one Female) along with some other counselors.

SCHEDULE IV

1

The Female Supervisor points out to the Female Camp Counselor that the camp uses two-way radios to communicate.  The Female Camp Counselor then uses a radio to talk to the Male Camp Counselor, who is in a different cabin with Male Supervisors.  A Male Supervisor informs the women (by radio) that the men are going out to search for an Assistant Supervisor who left earlier and has not been heard from.

The Female Camp Counselor suddenly sees a Menacing Figure, wearing a mask and carrying a scythe, pass by a window in the cabin she is in.  The Female Supervisor tells her about a Groundskeeper who was arrested in connection with the "incident" that led to the forced "shutdown."

The Male Camp Counselor and others come upon the Assistant Supervisor who had not been heard from since leaving the cabin.  He has been injured.  He was attacked (an action not seen by either Mark) and is woozy.  The Groundskeeper suddenly appears and is arrested by a Park Ranger for the attack.

The Female and Male Camp Counselors again see the Menacing Figure outside a window.  They use the two-way radio to call the Park Ranger for help.  He tells them that the Groundskeeper has escaped his custody.  Both the Male Camp Counselor and the Female Camp Counselor, now together in one cabin, see different people attacked outside by the Menacing Figure, who then breaks a window and yanks a Supervisor outside.  The Menacing Figure tries to get in but is stopped when the Host of the show enters and reveals to the Marks that they are on "Prank Encounters."


**SIMILARITY ANALYSIS**:

The concept of a mad man menacing people at a cabin in the woods is not new.  However, in this case, Plaintiffs' story is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in the Plaintiffs' original work, "Camp Kill," also appear in the Defendants' alleged copycat work, "Camp Scarecrow."

The fact that Defendants use additional characters, scenes and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and that "re-appears" in the Defendants' copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' work.

**The Plots Are Substantially Similar**

1.  In Plaintiffs' original work, a new Female Camp Counselor arrives at night at a kids' camp located in the remote woods where she has been hired to be a camp counselor.   This is the same setup utilized in Defendants' work, with the exception that two Marks are hired, one Male, the other Female. Plaintiffs did not have to have the Mark be a camp counselor.  Plaintiffs could have had the Mark be a cook, a prospective parent or person scouting camps on behalf of another.  The same is true for Defendants.

2.  In Plaintiffs' original work, the new Female Camp Counselor is informed by the Supervisors that the camp is just now re-opening after being closed due to an unfortunate incident. In Defendants' work, the Marks are also informed by their respective Supervisors that the camp is just now re-opening after an unfortunate incident. Defendants could have had the new Camp Counselors at the inaugural season of camp.  There did not have to be an "incident" at all.  Or, Plaintiffs could have presented the Marks with a story that the camp had formerly been a facility for the criminally insane.  There are a number of avenues to set the stage to invoke fear.  Plaintiffs chose an "incident" so terrible that it caused the camp to have been shut down.  Defendants chose the same "incident" theory.

3.  In Plaintiffs' original work, it is established by a Supervisor that the camp uses two-way radios to communicate. In Defendants' work, the same use of two-way radios is established by the Supervisors.  In today's age of unlimited advanced digital communication technology, that Plaintiffs chose a rather archaic two-way radio system to communicate is deliberate.  It was not necessary to create the "scare."  Plaintiffs could have had the Assistant

SCHEDULE IV

3

Supervisor be outfitted with a company cell phone with "location" fixed in an "on" position, but that happens to yield no information as to the whereabouts of the Assistant Supervisor.  That would have been ominous.  There was no artistic benefit for Plaintiffs to have employed two-way radios.  Two-way radios were, in no way, necessary to Plaintiffs' scare.  Similarly, Defendants' use of two-way radios was of no consequence to the scare in Defendants' episode.  Given the plethora of communication options available to Defendants, it is surprising that they chose two-way radios.

4.  In Plaintiffs' original work, a Supervisor leaves to get paperwork from another cabin, taking a radio with him.  In Defendants' work, a Supervisor also leaves a cabin to check something, and also carries a radio.   Defendants could have had the Supervisor forget the radio device and have that Supervisor's radio emit strange noises.  Instead, Defendants chose the same plot point as Plaintiffs.

5.  In Plaintiffs' original work, a Menacing Figure with a weapon is outside.  The figure walks by a window and the actors inside the cabin are positioned so only the Mark can see the figure out the window. In the Defendants' work, the exact same action occurs.  Plaintiffs could have had the Mark see the Menacing Figure while en route from the dining hall to the Mark's cabin, or from the pool area to the dining hall.  So, too, could Defendants.  Plaintiff did not and neither did Defendants.

6.  In Plaintiffs' original work, the Supervisor is attacked by a Menacing Figure, an incident not seen by the Mark.  In Defendants' copycat work, the Supervisor is attacked, an incident also not seen by either of the Marks.  It could have been the camp dog that got attacked in Plaintiffs' story or the cook.  It was not.  And, as we know, Defendants could have had the Menacing Figure attack anyone.  They instead chose to have the Menacing Figure attack a supervising male camp counselor.

7.  In Plaintiffs' original work, the injured Supervisor returns to the cabin and explains the attack.  In Defendants' work, the injured Supervisor also returns to a cabin and explains the attack. Plaintiffs could have had the camp counselors, including the New Camp Counselor, come upon the injured

SCHEDULE IV

4

Supervisor the next morning.  Plaintiffs did not.  Defendants could have had the Marks learn about an attack on a person or animal, such as the "camp" dog, in a variety of ways.  The discovery of the injured Supervisor was instead the same as in Plaintiffs' work.

8.  In Plaintiffs' original work, there is a moment of calm right before the Menacing Figure breaks a window in an attempt to attack people inside the cabin.  In Defendants' episode, there is also a moment of calm right before the Menacing Figure breaks a window to attack people inside the cabin.  Plaintiffs could have had the Menacing Figure appear behind a post or a tree while the counselors, and Mark, walked the grounds.  Defendants could have presented the Menacing Figure's threatened attack on the counselors and Marks in a variety of ways.  They did not.  They chose instead to mimic the presentation in Plaintiffs' original work.

9.  In Plaintiffs' original work, just as it appears the Menacing Figure is coming back, the New Camp Counselor is informed she is on TV.  In Defendants' episode, just as it appears the Menacing Figure is coming back, the Host of the show appears to inform the Marks they are on TV.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

The basic and original story line of Plaintiffs' "Camp Kill," the "spine of the story," is plainly evident and has been appropriated in Defendants' "Camp Scarecrow."

**The Sequencing Is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

For example, the "Menacing Figure" breaking through the window to attack people inside the cabin is deliberately sequenced late in Plaintiffs' work and

SCHEDULE IV

5

appears at an identical time in Defendants' work - right before the prank is revealed.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For example, Plaintiffs could have told the same story by having the Mark be hired as part of a cleaning crew or a person scouting the camp, and not as a camp counselor; Plaintiffs could have had the camp be fully operational, and not re-opening after something bad happened last season. And, the whole thing could have taken place during daylight hours. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.


**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' original work, we see a Mark who is hired to be a Camp Counselor. They meet with two Camp Supervisors and other Counselors.  At one point, they see a Menacing Figure outside.  In Defendants' work, the Marks are also hired to be Camp Counselors. Defendants could have had the Marks be clean-up crew or a parent or sibling interested in "scouting" the camp or a city inspector.  They did not.  As with Plaintiffs' Mark, Defendants' Marks meet with two Camp Supervisors and other Counselors.  Defendants Marks could have, instead, met with an inspector, parents interested in checking out the camp, or owners of the property.  The options are virtually endless.  Plaintiffs' work includes a Menacing Figure outside. Plaintiffs could have had a rabid dog, wolf, bobcat or even an alien or a character that rises from the dead.  Again, the options available to Plaintiffs and Defendants are

limitless.  Despite the plethora of options, Defendants' characters are virtually identical to those in Plaintiffs' original work.

## The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

There is no doubt that the settings of Plaintiffs' original work and Defendants' work are the same – a kids' summer camp in the remote woods at night. The specific setting of Plaintiffs' original work was clearly a creative choice. For example, Plaintiffs could have set the concept at a kids' sports camp in a gym during the day.  The gym could have been located at a major sports complex used by professional athletes. In fact, when things start going wrong at such an upscale facility, it might be even scarier. But the choice of an abandoned kids' summer camp in the remote woods at night was a concrete expression selected by Plaintiffs.

## The Moods Are Substantially Similar

The mood established in Plaintiffs' original work is, appropriately, "worried," i.e. from the moment the Camp Supervisors describe having to shut the camp down due to a mysterious "incident" to the appearance of a Menacing Figure outside, everyone in the cabins is on edge and worried.  Considering that Defendants used Plaintiffs' plot, characters and settings, it should be no surprise that the "worried" mood used by Defendants is identical to Plaintiffs'.

## CONCLUSION

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is an unabashed copy of the original.

SCHEDULE IV

7

# SCHEDULE V

## PLAINTIFFS' ORIGINAL WORK, "BICENTENNIALIEN"

The story is set at night, in a rural area, on an isolated plot of land. It begins with the main Historian (an actor) giving a brief history of the location (a graveyard) to the Assistant (the "Mark"), while the Videographer (an actor) is filming.

The Videographer continues to film at this graveyard, while the Historian explains they are about to enter what is believed to be a "burial ground" for a paranormal society from approximately 200 hundred years ago. The Assistant is told she will be helping to excavate the "burial ground" located on "scared land" and this effort is being taped for a paranormal-themed show called "Truthisodes."

The Assistant is given a Metal Detector to help and receives a "hit" that leads both the Assistant and the Historian to start digging to uncover the metal item.  After digging, the Historian and Assistant unearth a Small Coffin.

They discover a Strange Symbol on the exterior lid of the Coffin. The Historian explains to the Assistant that the Symbol is associated with a paranormal history. Opening the coffin, they find Bones that the Mark is told belong to an alien that crashed on the planet and who later spawned a hybrid civilization.

As the Historian and Assistant bundle up the bones and remove them from their original location, a Guardian of the land appears and demands to know who "dares trespass on this sacred land?" The Guardian has a symbol on his neck that matches the symbol on the Small Coffin. He is accompanied by three other Guardians.

When a fellow Guardian reports that the Assistant and the crew have "taken the bones", the Guardian summons a Paranormal Guardian to confront them.

The angered Paranormal Guardian lifts his arm and emits an invisible force at the Videographer.  The Videographer screams, shakes, and then his chest explodes in a big blood splatter and he collapses to the ground.  At this point, when the Assistant is at her most scared, the main Guardian informs the Assistant she is on Scare Tactics.

**DEFENDANTS' WORK, "GRAVEYARD SHIFT"**

The Defendants' work is roughly four times the length of Plaintiffs' work and includes filler that is not in Plaintiffs' original work.  Specifically, the back story about the development of the property for condos and the locating of a historical spoon are filler.  This filler and minor alterations do not materially change Plaintiffs' original story.

The Defendants' work also opens at night, in a rural area, on an isolated plot of land, only now there are two Marks.  One Mark is working with a construction crew and one Mark is a Historian Assistant.  Both have been recruited to help excavate what they are later told is a "burial ground" (aka graveyard, hence the title of the episode) located on "sacred land".

The Historian has a conversation with the Assistant about a paranormal civilization that used to live at the burial site in the 1700s.  The Historian describes a Strange Symbol associated with the paranormal civilization.

The Assistant is taken to the burial site where the crew is digging.  The Assistant reviews the items uncovered on the table and approves the removal of bones from the burial ground.

The Construction Assistant is given a Metal Detector to help and receives a "hit" that leads both Marks to start digging to uncover the metal item.  After digging, the Marks unearth a Small Coffin. A Strange Symbol is etched onto the exterior lid of the coffin.

The Assistants are informed that the site is a burial ground and was used by an ancient paranormal civilization that existed hundreds of years ago. The main Historian provides an explanation of the paranormal beings that once inhabited this land. She indicated they were "standing on a sacred burial ground."

Shortly after the bones are removed, a Paranormal Guardian appears, aided by two other Paranormal Guardians.  The Paranormal Guardian has a symbol on his neck that matches the symbol on the Small Coffin. Angered at hearing that bones have been disturbed, the Paranormal Guardian lifts his arm and emits an invisible force toward one crew member whose leg catches fire and toward another who screams, shakes, and then his chest explodes in a big blood splatter. At this point, when the Assistants are at their most scared, the host appears to inform the Assistants they are on Prank Encounters.

**SIMILARITY ANALYSIS**:

The dramatic concept of Paranormal Guardians at a burial site is not new. However, in this case, Plaintiffs' ideas are developed and expressed concretely through a skillful use of dialogue, setting, machinations, characters, and actors that expand the concept into an original and fresh story. These concrete elements established in Plaintiffs' original work "Bicentennialien" also appear in Defendants' alleged copycat work, "Graveyard Shift."

The fact that Defendants use additional characters, scenes, and action, does not alter the basic narrative and filmed action that originated in the Plaintiffs' work and "re-appear" in the Defendants' alleged copycat work.

The following is an analysis of the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements that make up the total sequence of events and the relationships between the major characters and the unauthorized appearance and use of these elements in Defendants' copycat work.

**The Plots Are Substantially Similar**

1. In Plaintiffs' original work, the prank takes place at night in an isolated rural area, established as the burial grounds of a paranormal society that is 100s of years old. This exact situation is used in Defendants' episode.

2. In Plaintiffs' original work, an Assistant (the "Mark") is recruited to aid in an excavation of the burial site. In Defendant's episode, two Assistants are recruited to aid in the excavation of the burial site.

3. In Plaintiffs' original work, an Assistant is given a Metal Detector to aid in the excavation. In Defendants' episode, a Metal Detector is also used by an Assistant to aid in the excavation.

4. In Plaintiffs' original work, immediately after getting a hit from the metal detector, the Assistant & Historian begin digging with small garden tools. In Defendants' episode, these same story elements appear.

5. In Plaintiffs' original work, the metal detector hit quickly leads to the excavation of a Small Coffin. In Defendants' episode, the exact same sequence occurs.

6. In Plaintiffs' original work, a Strange Symbol is immediately revealed to be etched into the exterior lid of the Small Coffin. In Defendants' episode, the exact same story element occurs.

7. In Plaintiffs' original work, there is a description of the symbol as well as its link to the paranormal civilization. In Defendants' episode, there is also a discussion about the paranormal civilization after the uncovering the coffin and seeing the symbol.

8. In Plaintiffs' original work, bones found at the excavation site are bundled up and removed. In Defendants' episode, bones are also bundled up and removed.

9. In Plaintiffs' original work, the Historian indicates that she does not think they should leave after the Guardians appear. This story element also appears in Defendants' work.

11. In Plaintiffs' original work, four Guardians appear, demanding to know who "has dared trespassed" on this sacred site. Learning that bones were moved triggers the Guardian's anger. In Defendants' episode, three Paranormal Guardians appear, also angered at the trespassing and bone removal.

12. In Plaintiffs' original work, the Historian notices that one of the main Guardians has a symbol on his neck that matches the symbol on the coffin. In Defendants' episode, the main Guardian has a symbol on his neck that matches the symbol on the coffin.

13. In Plaintiffs' original work, one of the Guardians, a clearly Paranormal Guardian, turns his anger on one of the crew. Using supernatural power, he lifts his arm and emits an invisible force causing the man to scream, shake, and then his chest explodes in a big blood splatter and he collapses to the ground. In Defendants' work, a Paranormal Guardian also uses supernatural powers to attack the crew member who screams, shakes, his chest explodes with blood splatter and he collapses.

14. In Plaintiffs' original work, following the "chest exploding", when the Mark is at her most scared, an actor reveals that she is on Scare Tactics. In Defendants' work, the host's reveal also follows right after the chest exploding.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from story genesis through specific actions, characters, dialogue, use of props, and the conclusion.

**The Sequencing is Substantially Similar**

In addition to the same, virtually identical plot elements appearing in both works, these elements appear in the same order or sequence in each work.

As the "original", Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.

The sequencing of Plaintiffs' original work was clearly a creative choice. Plaintiffs' original story could have started by the crew seeing "lights in the sky" that lead them to a remote field where they discover a mysterious piece of metal that belongs to an alien space craft. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

Instead of copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not. As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

**The Characters Are Substantially Similar**

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line. In Plaintiffs' work, there is an Assistant (also known as the "Mark"), a Historian, and a Crew Member who is attacked. Further, there are Paranormal Guardians that use supernatural powers to intimidate the Mark. These characters are used identically in Defendants' work.

**The Settings are Substantially Similar**

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

Plaintiffs' work was designed to take place in a rural area, on an isolated plot of land. Further, this land is actually a sacred burial ground belonging to a paranormal society hundreds of years old. These were obviously creative choices as there are different "settings" that could have been selected to create a different mood (i.e. a lonely road in the middle of the desert could create a different mood for the viewer). But the choice of a remote burial ground supports the apparent existence

of paranormal beings.  The setting in Defendants' work is virtually identical and Defendants' work also takes place at "night".

**The Moods Are Substantially Similar**

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the viewers.  Mood is developed in a literary piece through various methods, including setting, theme, tone, and diction.  Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and excited.  In the case of Plaintiffs' work, this may include fearful, suspenseful, tense, creepy, ghoulish, scary, dark, paranormal, frightful, otherworldly, spooky, supernatural, and hair-raising.

The overall mood in Bicentennialien is mysterious, in that, from the outset there is a sense that there is something paranormal and historical to be uncovered with the civilizations that are 100s of years old, the burial ground, and the search for a historical artifact. The mood in Graveyard Shift is exactly the same.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of their original story, including an articulation of the actual concrete elements of plot points, sequencing, characters, props, special effects, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of the original.

## SCHEDULE VI

## ANALYSIS OF "DANGEROUS OBSESSION" AND "RE-FACE FEARS" SEQUEL

Defendants' episode entitled "Re-Face Fears" is, quite simply, a direct sequel to their first season episode called "Face Fears," which was itself a copy of Plaintiffs' original work "Dangerous Obsession."

The Defendants do not even try to hide the episode's copycat origins, as the Host refers to it as a "sequel," and Netflix promotes the copycat work as a "continuation" of the Defendants' first season episode, "Face Fears." Even the title, "Re-Face Fears", is a dead giveaway that this is an unauthorized sequel of the infringing work, "Face Fears."

Defendants also utilize about a minute worth of clips from the infringing work, "Face Fears", to set the scene for the sequel. The clips themselves showcase elements copied from Plaintiffs' original work.

There is no reason to summarize the story line of Defendants' "Re-Face Fears," as Plaintiff never made a sequel to their original work "Dangerous Obsession"; thus, there are no plot points to compare.

However, Defendants' "Re-Face Fears" uses the same horror show theme, story elements, and characters as in their original copycat work, which was copied from the themes, story elements, and character types first established in Plaintiffs' original work, "Dangerous Obsession."

"Re-Face Fears" returns two of the exact same characters from Defendants' copycat work "Face Fears": a "Doctor" and his "Victim."  A third character, a "private investigator," claims to be the brother of the investigator murdered by the Doctor in Defendants' first copycat work.

Additionally, the two new prank targets (also known as "Marks") are assigned the same roles as in the first copycat episode. One is a female "assistant" instructed to keep an eye on the health of her new boss (as was the case in the first copycat episode), the other is a male "aide" to the private investigator, also handed down from the first copycat episode.

Defendants' "Re-Face Fears" is clearly a sequel to their first copycat work, which itself would not exist without utilizing the original material created by the Plaintiff's work "Dangerous Obsession."

## SCHEDULE VII

**PLAINTIFFS' ORIGINAL WORK, "FEAR ANTICS" SERIES**

"Fear Antics" is a fictional show featured in the reality comedy prank series, "Scare Tactics."  What sets it apart from ordinary prank shows is that the person who thinks they are pulling a prank are in fact the Victim of the prank; similar to a reverse sting.  This is a unique and original take on the concept of prank shows.

**PLAINTIFF'S ORIGINAL WORK, "FEAR ANTICS: ROOM WITH A VIEW"**

This episode of "Fear Antics" begins with a young man telling the audience that a pal of his needs to be taken down a notch.  We then meet his friend, hereafter known as the Mark.  The Mark thinks he's going to prank two innocent "construction workers" for the benefit of a hidden camera show called "Fear Antics."  He's told the set-up by the "Host/Producer" of the fabricated show: the house they are in is being re-modeled, and the workers are coming to start the job.

The Producer shows the Mark a Closet, and tells him he must warn the workers about entering it; no one goes inside!

When the workers arrive, the Mark emphatically warns them about not entering the Closet, then leaves so they can begin work.  The two construction workers speculate about what could be inside the closet as the Mark meets up with the Host, who applies Scary Makeup to the Mark's face.

The workers eventually decide to peek inside the Closet.  When they open the door, they discover it leads to a bathroom, where a dead body slumps on a chair, wrapped in plastic.  As they recoil in fear and horror, the Mark bursts into the room, his face smeared with Makeup, wielding a knife.

A construction worker is so terrified he rapidly backs up, "accidentally" falling out a Window.  The man plummets to the ground a story below.  The Mark, stunned at the turn of events, rushes downstairs with the other worker.

Outside, they discover the man who fell lying on the pavement, apparently badly injured, possibly dying.  The Mark freaks out, screaming that it's not his fault.  It is here that the Mark learns the workers are actors/stuntmen, his friend set him up, and that he is the victim of a reverse prank.

**DEFENDANTS' WORK "OPEN HOUSE OF HORRORS"**

This episode of Defendants' copycat series "Double Cross" opens with a young woman telling the audience that she and her boyfriend enjoy practical jokes, and she wants to "one- up" him by turning the tables.

We then meet the Mark, and we are led to believe that he's going to pull a prank on his girlfriend, standing inside a home that is supposedly for sale.  The Host/Producer of the prank show tells the Mark that the girlfriend has been summoned to see the property as part of an "open house."

When the Mark shares his concern that the girlfriend will not believe they could buy such a nice property, the Producer tells him to say that the reason the house is priced so reasonably is that a murder occurred here, thus driving down the cost. The Producer then informs the Mark that once the girlfriend arrives and begins touring the property, the Mark will make an excuse to go upstairs, where he will have Scary Makeup applied to his face, as well as being partially swathed in a straightjacket.  The plan is to jump out of a Closet when the girlfriend enters the upstairs bedroom and scare her.

The Mark calls down to his girlfriend to come upstairs, then hides in the Closet. Hearing someone arrive, and thinking it's his girlfriend, the Mark leaps out.   But it's not the girlfriend, it's a "Female Realtor" who, startled and terrified, "accidentally" backs out of the Window, plummeting below.

The Producer rushes in, supposedly unaware of what has happened.  The shaken Mark screams that the woman who he pranked was not his girlfriend but the realtor.  Thinking she has died, they rush downstairs.

Once outside, they find the "realtor" lying on top of a car, apparently badly injured. The Mark's girlfriend asks what happened, and the Mark, claiming it's not his fault, explains that it was a prank that backfired.  It's here that the Mark learns that the realtor is an actor/stuntwoman, his girlfriend was in on the deception, and that he is the victim of the prank.

**SIMILARITY ANALYSIS**:

Plaintiffs' idea is developed and expressed concretely through a skillful use of dialogue, settings, machinery, characters, and actors that expand the concept into an original and fresh story.  These concrete elements established in Plaintiffs'

original work "Fear Antics: Room with a View", also appear in the Defendants' alleged copycat work, "Open House of Horrors".

The two concepts, Plaintiffs original work "Fear Antics" and Defendant's work "Double Cross", are so similar they are essentially the same idea.  The original and unique idea of "pranking the prankster" or "reverse sting" as established in "Fear Antics" is so distinctive as to render the copycat concept "Double Cross" as nearly identical.

It's as if someone wanted to replicate "the Voice", but instead of turning the judges backs to the singers, the judges face the contestants but are blindfolded.  The result is exactly the same: the judges do not get to see the faces of the singers.  In this case, the only difference between the set up of the copycat "Double Cross" and Plaintiffs' original work "Fear Antics" is the amount of participation of the Mark's friends in pulling off the prank.  In "Fear Antics", the Mark's friend passively sets up the prank, but does not appear in the prank; whereas in "Double Cross", the Mark's girlfriend is an active participant behind the scenes and on camera. Aside from that one small difference, the concept, tone, setting, dramatic thrust and shock elements are essentially indistinguishable, as identified below.

**The Plots Are Substantially Similar**

1.      The original concept of "pranking the prankster" is established in Plaintiffs' original work, "Fear Antics."  This unique and original concept is utilized in Defendants' copycat work, "Double Cross".

2.      The setting for the reverse prank in Plaintiffs' original work, "Room with a View" is an unoccupied house in transition, in this case being remodeled.  In "Open House of Horrors", it's an unoccupied house that is up for sale.

3.      In Plaintiffs' original work, the "Prankster/Mark" meets a producer who walks him through the house and explains the whole setup of the prank. Defendants' work utilizes this element in the exact same way.

4.      In Plaintiffs' original work, the prank involves a murdered body.  In Defendants' work, the setting for the prank is supposedly a home where a murder occurred.  Both episodes share a "murder house" as a backdrop.

5.      In Plaintiffs' original work, the Mark hides in a closet to scare someone.  In Defendants' work, the exact same situation occurs.

6.      In Plaintiffs' original work, spooky makeup is applied to the Mark's face to aid in the shock. Defendants' episode copies the same beat.

7.      In Plaintiffs' original work, an "unsuspecting person" is frightened by the Mark, and "accidentally" crashes through an upstairs window in terror. The exact same situation, an unsuspecting person falling from an upstairs window, is copied in the Defendants' episode.

8.      In Plaintiffs' original work, the Mark rushes downstairs to find the "innocent" writhing in pain.  Defendants copy the same beat in their episode.

9.      In Plaintiffs' original work, the Mark learns that the "unsuspecting person" is actually a stunt person and is uninjured.  Defendants copy the same element in their episode.

10.      In Plaintiffs' original work, the Mark is informed that he is the victim of a reverse prank, and exhales relief.  The same reveal is copied in Defendants' work.

The pivotal scenes in the Defendants' work dramatically mimic scenes in the Plaintiffs' original work, from the story genesis through specific actions, dialogue, use of props and set up, as well as the conclusion. In some cases, Defendants' work wholly appropriates key scenes, and situations from Plaintiffs' original work.


**The Sequencing Is Substantially Similar**

In addition to the virtually identical plot elements appearing in both Plaintiffs' work and Defendants' work, these elements appear in the same order or sequence in each work.

The sequencing of Plaintiffs' original work was clearly a creative choice even though Plaintiffs' story could have been told through a different play-by-play lineup of plot elements while delivering the same finished scary product.  For instance, the Mark in Plaintiffs' original work could have come into a house where the workers were already inside. Then, the Mark could have lured the workers outside for a different scary prank. This is not the same sequence that Plaintiffs' work followed, demonstrating the Plaintiffs' creative story choices and sequencing

of elements (whether protected or not) are unique and concrete expressions of the underlying story concept.

In Plaintiffs' original work, the first story element is that the Mark is misled to believe they are the masters of a prank.  This is the first story element of Defendants' copycat work.

In Plaintiffs' original work, the Mark is then coached by a Producer on what to say to the supposed victims of the prank.  This occurs at exactly the same point in Defendants' episode.

In Plaintiffs' original work, once the setup has been established, the Mark disappears to have spooky makeup applied as he hides.  This sequence appears at the same story junction in Defendants' work.

In Plaintiffs' original work, the Mark leaps into the room and frightens an "innocent" so badly the person falls through an upstairs window.  This action is duplicated at the same point in the story in Defendants' copycat episode.

In Plaintiffs' original work, the Mark rushes downstairs to find the innocent lying injured. The exact same beat follows at the same juncture in Defendants' episode.

In Plaintiffs' original work, the truth is finally revealed to the Mark in as he frets over the "injured" party.  This exact story beat is duplicated at the exact same time in Defendants' copycat work.

Rather than copying Plaintiffs' original sequencing, Defendants could have adjusted their sequencing, but they did not.  As a result, Defendants' sequence is substantially similar to Plaintiffs' original.

## The Characters Are Substantially Similar

A character is a person (or perhaps an animal or creature) used to perform action and speak dialogue, moving the story along a plot line.  In Plaintiffs' work, there are four main characters: the Accomplice (friend who set up the Mark), the "Mark/Prankster," the "Producer" and the "stunt actor".  These four characters are used identically in Defendants' work.

## The Settings Are Substantially Similar

The setting is the time and location in which the story takes place. The definition of setting can also include social status, weather, historical period, and details

about immediate surroundings. The setting provides the backdrop to the story and helps create mood.

In Plaintiffs' original work, the prank takes place in an unoccupied two-story house supposedly being remodeled, so there is no one around save the prank participants. In Defendants' episode, the prank is set in an unoccupied two-story house supposedly for sale, and thus again, no one is around except the prank participants. Both houses have the aura of "murder" surrounding them. Both employ hiding their Mark behind a closed door in a Closet so the Mark can jump out and scare an unsuspecting person. And both employ stunts where someone supposedly falls from an second story window.

**The Moods Are Substantially Similar**

Usually, mood is referred to as the atmosphere of a work, as it creates an emotional setting that surrounds the viewers. Mood is developed in a literary piece through various methods, including setting, theme, tone, and diction. Although the list is long, some common words to describe mood may include cheerful; gloomy; reflective; and excited. In the case of Plaintiffs' works, this may include: surprise, shock, tense, and anxious. The mood in Room With A View is suspenseful, in that, from the outset, the prankster is waiting to scare an unsuspecting person in an unoccupied house where something is "not quite right" and where a murder took place.  The mood in Open House is the same.

**CONCLUSION**

After analyzing the specific details of Plaintiffs' rendering of the original story, including an articulation of the actual concrete elements including plot points, sequencing, characters, setting, and mood, it is abundantly clear that the Defendants' work is a blatant copy of the original.